IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MACIEJ MURAKOWSKI,        )
                             )
           Plaintiff,       )
                             )
          v.             )     C.A. No. 07-475 MPT
                             )
UNIVERSITY OF DELAWARE,   )
                             )
          Defendant.     )

**OPENING BRIEF OF MACIEJ MURAKOWSKI
IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155
(302) 884-6766
Attorney for plaintiff Maciej Murakowski

Dated: March 17, 2008

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.    MR. MURAKOWSKI'S WEBSITE POSTINGS ARE ENTITLED TO FIRST
      AMENDMENT PROTECTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      A.    UD IS A STATE ACTOR FOR PURPOSES OF 42 U.S.C. §1983. . . . . . . . . . 11

      B.    MR. MURAKOWSKI'S WEBSITE WAS A LIMITED PUBLIC FORUM
            ENTITLED TO STRONG FIRST AMENDMENT PROTECTION.. . . . . . . . . 12

            1.    The Contents of Mr. Murakowski's Website Are Entitled to the Protections
                  of the First Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                  a.    The Website Did Not Contain Any "True Threats.". . . . . . . . . . 14

                  b.    Mr. Murakowski's Statements Do Not Constitute Unlawful
                        Incitement.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      C.    THE SUSPENSION OF MR. MURAKOWSKI WAS UNLAWFUL PUNISHMENT
            OF PROTECTED SPEECH. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

II.   MR. MURAKOWSKI WAS DENIED DUE PROCESS. . . . . . . . . . . . . . . . . . . . . . . . 24

III.  THE CONVICTION FOR FAILURE TO COMPLY DOES NOT JUSTIFY AFFIRMING
      THE SUSPENSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

IV.   THE COURT SHOULD AWARD MR. MURAKOWSKI HIS COSTS, DAMAGES AND
      ATTORNEY'S FEES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      A.    DAMAGES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      B.    COSTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

      C.    ATTORNEY'S FEES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*B.V.A. v. Farmington R-7 School Dist.*, 508 F.Supp.2d 740 (E.D. Mo. 2007). . . . . . . . . . . . . . 21

*Barnes Foundation v. Township of Lower Merion*, 242 F.3d 151 (3rd Cir. 2001). . . . . . . . . . . 27

*Boos v. Barry*, 485 U.S. 312 (1988).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Brandenburg v. Ohio*, 395 U.S. 444 (1969).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Christiansburg Garment Co. v. EEOC,* 434 U.S. 412 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*College Republicans at San Francisco State University v. Reed*, 523 F.Supp.2d 1005 (N.D. Cal. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Colon v. Coughlin*, 58 F.3d 865 (2nd Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Donohue v. Baker*, 976 F.Supp. 136 (N.D.N.Y. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Eaton v. University of Delaware*, C.A. No. 00-709-GMS, 2001 WL 863441, Sleet, J. (D. Del. July 31, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98 (2nd Cir. 2001). . . . . . . . 13

*Gomes v. University of Maine System*, 365 F.Supp.2d 6 (D. Me. 2005). . . . . . . . . . . . . . . . . . . 24

*Groman v. Township of Manalpan*, 47 F.3d 628 (3rd Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . 11

*Hess v. Indiana*, 414 U.S. 105 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Husain v. Springer*, 493 F.3d 108 (2nd Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Douglas D*, 626 N.W.2d 725 (Wis. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*IOTA XI Chapter of Sigma Chi Fraternity v. George Mason University*, 773 F.Supp. 792 (E.D. Va. 1991), *aff'd*, 993 F.2d 386 (4th Cir. 1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Layshock v. Hermitage School Dist.*, 496 F.Supp.2d 587 (W.D. Pa. 2007). . . . . . . . . . . . . . . . 22

*Planned Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 290 F.3d 1098 (9th Cir. 2002), *cert. denied*, 539 U.S. 958 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Roberson v. Hayti Police Dept.*, 241 F.3d 992 (8th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Saxe v. State College Area School Dist.*, 240 F.3d 200 (3rd Cir. 2001). . . . . . . . . . . . . . . . . . 21

*Shuman ex rel. Shertzer v. Penn Manor School Dist.*, 422 F.3d 141 (3rd Cir. 2005). . . . . . . . . 11

*Springer v. Henry*, 435 F.3d 268 (3rd Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Thomas v. Frederick*, 766 F.Supp. 540 (W.D. La. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503 (1969). . . . . . . . . . . . . . . . . 21

*U.S. v. Baker*, 890 F.Supp. 1375 (E.D. Mi. 1995), *aff'd*, 104 F.3d 1492 (6th Cir. 1997). . . . . . . 17

*U.S. v. Francis*, 164 F.3d 120 (2nd Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Virginia v. Black*, 538 U.S. 343 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Woodfin Suite Hotels, LLC v. City of Emeryville*, C.A. No. C 06-1254 SBA, 2007 WL 81911, Armstrong, J. (N.D. Cal. Jan. 9, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## Other authorities

14 *Del. C.* §5101. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 *U.S.C.* §875(c).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

42 *U.S.C.* §1983.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11, 26

*Fed. R. Civ. P.* 54(d)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Maciej Murakowski filed a Verified Complaint in this action on August 1, 2007. Defendant the University of Delaware ("UD") filed an Answer on August 22, 2007.

The parties submitted a stipulated Consent Order to the exercise of jurisdiction by the U.S. Magistrate Judge on January 22, 2008.  That Consent Order was entered on January 24, 2008.

The Court entered a Scheduling Order on October 25, 2007.  The Court entered a Supplemental Scheduling Order on February 14, 2008.

In accordance with the terms of the Scheduling Order and Supplemental Scheduling Order, Mr. Murakowski filed a Motion for Summary Judgment on March 17, 2008.  This is Mr. Murakowski's opening brief in support of that motion.

1

## SUMMARY OF ARGUMENT

1.      UD is a "state actor" subject to liability under 42 *U.S.C.* §1983 because (i) the Delaware Code explicitly confers powers on UD to appoint police officers with state law enforcement powers on the UD campus, (ii) the Delaware General Assembly has conferred numerous benefits and requirements on UD throughout the Delaware Code, including grants of tax revenues, (iii) Delaware state courts have recognized that UD is a state actor.

2.      UD, by allowing students to utilize its resources to create their own websites, with no censorship by UD, has created a "limited public forum," and so may not penalize Mr. Murakowski for the content of his website.

3.      The contents of Mr. Murakowski's website are entitled to full First Amendment protection, as they do not contain "true threats," since no reasonable reader could reasonably interpret his writings as a threat to act out violently toward any specific person or group of persons. Nor do Mr. Murakowski's website postings constitute "incitement," as they neither seek nor are likely to results in imminent physical harm to another.

4.      UD improperly convicted and punished Mr. Murakowski for the content of his website, with no evidence of actual or potential material and substantial disruption.

5.      UD improperly convicted and punished Mr. Murakowski for disruption based solely on double hearsay regarding states of mind, with no opportunity for Mr. Murakowski to challenge the witnesses.

6.      Mr. Murakowski should be awarded compensatory damages (in the form of lost future revenue), costs and attorney's fees.

2

## STATEMENT OF FACTS

Mr. Murakowski, at the time of the events described herein, was a 19-year old sophomore at UD. (Compl. ¶2[1]).

UD is a public, state-sponsored educational institution organized and existing pursuant to Delaware law, specifically 14 *Del. C.* §5101 *et seq.* (Compl. ¶3).

UD permits its students access to its Internet resources, including granting students the right to set up their own websites. UD's Policy for Student Use of Computing Resources for Home Pages states that "Students may also participate in the exchange of information on the Internet through newsgroups and publish personal home pages on the World Wide Web." The same policy also states that UD "will not impose any restraints on, nor make any effort to monitor the content of, communications other than those imposed by applicable Federal, State or local laws, including laws regarding the right to privacy and laws which prohibit defamatory material." (Compl. ¶7; Murakowski Decl. Ex B[2]).

Mr. Murakowski matriculated and began classes at UD in 2005. In June, 2005, Mr. Murakowski set up a website using UD's server, with the web address http://udel.edu/~kuactet. The website contained essays by Mr. Murakowski on a variety of topics, often adopting a cynical or sardonic or satirical tone. Mr. Murakowski never advertised the existence of this website. (Compl. ¶8; Murakowski Decl. Ex. A).

---

[1]

The Verified Complaint filed in this action is cited to herein as "Compl. ¶___." On a motion for summary judgment, a verification has the same effect as an affidavit. *Roberson v. Hayti Police Dept.*, 241 F.3d 992, 994-95 (8th Cir. 2001); *Colon v. Coughlin*, 58 F.3d 865, 872 (2nd Cir. 1993).

[2]

The Declaration of Maciej Murakowski, cited to herein as "Murakowski Decl. ___," is appended hereto as Exhibit 1.

Some of these postings also include references to violence and sexual abuse, for satirical or shock effect.  For example, in a mock review of Star Wars Episode 3, Mr. Murakowski made reference to a scene where Darth Vader starts shooting and cutting up children.  In another mock review of Charlie and the Chocolate Factory, Mr. Murakowski refers to an imaginary scene where Oompa-Loompas are found dead, hanging on a meat hook.  (Compl. ¶9).

In another posting, commenting on as list indicators for potential rapists found on Wikipedia, such as "extreme emotional insensitivity and egotism," Mr. Murakowski writes, "Reading over those, all I can say is 'Shit.' No matter how I interpret them, shit.  Don't walk with me at night, ladies."  (Compl. ¶10; Murakowski Decl. Ex. A).

In another post, Mr. Murakowski described a favored pair of black gloves as "the bitch-chokingest gloves in the entire universe."  (Compl. ¶11; Murakowski Decl. Ex. A).

In a posting dated January 12, 2007, titled "Maciej's Definitive Guide to Sex," Mr. Murakowski lists various imaginary sexual acts, including "The Emo...shake and cry whenever your partner touches you," and "The Good Wife...make dinner," and "The Rocket Scientist...Obtain an advanced degree from a prestigious university.  Become a renowned expert in your field."  These silly and nonsensical sex acts are mixed with darker and more violent acts such as "The Sociopath...On a Friday night, leave her a trail of rose petals leading to a hot bath. Wash her gently, using oils and scented soaps where appropriate. Dry her, then take her into the bedroom for a sensual massage (be careful, you are not kneading dough!) Kiss her and tell her she is beautiful. Slowly let your hands explore her body. Kiss her some more. Then make sweet gentle love to her for hours. After you both climax, hold her and let her fall asleep in your arms. Then set her on fire," and "The John F. Kennedy...Position your partner halfway on the bed, facing up, so that her legs are hanging

4

off the edge. You stand facing her, lift her legs, put her ankles on your shoulders, and lean forward as far as you can. Then you kill the President." The piece ends with referring to disposing of the dead body of a sex partner. (Compl. ¶12; Murakowski Decl. Ex. A).

On April 19, 2007, Mr. Murakowski's father (who is a research engineer at UD) received a call from Cynthia Cummings, the Vice President of Campus Life. Ms. Cummings expressed her concern about the posting "Maciej's Definitive Guide to Sex," and asked that Mr. Murakowski be removed from campus for the night, and come to see her the next day. (Compl. ¶13).

On April 20, 2007, at approximately 3:15 p.m., Mr. Murakowski and his father met Ms. Cummings at her office. Ms. Cummings confronted Mr. Murakowski about the "Maciej's Definitive Guide to Sex" posting. Mr. Murakowski explained that it was a humor piece. Ms. Cummings said "I don't think its funny, and I don't think anyone else does either." Mr. Murakowski responded that he respectfully disagreed. (Compl. ¶14).

Ms. Cummings presented Mr. Murakowski a letter, stating that there had been complaints about the website[3] because of its "sexually graphic, hostile and violent" content, including "racist, sexist, anti-Semitic, and homophobic statements." The letter went on to state that, because of these reports:

> "1.    You will be charged through the University's judicial system with violating the Responsible Computing Policy.
> 2.    You will be prohibited from staying in your residence hall room or attending classes until you receive a psychiatric assessment.

---

[3]

The letter cited two complaints, the first of which was on November 9, 2005, over seventeen months earlier. (Murakowski Decl. Ex. C).

5

3.    You must provide me with a letter from a licensed mental health provider that indicates that you are not a threat to yourself and to others.

4.    You must sign a waiver granting me permission to speak with that licensed mental health provider to confirm his or her conclusions and to learn about any recommendations he or she might have pertaining to mental health treatment."

(Compl. ¶15; Murakowski Decl. Ex. C).

Ms. Cummings also presented Mr. Murakowski with a document charging him with  one count of violating UD's Disruptive Conduct policy, and one count of violating UD's Responsible Computing and Use of University Computing Resources policy.  UD gave the following explanation of the charges in the document: "Mr. Murakowski is alleged to have used University computer resources for non-academic purposes to create a post a website (http://copland.udel.edu/~kuactet).  The contents of this site have caused concern and alarm to university community members.  The information posted is graphic in nature, violent, derogatory, hostile and disturbing."  (Compl. ¶16; Murakowsk Decl. Ex. D).[4]

Mr. Murakowski asked for permission to return to his dorm room for the purpose of obtaining some items to take with him back to his parents' house. Ms. Cummings granted that permission.  Mr. Murakowski returned to his dorm room, picked up some items, and left the campus While there he posted a notice on his door for his friends, telling them that he had been suspended. (Compl. ¶17).

---

[4]

Ms. Cummings apparently took a quick disliking to Mr. Murakowski.  In an e-mail dated April 20, 2007, the same date as that initial meeting, Ms. Cummings described Mr. Murakowski as "strange; he's a smart aleck; and he thinks he's smarter than everyone else. I don't think that he's a lunatic, but he's definitely maladjusted.  He has played too many video games and watched too much pornography." (Murakowski Decl. Ex. H).

On April 23, 2007, Mr. Murakowski was psychologically evaluated by Philip R. Braun, Ph.D. Dr. Braun wrote a letter to Ms. Cummings in which he stated, in pertinent part:

> Upon my review of his writings and his responses to me during the clinical assessment, I do not believe that this young man is a threat to himself or others. Some of his writings are insensitive and depending on the context in which they are read can be seen as disrespectful to some individuals. While I certainly do not condone such expressions, I do not believe that they reflect any potential for physically acting out against any member of any of the groups referenced in your letter to Mr. Murakowski dated April 20, 2007.

(Compl. ¶18; Murakowski Decl. Ex. E).

On April 24, 2007, Mr. Murkowski delivered Dr. Braun's letter to Ms. Cummings, and asked for permission to return to his classes and his dormitory room, as the conditions listed in the letter had been met. Ms. Cummings denied the request, stating "I don't care what that letter says, you may not return to class until I say so." Mr. Murakowski then left. (Compl. ¶19).[5]

---

[5]

In discovery responses, UD attempted to explain Ms. Cummings' behavior this way: "The letter provided to the University by Mr. Murakowski and purporting to confirm that he was not a danger to himself or others left some question about whether the psychologist had reviewed all the material that the University had found disturbing. The University therefore contacted the psychologist to confirm what materials he had reviewed, and the psychologist confirmed that he had only reviewed those materials furnished to him by Mr. Murakowski. Concerned that the materials might not have given him the complete picture, the University offered to provide other material from Mr. Murakowski's website. Before that process could be completed, however, the University learned that Mr. Murakowski had violated the instruction to remain out of his dormitory and he was placed on emergency suspension from the residence halls pending the outcome of the Student Judicial hearing. Shortly thereafter, Mr. Murakowski agreed to commute for the remainder of the semester." (Murakowski Decl. Ex. J at 4)

Putting aside the question of how did Dr. Braun's letter leave "some question" about what documents he reviewed (other than the fact that Ms. Cummings did not like the result), the fact is that although Ms. Cummings only instructed Mr. Murakowski to show the psychologist the essay "Maciej's Definitive Guide to Sex" specifically, Mr. Murakowski printed out and gave to Dr. Braun all of the essays on his website. (Murakowski Decl. ¶3). UD's response does not make clear

(continued...)

7

As a result of UD's actions, Mr. Murakowski missed classes on April 23, 24, 25 and 26. At around 5:00 p.m., Mr. Murakowski and his father received a call from Ms. Kathryn Goldman, a director of the UD Office of Judicial Affairs, asking them to come to see her. Ms. Goldman told Mr. Murakowski that he could return to attending his classes, but that pending resolution of the charges he could not return to his dorm room and that, based on a report from Ms. Cummings that Mr. Murakowski had returned to his dorm on other occasions, he was also being charged with Failure to Comply. Ms. Goldman handed Mr. Murakowski a letter from her to the same effect. (Compl. ¶20).

A hearing on the charges was held on May 2, 2007. Lt. Rahmer, a UD police officer testified that there had been a complaint about Mr. Murakowski's website on April 8, 2007, but that after investigation it was concluded that nothing illegal had occurred. (Compl. ¶21).

The only other "witness" to the charge of "Disruptive Conduct" was a female student who claimed to have an "incident" with Mr. Murakowski. However, this student did not testify at the hearing. Instead, an e-mail was submitted by UD as evidence. The e-mail is not from the student, but from a third party, addressed to Holli Harvey, Assistant Director, describing that third party's interaction with the female student. The e-mail stated that the female student was visibly shaking, purportedly arising from an "incident" involving Mr. Murakowski on or prior to April 25, 2007. The

─────────────────

[5](...continued)
whether Dr. Braun was asked what essays (or how many) he reviewed.

A more important issue is, if Ms. Cummings truly remained concerned that Mr. Murakowski might be a danger to the community (such that she was not willing to allow him to return to his dormitory and placed a call to Dr. Braun), why did she stop the "process" after Mr. Murakowski agreed to commute and not live in his dorm? How was the community less in danger by Mr. Murakowski being free to roam the campus, but not return to his dorm room?

e-mail does not describe the "incident," nor does it make any reference to Mr. Murkowski's website. (Compl. ¶22; Murakowski Decl. Ex. F).

Given that neither the female student nor the author of the e-mail were present at the hearing, Mr. Murakowski had no opportunity to ask either of them questions, to test the validity and reasonableness of any claim that his website grievously affected her. (Compl. ¶23).

Several female UD students testified that they were not disturbed or threatened by the content of Mr. Murakowski's website. (Compl. ¶24; Murakowski Decl. Ex.G).

On May 23, 2007, the University of Delaware Office of Judicial Affairs issued a letter ruling from Scott F. Mason, University Hearing Officer, addressed to Mr. Murakowski. In the letter, Mr. Mason ruled that Mr. Murakowski was not guilty of violating the Responsible Computing Policy, but was guilty of the Disruptive Conduct Policy and guilty of the Failure to Comply Policy. (Compl. ¶25; Murakowski Decl. Ex. G).

Mr. Mason's ruling is littered with references to the content of Mr. Murakowski's website, which he describes as containing "material degrading, demeaning and violent toward women, as well as advocating violence toward others or in general," "racist and/or sexist," "filled with violence," and "even some pieces that may start out wittily or humorously continue to descend into nothing more than a violent end or a violent solution." Mr. Mason's concluded that the content of Mr. Murakowski's website justified a finding of guilty of Disruptive Conduct, stating that "you are responsible for putting the content there and for what outcomes may occur as a result of reviewing the content." Mr. Mason also stated that "even if you content your site is satire that it too could cause the same response, thus being disruptive to the community in which you live." (*Id.*).

9

As a sanction, Mr. Murakowski was suspended from classes and banned from all UD facilities through the end of Fall 2007 and thereafter would be readmitted after reapplying to ID through the Admissions Office.  If readmitted, Mr. Murakowski would be banned from all UD-owned residence halls through graduation.  Additionally, if readmitted, Mr. Murakowski would be placed on "Deferred Expulsion" status, meaning that if Mr. Murakowski were to again be adjudicated as having violated the UD Code of Conduct, he would be expelled. (*Id.*).

In accordance with UD protocol, Mr. Murakowski appealed this ruling.  The Appellate Judicial Board rejected his appeal by letter dated July 2, 2007. (Compl. ¶28; Murakowski Decl. Ex. I).  His suspension began immediately.  (*Id.*).

Mr. Murakowski was permitted to return to UD and begin classes as of the following semester (subject to the restrictions discussed above).  However, as a consequence Mr. Murakowski has missed classes that are a requirement for graduation, which may delay his graduation for one year.  (*Id.* ¶5).

## ARGUMENT

### I.  MR. MURAKOWSKI'S WEBSITE POSTINGS ARE ENTITLED TO FIRST AMENDMENT PROTECTION.

In order to have a valid civil rights claim under 42 *U.S.C.* §1983, Mr. Murakowski must establish that (i) he has been deprived of a federal right, and (ii) the party which deprived him of that right acted under color of law.  *E.g., Shuman ex rel. Shertzer v. Penn Manor School Dist.*, 422 F.3d 141, 146 (3rd Cir. 2005);  *Groman v. Township of Manalpan*, 47 F.3d 628, 633 (3rd Cir. 1995).

As demonstrated below, (i) UD is deemed under law to be a state actor acting under color of law for purposes of 42 *U.S.C.* §1983, (ii) as UD granted Mr. Murakowski the right to create a website on UD's server expressly providing that there would be no control over content, that website constituted a "limited public forum" entitled to full First Amendment protection, and (iii) UD violated Mr. Murakowski's rights by suspending him for a semester based on the content of his website, and without evidence of material disruption of UD's functions.

### A.  UD IS A STATE ACTOR FOR PURPOSES OF 42 U.S.C. §1983.

Whether UD is a state actor operating under color of state law was resolved in *Eaton v. University of Delaware*, C.A. No. 00-709-GMS, 2001 WL 863441, Sleet, J. (D. Del. July 31, 2001) (Exhibit 2 hereto).  In that case, the Court determined that UD is a state actor acting under color of law for purposes of 42 *U.S.C.* §1983 because (i) the Delaware Code explicitly confers powers on UD to appoint police officers with state law enforcement powers on the UD campus, (ii) the Delaware General Assembly has conferred numerous benefits and requirements on UD throughout the Delaware Code, including grants of tax revenues, (iii) Delaware state courts have recognized that UD is a state actor. WL Op. at *4.  None of the facts have changed since then.

**B.    MR. MURAKOWSKI'S WEBSITE WAS A LIMITED PUBLIC FORUM ENTITLED TO STRONG FIRST AMENDMENT PROTECTION.**

UD allows its students access to its servers for the posting of person web pages.  The relevant

language from UD's Policy for Student Use of Computing Resources for Home Pages is as follows:

> Because the University recognizes the value of the Internet as a resource for information and communication, when computing resources are available, students may use them for co-curricular or personal purposes provided they abide by the policies and procedures governing such use.
>
> *            *            *
>
> Students may also participate in the exchange of information on the Internet through newsgroups and publish personal homepages on the World Wide Web.
>
> *            *            *
>
> Students are advised to consider the public nature of information they disseminate on the Internet through the World Wide Web. Information in a home page is published and available to everyone who can get to the World Wide Web.  Students must not assume that their information is restricted to only a close circle of friends, or even the campus community.
>
> *The University will not impose any restraints on, nor make any effort to monitor the content of, communications other than those imposed by applicable Federal, State or local laws, including laws regarding the right to privacy and laws which prohibit defamatory material.* Users of the University's information systems are advised that their communications are subject to such laws and the consequences of violations can be severe.

(Murakowski Decl. Ex. B, italics added).

When a public college or university makes a media outlet available to its students, it creates

a "limited public forum" which entitles those students to strong First Amendment free-speech

protection.  As such, UD may not interfere with the viewpoints expressed in said media, and may

not censor, retaliate or otherwise chill the students' speech based on the content or viewpoints expressed through that outlet. *Husain v. Springer*, 493 F.3d 108, 121-24 (2nd Cir. 2007) (discussing additional case law).

As UD has made available its resources to students for publication of their own websites, and as its expressed formal policy is not to censor the content of those websites in any way (other than to avoid violations of law), UD has created a limited public forum which entitles students (including Mr. Murakowski) to strong First Amendment protection, protections equal to that of any citizen:

> [F]or purposes of First Amendment analysis there are very important differences between primary and secondary schools, on the one hand, and colleges and universities, on the other. As the courts often have acknowledged, the state does not require higher education and has much less interest in regulating it, the students in colleges and universities are not children, but emancipated (by law) adults, and, critically, the mission of institutions of higher learning is quite different from the mission of primary and secondary schools. As courts have emphasized, "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher learning]." Healy v. James, 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972) (internal citation and quotation omitted). As our highest court has said, "[t]he college classroom with its surrounding environs is peculiarly the 'marketplace of ideas....' " *Id.* Supreme Court precedents "leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large." *Id.* (internal quotations omitted). Indeed, the core principles of the First Amendment "acquire a special significance in the university setting, where the free and unfettered interplay of competing views is essential to the institution's educational mission." *Doe v. Univ. of Mich.,* 721 F.Supp. at 863 (citing *Keyishian v. Bd. of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967)).

*College Republicans at San Francisco State University v. Reed*, 523 F.Supp.2d 1005, 1015-16 (N.D. Cal. 2007). *Accord Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98, 106 (2nd

Cir. 2001) ("University students' speech deserves the same degree of protection that is afforded generally to citizens in the community....").

> 1.     **The Contents of Mr. Murakowski's Website Are Entitled to the Protections of the First Amendment.**

UD appears (from its Fourth Affirmative Defense) to challenge that Mr. Murakowski's website is not entitled to First Amendment protection. Mr. Murakowski anticipates that UD will take the position that some or all of Mr. Murakowski's writings constitute a "true threat," or possibly "incitement," neither of which is not entitled to First Amendment protection. Such position is without merit.

Whether given speech is protected under the First Amendment is a question of law. *Springer v. Henry*, 435 F.3d 268, 275 (3rd Cir. 2006); *U.S. v. Francis*, 164 F.3d 120, 123 n.4 (2nd Cir. 1999). As demonstrated below, Mr. Murakowski's website did not constitute a "true threat," and does not meet the definition of "incitement," under the strict parameters set down by the courts.

> a.     **The Website Did Not Contain Any "True Threats."**

"True threats" encompass those statements where the speaker communicates a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. The speaker need not actually intend to carry out the threat, as long as a reasonable person would conclude that the speaker intended to carry out the threat. *Virginia v. Black*, 538 U.S. 343, 359-60 (2003).

In determining whether a statement constitutes a "true threat," the Court must analyze the statements in context and under all the circumstances to determine whether a reasonable person would construe the statement as a serious expression of a threat to inflict bodily harm. *Planned*

14

*Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 290 F.3d 1098,

1077 (9th Cir. 2002), *cert. denied*, 539 U.S. 958 (2003).

The context and surrounding circumstances are as follows:

1.      There is no expression of intent by Mr. Murakowski to injure anyone.  In "Maciej's

Definitive Guide to Sex," Mr. Murakowski does not state anywhere that he has performed any of the

acts described (and indeed concedes at the outset that he is a virgin) or that he will be performing

any of these acts in the near future (he writes "I personally won't be having sex anytime soon...").[6]

As such, there is no threat, either express or implied.[7]  In "The Relationship Advice Pamphlet," there

is nothing that could suggest to a reader that Mr. Murakowski is making a statement of his intentions

or  intends any harm toward them, as he is merely discussing relationships in general. In "How to

Skin A Cat," there is no reference to physical harm to any human.

2.      This leaves three essays with references to engaging in violence against women.

However, in none of those essays does Mr. Murakowski indicate that he has any intention of acting

on any scenario he describes:

a.      In "Sexual Assault Awareness," Mr. Murakowski describes "raping some

drunk girl in a dark alley," which he describes as being ironic because he would be wearing a shirt

promoting sexual assault awareness.  He also reports on possible predictors for being a rapist and,

---

[6]

Indeed, assuming the reader has no sense of either humor or reality (*see* footnote 6), Mr. Murakowski at most merely offers the acts as suggestions for others, as opposed to statements of his intentions.

[7]

A further indicator is that fact that many of the proposed acts in fact are not sexual acts at all, and so indicate a lack of serious intent.  Examples include "The Emo...shake and cry whenever your partner touches you," and "The Good Wife...make dinner," and "The Rocket Scientist...Obtain an advanced degree from a prestigious university.  Become a renowned expert in your field."

after listing them he reports, "Reading over those, all I can say is, 'Shit.' No matter how I interpret them, shit. Don't walk with me at night ladies." Thus, even if a reasonable reader (with a reasonably developed sense of humor) would not recognize this statement as a sarcastic comment on the over-generality of such predictors, rather than a threat to anyone, Mr. Murakowski is warning readers to keep away from him, rather than threatening to go after them and harming them.

b.    In "Happy Birthday to Me," Mr. Murakowski lists among the items he would want to receive for his birthday (a cane, crutches, wheelchair and cast), "A small Asian girl. I would keep her tied up in the closet (like the brother does with his) and do unspeakable things to her when I got bored." Nowhere in the essay does Mr. Murakowski suggest that he would go out on his own and kidnap an Asian girl, nor is such a sentiment fairly implied. At worst, even if taken as a serious statement, it is a statement of personal taste or desire, with nothing to suggest that Mr. Murakowski intends to act on that desire.

c.    In "Rub My Belly for Luck," after a discussion of a Stars Wars movie, Mr. Murakowski refers to a pair of his black gloves by stating: "This is my glove choking a bitch. That bitch has been thoroughly choked. See if you can spot my glove. Hint: it's the one choking *him*." (Italics added).[8] Mr. Murakowski goes on to add: "Apart from keeping my hands warm and being the bitch-chokingest gloves in the entire fucking universe, the gloves make me feel menacing. When I wear them...I forget that I am a spindly pale virgin...." Here, not only is there no suggestion by Mr. Murakowski that he is going to actually seek to choke someone, but he also provides to the reader

---

[8]    It should be noted that the term "bitch," in its slang usage, can refer to men as well as women. http://dictionary.reference.com/browse/bitch (printout attached hereto as Exhibit 3).

an indicator that he really does not have the capacity to act on the fantasy because he is a "spindly pale virgin."

None of these three essays states or implies any intention to act out any of the things described. To the contrary, their context and indicators reveal that none of this is to be taken literally or even seriously. Mr. Murakowski signals that he lacks the capacity to act out.

    3.  Even if the Court were to interpret these statements as suggesting an intention to commit violence, the class of claimed victims is so large and generalized as to preclude a finding of "true threat" under the First Amendment. The statements relate to acts performed against women generally (and in one case a man). There is no qualifier by name, age group, location or anything to narrow it down. Indeed, there is no reference to UD or even to students. Mr. Murakowski has not found any case law which held that a "true threat" can exist where the target is an entire gender, much less all humankind. To the contrary, case law indicates that such a generalized target precludes a finding of "true threat."

In *U.S. v. Baker*, 890 F.Supp. 1375 (E.D. Mi. 1995), *aff'd*, 104 F.3d 1492 (6th Cir. 1997), the defendants (one of whom was a college student) were charged with transmitting in interstate commerce via e-mail threats to kidnap or injury another, in violation of 18 *U.S.C.* §875(c).[9]

The indictment focused on e-mails between the defendants. The first one read:

> I highly agree with the type of woman you like to hurt. You seem to
> have the same tastes I have. When you come down, this'll be fun!
> Also, I've been thinking. I want to do it to a really young girl first. !3
> [sic] or 14. There innocence makes them so much more fun – and
> they'll be easier to control....

---

[9]
  The issue of what constitutes a "true threat" most commonly is analyzed in the context of such criminal prosecutions.

The second e-mail responded:

> I would love to do a 13 or 14 year old.  I think you are right...not only
> their innocence but their young bodies would really be fun to hurt.
> As far as being easier to control...you may be right, however you can
> control any bitch with a rope and a gag...once tey [sic] are tieed [sic]
> up and struggling we could do anything we want to them...to any girl.
> The trick is to be careful in planning.  I will keep my eye out for
> young girls, and relish the fantasy...BTW how about your neighbour
> at home, youm [sic] may get a chance to see her...?...?

The third e-mail replied:

> True.  But young girls still turn me on more.
> Likely to be nice and tight.  Oh, they'd scream nicely too!
> Yeah.  I didn't see her last time I was home.  She might have moved.
> But she'd be a great catch.
> She's real pretty, with nice long legs, and a great girly face...I'd love
> to make her cry...

*Id.* at 1387.

The bill of particulars identified the targets of these statements as "13 or 14-year old girls

who reside in Defendant Jake Baker's neighborhood in Ann Arbor, Michigan, and teenage girls who

reside in Defendant Jake Baker's neighborhood in Boardman, Ohio."  *Id.* at 1388.

In dismissing this count of the indictment, the Court began with this pertinent observation:

> The test is not satisfied by finding that the desires expressed in the
> statement are so deviant that the person making the statement must be
> unstable, and therefore likely to act in accordance with his or her
> desires at any moment.  Something in the statement itself must
> indicate some intention imminently to act.  Otherwise, the statement
> may be unsettling or alarming, but is not a true threat for the purposes
> of the First Amendment.

*Id.* at 1386 n. 16.

The Court went on to hold:

This Count falls short of the constitutional "true threat" requirement. As an initial matter, it does not refer to a sufficient specific class of targets. The more limited class identified in the bill of particulars is not apparent from the face of the communications. Nothing in the exchange quoted in Count I implicitly or explicitly refers to 13 or 14 years old girls *in Ann Arbor*, nothing in the exchange identifies Boardman, Ohio (Baker's actual home) as the "home" referred to, and nothing in the exchange allows one to determine that the neighbor discussed is a teen-age girl. In reality, the only class of people to whom the messages can be taken to refer is 13 or 14 year old girls, anywhere. This class is too indeterminate to satisfy *Kelner's* requirement of specificity as to the person threatened, even under the liberal interpretation given the requirement by some courts.

As to the content of the messages, Baker's discussing his "tastes" in the first paragraph of his December 1 message does not involve any identifiable threatened action. In the second paragraph of the December 1 message, he expresses a desire "to do it to" a 13 or 14 year old girl. Even assuming that more context could clarify the phrase "to do it," the second paragraph also fails to mention an intention to do anything...Discussion of desires, alone, is not tantamount to threatening to act on those desires. Absent such a threat to act, a statement is protected by the First Amendment.

....It is not constitutionally permissible under *Kelner* to infer an intention to act on a desire from a simple expression of the desire. The intention (whether or not actually held) must itself be expressed in the statement.

*Id.* at 1388 (italics in original).

The *Baker* decision highlights the flaws in any argument that Mr. Murakowski's statements constitute true threats: the alleged target class (women generally) is too general. Further, there is no statement of any intention to act. As such, Mr. Murakowski's statements constitute protected expression under the First Amendment.

19

       b.     **Mr. Murakowski's Statements Do Not Constitute Unlawful Incitement.**

UD may argue that "Maciej's Definitive Guide to Sex" is not protected by the First Amendment because it encourages others to go out and commit the described violent acts. However, nothing in that (or any other) essay demonstrates a threat of imminent violence, and so the argument fails.

Speech is outside the protection of the First Amendment where (i) it is directed at inciting or producing imminent lawless action, and (ii) it is likely to incite or produce such action. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002); *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). However, words amounting to nothing more than advocacy of illegal action at some indefinite time in the future are not subject to this exception. *Hess v. Indiana*, 414 U.S. 105, 108 (1973).

In the absence of anything indicating a call to immediate unlawful action, there is no basis to conclude that Mr. Murakowski's website is not protected speech because it incites readers to imminent unlawful action.

## C. THE SUSPENSION OF MR. MURAKOWSKI WAS UNLAWFUL PUNISHMENT OF PROTECTED SPEECH.

The suspension of Mr. Murakowski was punishment because of the content of his website, using the pretext that it was "disruptive." The underlying factual basis for this conclusion was that, our of almost 16,000 students, (i) "the brother of a female student reported...that his sister...and her roommate were disturbed and concerned" about the contents of the website, and (ii) one female student "was so scared for her personal safety and distressed due to [his] postings that she could not focus on her studies and had to drop to 'audit' status." (Murakowski Decl. Ex. G at 1).

The term "disruptive" has no clear legal definition. However, it must be interpreted in light of the First Amendment. Under the First Amendment, speech may not be punished merely because it may be upsetting or cause psychological harm to the listener or reader. *See Boos v. Barry*, 485 U.S. 312, 321 (1988); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55 (1988) (noting the Court's "longstanding refusal to [punish speech] because the speech in question may have an adverse emotional impact on the audience"). Thus, UD may not punish speech based on the emotive impact its offensive content may have on a reader. *Saxe v. State College Area School Dist.*, 240 F.3d 200, 209 (3rd Cir. 2001).

Additionally, it is not enough to claim that one or two students were disturbed by what they read. Instead, UD was obligated to establish material and substantial disruption of the education process. *E.g., Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 513 (1969) (in high school context); *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason University*, 773 F.Supp. 792, 794 (E.D. Va. 1991), *aff'd*, 993 F.2d 386 (4th Cir. 1993) (college students could not be punished for conduct considered racist and sexist in the absence of "substantial or material disruption of GMU's educational mission"). Mere apprehension of disruption is inadequate. There must be substantial facts which reasonably support a forecast of likely disruption. *B.V.A. v. Farmington R-7 School Dist.*, 508 F.Supp.2d 740, 747 (E.D. Mo. 2007).

In the present action, the only "evidence" of disruption is third-hand accounts of a couple of students' subjective emotional reactions to what they read, which does not permit a finding of disruption satisfactory to the First Amendment. There were none of the accepted indicia of disruption. No classes were cancelled, interrupted or prevented from occurring. There was no widespread disorder, or disorder of any kind. (Murakowski Decl. Ex. J at 8). *See Layshock v.*

21

*Hermitage School Dist.*, 496 F.Supp.2d 587, 599-600 (W.D. Pa. 2007) (absence of interruption of classes or widespread disorder precluded a finding of substantial or material disruption).[10]

Nor was there any finding of a potential for disruption, or the identification of any evidence to support such a conclusion. *See Saxe*, 240 F.3d at 209 (evidence of past disruption for similar speech may provide basis to conclude there was a risk of future disruption). As such, the claim of "disruptive conduct" fails for lack of evidence and lack of constitutional justification.

On the other hand, the evidence is clear that UD punished Mr. Murakowski because of the content of his website. The decision of the Office of Judicial Affairs contains several disparaging references to the content of the site:

- Mr. Murakowski's website was described as "containing a preponderance of material degrading, demeaning, and violent toward women, as well as advocating violence towards others or in general. Many of the examples contained content that was racist and/or sexist;

- "[T]hough the content of your website is not in violation of the use of the University's computing resources, you are responsible for putting the content there and what outcomes may occur as a result of reviewing the content."

- "The bottom line is that your web site is filled with violence that created an uncomfortable and disruptive environment in your residence hall."

(Murakowski Decl. Ex. G).

---

[10]    Indeed, the fact that seventeen months passed between the first and second complaint (Murakowski Decl. Ex. C) strongly evidences the lack of a risk of material disruption.

22

Thus, the "bottom line" for UD was that Mr. Murakowski's content was offensive to a few students (and, presumably, to the administration).[11]  The "bottom line" for this Court, however, is that, offensive or not, Mr. Murakowski's content was protected by the First Amendment.  There was no evidence of disruption, actual or anticipated, much less substantial and material disruption.  As

---

[11]

Mr. Mason, the ruling judicial officer, also concluded that Mr. Murakowski's website was not satire, although Mr. Mason's qualifications to make that literary determination were not set forth. (Murakowski Decl. Ex. G).  As one source has noted:

> Because satire often combines anger and humour it can be profoundly disturbing - because it is essentially ironic or sarcastic, it is often misunderstood. In an interview with Wikinews, Sean Mills, President of The Onion, said angry letters about their news parody always carried the same message. "It's whatever affects that person," said Mills. "So it's like, 'I love it when you make a joke about murder or rape, but if you talk about cancer, well my brother has cancer and that's not funny to me.' Or someone else can say, 'Cancer's hilarious, but don't talk about rape because my cousin got raped.' I'm using extreme examples, but whatever it is, if it affects somebody personally they tend to be more sensitive about it."

> Common uncomprehending responses to satire include revulsion (accusations of poor taste, or that it's "just not funny" for instance), to the idea that the satirist actually does support the ideas, policies, or people he is attacking. For instance, at the time of its publication, many people misunderstood Swift's purpose in "*A Modest Proposal*" – assuming it to be a serious recommendation of economically-motivated cannibalism. Again, some critics of Mark Twain see *Huckleberry Finn* as racist and offensive, missing the point that its author clearly intended it to be satire (racism being in fact only one of a number of Mark Twain's known pet bugbears attacked in *Huckleberry Finn*).

*Wikipedia:*  http://en.wikipedia.org/wiki/Satire#Misconception_of_satire at 6 (footnote omitted)

(appended here to as Exhibit 4).

23

such, the Disruptive Conduct conviction is unconstitutional, in violation of Mr. Murakowski's First Amendment rights, and must be expunged.

## II.    MR. MURAKOWSKI WAS DENIED DUE PROCESS.

The scope of due process protection to which a student at a public college or university is entitled in disciplinary proceedings is not fully developed in the law.  However, courts do hold that where there is the risk of a serious penalty, such as expulsion or suspension, and where credibility is at issue, a decision against a student may not be based solely on hearsay, and the accused has a right to question the accuser in some manner.  *See Donohue v. Baker*, 976 F.Supp. 136, 147 (N.D.N.Y. 1997); *Gomes v. University of Maine System*, 365 F.Supp.2d 6, 16 (D. Me. 2005).

As to the charge of Disruptive Conduct, the issue was disruption.  The "evidence" of disruption was that:

- a couple of students were allegedly disturbed by the content.  Neither of these students testified.  Instead, the brother of one of the students made a report to University Public Safety. The brother did not testify.  Instead, a University Public Safety Officer testified as to what the brother said that his sister and her friend told him (Murakowski Decl. Ex. G); and

- another student was so scared and distressed by what she read that she could not focus on her studies and had to drop to "audit" status.  This student did not testify. Instead, she spoke to Cheryl A. Davis-Robinson, an academic advisor.  Ms. Robinson did not testify either. Instead, she sent an unsworn e-mail to Holli Harvey, the "prosecutor," who submitted it as evidence at the hearing. In that e-mail there is nothing explaining what affected the student or why.  There was no indication by Ms.

24

Robinson of any discussion or subsequent investigation of the student's personal history that might provide an alternate explanation for her reaction. (Murakowski Decl. Ex. G).

As noted previously, UD did not properly apply the First Amendment test for disruption. However, even if the Court were to disagree, UD convicted Mr. Murakowski of Disruptive Conduct based solely on double-hearsay claims of disruption. There was no effort to examine (even outside of the hearing) any complainant to determine his or her true state of mind (which was the basis for the claim of disruption), or whether the complainant's person circumstances rendered his or her state or mind reasonable.

UD will likely argue that it would be unreasonable to require a witness who is scared (albeit unreasonably) to face Mr. Murakowski at a hearing.[12]  Even accepting that at face value, there were possible alternatives.  As one possible example, UD could have offered Mr. Murakowski the opportunity to give the board questions in writing for the witness to respond to in writing under oath. If UD was going to suspend Mr. Murakowski based on absent witness evidence, it had an obligation to come up with some mechanism to protect his rights, and not just those of the absent witnesses, as best as possible.

UD's failure to provide any mechanism to test the verity of the complainants' assertions, and their mental well-being, denied Mr. Murakowski due process of law.

---

[12]

In fact, a face-to-face meeting between the two of them, under UD's auspices and control, would have been a far better thing than persecuting Mr. Murakowski.  Mr. Murakowski testified that he did not intend or desire to upset anyone. (Murakowski Decl. Ex. G). A meeting and an apology, helping relieve the complainant's stress and enabling her to focus again on her studies without fear, might have been beneficial to all and might have avoided all of this.  Unfortunately, no one at UD contemplated this non-adversarial approach.

## III.   THE CONVICTION FOR FAILURE TO COMPLY DOES NOT JUSTIFY AFFIRMING THE SUSPENSION.

UD may argue that, notwithstanding the constitutional violation, the judgment of suspension (and denial of access to the dormitories upon return) should be upheld because Mr. Murakowski was also found guilty of Failure to Comply.

However, Failure to Comply does not carry a mandatory penalty of suspension. Nor does the ruling of the Office of Judicial Affairs indicate how much weight was accorded to the Failure to Comply in determining the penalty. As such, this Court has no basis to conclude that finding of Failure to Comply automatically and of itself would have resulted in the same sanctions as were imposed.

If the Court determines that UD violated Mr. Murakowski's First and/or Fourteenth Amendment rights, then the UD's ruling and its sanctions should be declared unlawful and void. If UD thereafter wants to revisit the Failure to Comply issue separately with an impartial tribunal not infected with the belief in the constitutional violation, it is free to do so.

## IV.   THE COURT SHOULD AWARD MR. MURAKOWSKI HIS COSTS, DAMAGES AND ATTORNEY'S FEES.

### A.   DAMAGES.

Compensatory damages in an action under 42 *U.S.C.* §1983 include lost future earnings. *Thomas v. Frederick*, 766 F.Supp. 540, 559 (W.D. La. 1991).

As a consequence of the suspension, Mr. Murakowski's missed the opportunity to take some courses required for graduation. Having to wait for those courses (which are also a prerequisite to other courses), will set back his graduation by approximately one year.

26

Mr. Murakowski is seeking a degree in chemical engineering. According to the U.S. Department of Labor, the average starting salary for a chemical engineer with a bachelor's degree is $59,361.00. (Murakowski Decl. Ex. I).[13] As such the UD's unconstitutional conduct will set Mr. Murakowski back a year in his income generating capability, the Court should award him $59,361.00 as compensatory damages.

### B.    COSTS.

As the prevailing party, Mr. Murakowski should be awarded his costs. *Fed. R. Civ. P.* 54(d)(1).

### C.    ATTORNEY'S FEES.

Under Section 1983, a prevailing party is entitled to an award of attorney's fees absent special circumstances which would render an award unjust. *Barnes Foundation v. Township of Lower Merion*, 242 F.3d 151, 158 (3rd Cir. 2001) (citing *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421 (1978)).

As there are no special circumstances which would render an award unjust here, Mr. Murakowski respectfully request that the Court grant an award of attorneys' fees. If such award is granted, counsel will submit a declaration to support an award in a specific amount.

---

[13]

This Court may take judicial notice of the contents of the website of the U.S. Department of Labor. *Woodfin Suite Hotels, LLC v. City of Emeryville*, C.A. No. C 06-1254 SBA, 2007 WL 81911, WL Op. at * 2, Armstrong, J. (N.D. Cal. Jan. 9, 2007) (Exhibit 4 hereto).

**<u>CONCLUSION</u>**

This is not a case about a threat to public safety. Any concern UD had about public safety was alleviated when (i) Mr. Murakowski delivered the letter from the psychologist, and (ii) UD accepted Mr. Murakowski agreeing to no longer live in a dorm, but to commute. After all, if UD had still considered Mr. Murakowski a danger, it would not have allowed him to return to the campus at all. It would make no sense. So the Court should not allow itself to be lured into thinking that this case somehow relates to public safety.

Nor should this Court allow itself to be manipulated by invocations of the shooting at the Virginia Tech or similar tragedies. "[T]his court must not succumb to public pressure when deciding the law. Headlines may be appropriate support for policy arguments on the floor of the legislature, but they cannot support an abandonment in our courthouses of the constitutional principles that the judiciary is charged to uphold." *In re Douglas D*, 626 N.W.2d 725, 742 n.16 (Wis. 2001) (finding that student's essay involving chopping off the teacher's head to be protected speech).

Stripped to its core, this case involves over-protective administrators, faced with an upset female student, who wanted to help her. This is understandable, and compassion is commendable. However, in so doing, those same administrators showed little compassion for the constitutional rights of Mr. Murakowski, and have subjected him to deprivation of his education, employment opportunities, and his constitutional freedoms. Institutions of higher learning should do better.

28

WHEREFORE, for the foregoing reasons, Maciej Murakowski respectfully requests that this Court enter an Order (i) declaring that UD violated Mr. Murakowski's constitutional rights, (ii) declaring that the judgment issued by UD against Mr. Murakowski, and the sanctions imposed by UD against him, past and present, are deemed null and void, (iii) ordering that UD expunge all record of this judgment and punishment of Mr. Murakowski from its records, and (iv) awarding Mr. Murakowski compensatory damages and court costs, including reasonable attorney's fees.

Dated: March 17, 2008

Respectfully submitted,

 /s/ David L. Finger
David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155
(302) 884-6766
Attorney for plaintiff Maciej Murakowski

29

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MACIEJ MURAKOWSKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-475 MPT |
| | ) | |
| THE UNIVERSITY OF DELAWARE, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF MACIEJ MURAKOWSKI

1.    My name is Maciej Murakowski.  I am over eighteen years of age and have personal knowledge of the facts contained in this Declaration.  I make this declaration in support of my motion for summary judgment.

2.    I incorporate herein the factual allegations contained in the Verified Complaint in this action, which allegations are based upon my personal knowledge.  I also add the following.

3.    Cynthia Cummings, when instructing me to obtain a letter from a psychologist, specifically told me to show the psychologist my website posting titled "Maciej's Definitive Guide to Sex."  However, I went beyond that and printed out my entire website for the psychologist to review, which he did in my presence.

4.    I have been and am working toward a B.S. degree in Engineering, with an emphasis in Chemical Engineering.

5.    My suspension was effective as of July 2, 2007.  I was re-admitted for the winter term 2008.  As a consequence, I missed an opportunity to take some classes I need to graduate, and which I need to have taken to qualify for other classes.  This will defer my graduation as much as a full year.

6.  Attached hereto as Exhibit A are true and correct copies of the essays from my website at issue in my suspension.

7.  Attached hereto as Exhibit B is a true and correct copy of the University of Delaware Policy for Student Use of Computing Resources for Home Pages, as set forth on the University's website at www.udel.edu/webstart/stuorg/student.resource.html.

8.  Attached hereto as Exhibit C is a true and correct copy of a letter to me from Cynthia Cummings dated April 20, 2007.

9.  Attached hereto as Exhibit D is a true and correct copy of the University Judicial Charge.

10.  Attached hereto as Exhibit E is a true and correct copy of a letter to Cynthia Cummings from Dr. Richard R. Braun dated April 23, 2007.

11.  Attached hereto as Exhibit F is a true and correct copy of an e-mail to Holli Harvey from Cheryl A. Davis Robinson dated May 1, 2007, which was produced by the University of Delaware during discovery in this action.

12.  Attached hereto as Exhibit G is a true and correct copy of the letter ruling of the University of Delaware Office of Judicial Affairs, dated May 23, 2007.

13.  Attached hereto as Exhibit H is a true and correct copy of an e-mail from Cynthia Cummings to various individuals dated April 20, 2007.

14.  Attached hereto as Exhibit I is a truly and correct copy of the letter ruling from the University of Delaware Office of Judicial Affairs dated July 2, 2007.

15.  Attached hereto as Exhibit J is a true and correct copy of Defendant University of Delaware's Responses to Plaintiff's First Set of Interrogatories and First Request for Production of Documents Directed to Defendant.

16.    Attached hereto as Exhibit I is a true and correct copy of a page from the website of the U.S. Department of Labor, www.bls.gov/oco/ocos027.htm.

17.    I declare under penalty of perjury under the laws of the United States and the State of Delaware, pursuant to 28 U.S.C. §1748, that the foregoing is true and correct.  Executed on this 15th day of March, 2008 in Newark, Delaware.

_____
Maciej Murakowski

# Exhibit A

# How to Skin a Cat



Maciej Murakowski
Patrick J. White
March 12, 2007

UD055

## Introduction



The phrase "There's more than one way to skin a cat," has its origins in Colonial America where it was first used describing that there are, in fact, multiple ways to skin a cat. For example, with one's teeth. Naturally, each method has its own advantages and disadvantages, for example, hairballs.

However, there is only one way to skin a cat and keep the skin intact. The following is a set of instructions, with pictures, for this method.

*Fig 1: A cat, with skin*

## Materials

The following materials are needed before any attempts are made to skin a cat:

- A cat, preferably alive
- A pair of sharp scissors (may be substituted with a knife), preferably with a rounded point.

## Step 1: Kill the Cat



If you can't kill the cat, how do you expect to be able to skin it? Pick it up, pet it a little, coo and cuddle with it and viciously break its frail little neck, as in Fig 2. Those of you that cannot complete this step should give up now and go

*Fig 2: Breaking the neck*



*Fig 3: A dead cat*

back to petting the cat. You have failed. You will never be cat skinner now.

For those still with us, lay the cat flat on its back, as shown in Fig 3. When you begin cutting, there may be a lot of blood, so it's important to put it on a surface you don't mind having stained with the precious lifeblood of an ex-mammal (or one that is easy to clean). Get your scissors (knife?) out, as you'll be needing them now.

## Step 2: The Cuts

Find the spot at the bottom of the ribs where they meet the sternum. That little hollow spot just underneath that is where you will start cutting. Take your cutting tool and make a small, shallow cut there, large enough to insert the blade into.

Note: with scissors it is easier to keep from cutting the flesh beneath the skin, but with a knife it is easier to keep from cutting the hair. If you choose the knife, cut by inserting it under the skin with the edge facing up, towards you, and slice upwards. If you choose scissors, cut as though you're cutting paper, taking whatever care you deem necessary to prevent damage to the fur. Use whichever tool suits you.



*Fig 4: What a lovely hat...*

Insert the blade under the skin, and begin cutting upwards in a straight line towards the neck. Stop just under the chin. If you want your skin to have a face, leave

UD057

this for now. If you don't want the head, cut the skin around the neck, detaching the head-skin. The head can add both character and major what-the-fuck factor, those eyes always open and staring, seeming to ask, "Why, James, *why*?" Use your own judgment.

Return to the cut you had made at the ribs. Again insert the edge underneath the skin, this time cutting downwards towards the pelvis. Stop before you reach the genitals (on cats, they are disproportionately small).

You have just completed the primary cut. This (along the underside of the animal) is called the 'ventral cut.' There is also a 'dorsal cut' which runs along the back, but is generally less desirable for most applications of the skin.

Next, cut out from the ventral cut down the inside of each leg. Cut past the knee, to wherever you want the skin to end, and cut around the leg at that point. Note: it is not recommended that you keep the paws (and claws) attached, in case the cat's spirit decides to come back and haunt your shit; see Fig 5.


*Fig--Oh Jesus fuck!*

## Removing the Skin

Starting from the ventral cut and moving down the legs, gently peel the skin away from the underlying tissue, being careful to take only the skin. In general, it is loosely attached and should be easy to remove, but you will sometimes run into problem areas. Remember: work slowly and carefully, until the skin is only attached at the head (if you're keeping it), genitals, anus, and tail.

Now, cut around the genitals and anus, leaving the patch of skin and fur around

them attached... unless you want to make a little 'toy,' in which case, shame on you. Then, cut down the tail, and remove the skin from it. If you don't want the head, you are done! Congratulations! Wash your hands, bury the cat, or clean and eat it; I hear they make great soup. Otherwise, continue on.

## Skinning the Head

Are you sure you want to keep the head, James? Because that's fucking creepy. Well, if you're sure...



Fig 6: Skinning the head

Skinning the head is delicate and involved, and will probably take as long as the rest of the cat. Extend your initial cut from under the chin to the corner of the mouth, and begin peeling the skin away from there. Continue peeling until you reach the ears. You can feel underneath them, the ear canal. Cut this, and continue peeling. At this point, you may want to switch to a scalpel or razor blade, as the skin is usually tighter and thinner, and it is easier to work with a smaller blade.

Continue peeling until you reach the eyes. Cut around the sockets, leaving the eyelids and a little bit of skin attached to the body. Note: if you nick the eyeballs, you'll make a mess. Try to avoid this. Cut deep, almost to the bone, around the mouth. At the nose, leave it attached to the skin and cut away the tissue behind it. Check the inside of the skin to make sure you have not cut away any tissue. Peel or scrape (carefully!) away any that you find.

Congratulations! You have a skin!

UD059

# But... Why?

There are many legitimate reasons for wanting a cat skin: you could intend to use it as a coat, for example, or as a glove or a scarf. Cat fur is both warm and soft, especially if the cat is young (the disadvantage of this is that there is simply less of it). Especially as cats typically have a fairly small surface area, this greatly limits the amount of skin that can be obtained from any one animal.



*Fig 7: Why, James? Oh, God, why? It hurts. Please, James, stop, it hurts so much. Oh, no, James, please... just let me die, please, James, why? Aah, no...*

However, this limitation can often be overcome by using a Bonsai Kitten; while the odd shape may increase the difficulty of skinning, it can often result in a significant decrease in effort required to utilize the coat. For example, the skin of a hand shaped Bonsai Kitten can be easily worked into a glove, while a toroidal kitten makes a lovely scarf.

More than being just suited for fashion accessories, cat fur also has many practical applications. A well-cared-for cat skin can be used, for example, as part of a lure to trap *more* cats. Alternately, the skin could be used as part of a larger sheet of insulation for your yurt. Or as bedding. The possibilities for a high-quality fur are nearly endless.

Or, you could just, you know, wear it. Like Ed Gein (Fig 8).



*Fig 8: Warm and sexy*

## Conclusion

Before the fur can be used, it must be treated and preserved. Unfortunately, such care is beyond the scope of this guide. Contact your local taxidermist for additional instructions. I hope you found these instructions informative, and happy skinning!



*Fig 10: Your local taxidermist*

UD061

# The Relationship Advice Pamphlet

## (For girls in a relationship)

My boyfriend punches his friends in the arm, as a form of greeting. He started doing this to me, except really hard and in the stomach, when I told him that I might be pregnant. I want to feel like part of the group, but it hurts! What should I do?

You should feel proud that he's treating you like one of his male friends. This sort of abuse, and most other forms, is perfectly acceptable in an otherwise healthy relationship. Above all, remember that he's only hitting you because he loves you. And to kill the baby.

It burns when I urinate, and lately it has started turning red. Whenever I mention this to my boyfriend, he looks guilty and quickly says that it's a normal part of puberty. He's twenty, so I want to believe him, but I still think I should see a doctor. What should I do?

A doctor would only confirm what your boyfriend has already told you: it's a normal part of puberty. Your boyfriend knows best, after all.

I want to marry my boyfriend, but he says he's not ready to settle down yet. I don't want to pressure him, but I don't want to wait forever. What should I do?

Wait until he's ready. If you get bored, you could always make him dinner and get him some beer.

I have a rash...

Please refer to the Quick Tips section of this pamphlet.

My uncle Ted says that I'm a bad little girl and I need to be punished. Is he right?

Yes.

I don't like cooking. And I miss the daylight.

That's not a question!

If you have any more relationship questions, email them to kuactet@udel.edu where a qualified relationship counselor will be happy to answer you.

Funded in part by:

The KE Foundation
and
Pirates for a Better Life

UD043

The most commonly asked question about relationships: <u>What is it?</u>

Well, a relationship is a consensual or non-consensual union between two people, where they share their thoughts, mind, souls, possessions, and body fluids. It can be between a man and a woman, between a men and two women, between a man and three women, or between a man and many women. It can involve sex, cooking, servitude, children, and yes, sometimes conversation. There are no age limits on relationships. And, no matter how you define one, a relationship is a wonderful thing.

<u>How do I know I'm in a relationship?</u>

There are many ways that you can tell you're in a relationship. You're probably in a relationship if:
-There is one man in your life that you spend most of your time with. This person is often known as your boyfriend or husband.
-There is one man in your life that you do most of your cooking for. This person is often known as your boyfriend or husband.
-There is one man in your life that you have all of your sex with. This person is often known as your boyfriend or husband.
-You are tied up in a closet for the majority of your waking hours, except for brief interludes of violent, painful sex with a masked man who insists you call him 'Master.' And that's what he is.

Some relationship do's and don't's for common relationship issues:

<u>If you are unhappy in your relationship:</u>

Don't: Try to end it. It will only make your boyfriend unhappy as well.

Do: Concentrate on satisfying your boyfriend. His happiness will trickle down to you, if he deems you worthy.

<u>If your boyfriend beats you:</u>

Don't: Tell your family about it. Their worry that he might be abusive, as well as the subsequent police investigation, will be sure to make him love you less.

Do: Ask him what you did wrong, and how you can correct it in the future. He doesn't want to hit you, but he has to, because you disappointed him somehow.

<u>If your boyfriend wants to do something you feel uncomfortable with:</u>

Don't: Think your opinion matters. It doesn't.

Do: Whatever he wants. He is your life now.

The most common mistake that girls in their first relationship make is thinking that their feelings and opinions matter. This will not only quickly end your current relationship, but make you less desirable to all other men. Don't fall into the trap!

# Quick Tips
for a healthy relationship:

-Yes, that rash is normal.
-Your boyfriend owns you.
-God hates condoms.
-Chastity is an old-fashioned concept.
-STDs are just another way to show you that he cares.
-You deserve it.

# In Closing,

A relationship can be the best thing that's ever happened to you, but only if you handle it correctly. Just remember the Three O's:

1) Obedience

2) Obeisance

3) O:

UD044



Happy April!

April is Sexual Assault Awareness Month. But, that's not really the important thing. The important thing is that April is also Chocolate Eaters and Mathematics Education Month. And Poetry Month. And National Pecan Month. And National Smile Month. So, everybody, smile! Smile and write poetry while being sexually assaulted by a chocolate-pecan-eating math teacher!

The Office of Women's Affairs has a bunch of shit going on this month. And most of it does not have to do with poetry or pecans. In fact, pretty much all of it has to do with rape.

**April 6**
NATIONAL "DAY TO END SEXUAL VIOLENCE"
All survivors of sexual violence, their friends and loved ones, and anyone who wishes to raise awareness or show support for survivors are encouraged to wear teal shirts, as **teal represents sexual assault awareness**. Join others locally and nationally to show your individual commitment as well as our collective campus commitment to ending sexual violence. If you don't have a teal shirt, stop by our kiosk on Monday, April 3, or attend an event to pick one up for free while supplies last. Or support our student groups who work to end sexual violence by wearing your V Day UD/Vagina Monologues shirt, MARS (Men Against Rape Society) "No" shirt, or your tye-dyed "No Means No" shirt from First Night at DelaWorld.

**Teal**? Who the fuck thought of that? What the hell does **teal** have to do with sexual assault? Why not **bukkake gray**, or

UD045

**red**, like fresh vaginal blood? Or, you know, something that actually makes sense? But, still, I'm going to go get one of those shirts. And then wear it while I'm raping some drunk girl in a dark alley. It'd be funny. Or maybe ironic. She'd certainly be aware of sexual assault. And that's ironic because the shirts are about promoting sexual assault awareness. Get it?

One more thing: V Day UD/Vagina Monologues shirt? What the fuck? Vagina monologues? That's either sexy or scary, and I can't decide which. Oh, wait. I can. And it's not sexy.

## April 13
## PORNOGRAPHY AND THE SEXUAL OBJECTIFICATION OF WOMEN

How is pornography made: Who profits and who is hurt in the process? What does pornography say: What are the themes in its content? How is pornography used: What effects does it have on audiences? Pornography, so often portrayed as a harmless outlet for men's sexual energy, tells us stories about men and women, power and domination. As contemporary mass-marketed pornography becomes more mainstream and normalized, it also has become more overtly cruel and humiliating. In this lecture, University of Texas at Austin professor Robert Jensen will explore these questions and discuss the messages about gender and sexuality in pornography and their role in men's sexual behavior. He will also report on his research at the pornography industry's annual convention in Las Vegas in January 2006.

I can answer all of those questions right now. How is pornography made? Simple: a guy with a camera films people

UD046

having sex. What are the themes? I'd venture a guess and say, sex. What effects does it have on audiences? I can't say for certain, but I'm pretty sure it involves wood.

Now, I feel bad about mocking Robert for his career path. But, seriously, Rob, how did you tell your grandmother what you were doing for a living without killing the poor woman? Grandma, I'm studying porn...

Oh, and, good job mixing up the past and the future, asshats. But don't worry, I'm going to start doing that all the time in January of 2006, which is in the future.

**April 17**
THE ONE IN FOUR RV TOUR: WHAT MEN CAN DO
Presented by NO MORE, Inc. (National Organization of Men's Outreach for Rape Education), this powerful program approaches men as potential helpers, not potential rapists. Members of the audience will learn about ways they can help women recover from rape and how they can better define consent in their own intimate encounters. They will also learn how they can move from being a bystander to intervening to help end abuse of women.

Interesting that they should do that because, you know, pretty much all of the rapes committed against women (and a majority of those against men) are, in fact, done by men. I'm not saying that every man is a potential rapist; I'm just saying that, odds are, if you get raped, it won't be by a woman. And also that every man is a potential rapist.

UD047

**April 19**

**HOOCHES AND WHORES: HIP HOP AND THE CRISIS IN YOUNG BLACK WOMANHOOD**

"In the quiet, undisputed dignity of my womanhood..." Anna Julia Cooper's words in 1892 have all but disappeared in the current form of unbridled nastiness. Once considered queens and formidable rulers of countries, young black women have forgotten their legacy. Instead, they have replaced it with sexual arrogance and a loose regard for principles and virtue. This talk will investigate the recreation of young womanhood in the hip hop industry, its impact on the future, and what's at sake in the national and international communities. Likewise, in honor of Sexual Assault Awareness Month, we will talk about the silence surrounding rape and black women.

Unbridled nastiness. How eloquent.

I always knew that letting the negroids have their music was a bad idea...

**April 24**

**FRIEND OR FOE? WHAT YOUR FACEBOOK PROFILE SAYS ABOUT YOU**

Graduate students in Counseling In Higher Education will present this interactive program and discuss the positive aspects of online communities, (including Facebook, MySpace, BlackPlanet, MIGente, and JDate) as well as the potential risks of revealing too much information in your profile. Cyberstalking, in particular, may lead to sexual assault. Learn strategies to reduce your risk of cyberstalking and other negative consequences of participating in an

UD048

f 5

on-line community.

Wait, back up a moment. You're saying that... online communities like Facebook... have *positive* aspects? Huh. And here I was thinking that they were just dumb wastes of time. I'm going to go to this one, to find out exactly what positive aspects they're talking about.

I once went to JDate. It was horrifying. I don't know why anybody would ever post a profile there. I don't know why anybody would go there in the first place. Trust me. Don't click that link.

I looked online (wikipedia) and I found possible predictors for being a rapist:

-Extreme emotional insensitivity and egotism;
-Habitual degradation and verbal devaluation of others;
-Consistently using intimidation in language;
-Uses words like "bitch" and "whore" to describe women;
-Excessive, chronic, or brooding anger;
-Becoming obsessed with the object of his or her romantic affections, long after his advances have been rejected;
-Extreme mood swings;

Reading over those, all I can say is, "Shit." No matter how I interpret them, shit. Don't walk alone with me at night, ladies.

Email me. Or not. It's up to you: kuactet@udel.edu

UD049

of 5

⑤

Hey, my birthday is in a few days. There are a number of things that you could get me. I'd love you...

A pair of dark glasses. Not only do they look super-cool, but I'd combine them with the next item for a truly kickass effect.

A blind person's cane. How much would having a blind guy's cane rock? I contend that it would rock very much. I'd put on the dark glasses and wander around Main Street. If I saw somebody that looked like an asshole, WHAM! right in the shins with the cane. They'd be like, "What the hell's wrong with you?" And then I'd reply, "Oops, sorry, I didn't see you," and they'd feel bad. Or they should. If they tried to beat me up, well, what do you think happens to assholes that try to beat up the blind?

A wheelchair. I could have so much fun with one of those. Cruise around, running over toes and small creatures, I'd leave a trail of pain and anger in my wake. But what would any of those fuckers do about it? I'm a cripple, goddamn it.

A pair of crutches and a fake cast. This is for when I blow my cover as a blind guy and a paraplegic. I might be able to see, and I might have an intact spinal cord, but I've still got a broken leg. Do you really want to smack a guy with a broken leg in full view of everybody?

A raccoon. Preferably rabid, but healthy would still be OK. I could throw it at people and it would latch onto their head and start biting them all over. And they'd be screaming and yelling and I'd call the raccoon off their face and they'd be like, "Thank you for calling that raccoon off my face, now here is my wallet," and I'd be like, "Yeah." That would rock so much.

A small Asian girl. I would keep her tied up in the closet (like

UD050

file://C:\Documents and S

the brother does with his) and do unspeakable things to her when I got bored. It would be better than pretending to be a cripple.

Sympathy. Not a whole lot, I just want people to feel sorry enough for me that they don't throw rocks all the time. Please. The bruises really hurt.

Some nails. I could hammer them into things. Like your tires.

A prosthetic arm. I'd tuck my real arm into my shirt and wear the fake. Then, when I'd meet somebody, they'd think I had only one real arm until my hidden one whipped out and punched them in the crotch. It would rule.

A katana. You know, one of those Japanese sword things that you flip out and kill people with.

My brother also wants a blind guy's cane. And it's not too late to get him one.

Every asshole that would beat me if I pretended to be blind should...


Email me or die: kuactet@udel.edu

UD051

I don't know what's more pathetic: that I'm a virgin writing about sex, or that I got this idea from Encyclopædia Dramatica. However, I like to think mine suck less.

I've watched a lot of porn in my day. And while I personally won't be having sex any time soon, I know that some of you might. And you probably haven't watched as much porn as me. So, as a public service to all the couples out there, I present Maciej's **Definitive Guide to Sex**. You're welcome.

## Getting Started

First you need to find a partner. You could find them in a grocery store, outside, or on the internet. After you have found your partner, make sure nobody else is around, tie them up, and drag them to a secluded location.

## Foreplay

Foreplay is strictly optional. If you do it though, you might not have to go to jail after. I recommended it.

Foreplay is anything to get you warmed up and ready for sex, including (but not limited to):
-Sucking parts of their body.
-Petting them heavily, making the occasional unkind reference to other animals.
-Oral sex.
-Biting all exposed body parts (this includes eyeballs).
-Saying, "I love you," when you don't.

Now you are ready to begin the sex.

UD177

Moves marked with an (M) can only be performed by males during sex. (M/F) moves can be performed by members of either gender. Two guys are required for ones marked (M,M). And so forth. Unless otherwise noted, this guide assumes heterosexuals.

Moves and Positions:

**Bukkake** (M,M,M,M,M,M,M)
Get a bunch of your friends and gangrape a girl. Ejaculate on her face in turn. Note: this is fucking weird.

**Buttsex, Ungay** (M)
Fuck her shitter.

**Buttsex, Gay** (M)
Fuck his shitter.

**Buzzer, The** (M/F)
Words alone cannot describe it; this move is based on the television show Jeopardy. Watch that until you get it.

**Douchebag, The** (M/F)
During foreplay, masturbate to orgasm. Immediately go to sleep, leaving your partner unsatisfied.

**Emo, The** (M/F)
Shake and cry whenever your partner touches you.

**Flaming Gay** (M)
Find a man. Set him on fire. Repeat.

**Good Wife, The** (F)
Make dinner.

UD178

**John F. Kennedy, The** (M)
Position your partner halfway on the bed, facing up, so that her legs are hanging off the edge. You stand facing her, lift her legs, put her ankles on your shoulders, and lean forward as far as you can. Then you kill the President.

**Missionary, The** (M)
The woman lies on her back, with her legs spread, with the man on top, facing her. The penis goes in the vagina. The man thrusts his hips repeatedly for maximum effect. Contrary to the name, converting her to Christianity is not required, unless you don't want to catch sin.

**Rocket Scientist, The** (M)
Obtain an advanced degree from a prestigious university. Become a renowned expert in your field.

**Sociopath, The** (M)
On a Friday night, leave her a trail of rose petals leading to a hot bath. Wash her gently, using oils and scented soaps where appropriate. Dry her, then take her into the bedroom for a sensual massage (be careful, you are not kneading dough!) Kiss her and tell her she is beautiful. Slowly let your hands explore her body. Kiss her some more. Then make sweet gentle love to her for hours. After you both climax, hold her and let her fall asleep in your arms. Then set her on fire.

**Vow of Chastity, The** (M/F)
Don't.

The Aftermath

Wait until you feel like getting up to clean up. Then get up. Then clean up.

UD179

Maciej's Official Guide to Sex                                                                        Page 4 of 4

## Cleanup

What you need:
1 shovel
1 hole large enough to fit a dead body the size of your partner, dug in advance
1 tarp large enough to completely wrap said body

What you do:
Use your imagination.


Have fun, fuckers!


Email me. Or not. It's up to you: kuactet@udel.edu



UD180



i went to see Star Wars Ep. III: Revenge of the Sith again on Friday. Once again, it sucked, except for the part where children were dying. When Anakin started cutting up the kids, I started giggling. When the little boy got shot, I almost burst out laughing. And people all around me were staring, with the, "What the hell is wrong with you?" look that I get so often in theaters. Even though it was a terrible film, this time, I remembered to bring marshmallows to roast over Hayden Christensen's body. Like they say, smores always taste best when made over a burning cyborg.

Shorts kick ass. They are like pants, but better, since they give me a chance to show off my hot man-legs. They are fuzzy, like kittens. Or hobbits. Come and pet my Frodo, little girl.

I started to wear gloves, since my fingers were getting cold when I was biking to class; numb fingers are not fun, and the gloves really help with that. They are bulky and they rock. This is my glove. Is it not cool?

This is my glove choking a bitch. That bitch has been thoroughly choked. See if you can spot my glove. Hint: it's the one choking him.

The glove is like a fish, in that people ask me about them a lot:

"Why are you wearing those huge gloves?"

"What's up with the huge gloves?"

"Do you know that you look weird with those huge gloves on?"

"You have huge gloves on. Why?"

Lo, and behold, your questions are to be answered, right now.

UD070

Rub my belly for luck!                                                    Page 2 of 2

Apart from keeping my hands warm and being the bitch-chokingest gloves in the entire fucking universe, the gloves make me feel menacing. When I wear them, I find myself talking in a deeper voice, flexing my fingers, and generally intimidating the hell out of everybody. I forget that I am a spindly pale virgin, and feel more like a smooth ass-kicking biker. Or maybe OJ Simpson, on his way to choke some more bitches. Oh man, they rule so hard. And by 'they' I mean, 'me.' And by 'me,' I really mean 'the gloves.'

I have decided, that since I own everybody at everything and am the best, that I need a new name, a name that suitably reflects my cool. Of course, I am only cool with the gloves on. Therefore, when I am wearing the gloves, I will only respond to my new title.

Henceforth, I shall be known as Darth Buddha.

Look at him: thin and made of gold, with a head of pure evil. It is a perfect metaphor for me, the gold standing for my flesh and the head of pure evil standing for my head of pure evil. Darth Buddha: the name perfectly combines my sadistic streak with the part of me that just doesn't care. And it is the awesome.

And in case you are wondering, I'm serious.

Email me or die: kuactet@udel.edu

UD071

Don't you love my new page?                                    Page 1 of 1

Check out the original LJ version.

Well, thanks UD for hosting my site. Over the next few weeks, I'll be moving some of my old writing onto here, maybe polishing it up a bit (though I doubt it). There will be new content shortly.

Until then, I repeat my disclaimer:

This site is nothing more and nothing less than a glimpse into the mind of a seriously fucked-up Polak. It is bitter, angry, mostly useless, and only sometimes amusing (like the author). This site is not recommended reading for anybody under the age of eighteen, anybody that is easily offended, or anybody that is Jewish. Come to think of it, this is not recommended reading for anybody. If you choose ignore this warning, you accept sole responsibility for your actions and/or emotions. By reading any of my pages, including this one, you unconditionally absolve yourself of the right to complain about anything within them. If you get pissed off, it's not my problem. Nobody is asking you to read it. Ignorance of this disclaimer is not an excuse for failing to abide by its conditions.

*tends to offend* (handwritten annotation)

Now that I've covered my ass, fuck off.

Email me or die: kuactet@udel.edu

*Knows posting will cause shock & alarm by disclaimer* (handwritten annotation)

UD082

Exhibit B

 UNIVERSITY OF DELAWARE

UD Home    Find It    Site Map    UD Directories    UDaily

# Policy for Student Use of Computing Resources for Home Pages

The University's computing resources are intended to enable the institution to carry out its responsibilities of education, research and public service. Therefore, these functions have priority in using computing resources.

Because the University recognizes the value of the Internet as a resource for information and communication, when computing resources are available, students may use them for co-curricular or personal purposes provided they abide by the policies and procedures governing such use.

Students may use computing resources for electronic communications with faculty, staff, other students and acquaintances outside the University community and to take advantage of information resources on the Internet.

Students may also participate in the exchange of information on the Internet through newsgroups and publish personal home pages on the World Wide Web.

**Responsibility**
Students must abide by the Policy for Responsible Computing. They assume full, legal and moral responsibility for the content of their home pages. They must abide by all local, state and federal laws that pertain to communication and to publishing. This includes laws of libel and copyright law. Copyright law pertains to all published and unpublished material, including cartoons, pictures, graphics, text, song lyrics and sounds.

**Right to Privacy**
Students are advised to consider the public nature of information they disseminate on the Internet through the World Wide Web. Information in a home page is published and available to everyone who can get to the World Wide Web. Students must not assume that their information is restricted to only a close circle of friends, or even the campus community.

The University will not impose any restraints on, nor make any effort to monitor the content of, communications other than those imposed by applicable Federal, State or local laws, including laws regarding the right to privacy and laws which prohibit defamatory material. Users of the University's information systems are advised that their communications are subject to such laws and that the consequences of violations can be severe.

**Commercial Activity**
Students may not use home pages for commercial activity. This includes but is not limited to running any sort of private business through a home page.

**Fund Raising and Advertising**

Students may not use home pages for fund-raising or advertising for commercial or non-commercial organizations, except for University-related organizations and University-related events.

**Use of the University Name, Logo or Seal**
Students may not use the University name in their home pages in any way that implies University endorsement of other organizations, products or services. They may not use University logos and trademarks, including "YouDee," or the University seal. Permission to use the University name, logos and seal in any way is granted by the Office of Public Relations only.

Responsibility for the content of students' home pages resides solely with the author(s). The views and opinions expressed by students are strictly the views and opinions of the authors and do not constitute the official sanction of the University.

Publishing a Student Organization Web Page
Publishing a Student Web Page

 University of Delaware Home Page

Copyright © University of Delaware 1999-2004
Last Updated: September 7, 2004

# Exhibit C



 UNIVERSITY OF DELAWARE

**OFFICE OF THE**
**ASSOCIATE VICE PRESIDENT**
**FOR CAMPUS LIFE**

218 Hullihen Hall
University of Delaware
Newark, Delaware 19716-6107
*Ph:* 302/831-8939
*Fax:* 302/831-8191
*Website:* www.udel.edu/campuslife

April 20, 2007

Mr. Maciej Murakowski
214 Sypherd Hall

HAND DELIVERED

Dear Mr. Murakowski:

On April 19, 2007, I received a report from the University of Delaware Police Department that referred me to the following website, *http/udel.edu/~kuactet*. Apparently you created this website using the University of Delaware server. On the website, I found a number of postings that are sexually graphic, hostile, and violent. The subject matter includes such things as rape, murder, relationship violence, and animal torture and cruelty. It also contained racist, sexist, anti-Semitic, and homophobic statements.

The University Police Department became aware of this website as a result of formal complaint being filed by two students, one on November 9, 2005, and one on April 8, 2007. In addition, on April 20, 20007, the Counseling Center received a call from a parent expressing concern about your "bizarre behavior".

As a result of these reports, the following action will be taken:

1. You will be charged through the University's judicial system with violating the Responsible Computing Policy.
2. You will be prohibited from staying in your residence hall room or attending classes until you receive a psychiatric assessment.
3. You must provide me with a letter from a licensed mental health provider that indicates that you are not a threat to yourself or others.
4. You must sign a waiver granting me permission to speak with that licensed mental health provider to confirm his or her conclusions and to learn about any recommendations he or she might have pertaining to mental health treatment.

These actions are necessary because your behavior has caused alarm to members of the University of Delaware community.

Please feel free to contact me if you have any questions or concerns.

Sincerely,

Cynthia E. Cummings
Associate Vice President for Campus Life

cc:   James Flatley, University Police
      Kathryn Goldman, Director, Office of Judicial Affairs
      Kathleen Kerr, Director, Residence Life
      Januz Murakowski

AN EQUAL OPPORTUNITY UNIVERSITY

# Exhibit D



**UNIVERSITY OF DELAWARE**

OFFICE OF JUDICIAL AFFAIRS

218 Hullihen Hall
University of Delaware
Newark, Delaware 19716-6107
Ph: 302/831-2117
Fax: 302/831-8191

## UNIVERSITY JUDICIAL CHARGE

Name of Charged Student:  Maciej Murakowski
DOB: 2/4/88
Local Address:  214 Sypherd Hall, CAMPUS
Phone:  837-8944
Classification:    EG  09S  CHE
Date of Incident:   April 19, 2007 & on-going
Time of Incident:
Location:    University Computer Network
Name of Witness:  University Police
Address of Witnesses:    Academy Street
Reporting Party:  Office of Judicial Affairs
Address:  218 Hullihen Hall
Phone Number:  831-2117

Note: Numbers in parenthesis indicate multiple violations for each category.

( ) ___  Academic Honesty
( ) ___  Alcohol Regulations
( ) ___  Complicity
(1) _X_  Disruptive Conduct
( ) ___  Drug Policy
( ) ___  Endangering the Safety of Others
( ) ___  Failure to Comply
( ) ___  False Information
( ) ___  Guest Policy
( ) ___  Hazing
( ) ___  Misuse of University Materials, Services or Property
( ) ___  Off-Campus Convictions
( ) ___  Residence Hall Regulations
(1) _X_   Responsible Computing and Use of University Computer Resources
( ) ___  Sexual Assault
( ) ___  Sexual Harassment
( ) ___  Student Organizations
( ) ___  Theft
( ) ___  Weapons, Dangerous Instruments, and Explosive Chemicals or Devices on
        Campus

Please enter below a brief explanation of charges:

AN  EQUAL  OPPORTUNITY  UNIVERSITY

Mr. Murakowski is alleged to have used University computer resources for non-academic purposes to create and post a website (http://copland.udel.edu/~kuactet/). The contents of this site have caused concern and alarm to University community members. The information posted is graphic in nature, violent, derogatory, hostile, and disturbing.

University of Delaware
Student Judicial Referral

Note to Student:

The information contained in this e-mail concerns your alleged involvement in a recent violation of the *Student Guide to University Policies*. This e-mail serves as formal notification that you are charged with violating one or more policies of the Student Guide to University Policies (as listed and described above). You are directed to appear at the **Office of Judicial Affairs, 218 Hullihen Hall within three business days** of the date of this e-mail. Pre-hearings are held **Tuesdays, Wednesdays and Thursdays** from **9AM-12Noon and 1-4PM**. Pre-hearing appointments take place on a first-come, first-served basis.

**Failure to attend the pre-hearing meeting within the specified time will be considered an admission of guilt** to the violation(s) being considered and the referral will be handled administratively. A decision will be rendered in your absence and a sanction, including the potential for a fine and parental notification, will be imposed without your input.

During the pre-hearing, you will be given the chance to discuss the incident further, and will have the opportunity to ask questions and review relevant information available in your judicial file. You will also have the option of taking responsibility for the charge(s) by pleading "guilty" in the pre-hearing or contesting the charge(s) by pleading "not guilty" and requesting a full administrative hearing.

If you elect to have an administrative hearing following the pre-hearing, your charge(s) will be heard by an individual member of the University's staff, serving as an administrative hearing officer. You will be given a structured opportunity to hear the reporting party's information and to respond to all the information and charges. You will also have the right not to appear or you may choose to remain silent. The hearing officer will make and communicate a decision regarding your situation several days following the administrative hearing.

For more information about your rights as a charged student within the Undergraduate Student Judicial System, please refer to the Student Guide to University Policies at http://www.udel.edu/stuguide. Additional information may also be found on the Judicial Affairs website, located at http://www.udel.edu/judicialaffairs

Once again, **within three business days, you must to report to the Office of Judicial Affairs, 218 Hullihen Hall** to conduct a pre-hearing. Pre-hearings are held on **Tuesdays, Wednesdays and Thursdays from 9AM-12Noon and 1-4PM** and take place on a first-come, first-served basis.

Please contact the Office of Judicial Affairs at 831-2117 if you have any questions prior to your pre-hearing meeting. Thank you for your attention to this very important matter.

Sincerely,
Kathryn Goldman
Director of Judicial Affairs kgoldman@udel.edu
831-2117

# Exhibit E



**Behavioral Health Care Associates**

Cynthia E. Cummings
Associate Vice President for Campus Life
218 Hullihen Hall
University of Delaware
Newark De 19716-6107

April 23, 2007

Re: Maciej Murakowski date of birth 2/4/88

Dear Ms. Cummings,

I had the opportunity to both meet and assess the above mentioned young man on April 23, 2007. Mr. Murakowski was accompanied to the session by his mother and father. They remained in the session at my request for the initial introduction and then were excused from the interview. This was all done with Mr. Murakowski's approval.

Mr. Murakowski is a sophomore at the University majoring in engineering. His father is a professor of engineering at the University of Delaware as well. His mother is employed by the University in the food services division. Maciej is the older of two sons in this family; his younger brother is a senior in high school and plans to attend the University in the fall.

The purpose of the assessment was to determine the extent to which Mr. Murakowski presents a threat to himself or others. This question arose as a result of expressions of concern by members of the university community concerning his web-site. I asked Mr. Murakowski to reproduce a sample of the web-site writings. He presented approximately 25 pages of text to me for my review. In addition, I addressed the various issues of the subject matter of the web-site. My assessment is based on my clinical interview and review of the writings.

Mr. Murakowski presents himself as a highly intellectualized young man. There is some element of social disconnect present. He reports that he would rather be alone than in the company of others, however, does report having a number of close personal friends as well as internet relationships. His writing began as a result of a personal relationship which developed over the summer of 2004 when he was at a summer camp while still in high school. He reports that his website and his writings are motivated by other people's expression of interest in his writings.

Upon my review of his writings and his responses to me during the clinical assessment, I do not believe that this young man is threat to himself or others. Some of his writings are insensitive and depending on the context in which they are read can be seen as disrespectful to some individuals. While I certainly do not condone such expressions, I do not believe that they reflect any potential for physically acting out against any member of any of the groups referenced in your letter to Mr. Murakowski dated April 20, 2007.

It is clear that one can not predict future behavior with absolute certainty. I do not believe, based on the information that I have received and the writings I have reviewed, that Mr. Murakowski represents a threat at this time. I would certainly recommend he be permitted to return to the University, attend his classes and complete the semester. I did discuss with him the possibility of the utilization of the University counseling services should he experience subjective distress in the future. He is amenable to such an idea. I do not believe that counseling need be mandated at this time, but am heartened by his willingness to consider such an option should he feel the need.

I hope that my comments are helpful to you. I sincerely respect the position that recent events across the country have put you in and respect the posture you initially took concerning this young man. I do not believe, however, that, at this time, he represents a threat to the university. If I can be of further assistance to you please feel free to contact me. I can be reached during the day at 267-893-5282 or in the evening at 610-825-5112. Thank you very much.

Respectfully,

Philip R. Braun, Ph.D.
Licensed Clinical Psychologist

# Exhibit F

**Subject:** Student Follow Up -- ██████████
**From:** ██████████████████████████████
**Date:** Tue, 1 May 2007 14:50:35 -0400
**To:** <harv@UDel.Edu>
**CC:** ████████████████████████████████████

Holli:
Per Cynthia's request here is a summary of my interaction with ████████████ regarding the student, Maciej.

On Tuesday, April 25, 2007, ██████████ came to the Dean's office to request a late change of registration. She was requesting to change ██████████ for 07S from a standard grade to an audit (listener) status. ██████████ expressed that she had been dealing with a personal matter and the situation was really taking a toll on her emotionally. She said that she has been unable to focus and experiencing anxiety. She has been overwhelmed with everything that has occurred and worries if Maciej would find out that she was responsible for reporting him.

She shared with me the incident involving Maciej and how she was worried about her personal safety. ██████████ discussed how her father wanted to take her out of school for the semester but she and her mother talked him out of this option. If she pursued this option, she felt that it would only "draw attention" to herself if she withdrew from UD and was no longer a resident on the floor. The student Maciej would then know that she had some role and/or involvement. ██████████ then reported that she had visibly seen Maciej on the floor several times and her friends had seen him across campus. ██████████ reported that she thought "Maciej was suspended and not permitted on campus". I explained that there are different parameters of suspension. He could have been suspended from the residence halls but still permitted to attend class or suspended from all campus activities, including classes. I suggested she follow up with Officer Mease and/or Ms. Cynthia Cummings since she referred to both during our meeting. She shared that she did attempt to call Officer Mease when she first saw Maciej on the floor but to this day she has not receive a follow up phone call. ██████████ also stated that Maciej had his belongings in his room and thus could not understand this if he was suspended from the residence halls. Again, I suggested she follow up with Ms. Cummings and/or Officer Mease.

Student was physically shaking and her left hand was shaking uncontrollable. I asked if she would be all right. She said sure. She just wanted to finish the semester. I recommended that she seek out counseling to at least discuss her feelings with someone. We discussed the Counseling for Center and Student Development (CCSD), local resources, as well as her home physician. She was eager to hear that if she went to the

CCSD to speak with a counselor there would be no associated and/or additional cost. Also, she requested to speak with someone but she did not want her parents notified. She didn't want them to know that she was bothered by this incident and having trouble emotionally and academically. I provided student with the contact information for CCSD and printed out information from the website. Student said she would be making an appointment for this week.

I informed ████████ that I had no doubt that this situation is real and happened; however, I would need official documentation and/or confirmation before I was permitted to allow for a late change in registration. The deadline to make registration changes was Monday, April 9, 2007 by 5:00pm. Student understood. I asked her permission to contact either Office Mease, Campus Police and/or Ms. Cynthia Cummings. She agreed. I asked the student to return to see me on April 26, 2007. At time, I informed ████████ that I would have a decision on whether I would support her late registration request, pending approval.

The following day, I called Campus Police but Officer Mease was not available; thus, I spoke with Lt. Tom Rahmer. I then called Ms. Cynthia Cummings as well to confirm. Both Lt. Rahmer and Ms. Cummings confirmed an incident did occur that involved Maciej. Ms. Cummings informed me that upon ████████ arrival, please convey to her that Maciej is not permitted in the residence halls under any circumstances and that his pdi access had been revoked. Ms. Cummings also asked to convey to ████████ that if she or any of her friends notice Maciej in the residence halls, call Campus Police immediately.

Student returned on Wednesday, April 26, 2007. I approved her late registration request and completed the necessary paperwork for her to process the late change of registration to an audit status. Student did report that she was able to make an appointment with the CCSD office for next week. ████████ said she would keep me posted. Prior to departure, I shared with ████████ what Ms. Cummings wanted me to articulate to her. ████████ said this information was good to know.

If you have any additional questions and/or need clarification do not hesitate to contact me.



5/1/2007 4:38 PM

# Exhibit G

UNIVERSITY OF DELAWARE
OFFICE OF JUDICIAL AFFAIRS

**CONFIDENTIAL**

May 23, 2007

Maciej Murakowski
16 Waltham Dr.
Newark, DE 19713

Dear Mr. Murakowski:

This letter will summarize an Administrative Hearing that took place on May 2, 2007 in Hullihen Hall at 3pm. You appeared to address the charges of violating the Disruptive Conduct Policy, violating the Responsible Computing Policy, and violating the Failure to Comply Policy as reported by Holli Harvey of the Office of Judicial Affairs. The charges are the result of several incidents which occurred on campus during April 2007.

Holli Harvey (presenting party), you, and I were present for the entire hearing. Lt. Rahmer of University Public Safety, Melissa Day, Michelle Betty, Jennifer Wilson, Sohan Banthi, Janusz Murakowski, Dariusz Murakowski and Peter Adelman were present for portions of the hearing. You entered a plea of Not Guilty to all three charges.

The following information was presented during the hearing:

- Ms. Harvey submitted, and Officer Rahmer substantiated that a brother of a female student reported to Public Safety that his sister (which for the sake of this letter I will identify as "person A") and her roommate were disturbed and concerned about writings you had posted on your website on the University's Copeland server. Person A and her roommate live on the same floor (2nd) of Sypherd Hall as you do.
- Ms. Harvey submitted a letter from a campus Academic Advisor which detailed information about how Person A was so scared for her personal safety and distressed due to your postings that she could not focus on her studies and had to drop to "audit" status.
- Additionally, the Advisor's letter explained that Person A saw you in Sypherd Hall (despite you announcing in public postings that you had been banned from it); she feared retribution from you since you were blatantly ignoring the ban from your residence hall
- Ms. Harvey submitted a substantial number of print-outs from your website containing a preponderance of material degrading, demeaning, and violent toward women, as well as advocating violence towards others or in general. Many of the examples contained content that was racist and/or sexist.

- Here are **samples** used in my review of the case and submitted as information in the case file:
    - **Sample**: "How to Skin A Cat": a document you created and posted online about killing and skinning a cat; also posted as a hard copy on your door in Sypherd Hall.
    - **Sample**: While explaining your experience of seeing Star Wars Episode 3: "It sucked, except for the part where children were dying. When Anakin started cutting up the kids I started giggling. When the little boy got shot, I almost burst out laughing."
    - **Sample**: "This is my glove choking a bitch" and "Apart from keeping my hands warm and being the bitch-chokingest gloves in the entire fucking universe, the gloves make me feel menacing" These statements are from a section of your website where you talk about your black gloves which you and your witnesses later acknowledged in the hearing that you wear all the time. You go on to say on your website how the gloves make you feel powerful and you compare yourself to OJ Simpson. In the close of this section you clearly state, "And in case you are wondering, I'm serious."
    - **Sample**: In a section where you talk about what you want for your birthday you stated: "A small Asian girl. I would keep her tied up in the closet… and do unspeakable things to her when I get bored . . . . Some nails. I could hammer them into things. Like your tires . . . . until my hidden one (*arm*) whipped out and punched them in the crotch[and] one of those Japanese sword things that you flip out and kill people with."
    - **Sample**: While posting your thoughts on UD's Sexual Assault Awareness Week t-shirts: "and then wear it while I'm raping some drunk girl in a dark alley."
    - **Sample**: On an April 17th entry you say "every man is a potential rapist." In the next few postings you focus on different aspects of rape including a review of African-American women where you use the term "negroids.". You talk about looking at indicators for potential rapists and list those indicators you found on "wikipedia" and then state, "Reading over those, all I can say is 'Shit.' No matter how I interpret them, shit. Don't walk with me at night, ladies."
    - **Sample**: A "Relationship Advice Pamphlet" in which you mock relationships but once again state, "Above all, remember that he's only hitting you because he loves you" and include information about killing babies.
    - **Sample**: In a "Guide to Sex": "After you have found your partner, make sure no one else is around, tie them up, and drag them to a secluded location." You later close the guide with tips on how to dispose of the dead body of your partner once you have had sex with it.
    - **Sample**: In a "disclaimer" for your website you posted, "It [your site] is bitter, angry, mostly useless, and only sometimes amusing -like the author."
- Ms. Harvey submitted information on University policies regarding use of computer resources and stated that the content of your website was not within the mission of the University and the use of computer resources.
- Ms. Harvey presented a letter to you dated April 20, 2007 from the Associate Vice President for Campus Life, Cynthia Cummings. Amongst other information, the letter informed you that you were banned from your residence hall. You were only given permission to enter your room on that Friday in order to retrieve your belongings.

- Ms. Harvey presented a University Facilities report that detailed that your PDI Card that you use to access your residence hall was used twice on April 22 and twice on April 24 to access the residence hall while you were still banned from it.
- Ms. Harvey provided a print out from your website which detailed your meeting with Ms. Cummings as well as the action that was being taken by the University on April 20, 2007. Content of this post said: "Maciej Murakowski has been, effective immediately, suspended from classes and the dormitories…. Seriously. This is not a joke. (unlike 'How to Skin A Cat')"
- Ms. Harvey closed by stating that the content of your website affected other students living on your residence floor, creating an environment that was disruptive to their academic success and campus living environment, that the content of your website violated the responsible computing policies of the University, and that you blatantly failed to comply with the directive of a senior administrator by entering your residence hall while banned from it.
- You submitted several University web documents detailing other definitions of the use of computing resources besides those directly affiliated with the Code of Conduct. You also submitted quotes from Dr. Roselle and Dr. Brooks. You claimed that your website content was satirical composition which met the "creative use" definitions of academic pursuit.
- You claimed that all the content identified in the hearing by Ms. Harvey was meant as humor and satire.
- You submitted "A Modest Proposal" as an example of what is now considered a classical piece of satirical composition. You also explained that when it was first published during the Ireland potato famine with suggestions of eating babies that indeed the community was shocked and appalled to the extent that the author almost lost his patrons.
- You stated that a friend of yours, University student Melissa Day, was the one who used your PDI card to enter Sypherd. She did this for you in order to check on information that you had posted on your residence door as well as to place new information on your residence door. It was noted that this information was your detailed account of meeting with Ms. Cummings and being suspended, as well as letting your friends know that you had moved your website to an off-campus server.
- Melissa Day as your witness verified that she used your PDI card to enter Sypherd on the 22nd. I explained to you and Ms. Day that you both violated the University's Housing Contract and policies: you by giving Ms. Day your PDI card and Ms. Day by using that PDI card to gain entry to Sypherd. Both of you claimed that you were not aware of this fact.
- I asked you if you were in close proximity to Sypherd when Ms. Day entered and you said yes and that indeed people could see you from the residence hall windows if they were looking.
- I asked you why you couldn't just e-mail your friends the information, and you claimed you wanted to let everyone on your floor know what was happening to you since you were not there.
- You admitted that you entered your residence hall on April 24th as identified by the facility report; however, you defended that action by isolating Ms. Cumming's one bullet line from her April 20th letter: "2. You will be prohibited from staying in your residence hall room or attending classes until you receive a psychiatric assessment." You claimed that since you had received a psychiatric assessment that you then were permitted to enter your residence hall.

- Michelle Betty (UD student), Jennifer Wilson (UD student), Sohan Banthi (friend), Janusz Murakowski (your father), Dariusz Murakowski (your younger brother), Peter Adelman (UD student) and Ms. Day entered the hearing to state emphatically that the content of your website is only meant in humor and satire. They also claimed that, though you might be perceived as "weird" and they thought that some of the things you do are strange, they do not believe you are a violent person.
- I challenged you with the notion that in providing me information to consider as the Hearing Officer you were sometimes asking me to look at information in totality (*i.e.*, to consider your entire web site content and not just the isolated sentences of violence, etc.) to understand that it is overall a satirical or humorous composition. Yet, at the same time you were asking me to look at one specific sentence of a letter from a senior administrator as defense for entering your residence hall without looking at the overall spirit of the instructions.
- I told you that I could not review a case in both manners. Either you wanted me to look at the totality of information or pick and choose specific line by line elements. I asked which way you wanted and you told me to look at everything in totality.
- At that point you admitted that when taking item 3 of Ms. Cummings' letter, "You must provide me with a letter from a licensed mental health provider that indicates you are not a threat to yourself or others," in conjunction with item 2 quoted above, that indeed, your instructions were not to go back into the residence hall until you had the psychiatric assessment and provided the follow up documentation to Ms. Cummings.
- You admitted that you entered your residence hall at least once on the 24th before ever providing Ms. Cummings with the documentation.
- You made a statement toward the end of your information that you meant for some of your writing to be sexist and demeaning.
- You did state that you felt horrible that you caused Person A such distress and apologized for anyone else who may have been affected by your postings

Based on this information, I am finding you Guilty of violating the Failure to Comply Policy and Disruptive Conduct Policy. I am finding you NOT Guilty of violating the Responsible Computing Policy.

First, and clearly most obvious, the decision on the Failure to Comply is that you admitted to entering your residence hall on April 24th as well as standing right outside of it on April 22nd. You also admitted that you knew it was the intent of Ms. Cummings' letter that you not enter your residence hall until you provided her with the documentation of your psychiatric assessment. Furthermore, you also disregarded the housing policies by giving your PDI card to someone else to use, which is another example of failing to comply with University regulations while even on a serious emergency suspension.

Second, though the content of your website is not in violation of the use of the University's computing resources, you are responsible for putting the content there and for what outcomes may occur as a result of reviewing the content. You claimed numerous times, and your witnesses did as well, that the content of the site is meant as humor and satire. You likened your writings to that of the satirical essay "A Modest Proposal" but that essay was written as a means of political awareness or outcry in a time of national crisis in Ireland. Furthermore, you admitted that initially "A Modest Proposal" caused great disturbance. Your website taken in totality is not a satirical essay, nor is it

even a series of satirical essays. Many times it is nothing more than an on-line journal; sometimes it is a satirical spoof of a "how to guide" such as "How to Skin A Cat" or sometimes it is a simply a review of a film such as the Star Wars III entry. Unlike "A Modest Proposal" your entries do not appear to be satirical responses to national or even local crises. More importantly, no where in your "disclaimer" is the word "satire" found and it even says that your site is "bitter, angry, mostly useless, and only sometimes amusing -like the author." The overall consistency with your website is that the bulk of the entries end in some means, discussion, or promotion of violence. Or, the overall feel of the piece lends itself to violence. Even some pieces that may start out wittily or humorously continue to descend into nothing more than a violent end or violent solution. Indeed, if you can understand that "A Modest Proposal" caused disturbance upon its initial release then you realize that even if you contend your site is satire that it too could cause the same response, thus being disruptive to the community in which you live.

Finally, there is one overriding concern about your defense of the references to violence as satire and that you are not seriously promoting violence. In the section where you talk about using your gloves for violence you end the section saying... "And in case you are wondering, I'm serious." You use a similar statement when describing the judicial action... "Seriously. This is not a joke. (unlike 'How to Skin A Cat')." So, if one takes your website in totality, how is one to determine what is humor and what is not and therefore not become concerned about the violence? You claim to be serious about killing "bitches" with your gloves but then argue that saying you are serious is just satire. On the other hand, the details of your suspension were true and you had to clarify that you were serious. Thus, if you clarify that you are serious about the judicial action, why should a normal person not think it is possible that you are serious about using your gloves for violence? The bottom line is that your web site is filled with violence that created an uncomfortable and disruptive environment in your residence hall.

A review of your judicial record indicates this is your second case. Moreover, you failed to comply with a senior level administrator's directive. Accordingly, the following sanctions apply:

Effective upon the completion of your final exam for Spring Semester 2007, pending appeal, you are suspended from the University of Delaware and banned from Campus through the end of Fall 2007. You will be withdrawn from all classes, suspended from the residence halls (if applicable), and banned from all University facilities, rendered ineligible to register for any University class, and prohibited from participating in University activities for the period of the suspension. Entrance onto campus and into these facilities will be viewed as a violation of this sanction and you will be confronted and charged accordingly for trespassing and failure to comply. A student who is suspended from the University is nonetheless responsible for all financial obligations to the University. Your transcript will indicate you were withdrawn by the University. Should you wish to re-enter the University as a matriculated student following your period of suspension, you will be required to reapply to the University through the Admissions Office.

Also effective immediately, pending appeal, you are being Suspended and banned from any and all residence halls owned by the University of Delaware through graduation. *You must remove all your belongings from the room, turn in your key and access card to an appropriate staff member and complete all necessary check-out procedures no later than 7:00 p.m. on by May 25, 2007.* Failure to do so (or submit an appeal, as outlined below) by this date and time will result

in an additional charge of trespassing. If you do not return your key and key card upon moving out, the core will be changed and your card deactivated and you will be billed accordingly.

Finally, if you return to campus after your period of Suspension, you are being placed on Deferred Expulsion from the University through graduation. Deferred Expulsion means that if you are again found guilty of violating the Code of Conduct, you will be expelled from the University.

Finally, in accordance with the administrative processes of the Office of Judicial Affairs, a letter is normally sent to your parent(s)/guardian(s) informing them that you have been found guilty of violating a Code of Conduct policy. As your father attended the hearing on your behalf, this letter will be waived.

This action is being taken administratively in accordance with established University policy and at your request. Should you wish to exercise your right to appeal, you may do so by communicating this wish directly to the Chairperson of the Appellate Judicial Board, c/o Office of Judicial Affairs, 218 Hullihen Hall. Your appeal petition must be filed within five (5) days of receipt of this letter. The statement of appeal shall be prepared by you and your judicial advisor and shall be limited to three double spaced pages with regular margins. The statement of appeal shall not include citations to judicial or other authorities outside the University. (In the event that such citations are included, the chairperson may, in her or his discretion, reject the appeal.) The appeal must clearly explain, in detail, the basis for the appeal, and should include one or more of the appeal grounds:

1. The decision is contrary to evidence presented at the hearing or contrary to new evidence not known in advance of the hearing;
2. Procedures were not followed during the process; or
3. The sanction imposed is inappropriate or unreasonable.

If you submit an appeal, the presenting party and I will be provided an opportunity to respond to your petition. If you submit an appeal, sanctions will not take effect until the Appellate Board renders a decision, unless otherwise noted.


Sincerely,



Scott F. Mason
University Hearing Officer



cc: Holli Harvey, Judicial Affairs, Presenting Party
    Office of Residence Life
    File

# Exhibit H

From: Cummings, Cynthia
Sent: Friday, April 20, 2007 2:09 PM
To: Colm, Maxine
Cc: Roselle, David; Rich, Daniel; 'kkerr@UDel.Edu'; Goldman, Kathryn; 'flats@UDel.Edu';  'Jim Tweedy'
Subject: Room Search

Maxine, I spoke with Jim about searching Maciej Murakowski's room. Jim said he could not go in without a warrant and that he won't be able to get one. I have decided to have the Residence Life staff go in and do a safety check on the room. If they come upon anything suspicious or against policy (weapons, drugs, etc.) they will contact UDPD. Jim has agreed to confiscate and hold anything my staff finds, but he said that he won't be able to use any of it in court. I really don't care about that, because my intent at this time is not to pursue criminal action against the student. I do feel, however, that we must take whatever action is necessary to protect our community.

Please let me know if you have any questions or concerns. Cynthia

From: Cummings, Cynthia
Sent: Friday, April 20, 2007 4:50 PM
To: Roselle, David; Rich, Daniel; Colm, Maxine
Cc: 'kkerr@UDel.Edu'; Goldman, Kathryn; 'flats@UDel.Edu'; 'Jim Tweedy'
Subject: FW: Room Search

Jim Tweedy and Samantha Lopez entered Murakowski's room and searched it. They found nothing alarming.

Holli Harvey and I met with Murakowski and his father a bit ago. He has been charged with violating the Responsible Computing and Disruptive Conduct policies. He pleaded not guilty to both charges. Therefore, he will have a hearing to determine guilt/innocence and a sanction. In addition, I have suspended him from campus until he receives a psychiatric assessment and documentation that he is not a risk to himself or others.

The Murakowski family is from Poland. Therefore, Dr. Murakowski castigated me by saying I was using totalitarian tactics against his son. Eventually, he calmed down when he realized that I had no intention of changing my mind. They took the phone number for the Rockford Center and said they would get the assessment done as soon as possible. (Rockford provides psych assessments 24 hours a day.) Young Mr. Murakowski is strange; he's a smart aleck; and he thinks he's smarter than everyone else. I don't think that he's a lunatic, but he's definitely maladjusted. He has played too many violent video games and watched too much pornography. Because he is so smart, he could find a million more productive ways to pass his time.

I'll keep you updated. Have a great weekend!

# Exhibit I

University of Delaware
Office of Judicial Affairs


CONFIDENTIAL

July 2, 2007

Maciej Murakowski
16 Waltham Drive
Newark, DE 19713


Dear Murakowski,

The Appellate Board met on June 29, 2007 to review your request for an appeal concerning the incident that occurred on April 19, 2007. You appealed on the grounds that procedures were not followed, the decision is contrary to information presented at the hearing or contrary to new information not known in advance of the hearing, and the sanction imposed is inappropriate or unreasonable.

Upon reviewing all available information relevant to your situation, the Appellate Board has determined that you have not presented sufficient grounds on which to base an appeal. Therefore, the following sanctions will apply:

Effective immediately, you are suspended from the University of Delaware and Banned from Campus through the end of Fall semester 2007. You will be withdrawn from all classes, banned from all University facilities, rendered ineligible to register for any University class, and prohibited from participating in University activities for the period of the suspension. Entrance onto campus and into these facilities will be viewed as a violation of this sanction and you will be confronted and charged accordingly for trespassing and failure to comply. A student who is suspended from the University is nonetheless responsible for all financial obligations to the University. Your transcript will indicate you were withdrawn by the University. Should you wish to re-enter the University as a matriculated student following your period of suspension, you will be required to reapply to the University through the Admissions Office.

In addition, if you return to campus after your period of Suspension, you are being placed on Deferred Expulsion from the University through your graduation. Deferred Expulsion means that if you are again found guilty of violating the Code of Conduct, you will be expelled from the University.

Finally, in accordance with the administrative process of the Office of Judicial Affairs, a letter is normally sent to your parent(s)/guardian(s) informing them that you have been found guilty of violating a Code of Conduct policy. This letter will be waived as your father attended the hearing.

The decision of the Appellate Board is final.

Sincerely,


Frank Newton
Chairperson Appellate Judicial Board


cc:  Holli Harvey, Presenting Party
     Scott Mason, Hearing Officer
     File

# Exhibit J

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

MACIEJ MURAKOWSKI,                    )
                                      )
            Plaintiff,                )
                                      )
    v.                                )    C.A. No. 07-475***
                                      )
UNIVERSITY OF DELAWARE,               )
                                      )
            Defendant.                )

**DEFENDANT UNIVERSITY OF DELAWARE'S RESPONSES TO PLAINTIFF'S FIRST**
**SET OF INTERROGATORIES AND FIRST REQUEST FOR PRODUCTION OF**
**DOCUMENTS DIRECTED TO DEFENDANT**

Pursuant to Rules 26, 33 and 34 of the Federal Rules of Civil Procedure (the "Rules"),

Defendant University of Delaware (the "University"), by and through its undersigned counsel,

hereby responds to Plaintiff's First Set of Interrogatories and First Request for Production of

Documents Directed to Defendant (the "Discovery Requests") as follows:

**GENERAL OBJECTIONS**

1.      The University objects to these Discovery Requests to the extent that they seek

information or documents that constitute privileged attorney-client material, constitute attorney

work product or work prepared for, or in the anticipation of litigation, or that are otherwise

protected from disclosure on the basis of any applicable privilege. The inadvertent disclosure or

production of any privileged information or document shall not be deemed to be a waiver of any

applicable privilege with respect to such information or document or any other information or

document disclosed or produced by the University.

2.      The University objects to these Discovery Requests to the extent that they purport

to impose requirements beyond those permitted by the Rules.

3.      The University objects to these Discovery Requests to the extent that they seek documentation or information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence.

4.      The University objects to these Discovery Requests to the extent that they conflict with, contravene or contradict any Delaware statute, ordinance, or code section.

5.      The University objects to these Discovery Requests to the extent that they would require the making of an unreasonable investigation by the University.

6.      The University objects to these Discovery Requests to the extent that they would cause unreasonable annoyance, oppression, burden and expense to the University.

7.      The University objects to these Discovery Requests to the extent that they seek information protected by the self-critical analysis privilege or any comparable privilege or policy protecting internal investigations.

8.      To the extent that the University objects to particular requests on the basis of specific objections, the University hereby states that it does not thereby waive its general objections to all of the Discovery Requests. To the extent that the University objects herein to a particular request, but proceeds to answer said request in whole or in part, the University hereby states that it does not thereby waive any objection to the request in question.

9.      To the extent that these Discovery Requests specify a time period which is excessive in light of the issues raised by Plaintiff's Complaint, the University objects to each such request on the ground that it is overbroad and seeks information which is not relevant to any issue properly before the Court nor reasonably calculated to lead to the discovery of admissible evidence.

2

## INTERROGATORIES

1.    Identify each part of Plaintiff's Website which UD contends, pursuant to its Fourth Affirmative Defense, was not protected by the First Amendment, and as to each part state the factual and legal basis or bases of UD's contention that such part is not or was not protected by the First Amendment.

**ANSWER:    The University objects to this request as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  By way of further response, those statements from Plaintiff's website that were referenced at the Student Judicial Hearing and contained material that could be reasonably viewed as a threat are not protected by the First Amendment.**

2.    Identify each instance since 1980 where a UD student was found guilty solely of a charge of Failure to Comply (without identifying the identity of the student), and as to each such instance state what discipline was imposed.

**ANSWER:    The University objects to this request as overly broad and unduly burdensome as it would require the University to search twenty-seven years of disciplinary records and would further cause the University to review and redact said documents containing information protected from disclosure by State or Federal law.**

3.    State what factors are supposed to be considered whenever deciding whether or not to suspend a UD student.

**ANSWER:** *See* **The    University    Guide    to    Student    Policies, http://www.udel.edu/stuguide/07-08/disciplinary.html, for information about sanctions that may be imposed.  By way of further response, a hearing officer may naturally take into account the seriousness of the violation, those who were or may have been affected by the**

3

violation and the extent to which the student has prior disciplinary history at the University.

    4.     Identify any written statement of policy discussing the factors listed in UD's response to Interrogatory 3.

**ANSWER:** *See* **The** **University** **Guide** **to** **Student** **Policies,** **http://www.udel.edu/stuguide/07-08/disciplinary.html.**

    5.     State the reason(s) why Plaintiff was not permitted to return to his dormitory after he produced a letter from a mental health professional stating that he was not a threat to himself or others.

**ANSWER:** **The letter provided to the University by Mr. Murakowski and purporting to confirm that he was not a danger to himself or others left some question about whether the psychologist had reviewed all of the material that the University found disturbing. The University therefore contacted the psychologist to confirm what materials he had reviewed, and the psychologist confirmed that he had only reviewed those materials furnished to him by Mr. Murakowski. Concerned that those materials might not have given him the complete picture, the University offered to provide other material from Mr. Murakowski's website. Before that process could be completed, however, the University learned that Mr. Murakowski had violated the instruction to remain out of his dormitory and he was placed on emergency suspension from the residence halls pending the outcome of the Student Judicial hearing. Shortly thereafter, Mr. Murakowski agreed to commute for the remainder of the semester.**

4

6.     State why, after being told that he could not return to his dormitory until he presented a letter from a mental health professional that indicated that he was not a threat to himself and others, Plaintiff was then granted permission to return to his dormitory one time.

**ANSWER:     Plaintiff was permitted only to return to his dormitory to collect items he would need in the immediate future.  The University understands there may be items a student needs from his or her dormitory room and routinely allows students who have been temporarily removed from the dormitory to collect such items.  While supervision of the student during that time is important, Plaintiff was accompanied to the April 20 meeting with his father, a University employee, who had been contacted by the University and was specifically asked to bring Mr. Murakowski to the meeting.  The University reasonably determined that the risk of the destructive and dangerous behavior raised by his frightening postings was minimal given the required presence of his father, a University employee.**

7.     Why didn't UD have someone escort Plaintiff to his dormitory after granting him permission to go to his dormitory?

**ANSWER:     Plaintiff was accompanied by his father, a University employee.**

8.     Why was Plaintiff permitted to remain on the UD campus while being denied access to his dormitory?

**ANSWER:     The complaints and concerns about Mr. Murakowski had emanated from those in his dormitory, and the restrictions imposed appropriately balanced the safety of those in Mr. Murakowski's dormitory with the stated desire by Mr. Murakowski to attend classes.**

5

9.    Did any member of the UD administration ask Plaintiff to remove any text from his website prior to charging him with disciplinary offenses?

**ANSWER:    The University does not have current knowledge that anyone asked that he remove any materials from his website prior to the events giving rise to the disciplinary charges.**

10.    If the answer to Interrogatory 9 is "no," why not?

**ANSWER:    Mr. Murakowski was disciplined for his conduct and for the threats reasonably perceived by those viewing his posted materials.    Whether or not Mr. Murakowski removed that material after the fact would not have altered the facts giving rise to his disciplinary charges.  In addition, Murakowski's frightening postings were taken down from his dormitory door.**

11.    Did UD make any effort to shut down Plaintiff's website?

**ANSWER:    Mr. Murakowski apparently removed the materials himself.**

12.    If the answer to Interrogatory 11 is "no," why not?

**ANSWER:    See response to Interrogatory No. 11.**

13.    Identify any written policy or policies which authorizes UD to prevent a student from  entering his or her dormitory after that student has produced a letter from a mental health professional stating that he was not a threat to himself or others.

**ANSWER:    See response to Interrogatory No. 5.   By way of further response, see http://www.udel.edu/stuguide/07-08/disciplinary.html.**

14.    List all training Cynthia E. Cummings has had in psychology and/or psychiatry.

**ANSWER:    Objection to the extent that this Interrogatory presupposes that Ms. Cummings was purporting to act as a psychologist or psychiatrist. To the contrary, Ms.**

6

Cummings worked, at all times, in consultation with University staff psychologists. By way of further response, Ms. Cummings took the following courses at Indiana University: Introduction to Psychology; Child Psychology; Abnormal Psychology; Counseling Theory; Counseling Methods; and Group Counseling.

15.    State the name and last known address, telephone number and e-mail address of each and every individual who is known to UD to have registered a complaint about Plaintiff's Website prior to May 2, 2007, and as to each person state the specific nature and terms of their complaint(s).

**ANSWER:    The University objects to this request as not reasonably calculated to lead to the discovery of admissible evidence. Further, the University has a policy pursuant to which it will frequently withhold the names of students who have expressed fear or concern about the conduct of another student. If this information has any potential to lead to the discovery of relevant information in this case, that potential is outweighed by the University's duty to protect its students. Moreover, the release of this information is barred by the Family Educational Rights & Privacy Act ("FERPA").**

16.    State the name and last known address, telephone number and e-mail address of each individual who is known to UD to have investigated any complaint identified in response to Interrogatory 15.

**ANSWER:    1.    University of Delaware Department of Public Safety personnel, who may be contacted through undersigned counsel;**

**2.    Cynthia Cummings, who may be contacted through undersigned counsel;**

**3.    Holli Harvey, who may be contacted through undersigned counsel.**

7

17.     State whether there was any disorder or disruption on or off the UD campus which UD claims resulted from Plaintiff's Website and, if so, describe such disorder, the date(s), the location(s), and the party or parties involved.

**ANSWER:    Thankfully, there was no "disorder or disruption" beyond that described at the Student Judicial Hearing.**

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.     The recording of the hearing on May 2, 2007, identified in paragraphs 21 and 24 of the Answer.

**RESPONSE: A copy of the recording will be produced.**

2.     Any and all documents relating or referring to Plaintiff and/or his Website.

**RESPONSE: The University objects to this request as overly broad and unduly burdensome inasmuch as Mr. Murakowski is a student at the University and any number of offices or departments may have documents "relating or referring" to him.  Moreover, the University objects to the extent this request seeks documents which are protected by the attorney-client privilege or the attorney work product doctrine.  By way of further response, all relevant, non-privileged documents in the University's possession will be produced.**

3.     Any and all documents relating or referring to, or embodying communications about, Plaintiff and/or his Website, including, without limitation, any complaints registered about Plaintiff and/or his Website.

**RESPONSE: The University objects to this request as overly broad and unduly burdensome inasmuch as Mr. Murakowski is a student at the University and any number of offices or departments may have documents "relating or referring" to him.  Moreover,**

8

the University objects to the extent this request seeks documents which are protected by the attorney-client privilege or the attorney work product doctrine. **Further, the University has a policy pursuant to which it will frequently withhold the names of students who have expressed fear or concern about the conduct of another student. If this information has any potential to lead to the discovery of relevant information in this case, that potential is outweighed by the University's duty to protect its students. Moreover, the release of this information is barred by the Family Educational Rights & Privacy Act ("FERPA"). All other responsive, non-privileged documents will be produced.**

BUCHANAN INGERSOLL & ROONEY

William E. Manning, Esquire (#697)
James D. Taylor, Jr., Esquire (#4009)
Jennifer M. Becnel-Guzzo, Esquire (#4492)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801
(302) 552-4200
(302) 552-4295 (facsimile)
william.manning@bipc.com
james.taylor@bipc.com
jennifer.becnelguzzo@bipc.com
*Attorneys for the University of Delaware*

November 16, 2007

9

# Exhibit K



# U.S. Department of Labor
**Bureau of Labor Statistics**
*Occupational Outlook Handbook*

**www.bls.gov**



Search the *Handbook* [_____] GO

BLS Home | OOH Home | Frequently Asked Questions | A-Z Index | Contact Us

Printer-friendly version (**HTML**) (**PDF**)

## Engineers

- **Nature of the Work**
- **Training, Other Qualifications, and Advancement**
- **Employment**
- **Job Outlook**
- **Projections Data**
- **Earnings**
- **OES Data**
- **Related Occupations**
- **Sources of Additional Information**

**SIGNIFICANT POINTS**

- Overall job opportunities in engineering are expected to be good, but will vary by specialty.
- A bachelor's degree in engineering is required for most entry-level jobs.
- Starting salaries are among the highest of all college graduates.
- Continuing education is critical for engineers as technology evolves.

**NATURE OF THE WORK**          [**About this section**]          ⬆ **Back to Top**

Engineers apply the principles of science and mathematics to develop economical solutions to technical problems. Their work is the link between scientific discoveries and the commercial applications that meet societal and consumer needs.

Many engineers develop new products. During this process, they consider several factors. For example, in developing an industrial robot, engineers precisely specify the functional requirements; design and test the robot's components; integrate the components to produce the final design; and evaluate the design's overall effectiveness, cost, reliability, and safety. This process applies to the development of many different products, such as chemicals, computers, power plants, helicopters, and toys.

In addition to design and development, many engineers work in testing, production, or maintenance. These engineers supervise production in factories, determine the causes of component failure, and test manufactured products to maintain quality. They also estimate the time and cost to complete projects. Supervisory engineers are responsible for major components or entire projects. (See the statement on **engineering and natural sciences managers** elsewhere in the *Handbook*.)

Engineers use computers extensively to produce and analyze designs; to simulate and test how a machine, structure, or system operates; to generate specifications for parts; and to monitor product quality and control process efficiency. Nanotechnology, which involves the creation of high-performance materials and components by integrating atoms and molecules, also is introducing entirely new principles to the design process.

Most engineers specialize. Following are details on the 17 engineering specialties covered in the Federal Government's Standard Occupational Classification (SOC) system. Numerous other specialties are recognized by professional societies, and each of the major branches of engineering has numerous subdivisions. Civil engineering, for example, includes structural and transportation engineering, and materials engineering includes ceramic, metallurgical, and polymer engineering. Engineers also may specialize in one industry, such as motor vehicles, or in one type of technology, such as turbines or semiconductor materials.

**Occupations:**
Management
Professional
Service
Sales
Administrative
Farming
Construction
Installation
Production
Transportation
Armed Forces

**Related Links:**
Tomorrow's Jobs
OOH Reprints
Important Info
How to Order a Copy
Teacher's Guide to OOH

**Additional Links:**
Career Guide to Industries
Career articles from the OOQ
Employment Projections
Publications Home
BLS Home

**Aerospace engineers** design, develop, and test aircraft, spacecraft, and missiles and supervise the manufacture of these products. Those who work with aircraft are called *aeronautical engineers,* and those working specifically with spacecraft are *astronautical engineers.* Aerospace engineers develop new technologies for use in aviation, defense systems, and space exploration, often specializing in areas such as structural design, guidance, navigation and control, instrumentation and communication, or production methods. They also may specialize in a particular type of aerospace product, such as commercial aircraft, military fighter jets, helicopters, spacecraft, or missiles and rockets, and may become experts in aerodynamics, thermodynamics, celestial mechanics, propulsion, acoustics, or guidance and control systems.

**Agricultural engineers** apply knowledge of engineering technology and science to agriculture and the efficient use of biological resources. Because of this, they are also referred to as *biological and agricultural engineers.* They design agricultural machinery, equipment, sensors, processes, and structures, such as those used for crop storage. Some engineers specialize in areas such as power systems and machinery design; structures and environment engineering: and food and bioprocess engineering. They develop ways to conserve soil and water and to improve the processing of agricultural products. Agricultural engineers often work in research and development, production, sales, or management.

**Biomedical engineers** develop devices and procedures that solve medical and health-related problems by combining their knowledge of biology and medicine with engineering principles and practices. Many do research, along with life scientists, chemists, and medical scientists, to develop and evaluate systems and products such as artificial organs, prostheses (artificial devices that replace missing body parts), instrumentation, medical information systems, and health management and care delivery systems. Biomedical engineers may also design devices used in various medical procedures, imaging systems such as magnetic resonance imaging (MRI), and devices for automating insulin injections or controlling body functions. Most engineers in this specialty need a sound background in another engineering specialty, such as mechanical or electronics engineering, in addition to specialized biomedical training. Some specialties within biomedical engineering include biomaterials, biomechanics, medical imaging, rehabilitation engineering, and orthopedic engineering.

**Chemical engineers** apply the principles of chemistry to solve problems involving the production or use of chemicals and biochemicals. They design equipment and processes for large-scale chemical manufacturing, plan and test methods of manufacturing products and treating byproducts, and supervise production. Chemical engineers also work in a variety of manufacturing industries other than chemical manufacturing, such as those producing energy, electronics, food, clothing, and paper. They also work in health care, biotechnology, and business services. Chemical engineers apply principles of physics, mathematics, and mechanical and electrical engineering, as well as chemistry. Some may specialize in a particular chemical process, such as oxidation or polymerization. Others specialize in a particular field, such as nanomaterials, or in the development of specific products. They must be aware of all aspects of chemicals manufacturing and how the manufacturing process affects the environment and the safety of workers and consumers.

**Civil engineers** design and supervise the construction of roads, buildings, airports, tunnels, dams, bridges, and water supply and sewage systems. They must consider many factors in the design process, from the construction costs and expected lifetime of a project to government regulations and potential environmental hazards such as earthquakes and hurricanes. Civil engineering, considered one of the oldest engineering disciplines, encompasses many specialties. The major ones are structural, water resources, construction, environmental, transportation, and geotechnical engineering. Many civil engineers hold supervisory or administrative positions, from supervisor of a construction site to city engineer. Others may work in design, construction, research, and teaching.

**Computer hardware engineers** research, design, develop, test, and oversee the manufacture and installation of computer hardware. Hardware includes computer chips, circuit boards, computer systems, and related equipment such as keyboards, modems, and printers. (**Computer software engineers**—often simply called computer engineers— design and develop the software systems that control computers. These workers are covered elsewhere in the *Handbook*.) The work of computer hardware engineers is very similar to that of electronics engineers in that they may design and test circuits and other electronic components, but computer hardware engineers do that work only as it relates to computers and computer-related equipment. The rapid advances in computer technology

are largely a result of the research, development, and design efforts of these engineers.

**Electrical engineers** design, develop, test, and supervise the manufacture of electrical equipment. Some of this equipment includes electric motors; machinery controls, lighting, and wiring in buildings; automobiles; aircraft; radar and navigation systems; and power generation, control, and transmission devices used by electric utilities. Although the terms electrical and electronics engineering often are used interchangeably in academia and industry, electrical engineers have traditionally focused on the generation and supply of power, whereas electronics engineers have worked on applications of electricity to control systems or signal processing. Electrical engineers specialize in areas such as power systems engineering or electrical equipment manufacturing.

**Electronics engineers, except computer** are responsible for a wide range of technologies, from portable music players to the global positioning system (GPS), which can continuously provide the location, for example, of a vehicle. Electronics engineers design, develop, test, and supervise the manufacture of electronic equipment such as broadcast and communications systems. Many electronics engineers also work in areas closely related to computers. However, engineers whose work is related exclusively to computer hardware are considered computer hardware engineers. Electronics engineers specialize in areas such as communications, signal processing, and control systems or have a specialty within one of these areas—control systems or aviation electronics, for example.

**Environmental engineers** develop solutions to environmental problems using the principles of biology and chemistry. They are involved in water and air pollution control, recycling, waste disposal, and public health issues. Environmental engineers conduct hazardous-waste management studies in which they evaluate the significance of the hazard, advise on treatment and containment, and develop regulations to prevent mishaps. They design municipal water supply and industrial wastewater treatment systems. They conduct research on the environmental impact of proposed construction projects, analyze scientific data, and perform quality-control checks. Environmental engineers are concerned with local and worldwide environmental issues. They study and attempt to minimize the effects of acid rain, global warming, automobile emissions, and ozone depletion. They may also be involved in the protection of wildlife. Many environmental engineers work as consultants, helping their clients to comply with regulations, to prevent environmental damage, and to clean up hazardous sites.

**Health and safety engineers, except mining safety engineers and inspectors** prevent harm to people and property by applying knowledge of systems engineering and mechanical, chemical, and human performance principles. Using this specialized knowledge, they identify and measure potential hazards, such as the risk of fires or the dangers involved in handling of toxic chemicals. They recommend appropriate loss prevention measures according to the probability of harm and potential damage. Health and safety engineers develop procedures and designs to reduce the risk of illness, injury, or damage. Some work in manufacturing industries to ensure the designs of new products do not create unnecessary hazards. They must be able to anticipate, recognize, and evaluate hazardous conditions, as well as develop hazard control methods.

**Industrial engineers** determine the most effective ways to use the basic factors of production—people, machines, materials, information, and energy—to make a product or provide a service. They are primarily concerned with increasing productivity through the management of people, methods of business organization, and technology. To maximize efficiency, industrial engineers carefully study the product requirements and design manufacturing and information systems to meet those requirements with the help of mathematical methods and models. They develop management control systems to aid in financial planning and cost analysis, and design production planning and control systems to coordinate activities and ensure product quality. They also design or improve systems for the physical distribution of goods and services and determine the most efficient plant locations. Industrial engineers develop wage and salary administration systems and job evaluation programs. Many industrial engineers move into management positions because the work is closely related to the work of managers.

**Marine engineers and naval architects** are involved in the design, construction, and maintenance of ships, boats, and related equipment. They design and supervise the construction of everything from aircraft carriers to submarines, and from sailboats to tankers. Naval architects work on the basic design of ships, including hull form and stability.

Marine engineers work on the propulsion, steering, and other systems of ships. Marine engineers and naval architects apply knowledge from a range of fields to the entire design and production process of all water vehicles. Other workers who operate or supervise the operation of marine machinery on ships and other vessels sometimes may be called marine engineers or, more frequently, ship engineers, but they do different work and are covered under **water transportation occupations** elsewhere in the *Handbook*.

**Materials engineers** are involved in the development, processing, and testing of the materials used to create a range of products, from computer chips and aircraft wings to golf clubs and snow skis. They work with metals, ceramics, plastics, semiconductors, and composites to create new materials that meet certain mechanical, electrical, and chemical requirements. They also are involved in selecting materials for new applications. Materials engineers have developed the ability to create and then study materials at an atomic level, using advanced processes to replicate the characteristics of materials and their components with computers. Most materials engineers specialize in a particular material. For example, metallurgical engineers specialize in metals such as steel, and ceramic engineers develop ceramic materials and the processes for making them into useful products such as glassware or fiber optic communication lines.

**Mechanical engineers** research, design, develop, manufacture, and test tools, engines, machines, and other mechanical devices. Mechanical engineering is one of the broadest engineering disciplines. Engineers in this discipline work on power-producing machines such as electric generators, internal combustion engines, and steam and gas turbines. They also work on power-using machines such as refrigeration and air-conditioning equipment, machine tools, material handling systems, elevators and escalators, industrial production equipment, and robots used in manufacturing. Mechanical engineers also design tools that other engineers need for their work. In addition, mechanical engineers work in manufacturing or agriculture production, maintenance, or technical sales; many become administrators or managers.

**Mining and geological engineers, including mining safety engineers** find, extract, and prepare coal, metals, and minerals for use by manufacturing industries and utilities. They design open-pit and underground mines, supervise the construction of mine shafts and tunnels in underground operations, and devise methods for transporting minerals to processing plants. Mining engineers are responsible for the safe, economical, and environmentally sound operation of mines. Some mining engineers work with geologists and metallurgical engineers to locate and appraise new ore deposits. Others develop new mining equipment or direct mineral-processing operations that separate minerals from the dirt, rock, and other materials with which they are mixed. Mining engineers frequently specialize in the mining of one mineral or metal, such as coal or gold. With increased emphasis on protecting the environment, many mining engineers work to solve problems related to land reclamation and water and air pollution. Mining safety engineers use their knowledge of mine design and practices to ensure the safety of workers and to comply with State and Federal safety regulations. They inspect walls and roof surfaces, monitor air quality, and examine mining equipment for compliance with safety practices.

**Nuclear engineers** research and develop the processes, instruments, and systems used to derive benefits from nuclear energy and radiation. They design, develop, monitor, and operate nuclear plants to generate power. They may work on the nuclear fuel cycle—the production, handling, and use of nuclear fuel and the safe disposal of waste produced by the generation of nuclear energy—or on the development of fusion energy. Some specialize in the development of nuclear power sources for naval vessels or spacecraft; others find industrial and medical uses for radioactive materials, as in equipment used to diagnose and treat medical problems.

**Petroleum engineers** search the world for reservoirs containing oil or natural gas. Once these resources are discovered, petroleum engineers work with geologists and other specialists to understand the geologic formation and properties of the rock containing the reservoir, determine the drilling methods to be used, and monitor drilling and production operations. They design equipment and processes to achieve the maximum profitable recovery of oil and gas. Because only a small proportion of oil and gas in a reservoir flows out under natural forces, petroleum engineers develop and use various enhanced recovery methods. These include injecting water, chemicals, gases, or steam into an oil reservoir to force out more of the oil and doing computer-controlled drilling or fracturing to connect a larger area of a reservoir to a single well. Because even the best techniques in use today recover only a portion of the oil and gas in a reservoir, petroleum engineers research and

develop technology and methods to increase recovery and lower the cost of drilling and
production operations.

***Work environment.*** Most engineers work in office buildings, laboratories, or industrial
plants. Others may spend time outdoors at construction sites and oil and gas exploration
and production sites, where they monitor or direct operations or solve onsite problems.
Some engineers travel extensively to plants or worksites here and abroad.

Many engineers work a standard 40-hour week. At times, deadlines or design standards
may bring extra pressure to a job, requiring engineers to work longer hours.


**TRAINING, OTHER
QUALIFICATIONS, AND
ADVANCEMENT**                    [About this section]               Back to Top

Engineers typically enter the occupation with a bachelor's degree in an engineering
specialty, but some basic research positions may require a graduate degree. Engineers
offering their services directly to the public must be licensed. Continuing education to keep
current with rapidly changing technology is important for engineers.

***Education and training.*** A bachelor's degree in engineering is required for almost all
entry-level engineering jobs. College graduates with a degree in a natural science or
mathematics occasionally may qualify for some engineering jobs, especially in specialties in
high demand. Most engineering degrees are granted in electrical, electronics, mechanical,
or civil engineering. However, engineers trained in one branch may work in related
branches. For example, many aerospace engineers have training in mechanical engineering.
This flexibility allows employers to meet staffing needs in new technologies and specialties
in which engineers may be in short supply. It also allows engineers to shift to fields with
better employment prospects or to those that more closely match their interests.

Most engineering programs involve a concentration of study in an engineering specialty,
along with courses in both mathematics and the physical and life sciences. Many programs
also include courses in general engineering. A design course, sometimes accompanied by a
computer or laboratory class or both, is part of the curriculum of most programs. General
courses not directly related to engineering, such as those in the social sciences or
humanities, are also often required.

In addition to the standard engineering degree, many colleges offer 2-year or 4-year degree
programs in engineering technology. These programs, which usually include various hands-
on laboratory classes that focus on current issues in the application of engineering
principles, prepare students for practical design and production work, rather than for jobs
that require more theoretical and scientific knowledge. Graduates of 4-year technology
programs may get jobs similar to those obtained by graduates with a bachelor's degree in
engineering. Engineering technology graduates, however, are not qualified to register as
professional engineers under the same terms as graduates with degrees in engineering.
Some employers regard technology program graduates as having skills between those of a
technician and an engineer.

Graduate training is essential for engineering faculty positions and many research and
development programs, but is not required for the majority of entry-level engineering jobs.
Many experienced engineers obtain graduate degrees in engineering or business
administration to learn new technology and broaden their education. Many high-level
executives in government and industry began their careers as engineers.

About 1,830 programs at colleges and universities offer bachelor's degrees in engineering
that are accredited by the Accreditation Board for Engineering and Technology (ABET), Inc.,
and there are another 710 accredited programs in engineering technology. ABET
accreditation is based on a program's faculty, curriculum, and facilities; the achievement of
a program's students; program improvements; and institutional commitment to specific
principles of quality and ethics. Although most institutions offer programs in the major
branches of engineering, only a few offer programs in the smaller specialties. Also,
programs of the same title may vary in content. For example, some programs emphasize
industrial practices, preparing students for a job in industry, whereas others are more

theoretical and are designed to prepare students for graduate work. Therefore, students should investigate curriculums and check accreditations carefully before selecting a college.

Admissions requirements for undergraduate engineering schools include a solid background in mathematics (algebra, geometry, trigonometry, and calculus) and science (biology, chemistry, and physics), with courses in English, social studies, and humanities. Bachelor's degree programs in engineering typically are designed to last 4 years, but many students find that it takes between 4 and 5 years to complete their studies. In a typical 4-year college curriculum, the first 2 years are spent studying mathematics, basic sciences, introductory engineering, humanities, and social sciences. In the last 2 years, most courses are in engineering, usually with a concentration in one specialty. Some programs offer a general engineering curriculum; students then specialize on the job or in graduate school.

Some engineering schools have agreements with 2-year colleges whereby the college provides the initial engineering education, and the engineering school automatically admits students for their last 2 years. In addition, a few engineering schools have arrangements that allow students who spend 3 years in a liberal arts college studying pre-engineering subjects and 2 years in an engineering school studying core subjects to receive a bachelor's degree from each school. Some colleges and universities offer 5-year master's degree programs. Some 5-year or even 6-year cooperative plans combine classroom study and practical work, permitting students to gain valuable experience and to finance part of their education.

**Licensure.** All 50 States and the District of Columbia require licensure for engineers who offer their services directly to the public. Engineers who are licensed are called professional engineers (PE). This licensure generally requires a degree from an ABET-accredited engineering program, 4 years of relevant work experience, and successful completion of a State examination. Recent graduates can start the licensing process by taking the examination in two stages. The initial Fundamentals of Engineering (FE) examination can be taken upon graduation. Engineers who pass this examination commonly are called engineers in training (EIT) or engineer interns (EI). After acquiring suitable work experience, EITs can take the second examination, the Principles and Practice of Engineering exam. Several States have imposed mandatory continuing education requirements for relicensure. Most States recognize licensure from other States, provided that the manner in which the initial license was obtained meets or exceeds their own licensure requirements. Many civil, electrical, mechanical, and chemical engineers are licensed PEs. Independent of licensure, various certification programs are offered by professional organizations to demonstrate competency in specific fields of engineering.

**Other qualifications.** Engineers should be creative, inquisitive, analytical, and detail oriented. They should be able to work as part of a team and to communicate well, both orally and in writing. Communication abilities are becoming increasingly important as engineers frequently interact with specialists in a wide range of fields outside engineering.

**Certification and advancement.** Beginning engineering graduates usually work under the supervision of experienced engineers and, in large companies, also may receive formal classroom or seminar-type training. As new engineers gain knowledge and experience, they are assigned more difficult projects with greater independence to develop designs, solve problems, and make decisions. Engineers may advance to become technical specialists or to supervise a staff or team of engineers and technicians. Some may eventually become engineering managers or enter other managerial or sales jobs. In sales, an engineering background enables them to discuss a product's technical aspects and assist in product planning, installation, and use. (See the statements under management and business and financial operations occupations, and the statement on **sales engineers** elsewhere in the *Handbook*.)

Numerous professional certifications for engineers exist and may be beneficial for advancement to senior technical or managerial positions. Many certification programs are offered by the professional societies listed as sources of additional information for engineering specialties at the end of this statement.

**EMPLOYMENT**                    **[About this section]**        🔺 **Back to Top**

In 2006, engineers held about 1.5 million jobs. The distribution of employment by engineering specialty follows:

| Specialty | Jobs |
|---|---|
| Civil engineers | 256,000 |
| Mechanical engineers | 227,000 |
| Industrial engineers | 201,000 |
| Electrical engineers | 153,000 |
| Electronics engineers, except computer | 138,000 |
| Aerospace engineers | 90,000 |
| Computer hardware engineers | 79,000 |
| Environmental engineers | 54,000 |
| Chemical engineers | 30,000 |
| Health and safety engineers, except mining safety engineers and inspectors | 25,000 |
| Materials engineers | 22,000 |
| Petroleum engineers | 17,000 |
| Nuclear engineers | 15,000 |
| Biomedical engineers | 14,000 |
| Marine engineers and naval architects | 9,200 |
| Mining and geological engineers, including mining safety engineers | 7,100 |
| Agricultural engineers | 3,100 |
| All other engineers | 170,000 |

About 37 percent of engineering jobs were found in manufacturing industries and another 28 percent were in the professional, scientific, and technical services sector, primarily in architectural, engineering, and related services. Many engineers also worked in the construction, telecommunications, and wholesale trade industries.

Federal, State, and local governments employed about 12 percent of engineers in 2006. About half of these were in the Federal Government, mainly in the U.S. Departments of Defense, Transportation, Agriculture, Interior, and Energy, and in the National Aeronautics and Space Administration. Most engineers in State and local government agencies worked in highway and public works departments. In 2006, about 3 percent of engineers were self-employed, many as consultants.

Engineers are employed in every State, in small and large cities and in rural areas. Some branches of engineering are concentrated in particular industries and geographic areas—for example, petroleum engineering jobs tend to be located in areas with sizable petroleum deposits, such as Texas, Louisiana, Oklahoma, Alaska, and California. Others, such as civil engineering, are widely dispersed, and engineers in these fields often move from place to place to work on different projects.

Engineers are employed in every major industry. The industries employing the most engineers in each specialty are given in table 1, along with the percent of occupational employment in the industry.

**Table 1. Percent concentration of engineering specialty employment in key industries, 2006**

| Specialty | Industry | Percent |
|---|---|---|
| **Aerospace engineers** | Aerospace product and parts manufacturing | 49 |
| **Agricultural engineers** | Food manufacturing | 25 |
| | Architectural, engineering, and related services | 15 |
| **Biomedical engineers** | Medical equipment and supplies manufacturing | 20 |
| | Scientific research and development services | 20 |

| Chemical engineers | Chemical manufacturing | 29 |
|---|---|---|
| | Architectural, engineering, and related services | 15 |
| Civil engineers | Architectural, engineering, and related services | 49 |
| Computer hardware engineers | Computer and electronic product manufacturing | 41 |
| | Computer systems design and related services | 19 |
| Electrical engineers | Architectural, engineering, and related services | 21 |
| Electronics engineers, except computer | Computer and electronic product manufacturing | 26 |
| | Telecommunications | 15 |
| Environmental engineers | Architectural, engineering, and related services | 29 |
| | State and local government | 21 |
| Health and safety engineers, except mining safety engineers and inspectors | State and local government | 10 |
| Industrial engineers | Transportation equipment manufacturing | 18 |
| | Machinery manufacturing | 8 |
| Marine engineers and naval architects | Architectural, engineering, and related services | 29 |
| Materials engineers | Primary metal manufacturing | 11 |
| | Semiconductor and other electronic component manufacturing | 9 |
| Mechanical engineers | Architectural, engineering, and related services | 22 |
| | Transportation equipment manufacturing | 14 |
| Mining and geological engineers, including mining safety engineers | Mining | 58 |
| Nuclear engineers | Research and development in the physical, engineering, and life sciences | 30 |
| | Electric power generation, transmission and distribution | 27 |
| Petroleum engineers | Oil and gas extraction | 43 |

**JOB OUTLOOK**          [**About this section**]           Back to Top

Employment of engineers is expected to grow about as fast as the average for all occupations over the next decade, but growth will vary by specialty. Environmental engineers should experience the fastest growth, while civil engineers should see the largest employment increase. Overall job opportunities in engineering are expected to be good.

***Overall employment change.*** Overall engineering employment is expected to grow by 11 percent over the 2006-16 decade, **about as fast as the average** for all occupations. Engineers have traditionally been concentrated in slower growing or declining manufacturing industries, in which they will continue to be needed to design, build, test, and improve manufactured products. However, increasing employment of engineers in faster growing service industries should generate most of the employment growth. Job outlook varies by engineering specialty, as discussed later.

Competitive pressures and advancing technology will force companies to improve and update product designs and to optimize their manufacturing processes. Employers will rely on engineers to increase productivity and expand output of goods and services. New technologies continue to improve the design process, enabling engineers to produce and analyze various product designs much more rapidly than in the past. Unlike in some other occupations, however, technological advances are not expected to substantially limit employment opportunities in engineering because engineers will continue to develop new products and processes that increase productivity.

Offshoring of engineering work will likely dampen domestic employment growth to some degree. There are many well-trained, often English-speaking engineers available around the world willing to work at much lower salaries than U.S. engineers. The rise of the Internet has made it relatively easy for part of the engineering work previously done by engineers in this country to be done by engineers in other countries, a factor that will tend to hold down employment growth. Even so, there will always be a need for onsite engineers to interact with other employees and clients.

**Overall job outlook.** Overall job opportunities in engineering are expected to be **good** because the number of engineering graduates should be in rough balance with the number of job openings between 2006 and 2016. In addition to openings from job growth, many openings will be created by the need to replace current engineers who retire; transfer to management, sales, or other occupations; or leave engineering for other reasons.

Many engineers work on long-term research and development projects or in other activities that continue even during economic slowdowns. In industries such as electronics and aerospace, however, large cutbacks in defense expenditures and in government funding for research and development have resulted in significant layoffs of engineers in the past. The trend toward contracting for engineering work with engineering services firms, both domestic and foreign, has also made engineers more vulnerable to layoffs during periods of lower demand.

It is important for engineers, as it is for workers in other technical and scientific occupations, to continue their education throughout their careers because much of their value to their employer depends on their knowledge of the latest technology. Engineers in high-technology areas, such as biotechnology or information technology, may find that technical knowledge becomes outdated rapidly. By keeping current in their field, engineers are able to deliver the best solutions and greatest value to their employers. Engineers who have not kept current in their field may find themselves at a disadvantage when seeking promotions or during layoffs.

**Employment change and job outlook by engineering specialty.**

**Aerospace engineers** are expected to have 10 percent growth in employment over the projections decade, **about as fast as the average** for all occupations. Increases in the number and scope of military aerospace projects likely will generate new jobs. In addition, new technologies expected to be used on commercial aircraft produced during the next decade should spur demand for aerospace engineers. The employment outlook for aerospace engineers appears favorable. The number of degrees granted in aerospace engineering has declined for many years because of a perceived lack of opportunities in this field. Although this trend has reversed, new graduates continue to be needed to replace aerospace engineers who retire or leave the occupation for other reasons.

**Agricultural engineers** are expected to have employment growth of 9 percent over the projections decade, **about as fast as the average** for all occupations. More engineers will be needed to meet the increasing demand for using biosensors to determine the optimal treatment of crops. Employment growth should also result from the need to increase crop yields to feed an expanding population and produce crops used as renewable energy sources. Moreover, engineers will be needed to develop more efficient agricultural production and conserve resources.

**Biomedical engineers** are expected to have 21 percent employment growth over the projections decade, **much faster than the average** for all occupations. The aging of the population and the focus on health issues will drive demand for better medical devices and equipment designed by biomedical engineers. Along with the demand for more sophisticated medical equipment and procedures, an increased concern for cost-

effectiveness will boost demand for biomedical engineers, particularly in pharmaceutical manufacturing and related industries. However, because of the growing interest in this field, the number of degrees granted in biomedical engineering has increased greatly. Biomedical engineers, particularly those with only a bachelor's degree, may face competition for jobs. Unlike many other engineering specialties, a graduate degree is recommended or required for many entry-level jobs.

**Chemical engineers** are expected to have employment growth of 8 percent over the projections decade, **about as fast as the average** for all occupations. Although overall employment in the chemical manufacturing industry is expected to decline, chemical companies will continue to research and develop new chemicals and more efficient processes to increase output of existing chemicals. Among manufacturing industries, pharmaceuticals may provide the best opportunities for jobseekers. However, most employment growth for chemical engineers will be in service-providing industries such as professional, scientific, and technical services, particularly for research in energy and the developing fields of biotechnology and nanotechnology.

**Civil engineers** are expected to experience 18 percent employment growth during the projections decade, **faster than the average** for all occupations. Spurred by general population growth and the related need to improve the Nation's infrastructure, more civil engineers will be needed to design and construct or expand transportation, water supply, and pollution control systems and buildings and building complexes. They also will be needed to repair or replace existing roads, bridges, and other public structures. Because construction industries and architectural, engineering and related services employ many civil engineers, employment opportunities will vary by geographic area and may decrease during economic slowdowns, when construction is often curtailed.

**Computer hardware engineers** are expected to have 5 percent employment growth over the projections decade, **slower than the average** for all occupations. Although the use of information technology continues to expand rapidly, the manufacture of computer hardware is expected to be adversely affected by intense foreign competition. As computer and semiconductor manufacturers contract out more of their engineering needs to both domestic and foreign design firms, much of the growth in employment of hardware engineers is expected in the computer systems design and related services industry.

**Electrical engineers** are expected to have employment growth of 6 percent over the projections decade, **slower than the average** for all occupations. Although strong demand for electrical devices—including electric power generators, wireless phone transmitters, high-density batteries, and navigation systems—should spur job growth, international competition and the use of engineering services performed in other countries will limit employment growth. Electrical engineers working in firms providing engineering expertise and design services to manufacturers should have better job prospects.

**Electronics engineers, except computer** are expected to have employment growth of 4 percent during the projections decade, **slower than the average** for all occupations. Although rising demand for electronic goods—including communications equipment, defense-related equipment, medical electronics, and consumer products—should continue to increase demand for electronics engineers, foreign competition in electronic products development and the use of engineering services performed in other countries will limit employment growth. Growth is expected to be fastest in service-providing industries— particularly in firms that provide engineering and design services.

**Environmental engineers** should have employment growth of 25 percent during the projections decade, **much faster than the average** for all occupations. More environmental engineers will be needed to comply with environmental regulations and to develop methods of cleaning up existing hazards. A shift in emphasis toward preventing problems rather than controlling those that already exist, as well as increasing public health concerns resulting from population growth, also are expected to spur demand for environmental engineers. Because of this employment growth, job opportunities should be good even as more students earn degrees. Even though employment of environmental engineers should be less affected by economic conditions than most other types of engineers, a significant economic downturn could reduce the emphasis on environmental protection, reducing job opportunities.

**Health and safety engineers, except mining safety engineers and inspectors** are

projected to experience 10 percent employment growth over the projections decade, **about as fast as the average** for all occupations. Because health and safety engineers make production processes and products as safe as possible, their services should be in demand as concern increases for health and safety within work environments. As new technologies for production or processing are developed, health and safety engineers will be needed to ensure that they are safe.

**Industrial engineers** are expected to have employment growth of 20 percent over the projections decade, **faster than the average** for all occupations. As firms look for new ways to reduce costs and raise productivity, they increasingly will turn to industrial engineers to develop more efficient processes and reduce costs, delays, and waste. This should lead to job growth for these engineers, even in manufacturing industries with slowly growing or declining employment overall. Because their work is similar to that done in management occupations, many industrial engineers leave the occupation to become managers. Many openings will be created by the need to replace industrial engineers who transfer to other occupations or leave the labor force.

**Marine engineers and naval architects** are expected to experience employment growth of 11 percent over the projections decade, **about as fast as the average** for all occupations. Strong demand for naval vessels and recreational small craft should more than offset the long-term decline in the domestic design and construction of large oceangoing vessels. Good prospects are expected for marine engineers and naval architects because of growth in employment, the need to replace workers who retire or take other jobs, and the limited number of students pursuing careers in this occupation.

**Materials engineers** are expected to have employment growth of 4 percent over the projections decade, **slower than the average** for all occupations. Although employment is expected to decline in many of the manufacturing industries in which materials engineers are concentrated, growth should be strong for materials engineers working on nanomaterials and biomaterials. As manufacturing firms contract for their materials engineering needs, employment growth is expected in professional, scientific, and technical services industries also.

**Mechanical engineers** are projected to have 4 percent employment growth over the projections decade, **slower than the average** for all occupations. This is because total employment in manufacturing industries—in which employment of mechanical engineers is concentrated—is expected to decline. Some new job opportunities will be created due to emerging technologies in biotechnology, materials science, and nanotechnology. Additional opportunities outside of mechanical engineering will exist because the skills acquired through earning a degree in mechanical engineering often can be applied in other engineering specialties.

**Mining and geological engineers, including mining safety engineers** are expected to have 10 percent employment growth over the projections decade, **as fast as the average** for all occupations. Following a lengthy period of decline, strong growth in demand for minerals and increased use of mining engineers in the oil and gas extraction industry is expected to create some employment growth over the 2006-16 period. Moreover, many mining engineers currently employed are approaching retirement age, a factor that should create additional job openings. Furthermore, relatively few schools offer mining engineering programs, resulting in good job opportunities for graduates. The best opportunities may require frequent travel or even living overseas for extended periods of time as mining operations around the world recruit graduates of U.S. mining engineering programs.

**Nuclear engineers** are expected to have employment growth of 7 percent over the projections decade, **about as fast as the average** for all occupations. Most job growth will be in research and development and engineering services. Although no commercial nuclear power plants have been built in the United States for many years, nuclear engineers will be needed to operate existing plants and design new ones, including researching future nuclear power sources. They also will be needed to work in defense-related areas, to develop nuclear medical technology, and to improve and enforce waste management and safety standards. Nuclear engineers are expected to have good employment opportunities because the small number of nuclear engineering graduates is likely to be in rough balance with the number of job openings.

**Petroleum engineers** are expected to have 5 percent employment growth over the

projections decade, **more slowly than the average** for all occupations. Even though most of the potential petroleum-producing areas in the United States already have been explored, petroleum engineers will increasingly be needed to develop new methods of extracting more resources from existing sources. Favorable opportunities are expected for petroleum engineers because the number of job openings is likely to exceed the relatively small number of graduates. Petroleum engineers work around the world and, in fact, the best employment opportunities may include some work in other countries.


**PROJECTIONS DATA**         [About this section]          Back to Top

**Projections data from the National Employment Matrix**

| Occupational title | SOC Code | Employment, 2006 | Projected employment, 2016 | Change, 2006-16 | | Detailed statistics | |
|---|---|---|---|---|---|---|---|
| | | | | Number | Percent | | |
| **Engineers** | 17-2000 | 1,512,000 | 1,671,000 | 160,000 | 11 | PDF | zipped XLS |
| **Aerospace engineers** | 17-2011 | 90,000 | 99,000 | 9,200 | 10 | PDF | zipped XLS |
| **Agricultural engineers** | 17-2021 | 3,100 | 3,400 | 300 | 9 | PDF | zipped XLS |
| **Biomedical engineers** | 17-2031 | 14,000 | 17,000 | 3,000 | 21 | PDF | zipped XLS |
| **Chemical engineers** | 17-2041 | 30,000 | 33,000 | 2,400 | 8 | PDF | zipped XLS |
| **Civil engineers** | 17-2051 | 256,000 | 302,000 | 46,000 | 18 | PDF | zipped XLS |
| **Computer hardware engineers** | 17-2061 | 79,000 | 82,000 | 3,600 | 5 | PDF | zipped XLS |
| **Electrical and electronics engineers** | 17-2070 | 291,000 | 306,000 | 15,000 | 5 | PDF | zipped XLS |
| **Electrical engineers** | 17-2071 | 153,000 | 163,000 | 9,600 | 6 | PDF | zipped XLS |
| **Electronics engineers, except computer** | 17-2072 | 138,000 | 143,000 | 5,100 | 4 | PDF | zipped XLS |
| **Environmental engineers** | 17-2081 | 54,000 | 68,000 | 14,000 | 25 | PDF | zipped XLS |
| **Industrial engineers, including health and safety** | 17-2110 | 227,000 | 270,000 | 43,000 | 19 | PDF | zipped XLS |
| **Health and safety engineers, except mining safety engineers and inspectors** | 17-2111 | 25,000 | 28,000 | 2,400 | 10 | PDF | zipped XLS |
| **Industrial engineers** | 17-2112 | 201,000 | 242,000 | 41,000 | 20 | PDF | zipped XLS |
| **Marine engineers and** | | | | | | | zipped |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| naval architects | 17-2121 | 9,200 | 10,000 | 1,000 | 11 | PDF | XLS |
| Materials engineers | 17-2131 | 22,000 | 22,000 | 900 | 4 | PDF | zipped XLS |
| Mechanical engineers | 17-2141 | 226,000 | 235,000 | 9,400 | 4 | PDF | zipped XLS |
| Mining and geological engineers, including mining safety engineers | 17-2151 | 7,100 | 7,800 | 700 | 10 | PDF | zipped XLS |
| Nuclear engineers | 17-2161 | 15,000 | 16,000 | 1,100 | 7 | PDF | zipped XLS |
| Petroleum engineers | 17-2171 | 17,000 | 18,000 | 900 | 5 | PDF | zipped XLS |
| Engineers, all other | 17-2199 | 170,000 | 180,000 | 9,400 | 6 | PDF | zipped XLS |

NOTE: Data in this table are rounded. See the discussion of the employment projections table in the *Handbook* introductory chapter on ***Occupational Information Included in the Handbook***.

**EARNINGS**               [About this section]           Back to Top

Earnings for engineers vary significantly by specialty, industry, and education. Variation in median earnings and in the earnings distributions for engineers in various specialties is especially significant. Table 2 shows wage-and-salary earnings distributions in May 2006 for engineers in specialties covered in this statement.

**Table 2: Earnings distribution by engineering specialty, May 2006**

| Specialty | Lowest 10% | Lowest 25% | Median | Highest 25% | Highest 10% |
|---|---|---|---|---|---|
| Aerospace engineers | 59,610 | 71,360 | 87,610 | 106,450 | 124,550 |
| Agricultural engineers | 42,390 | 53,040 | 66,030 | 80,370 | 96,270 |
| Biomedical engineers | 44,930 | 56,420 | 73,930 | 93,420 | 116,330 |
| Chemical engineers | 50,060 | 62,410 | 78,860 | 98,100 | 118,670 |
| Civil engineers | 44,810 | 54,520 | 68,600 | 86,260 | 104,420 |
| Computer hardware engineers | 53,910 | 69,500 | 88,470 | 111,030 | 135,260 |
| Electrical engineers | 49,120 | 60,640 | 75,930 | 94,050 | 115,240 |
| Electronics engineers, except computer | 52,050 | 64,440 | 81,050 | 99,630 | 119,900 |
| Environmental engineers | 43,180 | 54,150 | 69,940 | 88,480 | 106,230 |
| Health and safety engineers, except mining safety engineers and inspectors | 41,050 | 51,630 | 66,290 | 83,240 | 100,160 |
| Industrial engineers | 44,790 | 55,060 | 68,620 | 84,850 | 100,980 |
| Marine engineers and naval architects | 45,200 | 56,280 | 72,990 | 90,790 | 113,320 |
| Materials engineers | 46,120 | 57,850 | 73,990 | 92,210 | 112,140 |
| Mechanical engineers | 45,170 | 55,420 | 69,850 | 87,550 | 104,900 |
| Mining and geological engineers, including mining safety engineers | 42,040 | 54,390 | 72,160 | 94,110 | 128,410 |
| Nuclear engineers | 65,220 | 77,920 | 90,220 | 105,710 | 124,510 |
| | | | | | Over |

| | | | | | |
|---|---|---|---|---|---|
| **Petroleum engineers** | 57,960 | 75,880 | 98,380 | 123,130 | 145,600 |
| **All other engineers** | 46,080 | 62,710 | 81,660 | 100,320 | 120,610 |

In the Federal Government, mean annual salaries for engineers ranged from $75,144 in agricultural engineering to $107,546 in ceramic engineering in 2007.

As a group, engineers earn some of the highest average starting salaries among those holding bachelor's degrees. Table 3 shows average starting salary offers for engineers, according to a 2007 survey by the National Association of Colleges and Employers.

**Table 3: Average starting salary by engineering specialty and degree , 2007**

| Curriculum | Bachelor's | Master's | Ph.D. |
|---|---|---|---|
| **Aerospace/aeronautical/astronautical** | $53,408 | $62,459 | $73,814 |
| **Agricultural** | 49,764 | | |
| **Architectural** | 48,664 | | |
| **Bioengineering and biomedical** | 51,356 | 59,240 | |
| **Chemical** | 59,361 | 68,561 | 73,667 |
| **Civil** | 48,509 | 48,280 | 62,275 |
| **Computer** | 56,201 | 60,000 | 92,500 |
| **Electrical/electronics and communications** | 55,292 | 66,309 | 75,982 |
| **Environmental/environmental health** | 47,960 | | |
| **Industrial/manufacturing** | 55,067 | 64,759 | 77,364 |
| **Materials** | 56,233 | | |
| **Mechanical** | 54,128 | 62,798 | 72,763 |
| **Mining and mineral** | 54,381 | | |
| **Nuclear** | 56,587 | 59,167 | |
| **Petroleum** | 60,718 | 57,000 | |
| Footnotes:<br> (NOTE) Source: National Association of Colleges and Employers | | | |

┌─ **FOR THE LATEST WAGE INFORMATION:** ─────────────────────────

The above wage data are from the **Occupational Employment Statistics** (OES) survey program, unless otherwise noted. For the latest National, State, and local earnings data, visit the following pages:

- **Aerospace engineers**
- **Agricultural engineers**
- **Biomedical engineers**
- **Chemical engineers**
- **Civil engineers**
- **Computer hardware engineers**
- **Electrical engineers**
- **Electronics engineers, except computer**
- **Environmental engineers**
- **Health and safety engineers, except mining safety engineers and inspectors**
- **Industrial engineers**
- **Marine engineers and naval architects**
- **Materials engineers**
- **Mechanical engineers**
- **Mining and geological engineers, including mining safety engineers**
- **Nuclear engineers**
- **Petroleum engineers**
- **Engineers, all other**

**RELATED OCCUPATIONS**          [**About this section**]           **Back to Top**

Engineers apply the principles of physical science and mathematics in their work. Other workers who use scientific and mathematical principles include **architects, except landscape and naval**; **engineering and natural sciences managers**; **computer and information systems managers**; **computer programmers**; **computer software engineers**; **mathematicians**; **drafters**; **engineering technicians**; **sales engineers**; **science technicians**; and physical and life scientists, including **agricultural and food scientists**, **biological scientists**, **conservation scientists and foresters**, **atmospheric scientists**, **chemists and materials scientists**, **environmental scientists and hydrologists**, **geoscientists**, and **physicists and astronomers**.

**SOURCES OF ADDITIONAL INFORMATION**          [**About this section**]           Back to Top

---
**DISCLAIMER:**

Links to non-BLS Internet sites are provided for your convenience and do not constitute an endorsement.

---

Information about careers in engineering is available from:
- JETS, 1420 King St., Suite 405, Alexandria, VA 22314. Internet: **http://www.jets.org**

Information on ABET-accredited engineering programs is available from:
- ABET, Inc., 111 Market Place, Suite 1050, Baltimore, MD 21202. Internet: **http://www.abet.org**

Those interested in information on the Professional Engineer licensure should contact:
- National Council of Examiners for Engineering and Surveying, P.O. Box 1686, Clemson, SC 29633. Internet: **http://www.ncees.org**
- National Society of Professional Engineers, 1420 King St., Alexandria, VA 22314. Internet: **http://www.nspe.org**

Information on general engineering education and career resources is available from:
- American Society for Engineering Education, 1818 N St. NW., Suite 600, Washington, DC 20036. Internet: **http://www.asee.org**

Information on obtaining engineering positions with the Federal Government is available from the Office of Personnel Management through USAJOBS, the Federal Government's official employment information system. This resource for locating and applying for job opportunities can be accessed through the Internet at **http://www.usajobs.opm.gov** or through an interactive voice response telephone system at (703) 724-1850 or TDD (978) 461-8404. These numbers are not toll free, and charges may result. For advice on how to find and apply for Federal jobs, see the *Occupational Outlook Quarterly* article "How to get a job in the Federal Government," online at **http://www.bls.gov/opub/ooq/2004/summer/art01.pdf**.

For more detailed information on an engineering specialty, contact societies representing the individual branches of engineering. Each can provide information about careers in the particular branch.

Aerospace engineers

- Aerospace Industries Association, 1000 Wilson Blvd., Suite 1700, Arlington, VA 22209. Internet: **http://www.aia-aerospace.org**
- American Institute of Aeronautics and Astronautics, Inc., 1801 Alexander Bell Dr., Suite 500, Reston, VA 20191. Internet: **http://www.aiaa.org**

Agricultural engineers

- American Society of Agricultural and Biological Engineers, 2950 Niles Rd., St. Joseph, MI 49085. Internet: **http://www.asabe.org**

Biomedical engineers

- Biomedical Engineering Society, 8401 Corporate Dr., Suite 140, Landover, MD 20785. Internet: **http://www.bmes.org**

Chemical engineers

- American Chemical Society, Department of Career Services, 1155 16th St. NW., Washington, DC 20036. Internet: **http://www.chemistry.org**
- American Institute of Chemical Engineers, 3 Park Ave., New York, NY 10016. Internet: **http://www.aiche.org**

Civil engineers

- American Society of Civil Engineers, 1801 Alexander Bell Dr., Reston, VA 20191. Internet: **http://www.asce.org**

Computer hardware engineers

- IEEE Computer Society, 1730 Massachusetts Ave. NW., Washington, DC 20036. Internet: **http://www.computer.org**

Electrical and electronics engineers

- Institute of Electrical and Electronics Engineers–USA, 1828 L St. NW., Suite 1202, Washington, DC 20036. Internet: **http://www.ieeeusa.org**

Environmental engineers

- American Academy of Environmental Engineers, 130 Holiday Court, Suite 100, Annapolis, MD 21401. Internet: **http://www.aaee.net**

Health and safety engineers

- American Society of Safety Engineers, 1800 E Oakton St., Des Plaines, IL 60018. Internet: **http://www.asse.org**
- Board of Certified Safety Professionals, 208 Burwash Ave., Savoy, IL 61874. Internet: **http://www.bcsp.org**

Industrial engineers

- Institute of Industrial Engineers, 3577 Parkway Lane, Suite 200, Norcross, GA 30092. Internet: **http://www.iienet.org**

Marine engineers and naval architects

- Society of Naval Architects and Marine Engineers, 601 Pavonia Ave., Jersey City, NJ 07306. Internet: **http://www.sname.org**

Materials engineers

- ASM International, 9639 Kinsman Rd., Materials Park, OH 44073. Internet: **http://www.asminternational.org**
- Minerals, Metals, and Materials Society, 184 Thorn Hill Rd., Warrendale, PA 15086. Internet: **http://www.tms.org**

Mechanical engineers

- American Society of Heating, Refrigerating, and Air-Conditioning Engineers, Inc., 1791 Tullie Circle NE., Atlanta, GA 30329. Internet: **http://www.ashrae.org**
- American Society of Mechanical Engineers, 3 Park Ave., New York, NY 10016. Internet: **http://www.asme.org**
- SAE International, 400 Commonwealth Dr., Warrendale, PA 15096. Internet:

http://www.sae.org

Mining and geological engineers, including mining safety engineers

- Society for Mining, Metallurgy, and Exploration, Inc., 8307 Shaffer Parkway, Littleton, CO 80127. Internet: http://www.smenet.org

Nuclear engineers

- American Nuclear Society, 555 North Kensington Ave., La Grange Park, IL 60526. Internet: http://www.ans.org

Petroleum engineers

- Society of Petroleum Engineers, P.O. Box 833836, Richardson, TX 75083. Internet: http://www.spe.org

**OOH ONET CODES**          [About this section]           Back to Top

17-2011.00, 17-2021.00, 17-2031.00, 17-2041.00, 17-2051.00, 17-2061.00, 17-2071.00, 17-2072.00, 17-2081.00, 17-2111.01, 17-2111.02, 17-2111.03, 17-2112.00, 17-2121.01, 17-2121.02, 17-2131.00, 17-2141.00, 17-2151.00, 17-2161.00, 17-2171.00, 17-2199.99

**Suggested citation:** Bureau of Labor Statistics, U.S. Department of Labor, *Occupational Outlook Handbook, 2008-09 Edition*, Engineers, on the Internet at **http://www.bls.gov/oco/ocos027.htm** (visited *December 27, 2007*).

**Last Modified Date:** December 18, 2007

Occupations: Management | Professional | Service | Sales | Administrative | Farming | Construction | Installation | Production | Transportation | Armed Forces

Related Links: Tomorrow's Jobs | OOH Reprints | Important Info | How to Order a Copy | Teacher's Guide to OOH

Additional Links: Career Guide to Industries | Career articles from the OOQ | Employment Projections | Publications Home | BLS Home

Back to Top                                                        www.dol.gov

Frequently Asked Questions | Freedom of Information Act | Customer Survey
Privacy & Security Statement | Linking and Copyright Information | Accessibility

**U.S. Bureau of Labor Statistics**                          URL: **http://www.bls.gov/OCO/**
Office of Occupational Statistics and Employment Projections          Phone: (202) 691-5700
Suite 2135                                                  Fax: (202) 691-5745
2 Massachusetts Avenue, NE          **Do you have a question** about the *Occupational Outlook*
Washington, DC 20212-0001                                          *Handbook?*
                                          Do you have a **Technical (web) question**?
                                          Do you have **Other comments**?



Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 863441 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

C

Eaton v. University of Delaware
D.Del.,2001.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Timothy J. EATON, Plaintiff,
v.
THE UNIVERSITY OF DELAWARE, a corpora-
tion of the State of Delaware, and Jeffrey Gates,
Defendants.
**No. C.A. 00-709-GMS.**

July 31, 2001.

MEMORANDUM AND ORDER

SLEET, District J.

I. INTRODUCTION

*1 On August 8, 2000, the plaintiff, Timothy J.
Eaton ("Eaton"), filed a three count complaint
against the defendants, The University of Delaware
(the "University") and Jeffrey Gates ("Gates")
(D.I.1). In his complaint, Eaton alleges violations
of 42 U.S.C. § 1983,[FN1] common law assault, and
the Delaware Constitution of 1897, Art. I, §§ 6 and
7. The University and Gates timely answered the
complaint (D.I.6). On June 1, 2001, the University
filed a motion for summary judgment on all claims
pending against it (D.I.82). Eaton timely answered
(D.I.85) and the University timely replied
(D.I.86).[FN2] Upon reviewing the parties' submis-
sions, including the limited record, the court con-
cludes that, as a matter of law, the University can-
not be held liable under 42 U.S.C. §
1983.[FN3]Therefore, the court will enter summary
judgment in favor of the University on Counts I and
III. As to Court II, however, court finds that Eaton
has sufficiently plead respondeat superior liability
against the University for any claim of assault and
battery against Gates.

    FN1. Since § 1983 cannot alone serve as a

basis of relief, Eaton has alleged that he
was "deprived of the rights and privileges
secured by the United States Constitution,
particularly under the provisions of the
Fourth, [Fifth], and Fourteenth Amend-
ments."*See* Compl. at ¶ 19; *see also* Joint
Status Rept. at ¶ 6 (D.I 19) (changing ¶ 19
of complaint to include Fifth Amendment
violation).

    FN2. The parties argue about why Gates
did not file a motion for summary judg-
ment on the claims pending against him.
*Compare* Def. Ans. Br. Sum. J. at 8 n. 3,
*with* Pl. Reply Br. Sum. J. at 3 n. 2. The
court believes it is inappropriate to specu-
late about Gates' motivations for not filing
a dispositive motion. Rather, it is sufficient
to note that, regardless of the court's dis-
position of the claims against the Uni-
versity, a trial against Gates must proceed
as scheduled.

    FN3. The court has received Eaton's letter
dated July 10, 2001 requesting oral argu-
ment on the issue of respondeat superior
and § 1983 liability (D.I.87). The Uni-
versity submitted a letter on July 20, 2001
stating that Eaton's request was untimely
(D.I.88) to which Eaton responded
(D.I.89). Aside from issues raised by the
parties, given the limited time between the
request and the approaching trial (as well
as the press of other matters), the court de-
cided not to grant Eaton's request.

II. STANDARD OF REVIEW

To prevail on a motion for summary judgment, the
moving party must establish "there is no genuine is-
sue as to any material fact and that the moving
party is entitled to judgment as a matter of law
."*See*Fed.R.Civ.P. 56(c). A district court, however,
may not resolve factual disputes in a motion for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 863441 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) (stating that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"); *see also Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh,* 229 F.3d 435, 441 n. 3 (3d Cir.2000).

In considering a motion for summary judgment, all evidence submitted must be viewed in a light most favorable to the party opposing the motion. *See Mc-Carthy v. Recordex Serv., Inc.,* 80 F.3d 842, 847 (3d Cir.1996) (citing *Anderson,* 477 U.S. at 247);*see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Although the summary judgment hurdle is difficult to over-come, it is by no means insurmountable. As the Su-preme Court has stated, "once the party seeking summary judgment has demonstrated the absence of a genuine issue of material fact, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." *See id.* at 586-87 (citations omitted). In other words, the inquiry in-volves determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."*See Brown v. Grabowski,* 922 F.2d 1097, 1111 (3d Cir.1990) (internal quotations and citations omitted).

**\*2** As both parties appear to agree, this case presents no disputed issues of material fact vis á vis the University. From the face of the complaint, Eaton does not allege any independent conduct by the University; he predicates his claims entirely on the doctrine of respondeat superior. *See* Compl. at ¶¶ 3, 8, 11; *see also* Def. Ans. Br. Sum. J. at 10. The University, for its part, admits that Gates is its employee. *See* Ans. at ¶¶ 8, 19; *see also* Pl. Reply Br. Sum. J. at 2. Finally, for the purposes of decid-ing the instant motion, the court will assume,

without deciding, that Gates used "excessive force" in violation of the various claims asserted in the complaint.

## III. DISCUSSION

As noted above, the issues before the court are purely legal ones. First, whether the University is responsible for actions of its employees under 42 U.S.C. § 1983.[FN4]Second, whether Eaton has suf-ficiently plead Count II so as to put the University on notice that the claim was asserted against it. If the court finds the answer to either question is neg-ative-that the University cannot be held liable or that it was not on notice-Eaton cannot proceed with his claims. On the contrary, if the court answers either question in the affirmative, Eaton may pro-ceed on that claim. The court will address the issues in turn.[FN5]

> FN4. The University asserts that this ques-tion deals with both Claims I and III since the relevant violations of the state constitu-tion are co-terminus with the United States Constitution. *See* Def. Op. Br. Sum. J. at 8 (citing cases). Eaton does not appear to contest this statement in his brief. Addi-tionally, the court has reviewed the cases cited by the University and conducted an independent investigation into the case law. Therefore, the court will analyze Claims I and III together insofar as they re-late to the University.

> FN5. Because of the lack of factual dispute between the University and Eaton, the court will dispense with a background statement of facts and proceed directly to a discussion of the legal issues.

A. The University Cannot Be Held Liable Under 42 U.S.C. § 1983

It is beyond dispute that municipalities and other "local government units" cannot be held vicariously liable for the actions of their employees. *See Mon-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2001 WL 863441 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

*ell v. Dept. of Social Servs.,* 436 U.S. 658 (1978); *see also, e.g., C.H. ex. rel. Z.H. v. Oliva,* 226 F.3d 198, 202 (3d Cir.2000) (stating that "there is no vicarious, respondeat superior liability under § 1983) (citing *Monell,* 436 U.S. at 694). Furthermore, it is similarly well established that the Eaton could not pursue his claims against the state of Delaware and certain types of "state actors." *See Will v. Michigan Dept. of State Police,* 491 U.S. 63-64 (1989); *see also Melo v. Hafer,* 912 F.2d 628, 634 (3d Cir.1990) (concluding that "neither a state nor state officials sued in their official capacities for money damages are 'persons' under § 1983") *cf. Quern v. Jordan,* 440 U.S. 332, 342(1979) (finding that § 1983 does not override state's traditional Eleventh Amendment immunity). Therefore, the question becomes, whether the University is more like the state of Delaware or like a municipality.

Both parties' briefs contain incomplete analysis of precedent and make conclusory assertions. *See* Pl. Op. Br. Sum J. at 7 (stating "[t]here is no dispute that the University is a state actor ...."); Def. Ans. Br. Sum. J. at 9 (asserting that "[i]t is well decided that the University is not a state agency."). A more accurate statement of the law is that the University is a "state actor" in some circumstances but not in others. An examination of mandatory and persuasive precedent leads the court to conclude (1) the University cannot invoke the Eleventh Amendment shield provided to states, (2) the University is a "person" "acting under color of state law" and can be sued under § 1983, and (3) Eaton cannot sue the University under the doctrine of respondeat superior for a violation of § 1983.

**\*3** This court has held that the University is not an "arm or alter ego of the state of Delaware under the Eleventh Amendment and therefore is not immune from suit." *See Gordenstein v. Univ. of Del.,* 381 F.Supp. 781, 722 (D.Del.1974). In *Gordenstein,* then District Court Judge Walter K. Stapleton focused on the financial relationship between the University and the state of Delaware. Judge Stapleton found that since the University "has both the power and the resources to pay any judgment entered against it," and the Board of Trustees had "entire control and management of the University," that the considerations underlying the Eleventh Amendment ban were not present.[FN6] *See Gordenstein,* 381 F.Supp. at 721-23. Therefore, the court agrees with Eaton insofar as his assertion that the University's status prevents it from relying on the Eleventh Amendment's protective cloak in defending against his claims.

> FN6. Analogies to other institutions of higher learning are of limited value because "each state university exists in a unique governmental context, and each must be considered on the basis of its own peculiar circumstances. *See Kovats v. Rutgers,* 822 F.2d 1303, 1312 (3d Cir.1987) (citation omitted). Nevertheless, other state universities have not been able to use the Eleventh Amendment bar. *See id.*(Rutgers); *Samuel v. Univ. of Pittsburgh,* 375 F.Supp. 718, 722 (W.D.Pa.1974), *aff'd in part, rev'd in part on other grounds,*538 F.2d 991 (3d Cir.1976) (declining to apply bar to University of Pittsburgh, Temple University, and Penn State University); *Hanshaw v. Delaware Tech. & Comm. Coll.,* 405 F. Supp 292, 296 (D.Del.1974) (finding that defendant "has not successfully invoked the Eleventh Amendment as a bar to the monetary damage relief requested by plaintiffs.").

Eaton's complete reliance on *Gordenstein,* however, is misplaced since the University did not assert the Eleventh Amendment as a ground upon which the court should grant it summary judgment.[FN7]Although Eaton would have the court believe that *Gordenstein* is dispositive of the University's liability under the § 1983, this is simply not the case. A determination that the University is not immune from suit under the Eleventh Amendment is entirely separate from whether it is a "state actor" for pur-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

poses of the Fourteenth Amendment. *See Gorden-stein,* 381 F.Supp. at 722 n. 23 (stating that "clearly the Fourteenth Amendment test for 'state action' is less rigorous than the test for an 'arm' of the state mandated under the Eleventh Amendment") (discussing cases); *Cf. King v. Caesar Rodney Sch. Dist.,* 396 F.Supp. 423, 427 n. 7 (D.Del.1975) (stating that determination that local school district is not immune from suit under the Eleventh Amendment "is not inconsistent with the principle that the action of local school districts is 'state action' for the purposes of the fourteenth amendment") (citing cases).

> FN7. The University's Answer, however, suggests that it could raise the defense of sovereign immunity to Eaton's claims. *See* Ans. at 4 (stating that "[p]laintiff's claims may be barred in whole or part by the doctrine [ ] of sovereign ... immunity."). As the above discussion demonstrates, however, the University cannot maintain such a defense at trial.

Neither party provided the court with information on the relationship between the University and the state of Delaware. Nevertheless, the court believes that statutes and caselaw (both state and federal) unequivocally support a finding of sufficient state action for Fourteenth Amendment, and by extension § 1983, purposes. *See Krynicky v. Univ. of Pittsburgh,* 742 F.2d 94, 97 (3d Cir.1984) (stating that "the requirement of section 1983 that the challenged activity be taken under color of state law has been treated as identical to the state action element of the fourteenth amendment.") (internal citations and footnote omitted) (citing cases). Although there is no uniform test for ascertaining whether state action exists, the Supreme Court has suggested two approaches that are relevant to this case; the "symbiotic relationship" and the "nexus" tests. *Compare, e.g., Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725 (1961) (symbiotic relationship), *with Jackson v. Metropolitan Edison, Co.,* 419 U.S. 449, 453 (1974) (nexus).

**\*4** The court concludes that the relationship between the state of Delaware and the University is sufficient under both of the above mentioned tests to establish the requisite amount of state action to trigger § 1983. The nexus test is easy; the Delaware Code explicitly confers powers on the University to appoint police officers who have state law enforcement officer powers on the University campus. *See* 14 Del. C. § 5194. The key to the "symbiotic relationship" test is determining whether:

the State has so far insinuated itself into a position of interdependence with [the acting party] that it must be recognized as a joint participant in the challenged activity, which, on account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment.

*Burton,* 365 U.S. at 725. The Delaware General Assembly has conferred numerous benefits and requirements on the University throughout the Delaware Code. For the sake of brevity, the court will only list a few examples.

The benefits go to the core of the University. *See, e.g.,* 30 Del. C. §§ 5506(d)(1) and 545(b)(1)(a) (stating University is a "state agency" for tax purposes); 29 Del. § 6102(b) (providing that University is "state agency" for certain General Fund purposes); 14 Del. C. § 5701 (designating University as land-grant college, meaning that Delaware General Assembly "donat[ed] public lands" for its use); *id.* at § 5310 (providing that Delaware Secretary of State must send University all duplicates of public documents); *id.* at § 5115 (proving that University can issue tax exempt revenue bonds for various purposes); *id.* at § 5114 (granting University power of eminent domain); *id.* § 5102 (establishing "leading object" of University as promoting education of persons "of all classes").

The requirements imposed by the Delaware General Assembly equally shape the University. *See, e.g., id.* at §§ 5302-5309 (requiring that University provide courses on Delaware history and government to be taken by all students as well as maintain

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

School of Agriculture, Department of Physical Edu-
cation, and summer school for teachers); *id.* at. §
5110 (requiring President of University to "make a
report of all the activities of the University" to
Board of Trustees who shall, in turn, transmit it to
Governor and General Assembly); *id.* at § 5105
(requiring that Governor shall not only serve on
Board of Trustees, but also appoint eight active
members).

It is also instructive to look at how the Delaware
state courts view the University. In an oft-cited and
landmark opinion from 1950, then Vice-Chancellor,
and former Chief Judge of the Third Circuit Court
of Appeals, Collins J. Seitz explicitly held under
that for purposes of both the common law and the
Fourteenth Amendment, the University is a state
agency. *See Parker v. Univ. of Delaware,* 75 A.2d
225, 228-30 (Del. Ch. Ct.1950); *see also Delaware
State Univ v. Delaware State Univ. Chapter of the
Amer. Assn. of Univ. Professors,* Civ.A.No.
1389-K, 2000 WL 713763 (Del. Ch. Ct. May 9,
2000) (citing *Parker* ). At least one court in this
district has cited *Parker* with approval. *See Gor-
denstein,* 381 F.Supp. at 725 & n. 32. The court,
therefore, holds that the University is a "state actor"
for purposes of § 1983.

**\*5** The final piece of the puzzle in resolving Eaton's
Claims I and III is the argument that the parties fo-
cus on in their papers: whether the University can
be held liable for violations of § 1983 under the
doctrine of respondeat superior.[FN8]Given the
above discussion, the court can dispose of this issue
rather easily. Put simply, the University cannot be
held liable under a theory of respondeat superior for
the federal and state constitutional claims that
Eaton raises. *Scott v. Univ. of Delaware,* 385
F.Supp. 937, 944 (D.Del.1974) (holding that Uni-
versity can be sued under § 1983 but that it "may
not be vicariously liable for wrongful acts of [its]
employees"); *see also Harel v. Rutgers,* 5
F.Supp.2d 246, 267 (D.N.J.1998) (citing *Monell,*
436 U.S. at 658, 691) (holding that Rutgers, " 'a
government entity' cannot be held liable for the ac-

tions of its employees on a theory of respondeat su-
perior"); *Cf. Salehpour v. Univ. of Tennessee,* 159
F.3d 199, 207-07 (6th Cir.1998) (stating that uni-
versity president and chancellor were not subject to
supervisory liability absent showing they encour-
aged or condoned actions); *D.O. Kline v. Northern
Texas State Univ.,* 782 F.2d 1229, 1235 (5th
Cir.1986) (holding that dean who merely super-
vised and disciplined faculty was not liable under §
1983 merely because of supervisory position).[FN9]

> FN8. The court does not mean to suggest
> that the proceeding discussion is dicta or
> unnecessary to the holding in any way. On
> the contrary, the above issues are integral
> to the court's analysis. First, the parties im-
> plicitly and vaguely raised the arguments,
> and the court needed to unravel them.
> Second, the court has an independent duty
> to satisfy itself of the "metes and bounds"
> of its authority.

> FN9. Even if the court had found that the
> University was not a state actor, Eaton's
> claims must still fail since respondeat su-
> perior cannot support § 1983 claims
> against private universities. *See Dove v.
> Fordham Univ.,* 56 F.Supp.2d 330, 336
> (S.D.N.Y.1999) (citing cases).

B. The University Was On Notice That Count II In-
cluded Vicarious Liability

The University seeks a grant of summary judgment
in its favor on Court II on the ground that Eaton's
complaint failed to assert a claim against it. Ac-
cording to the University, Count II "makes no men-
tion of [the University] or of the doctrine of respon-
deat superior."*See* Pl. Op. Br. Sum. J. at 9. The is-
sue before the court, however, is more nuanced
than whether Eaton makes an explicit mention of
the doctrine of respondeat superior in Count II.
Rather, Eaton must merely satisfy the requirement
of notice pleading under the Federal Rules of Civil
Procedure. In other words, the court's task is not to
determine the artfulness of the complaint or its

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                         Page 6
Not Reported in F.Supp.2d, 2001 WL 863441 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

choice of language, but rather if the University was fairly on notice. *See* Fed.R.Civ.P. 8(a)(2); *see also Remick v. Manfredy,* 238 F.3d 246, 263-64 (3d Cir.2001) (holding that district court improperly dismissed claim by imposing pleading requirement beyond that required by the Federal Rules of Civil Procedure since plaintiff "put the defendants on notice as to the circumstances surrounding the alleged tortious behavior."); *Lundy v. Admat of New Jersey, Inc.,* 34 F.3d 1173, 1193 & n. 14 (3d Cir.1994) (Becker, J. concurring and dissenting in part) (describing rationale behind liberal notice pleading requirement) (citing cases).

Count II of Eaton's complaint reads as follows: "The plaintiff incorporates herein and makes part hereof the allegations contained in paragraphs 1 through 19. As a result of the assault and battery by the defendant, Gates, the plaintiff Eaton has suffered significant physical injuries as described above." The University contends that the use of the singular "defendant" and the express mention of Gates makes Count II different than Counts I and III (which refer to both Gates and the University and use the word "defendants"). Eaton replies that Count II's incorporation of paragraphs 1 through 19 (specifically paragraph 8),[FN10] is, standing alone, sufficient to satisfy the liberal notice pleading requirements. *See* Def. Ans. Br. Sum. J. at 12. Although the court disagrees with both parties' arguments, it finds that the University was adequately placed on notice of possible respondeat superior liability in Claim II.

> FN10. Paragraph 8 of the complaint states, "At all times relevant ... Gates ... was acting in the course of his employment by ... the University ... which is, under the doctrine of respondeat superior, responsible for his actions."

**\*6** Eaton's complaint, the University's Answer, and the conduct of the parties to date all combine to convince the court that the University was on notice that it was included in Count II of the complaint under the doctrine of respondeat superior. First, as already stated, paragraph 8 of the complaint (which was incorporated in Count II) explicitly alleges that Gates was acting within the scope of his employment. Further, in Eaton's prayer for relief, he asked the court to award him various types of damages for, inter alia, violations of state statutory rights. *See* Compl. at ¶ 24(b). Since the only state statutory rights Eaton's complaint could conceivably allege are assault and battery, it seems that this statement is further notice to the University that Eaton intended the inclusion of an allegation of vicarious liability in Count II.[FN11]

> FN11. The parties have not presented the court with any Delaware statute which codifies common law assault and battery in the civil context. Nevertheless, Counts I and II only allege federal and state constitutional violations.

Second, Gates and the University filed a joint Answer to Eaton's complaint. The University, therefore, responded to paragraph 8 of Eaton's complaint by stating "Admitted that Gates was employed by the University in October, 1998. The remaining allegations ... are denied." *See* Ans. at ¶ 8. This statement was incorporated by reference in the University's answer which denied Count II. *See id.* at ¶ 20-21. Additionally, the Answer contains affirmative defenses which state, inter alia, that Eaton "fails to state a cause of action for respondeat superior liability."[FN12] *See id.* at ¶ 4. Third, the Joint Status Report that the parties submitted to the court on May 29, 2001 stated that one of the "basic issues" in the case was, "... whether or not the common law claim of assault is barred by the state Tort Claims Act." Although this statement could refer to Gates or the University, the point is that it is sufficiently vague so as to possibly encompass both of them.

> FN12. Although the reference to respondeat superior could merely refer to Claims I and III, the language of the Answer is not so limited. Furthermore, elsewhere in its Answer, the University asserts that Eaton fails to state a cause of action under § 1983

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 7
Not Reported in F.Supp.2d, 2001 WL 863441 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

and various other defenses relating to im-
munity. As a result, the court concludes
that the University's broad inclusion of re-
spondeat superior in its answer is not
merely limited to Eaton's § 1983 and con-
stitutional claims.

Given the above conduct by the parties, it seems
unfair to let the University now argue that it was
completely unaware that it was included in Count II
of the complaint. Up until the filing of the instant
motion, the University and Gates have acted in con-
cert; they are represented by the same attorneys and
have not sought to differentiate themselves in their
prior submissions to the court. To suddenly assert
that the University was unaware of the progression
of this case and the underlying theories is surpris-
ing, to say the least. Further, not only did the Uni-
versity fail to raise the issue of Claim II before the
instant motion, but its Answer and contribution to
the Joint Status Report suggest that it either be-
lieved respondeat superior liability applied to the
entire cause of action or that it failed to alert the
court (and Eaton) to this possible defense.[FN13]Fi-
nally, it appears that the University may be unduly
parsing Eaton's complaint. Reading the complaint
as a whole, there is no doubt that Eaton claims that
the University is liable under the doctrine of re-
spondeat superior for an incident between Eaton
and Gates.

    FN13. The University seeks to chastize
Eaton for failing to seeking to amend his
complaint, either at a prior point or now.
The court notes, however, that the Uni-
versity did not bring a motion to dismiss
Count II prior to-or concurrent with-the fil-
ing of a motion for summary judgment.

**\*7** The court, therefore, finds that Eaton's com-
plaint is sufficient to put the University on notice of
his claim of respondeat superior liability for Gates'
alleged assault and battery. Such a determination,
however, does not prevent the University from
presenting any or all of its affirmative defenses at
trial. Rather, the court is unwilling to bar Eaton

from the courthouse door on such a slim
ground.FN14

    FN14. The parties also devote a portion of
their briefs to arguing whether Gates' con-
duct constitutes an intentional tort within
the meaning of Delaware law. *Compare* Pl.
Op. Br. Sum. J. at 9-10, *with* Def. Ans. Br.
Sum. J. at 12. The court declines to address
this issue since not only does it not have
any facts before it upon which it can make
such a finding, but Gates has not filed a
motion for summary judgment on this
ground. Such an assertion by the Uni-
versity, however, underscores the court's
earlier point that the dual representation of
Gates and the University by the same attor-
neys suggests that the University cannot
claim surprise or that it was unaware of the
underlying factual disputes and how they
relate to any allegations of liability.

IV. CONCLUSION

The court will grant the University's motion for
summary judgment in part. Since it is sufficiently
connected with the state of Delaware for purposes
of § 1983 liability, the University cannot be held li-
able for Gates' actions under a theory of respondeat
superior. The court will therefore enter summary
judgment in favor of the University on Counts I and
III of the complaint. The court will not grant the
University summary judgment on Count II of the
complaint since it finds that Eaton has sufficiently
plead respondeat superior liability.

Therefore, IT IS HEREBY ORDERED that:
1. The University's motion for summary judgment
(D.I.82) is GRANTED IN PART pursuant to Feder-
al Rule of Civil Procedure 56(c).
2. Summary judgment BE AND IS HEREBY
ENTERED in favor of the University on Counts I
and III of the complaint.

D.Del.,2001.
Eaton v. University of Delaware

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 8
Not Reported in F.Supp.2d, 2001 WL 863441 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**


Not Reported in F.Supp.2d, 2001 WL 863441
(D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



P Premium Content  |  Register  |  Log In  |  Help

bitch

[ Search ]

Dictionary    Thesaurus    Encyclopedia    All Reference    The Web

  

A D V E R T I S E M E N T

## 9 results for: *bitch*

(Browse Nearby Entries)

Sponsored Links

**"2008 Diet Of The Year:"**
Finally, A Diet That Really Works! As Seen On CNN, NBC, CBS & Fox News
*www.Wu~YiSource.com*

**English To Spanish**
The Pros And Cons Of Free English To Spanish Translation Software.
*ForAndAgainst.com*

  





A D V E R T I S E M E N T

Related Ads:

Freestyle Rap Lyrics      Hedwig Lyrics
Gospel Music Lyrics       Everclear Lyrics
Lil Webbie Lyrics         Meredith Brooks

*Dictionary.com Unabridged (v 1.1)* – *Cite This Source* – *Share This*

**bitch** P 🔊  [bich] Pronunciation Key - Show IPA Pronunciation

*–noun*
1. a female dog.
2. a female of canines generally.
3. *Slang.*
   a. a malicious, unpleasant, selfish person, esp. a woman.
   b. a lewd woman.
4. *Slang.*
   a. a complaint.
   b. anything difficult or unpleasant: *The test was a bitch.*
   c. anything memorable, esp. something exceptionally good: *That last big party he threw was a real bitch.*
*–verb (used without object)*
5. *Slang.* to complain; gripe: *They bitched about the service, then about the bill.*
*–verb (used with object)*
6. *Slang.* to spoil; bungle (sometimes fol. by *up*): *He bitched the job completely. You really bitched up this math problem.*

[Origin: bef. 1000; ME *bicche,* OE *bicce;* c. ON *bikkja*]

*Dictionary.com Unabridged (v 1.1)*
*Based on the Random House Unabridged Dictionary, © Random House, Inc. 2006.*

*American Heritage Dictionary* – *Cite This Source* – *Share This*

**bitch** 🅟 🔊   (bĭch)   *Pronunciation Key*

n.
1. A female canine animal, especially a dog.
2. *Offensive*
   a. A woman considered to be spiteful or overbearing.
   b. A lewd woman.
   c. A man considered to be weak or contemptible.
3. *Slang* A complaint.
4. *Slang* Something very unpleasant or difficult.

v.   **bitched**, **bitch·ing**, **bitch·es**  *Slang*

v.   *intr.*
To complain; grumble.

v.   *tr.*
To botch; bungle. Often used with *up.*

[Middle English bicche, from Old English bicce.]

*(Download Now or Buy the Book)*
*The American Heritage® Dictionary of the English Language, Fourth Edition*
*Copyright © 2006 by Houghton Mifflin Company.*
*Published by Houghton Mifflin Company. All rights reserved.*

*Online Etymology Dictionary* – *Cite This Source* – *Share This*
**bitch**
O.E. *bicce,* probably from O.N. *bikkjuna* "female of the dog" (also fox, wolf, and occasionally other beasts), of unknown origin. Grimm derives the O.N. word from Lapp *pittja,* but OED notes that "the converse is equally possible." As a term of contempt applied to women, it dates from c.1400; of a man, c.1500, playfully, in the sense of "dog." In modern (1990s, originally black English) slang, its use with ref. to a man is sexually contemptuous, from the "woman" insult.

> "BITCH. A she dog, or doggess; the most offensive appellation that can be given to an English woman, even more provoking than that of whore." ["Dictionary of the Vulgar Tongue," 1811]

The adj. *bitchy* "bad-tempered" (usually of females) is first attested 1925. The verb meaning "to complain" is at least from 1930, perhaps from the sense in *bitchy,* perhaps influenced by the verb meaning "to bungle, spoil," which is 1823. But *bitched* in this sense seems to echo M.E. *bicched* "cursed, bad," a general term of opprobrium (e.g. Chaucer's *bicched bones* "(unlucky) dice"), which despite the hesitation of OED, seems certainly to be a derivative of *bitch.* Insult *son of a bitch* is O.N. *bikkju-sonr.* Slang *bitchen* "good" is first attested 1950s. *Bitch-goddess* coined 1906 by William James; the original one was success.

*Online Etymology Dictionary, © 2001 Douglas Harper*

*WordNet* – *Cite This Source* – *Share This*



**Baller Bitch Ringtones**

Get This Ringtone on your cellphone



NewestRingsNow.com
Ads by Google

A D V E R T I S E M E N T

Free download! Get instant dictionary, thesaurus, and encyclopedia access from your Windows programs with CleverKeys.

The perfect gift for word lovers - click here for Dictionary.com Premium Gift Subscriptions!

*noun*
1. an unpleasant difficulty; "this problem is a real bitch"
2. a person (usually but not necessarily a woman) who is thoroughly disliked; "she said her son thought [that woman] was a bitch" [syn: cunt]
3. informal terms for objecting; "I have a gripe about the service here" [syn: gripe]
4. female of any member of the dog family

*verb*
1. complain; "What was he hollering about?" [syn: gripe]
2. say mean things [syn: backbite]

*WordNet® 3.0, © 2006 by Princeton University.*

---

*Kernerman English Multilingual Dictionary (Beta Version) – Cite This Source –
Share This*

**bitch**[1] [bitʃ] *noun*
  the female of the dog, wolf or fox

| | |
|---|---|
| *Arabic:* كلبه ثعلبه، ذئبه | *Japanese:* 雌犬 |
| *Chinese (Simplified):* 母狗，母狼，母狐 | *Korean:* 암컷 |
| | *Latvian:* kuce |
| *Chinese (Traditional):* 母狗，母狼，母狐 | *Lithuanian:* kalė, vilkė, lapė |
| *Czech:* fena, samice od vlka, lišky | *Norwegian:* tispe |
| | *Polish:* suka |
| *Danish:* tæve | *Portuguese (Brazil):* cadela, loba, raposa–fêmea |
| *Dutch:* teef | |
| *Estonian:* emane | |
| *Finnish:* narttu, naaras | *Portuguese (Portugal):* fêmea |
| *French:* chienne, louve, renarde | *Romanian:* cǎţea; lupoaicǎ; vulpe |
| | *Russian:* самка |
| *German:* die Hündin, die Wölfin, die Füchsin | *Slovak:* suka, líška (samica), vlčica |
| *Greek:* το θηλυκό του σκύλου, του λύκου ἠ της αλεπούς | *Slovenian:* psica, volkulja, lisica |
| | *Spanish:* perra, *loba, *zorra |
| *Hungarian:* szuka | *Swedish:* hynda, tik, rävhona, varghona |
| *Icelandic:* tík | |
| *Indonesian:* anjing betina | *Turkish:* dişi köpek, *kurt, *tilki |
| *Italian:* cagna; lupa; volpe | |

femmina*

**bitch**[2] [bitʃ] *noun*

a (bad-tempered or unpleasant) woman

| | | | |
|---|---|---|---|
| *Arabic:* | إمْرَأةٌ داعِرَه | *Japanese:* | あばずれ女 |
| *Chinese (Simplified):* | 脾气坏的女人，泼妇 | *Korean:* | 심술궂은 여자 |
| *Chinese (Traditional):* | 脾气坏的女人，潑婦 | *Latvian:* | kuņa |
| *Czech:* | potvora, běhna | *Lithuanian:* | kalė |
| | | *Norwegian:* | merr, tispe |
| *Danish:* | mær; sæk | *Polish:* | jędza |
| *Dutch:* | kreng | *Portuguese (Brazil):* | prostituta |
| *Estonian:* | eit | *Portuguese (Portugal):* | cabra |
| *Finnish:* | ämmä | *Romanian:* | ticăloasă |
| *French:* | garce | *Russian:* | сука |
| *German:* | das Weibsstück | *Slovak:* | potvora |
| | | *Slovenian:* | deklina, babura |
| *Greek:* | στρίγκλα, σκύλα (μτφ.) | *Spanish:* | zorra, lagarta |
| *Hungarian:* | szajha | *Swedish:* | satkärring, subba |
| *Icelandic:* | tæfa, tík | *Turkish:* | kancık, kahpe |
| *Indonesian:* | perempuan nakal | | |
| *Italian:* | donnaccia; puttana | | |

*See also:* bitchy, son of a bitch

*Kernerman English Multilingual Dictionary (Beta Version), © 2000–2006 K Dictionaries Ltd.*

---

*Merriam-Webster's Medical Dictionary* – *Cite This Source* – *Share This*
Main Entry: **bitch**
Pronunciation: 'bich
Function: *noun*
: the female of the dog or some other carnivorous mammals

*Merriam-Webster's Medical Dictionary, © 2002 Merriam-Webster, Inc.*

---

*Acronym Finder* – *Cite This Source* – *Share This*
**BITCH**

BITCH: in Acronym Finder

*Acronym Finder, © 1988–2007 Mountain Data Systems*

---

*On-line Medical Dictionary* – *Cite This Source* – *Share This*
**bitch**

bitch: in CancerWEB's On-line Medical Dictionary

*On-line Medical Dictionary, © 1997–98 Academic Medical Publishing &*

View results from: Dictionary | Thesaurus | Encyclopedia | All Reference | the Web

Share This:



A D V E R T I S E M E N T

Perform a new search, or try your search for "bitch" at:

Amazon.com – Shop for books, music and more
Reference.com – Encyclopedia Search
Reference.com – Web Search powered by Google
Thesaurus.com – Search for synonyms and antonyms

Get the Dictionary.com Toolbar for your browser – FREE download! *From the makers of Dictionary.com*

About Dictionary.com | Privacy Policy | Terms of Use | Link to Us | Contact Us
Copyright © 2008, Lexico Publishing Group, LLC. All rights reserved.

# Satire

From Wikipedia, the free encyclopedia

**Satire** is strictly a literary genre, although it is found in the graphic and performing arts as well as the printed word. In satire, human or individual vices, follies, abuses, or shortcomings are held up to censure by means of ridicule, derision, burlesque, irony, or other methods, ideally with an intent to bring about improvement.[1] Although satire is usually meant to be funny, the purpose of satire is not primarily humor in itself so much as an attack on something of which the author strongly disapproves, using the weapon of wit.

A very common, almost defining feature of satire is its strong vein of irony or sarcasm, but parody, burlesque, exaggeration, juxtaposition, comparison, analogy, and double entendre are all frequently used in satirical speech and writing. The essential point, however, is that "in satire, irony is militant"[2]. This "militant irony" (or sarcasm) often professes to approve the very things the satirist actually wishes to attack.



1867 edition of *Punch*, a ground-breaking British magazine of popular humour, including a good deal of satire of the contemporary social and political scene.

# Contents

- 1 Term
- 2 Satire and Humour
- 3 Development
  - 3.1 Ancient Egypt
  - 3.2 Greece and Ancient Rome
  - 3.3 Middle Ages
  - 3.4 Persia
  - 3.5 Early modern western satire
  - 3.6 Anglo-American satire
  - 3.7 Satire in Victorian England
  - 3.8 20th century satire
  - 3.9 Contemporary satire
- 4 Misconception of satire
- 5 Satire under fire
- 6 Satire as prophecy
- 7 See also
- 8 References
- 9 Sources

# Term

The word satire comes from Latin *satura lanx* and means "medley, dish of colourful fruits" - it was held by Quintilian to be a "wholly Roman phenomenon" (*satura tota nostra est*). This derivation properly has nothing to do with the Greek mythological figure *satyr*[3]. To Quintilian, the satire was a strict literary form, but the term soon escaped from its original narrow definition. Robert Elliott wrote:

> "As soon as a noun enters the domain of metaphor, as one modern scholar has pointed out, it clamours for extension; and satura (which had had no verbal, adverbial, or adjectival forms) was immediately broadened by appropriation from the Greek word for "satyr" (satyros) and its derivatives. The odd result is that the English "satire" comes from the Latin satura; but "satirize," "satiric," etc., are of Greek origin. By about the 4th century AD the writer of satires came to be known as satyricus; St. Jerome, for example, was called by one of his enemies 'a satirist in prose' ('satyricus scriptor in prosa'). Subsequent orthographic modifications obscured the Latin origin of the word satire: satura becomes satyra, and in England, by the 16th century, it was written 'satyre.'"[4]

Satire (in the modern sense of the word) is found in many artistic forms of expression, including literature, plays, commentary, and media such as song lyrics. The term is nowadays applied to many works other than those which would have been considered satire by Quintilian - including, for instance, ancient Greek authors predating the first Roman satires.

## Satire and Humour

Satirical works often contain "straight" (non-satirical) humour - usually to give some relief from what might otherwise be relentless "preaching". This has always been the case, although it is probably more marked in modern satire. On the other hand some satire has little or no humour at all. It is not "funny" - and nor is it meant to be.

Humour about a particular subject (politics, religion and art for instance) is not necessarily satirical because the subject itself is often a subject of satire. Nor is humour using the great satiric tools of irony, parody, or burlesque always meant in a satirical sense.

## Development

### Ancient Egypt

The Satire of the Trades[5] dates to the beginning of the 2 millennium BC and is one of the oldest texts using hyperbole in order to achieve a didactic aim. It describes the various trades in an exaggeratedly disparaging fashion in order to convince students tired of studying that their lot as scribes will be far superior to that of the ordinary man in the street. Some scholars like Helck [6] think that, rather than satirical, the descriptions were intended to be serious.

The Papyrus Anastasi I[7] (late 2nd millennium BC) contains the text of a satirical letter in which the writer at first praises the virtues but then mercilessly mocks the meagre knowledge and achievements of the recipient of the letter.

### Greece and Ancient Rome

The Greeks had no word for what later would be called a satire, although cynicism and parody were used. In retrospect, the Greek playwright Aristophanes is one of the best known early satirists; he is particularly famous for his political satire in which he criticized the powerful Cleon (as in *The Knights*) and for the persecution he underwent.[8][9][10][11]

The oldest form of satire still in use is the Menippean satire by Menippos of Gadara. His own writings are lost, but his admirers and imitators mix seriousness and mocking in dialogues and parodies before a background of diatribe, a cynicistic criticism, a very biting comment by cynics.

In Rome, the first to discuss satire critically was Quintilian, who invented the term to describe the writings of Lucilius. In the 16th century, most believed that the term **satire** came from the Greek *satyr*; satyrs were the companions of Dionysos and central characters of the satyr plays of the Theatre of Ancient Greece. Its derivatives satir*ical* and satir*ise* are indeed, but the style of the **Roman satire** is rather linked to the *satira*, or *satura lanx*, a "dish of fruits" resembling the colourful mockings or figuratively a "medley". Pliny reports that the 6th century BC poet Hipponax wrote *satirae* that were so cruel that the offended hanged themselves.[12] The confusion with the satyr supported the understanding of satire as biting, like Juvenal, and not mild, like Horace, method of criticism in Early Modern Europe until the 17th century.

Criticism of Roman emperors (notably Augustus) needed to be presented in veiled ironical terms - but the term when applied to Latin works actually titled as "satires" is much wider than in the modern sense of the word, including fantastic and highly coloured humorous writing with little or no real mocking intent.

Prominent satirists from Roman antiquity include Horace and Juvenal, who were active during the early days of the Roman Empire and are the two most influential Latin satirists. Other important Roman satirists are Lucilius and Persius.

## Middle Ages

There are examples of satire from the Early Middle Ages, especially songs by goliards or vagants now best known as an anthology called Carmina Burana and made famous as texts of a composition by the 20th century composer Carl Orff. Satirical poetry is believed to have been popular, although little has survived. With the advent of the High Middle Ages and the birth of modern vernacular literature in the 12th century, it began to be used again, most notably by Chaucer. The disrespectful manner was considered "Unchristian" and ignored but for the **moral satire**, which mocked misbehavior in Christian terms. Examples are *Livre des Manières* (~1170), and in some of Chaucer's *Canterbury Tales*. The epos was mocked, and even the feudal society, but there was hardly a general interest in the genre. After the Middle Ages in the Renaissance reawakening of Roman literary traditions, the satires *Till Eulenspiegel* and *Reynard the Fox* were published, and also in Sebastian Brant's *Narrenschiff* (1494), Erasmus' *Moriae Encomium* (1509) and Thomas More's *Utopia* (1516).

## Persia

Obeid e zakani introduced satire into Persia during the 14th century. Between 1905 and 1911, Bibi Khatoon Astarabadi and other Iranian writers wrote notable satires.

## Early modern western satire

The Elizabethan (i.e. 16th century English) writers thought of satire as related to the notoriously rude, coarse and sharp satyr play. Elizabethan "satire" (typically in pamphlet form) therefore contains more straight forward abuse than subtle irony. The French Huguenot Isaac Casaubon pointed out in 1605 that satire in the Roman fashion was something altogether more civilised. 17th century English satire once again aimed at the "amendment of vices" (Dryden).

Direct social commentary via satire returned with a vengeance in the 16th century, when farcical texts such as the works of François Rabelais tackled more serious issues (and incurred the wrath of the crown as a result). In the Age of Enlightenment, an intellectual movement in the 17th and 18th century advocating rationality, began the breakthrough of English satire, largely due to the creation of Tory and Whig groups and the necessity to convey the true meaning of criticism, especially true for Daniel Defoe, Jonathan Swift, John Dryden and Alexander Pope. Here, astute and biting satire of institutions and individuals became a popular weapon. Although Isaac Casaubon discovered and published Quintilian's writing and presented the original meaning of the term (satira, not satyr), Early Modern satire was already an established genre, but the sense of wittiness (reflecting the "dishfull of fruits") became more important again.

Jonathan Swift was one of the greatest of Anglo-Irish satirists, and one of the first to practice modern journalistic satire. For instance, his *A Modest Proposal* suggests that poor Irish parents be encouraged to sell their own children as food, while his *The Shortest-Way with the Dissenters* says that dissenters (from established Church doctrine) are to be vigorously persecuted. In his book *Gulliver's Travels* he writes about the flaws in human society in general and English society in particular. Swift creates a moral fiction, for instance a world in which parents do not have their most obvious responsibility, which is to protect their children from harm, or in which freedom of religion is reduced to the freedom to conform. His purpose is of course to attack indifference to the plight of the desperately poor, and to advocate freedom of conscience.

John Dryden also wrote an influential essay on satire that helped fix its definition in the literary world.

## Anglo-American satire

Ebenezer Cooke, author of "The Sot-Weed Factor," was among the first to bring satire to the British colonies; Benjamin Franklin and others followed, using satire to shape an emerging nation's culture through shaping its sense of the ridiculous.

Mark Twain was a great American satirist: his novel Huckleberry Finn is set in the antebellum South, where the moral values Twain wishes to promote are completely turned on their heads. His hero, Huck, is a rather simple but good-hearted lad who is ashamed of the "sinful temptation" that leads him to help a runaway slave. In fact his conscience – warped by the distorted moral world he has grown up in, often bothers him most when he is at his best. Ironically, he is prepared to do good, believing it to be wrong.

Twain's younger contemporary Ambrose Bierce gained notoriety as a cynic, pessimist and black humourist with his dark, bitterly ironic stories, many set during the American Civil War, which satirized the limitations of human perception and reason. Bierce's most famous work of satire is probably *The Devil's Dictionary*, in which the definitions mock cant, hypocrisy and received wisdom.

## Satire in Victorian England

Novelists such as Charles Dickens often used passages of satiric writing in their treatment of social issues. Several satiric papers competed for the public's attention in the Victorian era and Edwardian period, such as *Punch* and *Fun*.

Perhaps the most enduring examples of Victorian satire, however, are to be found in the Savoy Operas of W. S. Gilbert and Sir Arthur Sullivan. In fact, in *The Yeomen of the Guard*, a jester is given lines that paint a very neat picture of the method and purpose of the satirist, and might almost be taken as a statement of Gilbert's own intent:

> *"I can set a braggart quailing with a quip,*
> *The upstart I can wither with a whim;*
> *He may wear a merry laugh upon his lip,*
> *But his laughter has an echo that is grim!"*

## 20th century satire

In the 20th century, satire was used by authors such as Aldous Huxley and George Orwell to make serious and even frightening commentaries on the dangers of the sweeping social changes taking place throughout Europe and United States. The film, *The Great Dictator* (1940) by Charlie Chaplin is a satire on Adolf Hitler. Many social critics of the time, such as Dorothy Parker and H. L. Mencken used satire as their main weapon, and Mencken in particular is noted for having said that "one horse-laugh is worth ten thousand syllogisms" in the persuasion of the public to accept a criticism. Joseph Heller's most famous work, Catch-22, satirizes bureaucracy and the military, and is frequently cited as one of the greatest literary works of the Twentieth Century[13]. Novelist Sinclair Lewis was known for his satirical stories such as Babbitt, Main Street, and It Can't Happen Here. His books often explored and satirized contemporary American values.

The film Dr. Strangelove from 1964 was a popular satire on the Cold War. A more humorous brand of satire enjoyed a renaissance in the UK in the early 1960s with the *Satire Boom*, led by such luminaries as Peter Cook, John Cleese, Alan Bennett, Jonathan Miller, David Frost, Eleanor Bron and Dudley Moore and the television programme *That Was The Week That Was*.

## Contemporary satire

Contemporary popular usage often uses the term "satire" in a very imprecise manner. While satire often uses caricature and parody; by no means all uses of these, and other humorous devices, are satiric. Refer to the careful definition of satire that heads this article.

Stephen Colbert's television program *The Colbert Report* is instructive in the methods of contemporary Western satire. Colbert's character is an opinionated and self-righteous commentator who, in his TV interviews, interrupts people, points and wags his finger at them, and "unwittingly" uses every logical fallacy known to man. In doing so, he demonstrates the principle of modern American satire: the ridicule of the actions of politicians and other public figures by taking all their statements and purported beliefs to their furthest (supposedly) logical conclusion, thus revealing their hypocrisy and stupidity. Other political satire includes various political

causes in the past, including the relatively successful Polish Beer-Lovers' Party and the joke political candidates Molly the Dog[14] and Brian Miner [15].



Cartoonists often use satire as well as straight humour. Garry Trudeau, whose comic strip *Doonesbury* has charted and recorded many American follies for the last generation, deals with story lines such as Vietnam (and now, Iraq), dumbed-down education, and over-eating at "McFriendly's". Trudeau exemplifies humor mixed with criticism. Recently, one of his gay characters lamented that because he was not legally married to his partner, he was deprived of the "exquisite agony" of experiencing a nasty and painful divorce like heterosexuals. This, of course, satirized the claim that gay unions would denigrate the sanctity of heterosexual marriage. Doonesbury also presents an example of how satire can cause social change. The comic strip satirized a Florida county that had a law requiring minorities to have a passcard in the area; the law was soon repealed with an act nicknamed the Doonesbury Act.[16]

Stephen Colbert satirizes an opinionated and self-righteous television commentator on his Comedy Central program in the United States.

Like some literary predecessors, many recent television "satires" contain strong elements of parody and caricature; for instance the popular animated series *The Simpsons* and *South Park* both parody modern family and social life by taking their assumptions to the extreme; both have led to the creation of similar series. As well as the purely humorous effect of this sort of thing, they often strongly criticise various phenomena in politics, economic life, religion and many other aspects of society, and thus qualify as "satirical". Due to their animated nature, these shows can easily use images of public figures and generally have greater freedom to do so than conventional shows using live actors.

Other satires are on the list of satirists and satires.

## Misconception of satire

Because satire often combines anger and humour it can be profoundly disturbing - because it is essentially ironic or sarcastic, it is often misunderstood. In an interview with *Wikinews*, Sean Mills, President of *The Onion*, said angry letters about their news parody always carried the same message. "It's whatever affects that person," said Mills. "So it's like, 'I love it when you make a joke about murder or rape, but if you talk about cancer, well my brother has cancer and that's not funny to me.' Or someone else can say, 'Cancer's *hilarious*, but don't talk about rape because my cousin got raped.' I'm using extreme examples, but whatever it is, if it affects somebody personally they tend to be more sensitive about it."[17]

Common uncomprehending responses to satire include revulsion (accusations of poor taste, or that it's "just not funny" for instance), to the idea that the satirist actually does support the ideas, policies, or people he is attacking. For instance, at the time of its publication, many people misunderstood Swift's purpose in "A Modest Proposal" – assuming it to be a serious recommendation of economically-motivated cannibalism. Again, some critics of Mark Twain see *Huckleberry Finn* as racist and offensive, missing the point that its author clearly intended it to be satire (racism being in fact only one of a number of Mark Twain's known pet bugbears attacked in *Huckleberry Finn*).

# Satire under fire

Because satire is stealthy criticism, it frequently escapes censorship. Periodically, however, it runs into serious opposition.

In 1599, the Archbishop of Canterbury John Whitgift and the Bishop of London George Abbot, whose offices had the function of licensing books for publication in England, issued a decree banning verse satire. The decree ordered the burning of certain volumes of satire by John Marston, Thomas Middleton, Joseph Hall, and others; it also required histories and plays to be specially approved by a member of the Queen's Privy Council, and it prohibited the future printing of satire in verse.[18] The motives for the ban are obscure, particularly since some of the books banned had been licensed by the same authorities less than a year earlier. Various scholars have argued that the target was obscenity, libel, or sedition. It seems likely that lingering anxiety about the Martin Marprelate controversy, in which the bishops themselves had employed satirists, played a role; both Thomas Nashe and Gabriel Harvey, two of the key figures in that controversy, suffered a complete ban on all their works. In the event, though, the ban was little enforced, even by the licensing authority itself.

In Italy the media tycoon Silvio Berlusconi attacked RAI Television's satirical series, Raiot, Daniele Luttazzi's *Satyricon*, Enzo Biagi, Michele Santoro's *Sciuscià*, even a special Blob series on Berlusconi himself, by arguing that they were vulgar and full of disrespect to the government. He claimed that he would sue the RAI for 21,000,000 Euros if the show went on. RAI stopped the show. Sabina Guzzanti, creator of the show, went to court to proceed with the show and won the case. However, the show never went on air again.

In 2001 the British television network Channel 4 aired a special edition of the spoof current affairs series Brass Eye, which was intended to mock and satirize the fascination of modern journalism with child molesters and pedophiles. The TV network received an enormous number of complaints from members of the public, who were outraged that the show would mock a subject considered by many to be too "serious" to be the subject of humour.

In 2005, the Jyllands-Posten Muhammad cartoons controversy caused global protests by offended Muslims and violent attacks with many fatalities in the Near East. It was not the first case of Muslim protests against criticism in the form of satire, but the Western world was surprised by the hostility of the reaction: Any country's flag in which a newspaper chose to publish the parodies was being burnt in a Near East country, then embassies were attacked, killing 139 people in mainly four countries (see article); politicians throughout Europe agreed that satire was an aspect of the freedom of speech, and therefore to be a protected means of dialogue. Iran threatened to start an International Holocaust Cartoon Competition, which was immediately responded to by Jews with a Israeli Anti-Semitic Cartoons Contest. Although not really satirical, the response to Salman Rushdie's *Satanic Verses* from 1988 was similarly violent; Khomeini responded with a fatwa, death sentence, for the author, resulting in a 10-year breach of Irano-British diplomatic relations and a continued threat to the author's life.

In 2006 British comedian Sacha Baron Cohen released *Borat: Cultural Learnings of America for Make Benefit Glorious Nation of Kazakhstan* a "mockumentary" that satirized everyone, from high society to frat boys. Criticism of the film was heavy, from claims of antisemitism (forgetting the author is Jewish), to the massive boycott of the film by the Kazakh government; the film itself had been a reaction to a longer quarrel between the government and the comedian.

Case 1:07-cv-00475-MPT     Document 29-7     Filed 03/17/2008     Page 8 of 9

# Satire as prophecy

Satire is often prophetic: the jokes precede actual events.[19] Among the eminent examples is the 1784 presaging of modern Daylight saving time, later actually proposed in 1907. While an American envoy to France, Benjamin Franklin anonymously published a letter in 1784 suggesting that Parisians economize on candles by arising earlier to use morning sunlight.[20] In the 1920s an English cartoonist imagined a very laughable thing for that time: a hotel for cars. He drew a Multi-story car park.[19]

# See also

- List of satirists and satires

# References

1. ^ Robert C. Elliott, Satire, in: Encyclopaedia Britannica 2004
2. ^ Northrop Frye, literary critic, quoted in: Elliott, satire
3. ^ With the Renaissance mixup of the two, the presumed Greek origin had some influence on the satire making it more aggressive than Roman satire generally was, B.L. Ullman "Satura and Satire" *Classical Philology* 8:2
4. ^ Robert C. Elliott, The nature of satire, in: Encyclopaedia Britannica, "Satire", 2004
5. ^ M. Lichtheim, *Ancient Egyptian Literature*, volume I, 1973, pp.184-193
6. ^ W. Helck, *Die Lehre des DwA-xtjj*, Wiesbaden, 1970
7. ^ Alan H. Gardiner, *Egyptian Hieratic Texts* - Series I: Literary Texts of the New Kingdom, Part I, Leipzig 1911
8. ^ *POLITICAL AND SOCIAL SATIRE OF ARISTOPHANES* in The Drama: Its History, Literature and Influence on Civilization, vol. 2. ed. Alfred Bates. London: Historical Publishing Company, 1906. pp. 55-59.
9. ^ J. E. Atkinson *Curbing the Comedians: Cleon versus Aristophanes and Syracosius' Decree* The Classical Quarterly, New Series, Vol. 42, No. 1 (1992), pp. 56-64
10. ^ Aristophanes: the Michael Moore of his Day by John Louis Anderson
11. ^ Sutton, D. F., *Ancient Comedy: The War of the Generations* (New York, 1993), p.56.
12. ^ Cuddon, Dictionary of Literary Terms, Oxford 1998, "satire"
13. ^ [1]"What is Catch-22? And why does the book matter?" BBC
14. ^ http://www.mollythedog2008.com
15. ^ http://www.brianminer2008.com
16. ^ Melnik, Rachel. A picture is worth a thousand politicians, Cartoons catalyze social justice, *McGill Tribune* (2007-01-23), Retrieved on 2007-01-25.
17. ^ An interview with The Onion, David Shankbone, *Wikinews*, November 25, 2007.
18. ^ *A Transcript of the Registers of the Company of Stationers of London, 1554-1640*, Vol. III, ed. Edward Arber (London, 1875-94), p.677.
19. ^ *a b* Daniele Luttazzi *Lepidezze postribolari* (2007, Feltrinelli, p.275) **(Italian)**
20. ^ Benjamin Franklin, writing anonymously (1784-04-26). "Aux auteurs du Journal" (in French). *Journal de Paris* (117). Retrieved on 2007-05-16. Its first publication was in the journal's "Économie" section. The revised English version (retrieved on 2007-05-26) is commonly called "An Economical Project", a title that is not Franklin's; see A.O. Aldridge (1956). "Franklin's essay on daylight saving". *American Literature* 28 (1): 23–29. Retrieved on 2007-05-16.

# Sources

- Lee, Jae Num. "Scatology in Continental Satirical Writings from Aristophanes to Rabelais" and

"English Scatological Writings from Skelton to Pope." Swift and Scatological Satire. Albuquerque: U of New Mexico P, 1971. 7-22; 23-53.

- Jacob Bronowski & Bruce Mazlish, *The Western Intellectual Tradition From Leonardo to Hegel*, p. 252 (1960; as repub. in 1993 Barnes & Noble ed.).
- *Theorizing Satire: A Bibliography* [2], by Brian A. Connery, Oakland University
- Bloom, Edward A. . "Sacramentum Militiae: The Dynamics of Religious Satire." Studies in the Literary Imagination 5 (1972): 119-42.
- The Modern Satiric Grotesque. Lexington: U of Kentucky P, 1991.

Theories/Critical approaches to satire as a genre:

- Frye, Northrop. Anatomy of Criticism. (See in particular the discussion of the 4 "myths").
- Emil Draitser. Techniques of Satire: The Case of Saltykov-Shchedrin. (Berlin-New York: Mouton de Gruyter, 1994) ISBN 3110126249.
- Hammer, Stephanie. Satirizing the Satirist.
- Highet, Gilbert. Satire.
- Kernan, Alvin. The Cankered Muse

The Plot of Satire.

- Seidel, Michael. Satiric Inheritance.
- Entopia: Revolution of the Ants (2008), by Rad Zdero.

Retrieved from "http://en.wikipedia.org/wiki/Satire"
Categories: Humor | Rhetoric | Satire

- This page was last modified on 15 March 2008, at 02:31.
- All text is available under the terms of the GNU Free Documentation License. (See **Copyrights** for details.)
  Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a U.S. registered 501(c)(3) tax-deductible nonprofit charity.



Slip Copy                                                                 Page 1
Slip Copy, 2007 WL 81911 (N.D.Cal.)
**(Cite as: Slip Copy)**

Woodfin Suite Hotels, LLC v. City of Emeryville
N.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
WOODFIN SUITE HOTELS, LLC; and Pacific
Hotel Management, LLC, Plaintiffs,
v.
CITY OF EMERYVILLE, Defendant.
**No. C 06-1254 SBA.**
**Docket No. 68.**

Jan. 9, 2007.

Brian Van Valeck, Heather M. Sager, Keith William Carlson, Carlton Disante & Freudenberger LLP, Irvine, CA, Brian F. Van Vleck, Carlton Disante & Freudenberger, Los Angeles, CA, for Plaintiffs.
Kevin Drake Siegel, McDonough Holland & Allen PC, Benjamin D. Winig, McDonough Holland & Allen PC, Attorney at Law, Oakland, CA, Carol Victor, Michael Biddle, City Attorney, Emeryville, CA, for Defendant.

### ORDER

SAUNDRA BROWN ARMSTRONG, United States District Judge.
**\*1** This matter comes before the Court on Defendant's Motion to Dismiss or for Judgment on the Pleadings, and Motion for Summary Judgment or Partial Summary Judgment.

### BACKGROUND

*Measure C*

On November 8, 2005, residents of the City of Emeryville passed Measure C ("Measure C" or "Ordinance"). On December 6, 2005, Measure C went into effect. Measure C applies to the hotels in the City which have more than 50 rooms (the "Hotels"). Measure C provides for, *inter alia:*

• Minimum compensation of $9 per hour and average minimum compensation of $11 per hour for all employees.
• Annual cost of living increases, calculated by the Consumer Price Index.
• Paid leave at the employees' regular rate of pay for jury duty.
• Protection against discharge for 90 days following a change in ownership of the Hotels or another employer within the Hotels, absent good cause.
• Payment of time-and-a-half for the room cleaners who clean more than 5,000 square feet in an 8 hour work day.
• Maintenance by Hotels of employee compensation records, including names, pay rates, and benefit payments (if the Hotels want to credit benefit payments toward total compensation).
• "Reasonable access" to Hotels by city representatives and organizations assisting employees in the hospitality industry for the purpose of monitoring compliance with Measure C and investigating complaints of non-compliance.

Measure C includes the following findings: "[I]t is proper to regulate employment conditions at large hotels first rather than trying to regulate all employers because [the People] believe that (1) large hotels are better able to afford the proposed conditions than other kinds of employers; (2) many large hotels in the Bay Area are already meeting the employment conditions required by this Ordinance, unlike the situation in other industries; (3) large hotels provide jobs similar to the janitorial jobs already protected by a similar state law on worker retention, Labor Code sections 1060-65; and (4) large hotels are generally less likely to respond to such regulations by closing or reducing employment than other kinds of businesses which can more readily move jobs offshore or to other locations, as large hotels wish to be here because of our city's location."Ordinance, § V.

*Procedural Background*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                              Page 2
Slip Copy, 2007 WL 81911 (N.D.Cal.)
**(Cite as: Slip Copy)**

On February 21, 2006, Plaintiffs filed a Complaint seeking declaratory and injunctive relief. The Complaint alleges that Measure C is unconstitutional and preempted by state and federal law. The same day, Plaintiffs filed a Motion for Preliminary Injunction. On August 23, 2006, after receiving supplemental briefing on the issue of Plaintiffs' standing to pursue their claims, this Court denied the Motion for Preliminary Injunction.

The Court held that Plaintiffs did have standing to challenge the minimum wage provision of the Ordinance (section I.A), the provision requiring room cleaners to be paid time-and-a-half if required to clean rooms larger than 5,000 square feet (section I.C), the provision making compliance with enforcement provisions a condition for issuance of a permit (section I.E), the provision requiring hotels subject to the Ordinance to pay an annual fee to cover its share of the City's enforcement costs (section II), and the annual reporting requirement (section IV.E). The Court held that Plaintiffs lacked standing to challenge all other provisions of Measure C.

**\*2** The Court also held that Plaintiffs had not demonstrated a likelihood of success on the merits of their claims. Specifically, the Court held that Measure C was not likely to be preempted by the National Labor Relations Act under either the *Machinists* doctrine or the *Garmon* doctrine. The Court also held that Measure C was not likely to be preempted by ERISA, or by California laws. Finally, the Court held that Plaintiffs lacked standing to challenge Measure C as unconstitutionally vague, and that Plaintiffs were unlikely to succeed in their Equal Protection challenge to Measure C.

On September 22, 2006, Defendant filed the instant Motion to Dismiss or for Judgment on the Pleadings and Motion for Summary Judgment. In their opposition, Plaintiffs asserted that they wished to voluntarily dismiss the action without prejudice. Accordingly, on December 20, 2006, this Court issued an Order directing Defendant to show cause why that request should not be granted pursuant to

Federal Rule of Civil Procedure 41(a)(2) [Docket No. 84]. Defendant filed a response to the Order on December 26, 2006.

In its response to the Order to Show Cause, Defendant provided information about the parties' interactions since the Motion for Preliminary Injunction was denied. Defendant contacted Plaintiffs' counsel on or about August 25, 2006, in an effort to negotiate dismissal of this action. Siegel Decl. at ¶ 3. Plaintiffs rejected this proposal. *Id.* Defendant sent a letter dated September 11, 2006 to Plaintiffs indicating that, because Plaintiffs refused to stipulate to dismissal, Defendant would file a dispositive motion, and requested that Plaintiffs reconsider their refusal. *Id.* at ¶ 4. Plaintiffs' counsel first informed Defendant that they were interested in dismissing the action without prejudice on December 18, 2006. *Id.* at ¶ 7. At that point, Defendant was not amenable to dismissal without prejudice. *Id.* at ¶ 8.

### ANALYSIS

**1. Judicial Notice**

Defendant requests that the Court take judicial notice of the following: (1) a copy of Measure C; (2) a printout from the Department of Labor website showing the Consumer Price Index for 2005 for the San Francisco-Oakland-San Jose region; and (3) several other local ordinances limiting employers' rights to terminate employees following a change in the employer (with web links to the text of these ordinances).

Under Federal Rule of Evidence 201(b), the Court may take judicial notice of documents "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." These documents are public records, and are judicially noticeable. *See Manufactured Home Communities, Inc. v. City of San Jose,* 358 F.Supp.2d 896, 904 (N.D.Cal.2003) (taking judicial notice of municipal ordinances), *rev'd in part on*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*other grounds,*420 F.3d 1022 (9th Cir.2005). Accordingly, Defendant's Request for Judicial Notice is GRANTED.

## 2. Amici

**\*3** A group of legal services and community organizations has filed a Motion for Leave to File Brief Amici Curiae. These organizations are: the Brennan Center for Justice at New York University School of Law ("Brennan Center"), the Legal Aid Society-Employment Law Center ("LAS-ELC"), the East Bay Community Law Center, and the East Bay Alliance for a Sustainable Economy ("EBASE"). They state that they are "united by a common interest in ensuring that cities such as Emeryville retain the authority to promote family-supporting jobs for low-income residents through policies such as living wage laws."Memorandum in Support of Motion for Leave to File Brief Amici Curiae at 2. Amici state that they will bring to the Court's attention additional legal authorities on the arguments made by the City of Emeryville, "such as several decisions rejecting similar challenges to laws similar to Measure C."*Id.* at 1.

Whether to allow Amici to file a brief is solely within the Court's discretion, and generally courts have "exercised great liberality ... [t]here are no strict prerequisites that must be established prior to qualifying for amicus status; an individual seeking to appear as amicus must merely make a showing that his participation is useful or otherwise desirable to the court."*In re Roxford Foods Litigation,* 790 F.Supp. 987, 997 (E.D.Cal.1991) (quoting *United States v. Louisiana,* 751 F.Supp. 608, 620 (E.D.La.1990)). In ruling on the Motion for Preliminary Injunction, the Court allowed EBASE and several individuals to file an Amicus brief. Now, it appears that the Amici can be of use to the Court by offering additional authorities. Thus, the Motion for Leave to File Brief Amici Curiae is GRANTED.

Amici have also filed a Request for Judicial Notice. They request judicial notice of the following: (1) a

printout from the State of California's Employment Development Department's website, as well as data from the United States Department of Labor's Bureau of Labor Statistics, showing wages in the hotel industry compared to other industries, and (2) copies of two articles about hotel industry revenues, printed off of the internet. With respect to the latter, amici are only requesting judicial notice of the fact that these articles were published, not of the truth of their content. *See Heliotrope General, Inc. v. Ford Motor Co.,* 189 F.3d 971, 981 n. 18 (9th Cir.1999).

Again, under Federal Rule of Evidence 201(b), the Court may take judicial notice of documents "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."These documents are government publications, whose accuracy is not in question, and articles which appear to be readily accessible via the internet. Thus, Amici's Request for Judicial Notice is GRANTED.

## 3. Dismissal

Federal Rule of Civil Procedure 41(a)(2) states that an action may be dismissed without prejudice by order of the court "upon such terms and conditions as the court deems proper."The decision whether to grant a voluntary dismissal under Rule 41(a)(2) is within the sound discretion of this Court, and the Court must "consider whether the defendant will suffer some plain legal prejudice as a result of the dismissal."*Hamilton v. Firestone Tire & Rubber Co.,* 679 F.2d 143, 145 (9th Cir.1982). The Court will consider whether significant discovery or pretrial preparations have taken place; prejudice does not result "simply when defendant faces the prospect of a second lawsuit or when plaintiff merely gains some tactical advantage."*Id. See also Wiesen v. Astrazeneca Pharmaceuticals, L.P. et al.,* 2006 WL 2529472 (N.D.Cal. Aug.31, 2006).

**\*4** In response to this Court's Order to Show Cause, Defendant argues that dismissal of this matter

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 4
Slip Copy, 2007 WL 81911 (N.D.Cal.)
**(Cite as: Slip Copy)**

without prejudice would prejudice Defendant. Specifically, Defendant argues that this Court should decline to dismiss this action without prejudice because Plaintiffs are "engaged in blatant forum shopping." Def.s' Response at 5:23. Plaintiff Woodfin is a defendant in a state action which concerns the validity of Measure C. Defendant submits a copy of Plaintiff Woodfin's answer to the complaint in the state action, in which Plaintiff Woodfin argues that Measure C is unconstitutional and unenforceable. Def.s' Response at 6:2; Siegal Decl., Exh. E at 7:21-24. Defendants argue that although Plaintiffs' Opposition concedes that Plaintiffs have no basis for pressing their claims in federal court, Plaintiffs' refusal to dismiss with prejudice and Plaintiff Woodfin's state court answer indicates that Plaintiffs "hope the California judiciary will find otherwise."Def.s' Response at 6:6-7. Defendant asserts it will be significantly prejudiced by a dismissal without prejudice because Defendant has already demonstrated the facial validity of Measure C, and it should have the benefits of res judicata or collateral estoppel in the state courts. Def.s' Response at 6:18-20.

Defendant has not sufficiently demonstrated that it will suffer prejudice in the event this Court dismisses this action without prejudice. First, the fact that Plaintiff Woodfin is a defendant in a state action, and raises the argument that Measure C is unconstitutional as one affirmative defense out of twenty-nine in that action, does not support Defendant's assertion that Plaintiffs are engaged in "blatant forum shopping." Second, Defendant's reliance on *Roybal v. Equifax* in support of its argument is misplaced. In that case, the plaintiffs filed their action in state court, only to have it properly removed to federal court under diversity jurisdiction, and subsequently dismissed by the district court pursuant to Rule 12(b)(6).2006 U.S. Dist. LEXIS 22380, ----4-5 (E.D. Cal., April 14, 2006). The plaintiffs in that matter chose not to seek remand, but instead proceeded to file a *second* action in state court, within a week after the district court granted a motion to dismiss, alleging almost

identical claims to those involved in the federal action, and then simultaneously requested that the district court dismiss its federal action under Rule 41(a)(2).*Id.* Here, Plaintiffs have not sought to raise "almost identical claims" in another action in state court, but instead one of the Plaintiffs in this action has been named as a defendant in a state action, and has raised the constitutionality of Measure C as one of several affirmative defenses. Thus, the reasoning applied in *Roybal* is inapplicable here.

Third, the Ninth Circuit has made it clear that legal prejudice does not result merely because a defendant will be inconvenienced by having to defend in another forum, and that "uncertainty because a dispute remains unresolved is not legal prejudice."*Westlands Water District v. United States,* 100 F.3d 94, 96 (9th Cir.1996); *see also Hamilton,* 679 F.2d at 145. Defendant has chosen to file a motion to intervene in the pending state action in which Plaintiff Woodfin is a defendant. Def.'s Response at 8:7-9. Defendant argues that it should have an opportunity to demonstrate that Plaintiff Woodfin is "barred from re-litigating" the constitutionality of Measure C, but none of these facts demonstrate that Defendant will suffer legal prejudice based on the standard articulated by the Ninth Circuit.

**\*5** Thus, as Defendant fails to demonstrate that it would suffer legal prejudice, this Court GRANTS Plaintiff's request for voluntary dismissal under Rule 41(a)(2).*See Waller v. Fin. Corp. of Am.,* 828 F.2d 579, 583 (9th Cir.1987) (a district court should grant a motion for voluntary dismissal unless a defendant can show that it will suffer some plain legal prejudice as a result).

Defendant argues that, in the event this Court decides to dismiss without prejudice, Plaintiffs should be ordered to pay Defendant's attorneys fees. In *Stevedoring Services of America v. Armilla Intern. B.V.,* 889 F.2d 919, 921 (9th Cir.1989), the court noted that:
Although costs and attorney fees are often imposed upon a plaintiff who is granted a voluntary dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                Page 5
Slip Copy, 2007 WL 81911 (N.D.Cal.)
**(Cite as: Slip Copy)**

missal under Fed.R.Civ.P. 41(a)(2), no circuit court has held that payment of the defendant's costs and attorney fees is a prerequisite to an order granting voluntary dismissal. Moreover, several courts have specifically held that such payment is not required. In *Puerto Rico Maritime Shipping Auth. v. Leith,* 668 F.2d 46 (1st Cir.1981), as in the present case, the defendants-appellants argued that the district court abused its discretion by granting the plaintiff's motion for voluntary dismissal without prejudice while refusing to impose the defendants' costs and attorney fees on the plaintiff. The court stated, "We do not read Rule 41(a)(2) as always requiring the imposition of costs as a condition to a voluntary dismissal, although it is usually considered necessary for the protection of the defendant."*Id.* at 51;*see also*9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2366 (1971).

Thus, it is clearly within the district court's discretion to award attorney's fees and costs as a condition of granting voluntary dismissal pursuant to Rule 41(a)(2), and doing so is commonplace and serves the purpose of protecting the defendant. *See also Westlands Water District,* 100 F.3d at 97 (holding that the expense incurred in defending a lawsuit does not constitute legal prejudice, because the defendant's interests "can be protected by conditioning the dismissal without prejudice upon the payment of appropriate costs and attorney fees").

In this case, Defendant would not have expended time on bringing the instant Motion for Summary Judgment or Motion to Dismiss had Plaintiff agreed to a voluntary dismissal months ago, after this Court issued its Order on the Motion for Preliminary Injunction. It is an equitable and appropriate exercise of this Court's discretion to award Defendant the amount of attorney's fees incurred since September 11, 2006 (the date on which Defendant notified Plaintiff that they would file a dispositive motion in this case, due to Plaintiff's refusal to stipulate to voluntary dismissal).*See* Siegel Decl. Ex. B. Accordingly, the Court GRANTS Defendant $10,000 in attorney's fees as a condition of the vol-

untary dismissal of the action. *See* Siegel Decl. ¶ 11 (documenting the $10,000 fee amount).

### CONCLUSION

**\*6** As the parties agree that this case should be dismissed, and only disagree as to whether the case should be dismissed with or without prejudice, Defendant's Motion for Summary Judgment is DENIED.

IT IS HEREBY ORDERED THAT this action is DISMISSED WITHOUT PREJUDICE pursuant to Rule 41(a)(2). IT IS FURTHER ORDERED THAT Defendant is awarded $10,000.00 in attorney's fees as a condition of dismissal.

IT IS SO ORDERED.

N.D.Cal.,2007.
Woodfin Suite Hotels, LLC v. City of Emeryville
Slip Copy, 2007 WL 81911 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.