## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MACIEJ MURAKOWSKI,   )
          )
    Plaintiff,   )
 v.        )  CA. No. 07-475 MPT
          )
UNIVERSITY OF DELAWARE,  )
          )
    Defendant.  )

## DEFENDANT UNIVERSITY OF DELAWARE'S ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

BUCHANAN INGERSOLL & ROONEY

William E. Manning, Esquire (#697)
James D. Taylor, Jr., Esquire (#4009)
Jennifer M. Becnel-Guzzo, Esquire (#4492)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE  19801
(302) 552-4200
(302) 552-4295 (facsimile)
william.manning@bipc.com
james.taylor@bipc.com
jennifer.becnelguzzo@bipc.com
*Attorneys for the University of Delaware*

April 9, 2008

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

NATURE AND STAGE OF THE PROCEEDINGS ...................................................... 1

SUMMARY OF THE ARGUMENT ............................................................................... 3

STATEMENT OF FACTS ................................................................................................ 4

ARGUMENT ................................................................................................................... 12

    I.    A university disciplinary setting is quite different from a criminal proceeding. ...........13

    II.    Murakowski admits he ignored the clear command of a University administrator, and he was appropriately punished for that violation. ...................................................13

    III.    The First Amendment does not entitle Murakowski to frighten and threaten other students. ...........................................................................................................................16

        A.    Murakowski's postings constitute "true threats." ................................................. 16

        B.    The University is not limited to responding only to "true threats." ...................... 20

    IV.    Murakowski was afforded Due Process. .........................................................................22

    V.    Murakowski is not entitled to damages as there were no constitutional violations. ......24

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*Blanche Road Corp. v. Bensalem Township*, 57 F.3d 253 (3rd Cir. 1995) .................................. 24

*Boim v. Fulton County School District*, 494 F.3d 978 (11th Cir. 2007)........................................ 21

*Boykins v. Fairfield Board of Education*, 492 F.2d 697 (5th Cir. 1974) ...................................... 23

*B.W.A. v. Farmington R-7 School District,* 508 F.Supp.2d 740 (E.D.Mo. 2007)........................ 22

*Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524 (9th Cir. 1992)............................................... 22

*Doe v. Pulaski County Special School District*, 306 F.3d 616 (8th Cir. 2002)............................. 16

*Esteban v. Central Missouri State College*, 415 F.2d 1077 (8th Cir. 1969)................................. 14

*Healy v. James*, 408 U.S. 169 (1972) ........................................................................................... 14

*Jaksa v. The Regents of the University of Michigan*, 597 F.Supp. 1245 (E.D. Mich. 1984)........ 13

*Jenkins v. Louisiana State Board of Education*, 506 F.2d 992 (5th Cir. 1975) ............................ 13

*J. S. v. Bethlehem Area School Distric*t, 807 A.2d 847 (Pa. 2002).................................................. 20

*Lovell v. Poway Unified School District,* 90 F.3d 367 (9th Cir. 1996)......................................... 16

*Morse v. Frederick*, 127 S. Ct. 2618 (2007) ........................................................................... 20, 21

*Newsome v. Batavia Local School Distric*t, 842 F.2d 920 (6th Cir. 1988)................................... 23

*Phillips v. Anderson County School Dist. 5*, 987 F.Supp. 488 (D.S.C. 1997) ............................. 22

*Pi Lambda Phi Fraternity, Inc. v. University of Pittsburg*h, 229 F.3d 435 (3d Cir. 2000) .......... 22

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ......................................................................... 17

*Re v. Gannett Co., Inc.*, 480 A.2d 662, 668 (Del. Super. Ct. 1984) ............................................ 24

*Schwartz v. Schuker*, 298 F.Supp. 238 (E.D.N.Y. 1969) .............................................................. 15

*Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969) ................ 20

*U.S. v. Baker*, 890 F.Supp. 1375 (E.D. Mich.1995), *aff'd sub nom. on other grounds,*
    *U.S. v. Alkhabaz*, 104 F.3d 1492 (6th Cir. 1997)................................................................ 19, 20

*United States v. Khorrami*, 895 F.2d 1186 (7th Cir. 1990) ............................................... 19

*United States v. Miami Univ.*, 91 F.Supp.2d 1132 (S.D. Ohio 2000) .............................. 13

*United States v. Veifhaus*, 168 F.3d 392 (10th Cir. 1999) ............................................ 19

*Virginia v. Black*, 538 U.S. 343 (2003) ........................................................... 16, 19

*Wagner v. Fort Wayne Community Schools*, 255 F.Supp.2d 915 (N.D. Ind. 2003) ..................... 23

*Watts v. United States*, 394 U.S. 705 (1969) ..................................................... 16, 20

*Widmar v. Vincent*, 454 U.S. 263 (1981) ............................................................ 22

*Winkfield v. University of Delaware*, Del. Ch., C.A. No. 2102, Noble, V.C. (May 2, 2006) 13, 15

*Wisniewski v. Board of Education of the Weedsport Central School District*,
    494 F.3d 34 (2d Cir. 2007) .................................................................... 20

## Statutes

20 U.S.C. §1221 ........................................................................................ 4

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Maciej Murakowski's ("Murakowski") Complaint challenges the University of Delaware's (the "University") discretion to discipline a student who posted threatening items on a website maintained on the University's server and disregarded the direct command, by a senior University administrator, designed to protect the safety of the campus and its students. Courts have consistently recognized that colleges and universities have broad discretion to discipline students who do not conform to standards of conduct established as part of the teaching mission. This is just such a case.

Murakowski, a student already on disciplinary probation, was charged through the University's student judicial system after University administrators learned from frightened students about postings Murakowski placed on a website and on his dormitory door. Because of the University's immediate concern for student safety, particularly in light of the events at Virginia Tech just 3 days earlier, Murakowski was immediately removed from his dormitory and advised that he could not return to campus until Ms. Cynthia Cummings, the Associate Vice President for Student Life, received a letter from a mental health professional declaring Murakowski not to be a danger to himself or others. Murakowski ignored that command almost immediately.

On May 2, 2007, a student disciplinary hearing was held before a neutral hearing officer during which Murakowski cross-examined witnesses, presented his defense and offered character witnesses. After considering the evidence, the hearing officer concluded that Murakowski violated the University's Disruptive Conduct and Failure to Comply policies. As a result, Murakowski was suspended for one semester, banned from residence halls and placed on

Deferred Expulsion through his graduation.  Murakowski appealed the hearing officer's decision to the University's Appellate Board, which upheld the hearing officer's decision and sanction.

On August 1, 2007, Murakowski filed this action.  Discovery has been completed.  This is the University's Answering Brief in Opposition to Murakowski's Motion for Summary Judgment and Opening Brief in Support of Its Motion for Summary Judgment.

## SUMMARY OF THE ARGUMENT

1.      Many of Plaintiff's claims mistakenly assume that a student in a disciplinary proceeding has the same rights accorded to a criminal defendant.  Not so.

2.      Murakowski admitted he ignored the clear instructions of a senior University official.  Not surprisingly, he was found to have violated the University's Failure to Comply policy.  No further facts are necessary in order to dismiss the Complaint.  That violation stands independent of the charge which, according to Murakowski, implicates his First Amendment rights.  Because suspension is an appropriate penalty for this violation, and because the record proves that this penalty would have been imposed without regard to the Disruptive Conduct violation, the sanction should be upheld and the Court need not inquire further into Murakowski's claims.

3.      Murakowski's postings constituted "true threats" or were otherwise disruptive to the University's mission.   They are not entitled to First Amendment protection.

4.      The University afforded Murakowski the "process" that was "due."

5.      Murakowski is not entitled to damages, costs or attorneys' fees, as there were no constitutional violations.  Moreover, the damages sought by Murakowski are purely speculative.

3

## STATEMENT OF FACTS

Plaintiff Maciej Murakowski was a student at the University of Delaware on April 19, 2007, when University administrators received complaints about postings he placed on the outside of his dormitory door and on a website he maintained on the University's server. His postings spoke of rape, murder and other unimaginable things in a way that was violent and morbid.

### The Threats

The University first learned about Murakowski's postings when the brother of a female student approached the University Police Department ("UDPD") on April 8, 2007. *See* email from Lt. Thomas Rahmer to Kathryn Goldman, a copy of which is included at B13-14.[1] The complainant informed UDPD that his sister and her roommate, who resided on the same dormitory floor as Murakowski, feared for their safety as a result of postings Murakowski had placed on a website he maintained on the University's server.[2] *Id.* Another complaint was received by the University's Counseling Center on April 20, 2007. *See* Letter from Cynthia Cummings to Murakowski, a copy of which is included at B15.

The rantings, which Murakowski claims he may freely publish regardless of impact, include:

- "Maciej's Official Guide to Sex," in which he vividly describes how to kidnap, rape and murder: "First you need to find a partner. You could find them in a grocery store, outside or on the internet. After you have found your partner, make sure nobody else is around, tie them

---

[1] To be compliant with the Family Educational Rights and Privacy Act, 20 U.S.C. §1221, *et. seq.*, and to preserve the anonymity of complaining students, the names of individual students have been redacted from the attached exhibits.

[2] Contrary to Murakowski's claim in his Complaint and Brief that he never advertised the existence of his website, Complaint at ¶8 and O.B. at 3, Murakowski acknowledged during his hearing that he placed materials on his dormitory door directing students to his website.

up, and drag them to a secluded location." A copy of this posting is included at B36-38. Murakowski also describes other violent sex attacks, including "Flaming Gay . . . Find a man. Set him on fire. Repeat[]" and "Sociopath . . . make sweet gentle love to her for hours . . . hold her and let her fall asleep in your arms. Then set her on fire." B36a. Murakowski concludes by explaining how to dispose of the murdered victim: "What you need: 1 shovel[,] 1 hole large enough to fit a dead body the size of your partner, dug in advance[, and] 1 tarp large enough to completely wrap said body[.] What to do: Use your imagination." B38.

- A post discussing Sexual Assault Awareness Day, in which Murakowski stated that he intended to obtain a sexual assault awareness t-shirt and "wear it while I'm raping some drunk girl in a dark alley. It'd be funny. Or maybe ironic. She'd certainly be aware of sexual assault. And that's ironic because the shirts are about promoting sexual assault awareness." A copy of this posting is included at B41-45.

- In the same posting, Murakowski referred to a list of predictors for being a rapist and stated, "Reading over those, all I can say is, 'Shit.' No matter how I interpret them, shit. Don't walk alone with me at night, ladies." B45.

- In his list of birthday wishes, Murakowski requests, "A small Asian girl. I would keep her tied up in the closet (like the brother does with his) and do unspeakable things to her when I got bored." A copy of this posting is included at B46-47. In addition, he requested, "A katana. You know, one of those Japanese sword things that you flip out and kill people with." B47.

- While writing about the black leather gloves he often wears year-round, Murakowski stated, "Apart from keeping my hands warm and being the bitch-chokingest gloves in the entire f---ing universe, the gloves make me feel menacing. When I wear them, I find myself talking in

a deeper voice, flexing my fingers, and generally intimidating the hell out of everybody. I forget that I am a spindly pale virgin, and feel more like a smooth ass-kicking biker. Or maybe OJ Simpson, on his way to choke some more bitches. Oh man, they rule so hard. And by 'they' I mean, 'me.' And by 'me,' I really mean 'the gloves.'" A copy of this posting is included at B67. Murakowski concludes the posting by suggesting he be known as "Darth Buddha" and explains: "the name perfectly combines my sadistic streak with the part of me that just doesn't care . . . And in case you are wondering, I'm serious." *Id.*[3]

- In "The Relationship Advice Pamphlet," Murakowski poses an apparently hypothetical question: "My boyfriend punches his friends in the arm, as a form of greeting. He started doing this to me, except really hard and in the stomach, when I told him I might be pregnant . . . What should I do?" Murakowski's answer: "You should feel proud that he's treating you like one of his male friends. This sort of abuse, and most other forms, is perfectly acceptable in an otherwise healthy relationship. Above all, remember that he's only hitting you because he loves you. And to kill the baby." A copy of this posting is included at B39-40. And, as one way to tell if you are in a "relationship," Murakowski offers: "You are tied up in a closet for the majority of your waking hours, except for brief interludes of violent, painful sex with a masked man who insists you call him 'Master.' And that's what he is." *Id.*

### The University responds

Eleven days after receiving the student complaint (and just 3 days after the horrific shootings at Virginia Tech), Lieutenant Thomas Rahmer, a UDPD officer, informed Cynthia Cummings, the Associate Vice President for Student Life, of the concerns expressed by the student's brother, as well as Lt. Rahmer's own concerns about Murakowski. B13. Ms. Cummings was alarmed, and immediately contacted Murakowski's father, a researcher at the

---

[3]   As he did with other postings, Murakowski ended this posting with the admonition: "Email me or die . . ." B67.

University, on April 19, 2007 and asked him to remove Murakowski from campus for the night and to report to Ms. Cummings' office the following day with Murakowski.  Complaint (D.I. 1) at ¶13.

On April 20, 2007, Ms. Cummings met with Murakowski and his father, explained her concerns regarding Murakowski's violent postings and the impact those postings had on other students and gave Murakowski a letter explaining that he was prohibited from entering his residence hall and attending classes until he received a letter from a licensed mental health professional indicating that he was not a threat to himself or to others.  A copy of Ms. Cummings' letter is included at B15.  Murakowski was also provided with a University Judicial Charge form advising him that he was being charged with Disruptive Conduct and a violation of the University's Responsible Computing policy.  A copy of the Judicial Charge Form is included at B16-17 and relevant portions of the University's Code of Conduct are included at B85-87. Ms. Cummings permitted Murakowski to return to his dormitory that evening with his father to retrieve items he would need for the weekend.[4]  See Hearing Officer's decision letter, a copy of which is included at B69-74.  Her letter made clear, however, that Murakowski was not to return to the dormitory again until the University received the letter from a mental health professional. B15.  Murakowski ignored those clear instructions.  B72.

Murakowski returned to Ms. Cummings' office on April 24, 2007 to advise her that Philip R. Braun, Ph.D., a licensed clinical psychologist, had examined Murakowski the previous evening.  See University's Answer to Interrogatory No. 5, Exhibit J to O.B.  Ms. Cummings explained to Murakowski that, while she had spoken with Dr. Braun that morning, they had not completed their conversation and she was waiting for a letter from Dr. Braun.  Id.  Murakowski

---

[4] Recently, the University learned that Murakowski's father apparently did not accompany him to his dormitory room that night.  This is yet another example of Murakowski flouting the University's rules and regulations.

7

was unhappy with Ms. Cummings' decision at that time and presented her with a letter stating that he would be returning to classes immediately. A copy of Murakowski's letter is included at B18. Ms. Cummings advised him that he was not to return to his dormitory or classes until she said it was okay. Specifically, Ms. Cummings wanted to confirm that the additional postings Dr. Braun had not seen would not cause him to change his opinion that Murakowski was not a threat to himself or others. *See* University's Answer to Interrogatory No. 5, Exhibit J to O.B. Later that afternoon, Ms. Cummings received Dr. Braun's letter via facsimile and learned that Dr. Braun had not seen all of Murakowski's postings. A copy of Dr. Braun's letter is included at B19-20.

However, before Ms. Cummings had the opportunity to provide Dr. Braun with the additional postings, she learned that Murakowski had disobeyed her direct command not to enter his dormitory. *See* email from Jim Tweedy to Ms. Cummings, a copy of which is included at B21. Specifically, University records showed that Murakowski's PDI[5] was used to gain access to his dormitory two times on April 22, 2007 and two more times on April 24, 2007. A copy of the PDI record is included at B22. In light of Murakowski's direct violation of a senior administrator's command, which was designed to protect students on the University campus and specifically those in Sypherd Hall – where the complaining female students also resided – Ms. Kathryn Goldman, Director of the Office of Judicial Affairs, wrote to Murakowski advising that, while he could return to classes, he was placed on emergency suspension from the residence halls and was being charged with Failure to Comply, in addition to the other charges. A copy of Ms. Goldman's letter is included at B24.

---

[5] Access to University dormitories is limited to only those students who reside in the dormitory. Each student is issued an electronic access card, or a "PDI," which permits them to access their dormitory building only.

**The hearing**

A hearing[6] was held on May 2, 2007 to address the three charges brought against Murakowski: Disruptive Conduct, Failure to Comply and violating the Responsible Computing policy. Mr. Scott Mason, the Associate Director of Student Centers at the University, served as the hearing officer and Ms. Holli Harvey, the assistant director of judicial affairs, was the presenting party. B69. Murakowski was present for the entire hearing and had an opportunity to ask Ms. Harvey and her witness, Lt. Rahmer, questions regarding the information presented. *Id.* In addition, Murakowski presented a defense and called several witnesses. *Id.*

Ms. Harvey presented evidence on the Disruptive Conduct charge that at least one student in Murakowski's dormitory was so frightened by his postings that her brother complained to the University police on April 8. *Id.* In addition, the student informed her academic advisor that her fear was affecting her studies and she therefore changed all of her classes to "listener" status.[7] She was very concerned that Murakowski would find out she reported him to the University and seek revenge against her. A copy of an email from Cheryl Davis-Robinson to Holli Harvey, which was introduced as an exhibit at Murakowski's student disciplinary hearing, describing Ms. Davis-Robinson's interaction with the frightened student is included at B27. Because of the student's fear, Ms. Harvey withheld the student's name and did not call her as a witness at the hearing.[8] Ms. Harvey also presented evidence in support of the Failure to Comply charge,

---

[6]  While a transcript has not been made, the parties have an audio recording of the entire hearing and will provide a transcript upon request by the Court.

[7]  Listener status means the student may attend class, but will not receive credit for the course.

[8]  That decision was consistent with University policy, which provides: "Prior to the hearing, [an accused student may] review all documents and materials in the possession of the Office of Judicial Affairs . . . that relate to the complaint, *provided, however, that such materials may be edited to shield the identity of those giving information when officials believe that confidentiality is necessary to avoid risk to those persons.*" *See* Student Guide, Section II, included at B88 (emphasis added).

introducing the PDI record showing that Murakowski's PDI card was used to enter his dormitory on 4 occasions from April 22 through April 24. *See* B71.

Murakowski defended his postings by arguing that they were satirical and funny, rather than threatening. *Id.* Witnesses called by Murakowski testified that he was not violent and that if the students reading the postings had known him, they would not have been frightened.[9] B71-72. Most importantly, Murakowski ***admitted he entered his dormitory on the morning of April 24*** in direct violation of the instruction that he stay out of Sypherd Hall. B72 ("You admitted that you entered your residence hall at least once on the 24th before ever providing Ms. Cummings with the documentation"). Murakowski also admitted that he had a friend enter the dormitory on three occasions, twice on April 22 and once on April 24, to post additional messages on his dormitory door. B71.

Following the hearing, Mr. Mason issued a decision letter finding Murakowski not guilty of violating the Responsible Computing policy, but guilty of violating the Failure to Comply and Disruptive Conduct policies. B69-74. Mr. Mason's decision letter makes clear that he was especially concerned with Murakowski's disregard for Ms. Cummings' directive that he not return to his dormitory. *See* B73 ("A review of your judicial record indicates this is your second case. *Moreover, you failed to comply with a senior level administrator's directive.*"). Murakowski admitted violating her directive and the hearing officer found that to be contrary to University policy. Further, Mr. Mason concluded that "[t]he bottom line is that your web site is filled with violence that created an uncomfortable and disruptive environment in your residence hall." B73.

---

[9] Murakowski, however, admits in his Complaint that the references to violence and sexual abuse were for "shock effect." Complaint, ¶9.

Following the hearing, Murakowski was suspended from the University and banned from campus through the end of the Fall 2007 semester. B73-74. However, Murakowski was permitted to complete his classes for the Spring 2007 semester and agreed to commute to school for the rest of the semester, so that he would no longer reside in a residence hall. An email from Kathryn Goldman to Murakowski is included at B26. In addition, Murakowski was banned from all University residence halls and placed on deferred expulsion through graduation. B73-74. These restrictions were hardly surprising given that Murakowski was already on probation for an earlier violation of the Code of Conduct that year. Documents regarding Murakowski's previous disciplinary charge are included at B1.

Murakowski appealed the hearing officer's decision to the University Appellate Board. A copy of Murakowski's appeal letter is included at B75-77. The hearing officer and Ms. Harvey, pursuant to University policy, wrote letters to the Appellate Board in support of their positions. Copies of Mr. Mason's and Ms. Harvey's letters to the Appellate Board are included at B78 and B79, respectively. Mr. Mason's letter reaffirms that the Failure to Comply violation alone justified the punishment:

> ***Even if one were to consider reversing my decision on disruptive conduct***, he makes no appeal, nor is there room for one, for his blatant failure to comply with (at the time) one of the two highest senior administrators in Student Life. ***This alone is worthy of a semester suspension because clearly if he has no respect for a senior [administrator] then will he ever listen to an RA***, Hall Director, professor, etc.? He needs to understand this failure to comply is not acceptable.

B78 (emphasis added). After considering Murakowski's appeal, the Appellate Board upheld Mr. Mason's decision and sanctions. A copy of the Appellate Board's decision is included at B81-84. Murakowski then filed his complaint with this Court.

## ARGUMENT

The University has the authority and responsibility to ensure the safety of its students. In the wake of the Virginia Tech tragedy and other infamous shootings and incidents on college campuses around the country, no institution of higher education can ignore threats and conduct that cause, or have the potential to cause, fear and apprehension on campus.

While Murakowski correctly points out that those tragedies do not limit his constitutional rights, *see* O.B. at 28, they certainly should not have been ignored and were a natural part of the context within which University officials acted. Moreover, the possibility that Murakowski *might not* murder or rape was not enough for the University. The decision to keep Murakowski away from campus until a qualified opinion could be sought was the correct immediate response. His choice to ignore that command easily justifies his sanction.

Therefore, while the University does not shrink from a review of its actions under the First Amendment, this case need not reach that issue. The University is certainly permitted to discipline a student who ignores the instruction of a University administrator and that, standing alone, should end this case.

The First Amendment does not prevent a publicly-supported University from imposing disciplinary sanction on a student who threatens others. Murakowski concedes that he aimed to "shock" students and others on campus when he wrote and posted his threatening materials. Complaint at ¶9. He succeeded – scaring a female student who resided on his residence hall floor and causing her to drop all of her classes to "listener" status, prompting her family to call the University Police and another to contact the University's Counseling Center.

I.      **A university disciplinary setting is quite different from a criminal proceeding.**

Before turning to the specific violations, it is important to understand the very real differences between a criminal trial and a student disciplinary hearing at a publicly-supported university. The latter requires far less due process and does not include most of the trappings typically found in criminal cases. *See Winkfield v. University of Delaware*, Del. Ch., C.A. No. 2102-N at 4, Noble, V.C. (May 2, 2006) (Ruling of the Court) ("[I]t is important to recognize that a college disciplinary process is not a criminal trial process . . . . a degree of informality in an academic community should not be unexpected.") (a transcript of the Court's oral ruling is attached hereto as Exhibit A). Other courts considering this subject have reached the same conclusion: "it is important to keep in mind that the primary purpose of a university is to educate its students. 'A school is an academic institution, not a courtroom or administrative hearing room.' Similarly, *a school disciplinary proceeding is not a criminal trial*." *Jaksa v. The Regents of the University of Michigan,* 597 F.Supp. 1245, 1250 (E.D. Mich. 1984) (internal citations omitted; emphasis added); *see also United States v. Miami Univ.,* 91 F.Supp.2d 1132, 1157 (S.D. Ohio 2000) ("[Student disciplinary proceedings] are not criminal in nature as they only regulate the relationship between the student and the university, and have no bearing on a student's legal rights or obligations under state or federal criminal laws."); *Jenkins v. Louisiana State Board of Education*, 506 F.2d 992, 1000 (5th Cir. 1975) ("Due process in the context of [student disciplinary proceedings] is not to be equated with that essential to a criminal trial . . . .").

II.     **Murakowski admits he ignored the clear command of a University administrator, and he was appropriately punished for that violation.**

When the University administration learned of the potential danger posed by Murakowski, Ms. Cynthia Cummings contacted his father (who happened to be a University employee) and asked that he and his son appear in her office to discuss the threats. During that

meeting, Ms. Cummings and another administrator, Ms. Holli Harvey, directed Murakowski to stay out of his residence hall pending clearance from a mental health provider that he was not an immediate threat to others.[10]   How did he respond?   He ignored the command, entered his dormitory, allowed another student to use his electronic access card (PDI) in violation of yet another University policy and hid those facts from the University until confronted with the PDI access records.

At his hearing, Murakowski confirmed that he both understood the instruction to stay out of his dormitory and chose to disobey it. B72.  That admission is fatal to his case, as the hearing officer explained that this violation alone would have resulted in a semester-long suspension.[11] As this was not Murakowski's first trip through the student disciplinary process, and he was already on disciplinary probation for the previous violation, there is no reason to wonder if he did not understand the consequences of his admission.   Copies of documents relating to Murakowski's earlier charge are included at B1-12; *see also* B73.

Courts have consistently recognized a university's right to maintain order on campus and discipline misbehaving students.  *See Healy v. James*, 408 U.S. 169, 194, n.24 (1972) ("In addition to the College administration's broad rulemaking power to assure that the traditional academic atmosphere is safeguarded, it may also impose sanctions on those who violate the rules . . . ."); *Esteban v. Central Missouri State College*, 415 F.2d 1077, 1088 (8th Cir. 1969) ("We agree with those courts which have held that a school has inherent authority to maintain order and to discipline students . . . . We further agree that a school has latitude and discretion in its

---

[10]   While it was understood that Murakowski would be returning to collect his belongings from his dormitory room, the University believed that return would be uneventful because i) his father had now been alerted and was cooperating and, indeed, was present when these instructions were given; and ii) residence life staff and University Police had been alerted and therefore necessary precautions could be made.

[11]   Plaintiff is simply wrong when he states that "this Court has no basis to conclude the finding of Failure to Comply automatically and of itself would have resulted in the same sanctions as were imposed." O.B. at 26.  The hearing officer's statement proves exactly that.

formulation of rules and regulations and of general standards of conduct."). As the Delaware Court of Chancery recognized when reviewing a University-imposed disciplinary sanction, "The question is not how I would evaluate this evidence. *The question is whether the hearing officer was within the realm of his discretion with which he acts when he made such a conclusion . . . Whether he was right obviously is not a question that I have the right to answer . . . ." Winkfield*, Del. Ch., C.A. 2102-N at 14, 16 (Exhibit A) (emphasis added).

Not surprisingly, it has also been held that "[g]ross disrespect and contempt for the officials of an educational institution may be justification *not only for suspension but also for expulsion of a student." Schwartz v. Schuker*, 298 F.Supp. 238, 242 (E.D.N.Y. 1969) (emphasis added). Under that test, the University's response was quite measured and it does not matter whether the student believed the command to be lawful or reasonable. *See id.* at 241 (noting there "surely was another way" to challenge the instruction other than to ignore it.).

Mr. Murakowski claims that the semester suspension was neither a "mandatory" nor "automati[c]" penalty for Failure to Comply. O.B. at 26. Those assertions are both correct and irrelevant. Indeed, so long as those sanctions were within the discretion of the University, the case should be dismissed. "Whether this is the right sanction or not is really not the question before [the Court]. *The question is whether the University, on the facts before it and the charges and facts set forth in the charging papers, could impose such a sanction in a manner consistent with due process . . . ." Winkfield*, Del. Ch., C.A. 2102-N at 19-20 (Exhibit A). It most certainly could.[12]

---

[12]   The University's Guide to University Policies prescribes a list of potential sanctions that may be imposed, and recites that "The University reserves the absolute discretion to determine appropriate sanctions to be imposed upon a student for any infraction of the Code of Conduct. The sanctions explained below may be cumulative, and no sanction need be exhausted before any other sanction may be imposed. The sanctions may be enhanced based on a past disciplinary record, the severity of behavior, or the impact upon the community. Sanctions may be tailored to specific situations. Therefore, the following list is not exhaustive." *See* Student Guide, Section III, included at B89.

**III.   The First Amendment does not entitle Murakowski to frighten and threaten other students.**

It is undisputed that the University may punish conduct and statements that threaten students at the University.  We doubt there would be a dispute if the same disturbing rantings were leveled at a particular student.  Why, then, should the result differ where statements are made about females as a group?

University officials, who have a unique responsibility to students on campus, have broad authority to impose sanctions on speech that constitutes "true threats" or that substantially disrupts or interferes with the opportunity of other students to obtain an education. Murakowski's did both.

**A.   Murakowski's postings constitute "true threats."**

The University may ban true threats of violence without offending the First Amendment. *See Virginia v. Black*, 538 U.S. 343, 359 (2003) (*citing Watts v. United States*, 394 U.S. 705 (1969)); *Doe v. Pulaski County Special School District*, 306 F.3d 616, 622 (8th Cir. 2002) (*citing Watts*, 394 U.S. 705); *see also Lovell v. Poway Unified School District*, 90 F.3d 367, 371 (9th Cir. 1996) (*citing Watts*, 394 U.S. 705).  "True threats" are "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or ***group of individuals***." *Virginia v. Black*, 538 U.S. at 359 (emphasis added).  Moreover, "[t]he ***speaker need not actually intend to carry out the threat.  Rather, a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.'*** " *Id.* at 359-60 (internal citations omitted; emphasis added).

Finally, the "true threat" exception weighs the slight social value of these threats against the "overriding interest in 'protecting individuals from the fear of violence, from the disruption

that fear engenders, and from the possibility that the threatened violence will occur.'" *Pulaski*, 306 F.3d at 622 (*quoting R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)). While Plaintiff claims that the website is a limited public forum entitled to heightened First Amendment protection, O.B. at 12, the University need not join that issue as "true threats" are entitled to ***no*** protection.

It cannot seriously be argued that these postings were not threatening. Female students were afraid enough to complain to the University Police. B13. One student was so afraid she dropped all classes to "listener status." B27-28. While Murakowski claims now that his threatening postings were meant to be satire, the law does not require that the writer intend to carry out the acts. Instead, it considers ***whether a reasonable, objective person would be afraid***. *See Pulaski*, 306 F.3d at 622 (applying "an objective test that focuses on whether a reasonable person would interpret the purported threat as a serious expression of an intent to cause a present or future harm."). Was it unreasonable for the hearing officer to conclude that writings describing in lurid detail how to kidnap, rape and murder would be threatening to others? Of course not.

Plaintiff asserts that these "statements" are not threats at all because there was "no expression of intent by Mr. Murakowski to injure anyone." O.B. 15. For reasons expressed just above, *his* intentions and *his* gloss on his own words simply don't matter. One cannot read his words without concluding that they could make a reasonable person fear for her safety:

- In "Maciej's Official Guide to Sex," he describes how to kidnap, rape and kill someone. B36-38. It was considered threatening by two complaining female students who lived near Murakowski.

17

- In another posting, Murakowski uses the first person and describes what he would wear "*while I'm raping some drunk girl in a dark alley.*" B42 (emphasis added). That threat is not excused or extinguished, as Plaintiff would have it, merely because he "warned" young women not to "*walk alone with me at night* . . . ." B45 (emphasis added). Murakowski cannot seriously suggest that words which threaten women with harm should they come near him should be excused as "fair warning" to all women – as if he deserves commendation for his thoughtful advice. One is put in mind of a murderer who claims it wasn't his fault: "I told him to put the phone down or I would shoot."

- Plaintiff also wishes for "[a] small Asian girl. *I would keep her tied up in the closet (like the brother does with his) and do unspeakable things to her when I got bored.*" B46-47 (emphasis added). Incredibly, Murakowski claims this is nothing more than a "statement of personal desire or interest[.]" O.B. at 16. Was it so unreasonable for others to take this as a threat of what he intended to do, particularly when it was followed with another wish: "A katana. You know, *one of those Japanese sword things that you flip out and kill people with.*" B47 (emphasis added).

- Plaintiff also asserts that he could not have meant any harm by his statements that the black leather gloves he apparently wears year-round are: "*the bitch-chokingest gloves in the entire f---ing universe, the gloves make me feel menacing.*" O.B. at 16-17 (emphasis added). How are others supposed to know that, especially when he describes how "[w]hen I wear them, I find myself talking in a deeper voice, flexing my fingers, and generally *intimidating the hell out of everybody.*" B67 (emphasis added).

- Murakowski also warns his audience that he is serious when describing his sadistic nature: "*And in case you are wondering, I'm serious.*" B67 (emphasis added).

18

There was simply no reason for his audience to pass these bizarre postings off as a joke. Murakowski did not include any disclaimer on those postings; to the contrary, he reminded his readers how "menacing" he was, how he "intimidat[ed] others" and how he was "serious."

Plaintiff argues that the target must be specifically identified in order to constitute a "true threat," and states that he found no case where a true threat can exist when it is directed at females generally. O.B. at 17. However, the very case he cites, *Virginia v. Black*, approved the sanction of a threat where there was no specifically identifiable target. There, the Supreme Court concluded that a threat may be directed at a "group of individuals." 538 U.S. at 359; *see also United States v. Khorrami*, 895 F.2d 1186, 1193 (7th Cir. 1990) (finding threats to all Israelis and those of the Jewish faith could be considered a "true threat"); *United States v. Veifhaus*, 168 F.3d 392, 396 (10th Cir. 1999) (threatened bombing of fifteen cities could be a "true threat.").

Plaintiff spends pages discussing a case that speaks just as persuasively for the University's position. *See U.S. v. Baker*, 890 F.Supp. 1375 (E.D. Mich. 1995), *aff'd sub nom. on other grounds, U.S. v. Alkhabaz*, 104 F.3d 1492 (6th Cir. 1997). O.B. at 17-19. Murakowski runs through open doors here and the University is willing to concede *arguendo*[13] that the application of a *criminal statute* must steer very clear of arguably protected speech and that the "true threat" analysis is limited in the context of a *criminal prosecution*. However, a University possessing the authority to set its own standards of conduct and responsible for educating its young charges while keeping them safe from harm, may proscribe conduct, including speech, if it interferes with the educational mission. Indeed, the same speech that was protected by the district court in *Baker* led to a suspension by the University of Michigan. *See http://en.wikipedia.org/wiki/Jake_Baker*. The result should be no different here.

---

[13] We limit our concession to this argument simply because we believe the district court was wrong on the merits. We note that the 6th Circuit ignored the First Amendment issue in its affirmance and the only appellate treatment of that issue is found in a stinging dissent. *See U.S. v. Alkhabaz*, 104 F.3d at 1496.

**B.    The University is not limited to responding only to "true threats."**

Regardless of whether Murakowski's postings constituted "true threats" and, thus, could be sanctioned *criminally*, educators possess "significantly broader authority to sanction student speech than the *Watts* ['true threat'] standard allows." *Wisniewski v. Board of Education of the Weedsport Central School District*, 494 F.3d 34, 38 (2d Cir. 2007) ("Although some courts have assessed a student's statements concerning the killing of a school official or a fellow student against the 'true "threat"' standard of *Watts*, we think that school officials have significantly broader authority . . . . With respect to school officials' authority to discipline a student's expression reasonably understood as urging violent conduct, we think the appropriate First Amendment standard is the one set forth by the Supreme Court in *Tinker*[14]'") (internal citations omitted); *see also J. S. v. Bethlehem Area School District*, 807 A.2d 847 (Pa. 2002) (considering both the "true threat" analysis and the disruption of school analysis).

The Supreme Court recently upheld a school's ability to regulate or proscribe student speech in *Morse v. Frederick*, 127 S. Ct. 2618 (2007).  In *Morse*, the Court recited *Tinker*'s warning that "schools may not prohibit student speech because of 'undifferentiated fear or apprehension of disturbance' or 'a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint,'" but it held that the "danger here is far more serious and palpable." *Morse*, 127 S. Ct. at 2629 (internal citations omitted).  The "serious and palpable" danger in *Morse* was the danger of celebrating illegal drug use at a school event. *Id.* at 2628.  The Court described "deterring drug use by schoolchildren" as "an 'important – indeed, perhaps compelling' interest." *Id.* at 2628 (internal citations omitted).  The case discussed the particular dangers of drug use by children and the potential for disruption of the education

---

[14] *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969).

process. *Id.* at 2628.   If peer pressure to use drugs is a serious and palpable danger entitling schools to discipline students, threats of violence must certainly meet that standard.

In a decision following *Morse*, the Eleventh Circuit considered a student's description of her dream – written in her notebook – of bringing a gun to school and shooting her sixth period teacher.  *See Boim v. Fulton County School District*, 494 F.3d 978 (11th Cir. 2007).   The Eleventh Circuit upheld the school's suspension of the student, and wrote, "[i]n this climate of increasing school violence and government oversight, and in light of schools' indisputably compelling interest in acting quickly to prevent violence on school property, especially during regular school hours, we must conclude that the defendants did not violate [the student]'s First Amendment rights."  *Id.* at 984.   Indeed the Eleventh Circuit cites *Morse* and writes that the "same rationale applies equally, if not more strongly, to speech reasonably construed as a threat of school violence. . . . *[There] is no First Amendment right allowing a student to knowingly make comments, whether oral or written, that reasonably could be perceived as a threat of school violence, whether general or specific, while on school property during the school day.*"  *Id.* (emphasis added).   The Eleventh Circuit reached this holding notwithstanding the "[l]iterary merit and technique" the student used.  *Id.* at 985.

While these cases involve elementary or secondary education students, their holdings are no less applicable in the higher education setting.   In a case addressing a university's right to exclude certain student groups from its open forum policy permitting access to university facilities, the Supreme Court noted the university's interest in educating its students:

> A university differs in significant respects from public forums such as streets or parks or even municipal theaters.   A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities.

*Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981). The Supreme Court in *Widmar* affirmed "a University's right to exclude even First Amendment activities that violate reasonable campus rules or substantially interfere with the opportunity of other students to obtain an education." *Id.* at 277. The Third Circuit has also held that First Amendment activities "need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education." *Pi Lambda Phi Fraternity, Inc. v. University of Pittsburgh*, 229 F.3d 435, 445 (3d Cir. 2000) (discussing First Amendment right of association).

Plaintiff contends that his actions could not have been disruptive because "[n]o classes were cancelled, interrupted or prevented from occurring. There was no widespread disorder, or disorder of any kind." O.B. at 21. While that statement is thankfully true, it is not the end of the matter. One student dropped all her courses to "listener" status because of her fears and apprehension and was sufficiently in fear to complain to her family and eventually to the University Police. The hearing officer had "substantial facts which reasonably support a forecast of likely disruption." *B.W.A. v. Farmington R-7 School District*, 508 F.Supp.2d 740, 747 (E.D.Mo. 2007) (*quoting Phillips v. Anderson County School Dist. 5*, 987 F.Supp. 488, 492 (D.S.C. 1997)). And, the University "need not wait for an actual disruption to occur." *Id.* (*quoting Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 529 (9th Cir. 1992)).

## IV.  **Murakowski was afforded Due Process**.

Murakowski also challenges the Disruptive Conduct violation on the grounds that he was denied the opportunity to confront the complaining students at the hearing. O.B. at 24. However, hearsay testimony is perfectly acceptable in a University disciplinary setting. *See Boykins v. Fairfield Board of Education*, 492 F.2d 697, 701 (5th Cir. 1974) ("Basic fairness and

integrity of the fact-finding process are the guiding stars. Important as they are, the rights at stake in a school disciplinary hearing may be fairly determined upon the 'hearsay' evidence of school administrators charged with the duty of investigating the incidents. We decline to place upon a board of laymen the duty of observing and applying the common-law rules of evidence."); *Newsome v. Batavia Local School District*, 842 F.2d 920, 925, n.4 (6th Cir. 1988) (the Court concluded that requiring cross-examination would "unnecessarily formalize school expulsion proceedings, imposing the additional burden on school administrators of applying, to some extent, the rules of evidence."); *Wagner v. Fort Wayne Community Schools*, 255 F.Supp.2d 915, 926 (N.D. Ind. 2003) (concluding that a school could proceed through hearsay evidence in an expulsion proceeding).

This was not a case with uncorroborated facts. Here, students complained about Murakowski's postings and conduct. The threatening messages were available for all to see, and Plaintiff himself admitted to writing the materials, posting them on his website and door and doing so to "shock" those who saw it. Complaint at ¶9. While Murakowski claims that he should have been offered the opportunity to question those students (or pose questions to them in writing), O.B. at 25, that was neither required by the standards for due process in a university disciplinary setting nor necessary where a violation may be found even where there is *no* witness expressing fear or apprehension. That there were complaining students here certainly aided the hearing officer, but his finding was not dependent on information gained from them.

Plaintiff's argument is both incorrect regarding the use of hearsay and, once again, misunderstands substantively the foundation needed for a violation. Plaintiff apparently believes that there must be a manifestation of fear – some witness who was *actually* threatened. O.B. at 20-21. The cases, though, do not require that there be evidence that someone actually *felt*

23

threatened; they require instead evidence of what a reasonable listener would have believed. While the evidence presented at the hearing dealt with young women who *were* frightened, it would have been enough for the hearing officer to conclude that an objective viewer would have been frightened. There was certainly ample reason to find that here, and the University submits that it is free to discipline a student for directing these threats to others. Again, the test is whether a reasonable person would fear the postings.

In his Complaint, Murakowski alleged other infirmities with the student judicial process, claiming that the University failed to follow its written procedures. Complaint at ¶¶39-40. The University, however, did follow its procedures and provided Murakowski with all that due process requires. As Murakowski failed to address these additional claims in his Opening Brief, it appears he has abandoned them.

## V.    Murakowski is not entitled to damages as there were no constitutional violations.

As there were no constitutional violations, Murakowski is not entitled to costs, fees and damages. Moreover, the compensatory damages Murakowski seeks are purely speculative as there is no evidence that Murakowski would be hired as a chemical engineer following graduation and no evidence that he would be paid over $59,000.00. *See Re v. Gannett Co., Inc.*, 480 A.2d 662, 668 (Del. Super. Ct. 1984) (future losses must "be established by substantial evidence and not be left to speculation"); *see also, Blanche Road Corp. v. Bensalem Township*, 57 F.3d 253, 265 (3rd Cir. 1995) ("[t]he level of damages [in a §1983 case] is ordinarily determined according to principles derived from the common law of torts.").

24

## CONCLUSION

Maciej Murakowski admits he intended to "shock" his fellow students. He did just that, causing fear and apprehension among at least two female students who lived in his dormitory and affecting one so severely that she changed her classes. While these complaints were being investigated, Murakowski was told to remain out of his dormitory – the very same one where the affected students lived. He ignored that command, returned to his dormitory and has been punished accordingly. There was ample evidence for the hearing officer to conclude that his postings were threats or had the potential to disrupt the University, and as such the First Amendment did not preclude the University from taking disciplinary action against him. The hearing officer's decision should be upheld.

BUCHANAN INGERSOLL & ROONEY

William E. Manning, Esquire (#697)
James D. Taylor, Jr., Esquire (#4009)
Jennifer M. Becnel-Guzzo, Esquire (#4492)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE 19801
(302) 552-4200
(302) 552-4295 (facsimile)
william.manning@bipc.com
james.taylor@bipc.com
jennifer.becnelguzzo@bipc.com
*Attorneys for Defendant University of Delaware*

April 9, 2008

# EXHIBIT A

EFiled: Jun 16 2006 4:50PM EDT
Transaction ID 11557906

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

PHILIP WINKFIELD,                          :
                                           :
              Plaintiff,                    :
                                           :
         v                                 :  Civil Action
                                           :  No. 2102-N
UNIVERSITY OF DELAWARE,                     :
                                           :
              Defendant.                    :

                    -  -  -

                    Chancery Courtroom No. 12D
                    New Castle County Courthouse
                    500 North King Street
                    Wilmington, Delaware
                    Tuesday, May 2, 2006
                    10:02 a.m.

                    -  -  -

BEFORE:  HON. JOHN W. NOBLE, Vice Chancellor.

                    -  -  -

              RULINGS OF THE COURT

                    -  -  -

-------------------------------------------------------
              CHANCERY COURT REPORTERS
            New Castle County Courthouse
         500 North King Street - Suite 11400
            Wilmington, Delaware 19801-3759
                  (302) 255-0524

2

```
1   APPEARANCES:

2          RICK S. MILLER, ESQ.
           JASON C. POWELL, ESQ.
3          Ferry, Joseph & Pearce, P.A.
             for Plaintiff
4
           WILLIAM E. MANNING, ESQ.
5          JAMES D. TAYLOR, ESQ.
           JENNIFER M. BECNEL-GUZZO, ESQ.
6          Klett, Rooney, Lieber & Schorling
             for Defendant
7

8                          -  -  -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

CHANCERY COURT REPORTERS

3

1              THE COURT:  Plaintiff Philip Winkfield

2  brought this action contesting his expulsion from the

3  University of Delaware where he is a freshman because

4  of drug and weapons possession.  Before the Court

5  today is his motion for a temporary restraining order.

6  The granting of that motion would allow him to return

7  to class and to complete the spring semester.

8              To obtain the extraordinary remedy of

9  a temporary restraining order, plaintiff must

10  demonstrate a colorable claim, irreparable harm, and a

11  favorable balancing of the equities.

12              My work is on an expedited basis.

13  Briefing was completed shortly before noon yesterday.

14  My work is also without the benefit of a

15  fully-developed factual record.  Temporary restraining

16  order applications frequently are framed by facts on

17  which the parties largely agree.  That, unfortunately,

18  is not the case here.

19              A fair amount of what I say in the

20  next several minutes could easily change with the

21  development of a factual record.

22              A few words about the nature of the

23  case may also be helpful.  Mr. Winkfield presents a

24  challenge to a college disciplinary system and its

CHANCERY COURT REPORTERS

4

1    application to him.  Although I will review the

2    factual background, it is not my function to find as a

3    factual matter whether or not he committed the alleged

4    acts.  It may be a bit simplistic, but it is fair to

5    characterize the Court's role as one of assuring due

6    process.

7            Although the nature and the extent of

8    necessary due process will vary with context, it is

9    important to recognize that a college disciplinary

10   process is not a criminal trial process.  In short, a

11   degree of informality in an academic community should

12   not be unexpected.

13           I turn to the factual record such as

14   it is.  Again, as I've noted, I'm not making factual

15   findings regarding Mr. Winkfield's alleged conduct,

16   and I will from time to time try to point out some of

17   the discrepancies in the parties' views of what

18   happened.

19           Mr. Winkfield resided in Christiana

20   West Tower.  His dormitory suite consisted of two

21   rooms, each shared by two students, and a common area

22   and kitchen.  His roommate was one Kopp.  On

23   December 1, 2005, a resident assistant smelled the

24   odor of marijuana emanating from the dorm room.  She

5

1    called campus police.  A campus police officer came to

2    the room and obtained the roommates' consent to

3    search.

4                  There is some dispute as to whether

5    permission for the search was coerced and about the

6    scope of the search.  Mr. Winkfield has moved to

7    exclude the evidence because his version of the

8    written consent form differs from the University's.

9    All I have is two pieces of paper which ought to be

10   the same but aren't.  That obviously is troubling; but

11   on the record, limited as it is, I can infer little.

12   Although this may reflect on the officer's

13   integrity -- and at this point I certainly don't know

14   -- the consent form is not that critical at this stage

15   of the proceeding.  It may be sufficient that the

16   other roommate let the officers in and Mr. Winkfield

17   and Mr. Kopp may have consented verbally.

18                  Mr. Winkfield was asked for

19   identification, and he reached into a green book

20   bag -- at least this is the testimony of the officer,

21   which it is clear the University's hearing officer

22   credited -- and after -- and he reached into that

23   green book bag in search of identification.  The

24   officer saw a pipe and a bag containing a green leafy

6

1   substance, which later was tested with positive

2   results for marijuana.  And they were on the

3   roommate's desk.  The roommate denied ownership, but

4   Mr. Winkfield stepped up and admitted possession.  The

5   officer also reported that Mr. Winkfield said "What's

6   mine is also his and vice versa."  The officer found a

7   pipe and some rolling papers in Mr. Winkfield's desk.

8            Mr. Winkfield now denies ownership of

9   the green book bag and its contents.  Recall that when

10  asked for identification, he reached into the bag.

11  According to the officer, however, he admitted in the

12  dorm room on the -- on December 1st to owning the book

13  bag and the contents.  The contents of the book bag

14  are of interest.  An incomplete inventory would

15  include two green bongs with odor and trace amounts of

16  marijuana, one clear bong with odor of marijuana,

17  three packets of rolling papers, a rolling device, one

18  pair of brass knuckles, one folding knife with a

19  three-and-one-half-inch blade, 13 small prepackaged

20  bags containing marijuana with yellow Batman logos on

21  them, 110 small empty Ziploc plastic baggies with the

22  Batman logo on them, two Ziploc bags containing

23  marijuana, one large plastic bag filled with a green

24  leafy substance commonly used to cut marijuana, two

CHANCERY COURT REPORTERS

7

1    Ecstasy pills, and one digital scale.  The weight of

2    the marijuana was 25.8 grams; the filler was 81 grams.

3    However, as Mr. Winkfield points out, no cash or

4    customer list was found.

5              Mr. Winkfield was notified of the

6    charges against him, violation of the University's

7    drug policy and possession of the brass knuckles, a

8    dangerous instrument or weapon.  A detailed factual

9    description of his conduct was provided to him as part

10   of the charging papers.

11             The University's drug policy

12   encompasses a range of offenses from simple possession

13   to delivery.  It is clear that the facts upon which

14   the hearing went forward were known to Mr. Winkfield

15   almost from the very beginning.  The charging papers

16   were sent on December 7, 2005.

17             Mr. Winkfield does not dispute that

18   the various items were found in the green book bag in

19   his room.  He does dispute the ownership of the book

20   bag was his and also that the ownership of the

21   contents was his.

22             The rules for the University's student

23   judicial disciplinary system are readily available

24   online.  The charging parties provided him with the

CHANCERY COURT REPORTERS

8

1    web site.

2              A hearing was held on February 24,

3    2006.  Mr. Winkfield was found guilty by the hearing

4    officer of possessing drugs, marijuana, and a

5    dangerous weapon, the brass knuckles.  He also was

6    found to have possessed the filler material.

7              The hearing officer's report goes on

8    to state -- and I think it's best that I read this in

9    its entirety, because I think one needs to read the

10   entire paragraph to understand what the hearing

11   officer found -- "Based on this information" -- and,

12   again, I'm quoting the hearing officer -- "I am

13   finding you guilty of violating the drug policy, two

14   counts, and the weapons/dangerous instruments and

15   explosives policy.  Corporal Robinson stated that you

16   admitted to being the owner of the book bag which

17   contained marijuana, illicit drugs, prohibited

18   weapons, drug paraphernalia, and items commonly used

19   to package, sell, and distribute marijuana.

20   Corporal" -- I'm sorry.  "Corporal Robinson also

21   recalled you searching the bag for identification,

22   further indication that the bag belonged to you.  I

23   find no reason for Corporal Robinson to for" --

24   "fabricate an admission by you to being the owner of

9

1    this bag.  Regardless of the actions or outcomes of

2    your former roommate, I believe you had both knowledge

3    and possession of the green book bag and its

4    contents."

5                    The hearing officer recommended

6    expulsion for the reasons set forth in his three-plus,

7    single-spaced page hearing officer's report.  That was

8    issued on March 3, 2006.  Mr. Winkfield appealed this

9    decision to the judicial appellate board.  That board

10   affirmed the decision.  Accordingly, Mr. Winkfield has

11   been expelled from the University as of April 18,

12   2006, and it is this process which he challenges here.

13                   The verified complaint alleges that

14   Mr. Winkfield was informed of the hearing officer's

15   decision by cell phone call.  That is true.  And when

16   I first read it, it was particularly troubling; but

17   that also is not the entire story.  At the close of

18   the hearing, the hearing officer apparently told Mr.

19   Winkfield that he could call him if he had not

20   received the decision by a certain date.  Mr.

21   Winkfield did call.  The hearing officer returned the

22   call and informed him of the decision.  A written

23   decision followed a few days later.

24                   The complaint alleges that Mr.

1    Winkfield was on the Dean's List.  It is relevant for

2    the Court's function in a matter such as this to

3    determine whether the target of the disciplinary

4    process is a good student or not.  It turns out that

5    the cumulative average following the fall semester was

6    a 1.5.  The Dean's List reference is simply the

7    product of what I think can fairly be characterized as

8    an administrative mistake.

9            Mr. Kopp was similarly charged.  He

10   pled guilty, did not contest the charges, and was

11   expelled.

12           The plaintiff raises a long list of

13   due process violations.  I turn to that list, which is

14   drawn primarily from paragraph 27 and Count II of the

15   verified complaint.

16           Respondents in the University's

17   student disciplinary system are not entitled to

18   representation by counsel.  They may be entitled to

19   representation with respect to the impact that process

20   could have on criminal charges.  It turns out that

21   counsel was present with Mr. Winkfield at the hearing.

22   Mr. Winkfield has not demonstrated that there is a

23   constitutionally-mandated due process right to counsel

24   in the contest -- context of academic and disciplinary

11

1    processes.  Moreover, he has not suggested that the

2    lack of counsel was material to the outcome.  I rely

3    primarily upon Judge Posner's analysis in Osteen.

4    There the Court "doubted" that the Constitution would

5    ever confer a right to counsel in any student

6    disciplinary proceeding.

7                   It's not necessary for me to define

8    the entire outline of this doctrine.  It could be --

9    I'm not suggesting that it would be -- that counsel

10   would be necessary with a particularly complex case;

11   but this case was certainly not complex.  It might

12   also be if the University decided to prosecute cases

13   with attorneys, that the respondent may be entitled to

14   representation.  Again, given the nature of this

15   proceeding, I do not need to go into any great detail

16   about that doctrine.

17                  I confess that it is somewhat

18   troubling that counsel is not available for what I do

19   view as an important moment in the student's life, but

20   I also acknowledge that the courts that have looked at

21   this before tend to focus on two things:  First, that

22   the presence of counsel is typically not going to be

23   outcome determinative and, second, the cost and the

24   academic burden, administrative burden, of having

CHANCERY COURT REPORTERS

12

1    full-flung adversary proceedings would outweigh any

2    benefits that might result.

3                    Now, everyone agrees that Mr.

4    Winkfield was entitled to the assistance of an

5    advisor.  His efforts to obtain a faculty advisor were

6    unsuccessful.  His efforts to obtain a student advisor

7    were also unsuccessful.  The University did appoint a

8    student advisor for him.  The hearing was held well

9    over two months after notice of the charges was given.

10   I'm not convinced that more time would have allowed

11   Mr. Winkfield the opportunity to get a better student

12   advisor.

13                   Mr. Winkfield -- Mr. Winkfield did

14   attack the competence and dedication of this student

15   advisor, but only in the most conclusory manner.  A

16   simple conclusory statement that the student advisor

17   was not interested in the case fails to provide me

18   with a sufficient basis to enter injunctive relief on

19   an interim basis.  I do note that this may be one of

20   those issues which, with further factual development,

21   may gain more substance.

22                   Mr. Winkfield chides the University

23   for failing to disclose all evidence against him

24   before the hearing.  I'm not certain what the

CHANCERY COURT REPORTERS

13

1   additional evidence is, but he certainly had the bulk

2   of the evidence available to him.  Indeed, the bulk of

3   the evidence appears to have been disclosed in the

4   charging papers.  I have not been directed to any

5   undisclosed evidence that would have had an impact on

6   the final decision, or at least would likely have an

7   impact on the final decision.

8            Mr. Winkfield alleges that the hearing

9   officer improperly considered and investigated

10  evidence outside of the hearing process.  This is

11  certainly an example of an allegation which deserves

12  further inquiry; but as of now, I have insufficient

13  facts upon which to reach any conclusion, even under

14  the standard that governs the temporary restraining

15  order process.

16            There is a dispute -- and I accept Mr.

17  Winkfield's version that there was a communication

18  between the hearing officer and the investigating

19  officer before the hearing.  Unfortunately, we do not

20  know what transpired in that conversation, and I do

21  not believe it is the proper function of the Court to

22  speculate about that.

23            There's been some dispute as to

24  whether or not it was raised at the hearing.  I'm

CHANCERY COURT REPORTERS

14

1   satisfied, based on representation of counsel, that it

2   was raised just prior to the hearing, certainly in a

3   timely and proper fashion; but there's nothing that I

4   can work with.  And, in short, I'm left with, what I

5   would characterize as factual limbo, with several

6   questions but no colorable claim.

7           Mr. Winkfield asserts that the hearing

8   officer made improper determinations of fact that were

9   not consistent with the actual charges.  The material

10  factual conclusions in the hearing officer's report

11  are the facts alleged in the charging papers and

12  relate directly to drug and weapons possession.

13          Mr. Winkfield contends that the

14  hearing officer did not properly factor in Mr. Kopp's

15  guilty plea.  In substance, Mr. Winkfield argues that

16  if Kopp had admitted possession as he did, then it

17  follows that Mr. Winkfield was not in possession and,

18  thus, was not responsible for the contraband.  The

19  question is not how I would evaluate this evidence.

20  The question is whether the hearing officer was within

21  the realm of his discretion with which he acts when he

22  made such a conclusion.  Simply because a codefendant,

23  if you will, even though I don't know that they were

24  designated as codefendants, admits to possession, it

15

1   does not follow that Mr. Winkfield was also not in

2   possession.  Not only do we have Mr. Winkfield's

3   statement that "What's mine is his and vice versa," we

4   also have Mr. Winkfield's admission, at least as

5   reported by the investigating officer, that the book

6   bag was his.

7            The University's drug policy has

8   guidelines for sanctions.  The guidelines -- and

9   guidelines emphasize that that's what they are,

10  guidelines, and they're not controlling -- suggest

11  that for the first offense of drug proceedings, some

12  type of probation is an appropriate sanction.  It

13  would seem that for the first offense, that expulsion

14  would not be warranted.

15           The difficulty with Mr. Winkfield's

16  argument is the quantity of illegal material in his

17  possession and the presence of brass knuckles.  He

18  argues that the University is punishing him for

19  possession with intent to distribute for being a drug

20  dealer without having charged him with that.  There is

21  something of an after-the-fact aspect to the

22  University's justification of its actions that is

23  somewhat troubling; but when the facts -- in essence,

24  what Mr. Winkfield had in his green book bag -- are

CHANCERY COURT REPORTERS

16

1    considered, expulsion seems a reasonable sanction.

2                        Perhaps the drug dealing aspect could

3    have been specified with more forcefulness in the

4    charging papers, but a fair reading of the charging

5    papers identifies aspects clearly related to matters

6    that go beyond simple possession, the reference to the

7    quantity of marijuana, the already-bagged marijuana,

8    bags with a logo consistent with the bags that had

9    marijuana, a digital scale, the list goes on.

10                       There's a general allegation that the

11   hearing officer was not fair and was not an impartial

12   fact-finder.  The record before the hearing officer

13   supported his factual findings.  Whether he was right

14   obviously is not a question that I have the right to

15   answer.  I'm satisfied that the plaintiff has not

16   demonstrated that the hearing officer's factual

17   findings denied a substantially fair hearing or due

18   process to Mr. Winkfield.

19                       The plaintiff next turns to a number

20   of challenges tied to the student judicial system

21   rules.  First, there's a complaint that all witnesses

22   should have been listed in the notice.  This is one of

23   those where there may be some technical substance to

24   it, but the simple fact is the only witness called by

17

1  the University to testify against him was the

2  investigating officer.   The investigating officer was

3  known to Mr. Winkfield.   There simply is no prejudice.

4           Second, Mr. Winkfield complains that

5  specific rules which he violated were not identified.

6  Any fair reading of the charging papers informed him

7  of the conduct which was alleged, and the charging

8  form had boxes specifically checked identifying the

9  policies or the charges alleged to have been violated.

10           As I've noted, this is not a criminal

11  process in the context of a college disciplinary

12  process.  In this context, that's all that's required

13  with respect to notice.

14           Third, there's a requirement that the

15  notice provide the student with a description of

16  procedures used at the hearing.  In this day and age

17  in a university setting, incorporating by reference a

18  University-maintained web site readily available to

19  the student is sufficient.   The procedures are

20  available there.

21           There is some complaint about a

22  prehearing meeting.   The charging papers urged Mr.

23  Winkfield to call the appropriate University

24  representative to schedule such a hearing.   Perhaps it

CHANCERY COURT REPORTERS

18

1  could have been done more promptly or efficiently.

2  The fact of the matter is, the prehearing meeting was

3  held, and there's been no showing of any prejudice.

4          Similarly -- similarly, there's a

5  complaint that notice did not expressly advise Mr.

6  Winkfield of his rights to call witnesses or question

7  witnesses.  Again, this is all addressed on the web

8  site.

9          I also note that during the course of

10  this process, Mr. Winkfield was advised by counsel.

11          Next, Mr. Winkfield contends that he

12  was not given the opportunity to review all documents

13  and materials in possession of the Office of Judicial

14  Affairs before the hearing.  Again, I'm not satisfied

15  that there's been a showing of prejudice beyond

16  perhaps the consent to search form, which I already

17  addressed.  I'm not sure what those documents would

18  have been, anyway.  The evidence that mattered was the

19  evidence that was seized from the dorm room.

20          There's a complaint that the hearing

21  officer did not render a decision within five days as

22  required by Section 2(D)(2)(j) of the student judicial

23  system rules.  That section provides that "the

24  administrative hearing officer shall send a written

19

1    decision to the Office of Judicial Affairs within five

2    calendar days after the conclusion of the hearing."

3    Subsection (k) goes on to say that the Office of

4    Judicial Affairs shall notify the accused student.

5              The technical answer is that the duty

6    is to send the notice of the decision to the Office of

7    Judicial Affairs, not to the student and that there's

8    no timeline for providing notice to the student.  The

9    question raised by the plaintiff is whether the

10   failure of the administrative hearing officer to send

11   the decision to the Office of Judicial Affairs within

12   five days requires dismissal of the charges.  The

13   rules suggest otherwise.  Practical considerations

14   suggest otherwise.  Most importantly -- and I would

15   suggest this is controlling -- there's no suggestion

16   of prejudice.

17             We come now to the plaintiff's

18   challenge to the appropriateness of the sanction.

19   Again, I've already addressed it once.  Whether --

20   whether this is the right sanction or not is really

21   not the question before me.  The question is whether

22   the University, on the facts before it and the charges

23   and facts set forth in the charging papers, could

24   impose such a sanction in a manner consistent with due

20

process is the question.  And at least for the present
purposes, I'm not persuaded that there's a colorable
claim that the University did not act appropriately.

There is also a challenge to the
failure of the University to provide all necessary
information for his appeal.  This is one of those
issues where the plaintiff may, with the development
of a factual record, have a -- a much more compelling
and much more interesting argument; but at this point,
I don't have a basis for granting relief on that
ground.

Finally, the plaintiff contends the
University has a policy to wait until resolution of
any charges in the criminal system before invoking its
own disciplinary processes.  I'm not certain, nor has
plaintiff persuaded me, given me a reason to believe
that there is such a policy with respect to violations
on campus.

Mr. Winkfield was charged criminally.
It appears the charges will be resolved through the
diversion program.  The impact of this is open to
debate from whether participation in that program
requires an admission of guilt to whether expulsion
from the University impairs his ability to participate

CHANCERY COURT REPORTERS

21

1    in that process.  Ultimately, because this case really

2    is about whether the University complied with its due

3    process obligations, what transpires in the criminal

4    justice system is of little value, at least as it has

5    transpired so far.

6             In sum, I am persuaded that Mr.

7    Winkfield has not demonstrated -- I am persuaded -- I

8    am not persuaded that Mr. Winkfield has demonstrated a

9    colorable claim within my understanding of that

10   concept.  I am troubled because there are some steps

11   taken by the University which, upon development of a

12   factual record, may give credence to his complaint.

13   On the other hand, I am also troubled that in almost

14   any college disciplinary effort there will be some

15   procedural failures.  The fact that the rules are not

16   complied with to a hundred percent perfection cannot

17   be the standard that the Court employs on an interim

18   basis, especially in the absence of a showing of

19   prejudice from the procedural shortcomings.  I

20   recognize that that puts the plaintiff at a real

21   burden, but the problem that the plaintiff has to

22   acknowledge is that there is a -- a regularity that

23   one anticipates from administrative or university

24   disciplinary process.

CHANCERY COURT REPORTERS

22

1            My concern here ultimately is one for
2    the fairness of the process.  A hearing officer whose
3    integrity, who has not yet sufficiently on this record
4    been questioned to put his decision in jeopardy,
5    concluded rationally but, admittedly, not necessarily,
6    from the facts that it was appropriate that Mr.
7    Winkfield be expelled.  I am uneasy about adopting
8    what Mr. Winkfield's theory of the case ultimately
9    boils down to, which is if there are procedural
10   violations and the result is his expulsion from
11   school, a temporary restraining order should almost
12   follow as a matter of course.  I believe that I'm
13   called upon to respect the academic disciplinary
14   policy and its application unless there's a showing
15   the due process rights of the student were impaired.
16   That did not occur here.  He was aware of the charges,
17   conduct alleged.  He could confront his accusers, he
18   could testify.  He could present the testimony of
19   others.  This process, at least for preliminary
20   purposes, was sufficient.  In short, there's no
21   showing of a colorable claim.
22            The parties debated at great length as
23   to whether or not expulsion from school constitutes
24   irreparable harm.  That debate was in the papers.

CHANCERY COURT REPORTERS

23

1  Regardless of how one tries to reconcile the

2  University's record showing Mr. Winkfield on the

3  Dean's List and academic probation at the same time,

4  the fact remains that he's at the bottom of his class.

5  And I also acknowledge that a student wrongfully

6  expelled from school will have lost a semester at

7  least of his life, will have little to show for it,

8  and he will be required to explain it in the future,

9  all of which may be terribly unfair and all of which I

10  would suggest in the proper circumstances could,

11  indeed, constitute irreparable harm.  Thus, I do not

12  base my decision today in any way on whether there was

13  irreparable harm.

14             Finally, I'm called to balance the

15  equities.  The University states that it believes that

16  Mr. Winkfield is a drug dealer.  Given the evidence,

17  that's a conclusion that one can rationally draw.  I

18  certainly express no views as to whether it's the

19  right conclusion.  If someone is dealing drugs at the

20  University, expulsion would seem not only to be

21  appropriate but perhaps inevitable.  I note that the

22  presence of brass knuckles adds to the mix.

23             I acknowledge that the University did

24  not expedite this and that perhaps suggests that the

CHANCERY COURT REPORTERS

24

1    University does not consider Mr. Winkfield that much

2    of a risk.  On the other hand, it may well turn out to

3    the delay was as much a product of its concern that

4    his due process rights be satisfied.  Again, that's

5    not a debate that I have to resolve today.

6                 Accordingly, for these reasons, the

7    motion for temporary restraining order will be denied.

8    I will be entering an order to that effect either

9    today or tomorrow.

10                With that we need to address where

11   does this go from here.  I'm perfectly prepared to

12   deal with this on a preliminary injunction basis if

13   the parties want to do it that way.  It may be that

14   the development of some limited factual record my

15   views will change.  I still keep an open mind about a

16   lot of what I've said.  I simply have to deal with the

17   record as -- such as it is in front of me.

18                The concern that I have is that as a

19   practical matter, by the time we can get to the normal

20   preliminary injunction record, it probably will be too

21   late, that even if Mr. Winkfield should prevail, to do

22   him any good, at least with respect to this semester.

23                MR. POWELL:  Your Honor, what I would

24   propose is an opportunity to speak to my client,

CHANCERY COURT REPORTERS

25

1   opposing counsel about where to go from here and then

2   set forth a course of action to the Court.

3                THE COURT:  The -- that's one prong of

4   scheduling.  The other scheduling is I see absolutely

5   no reason why we can't get this to final resolution in

6   the summer so that if we all conclude that -- more

7   accurately, if I conclude he was wrongfully expelled,

8   that the fall semester this year will be available to

9   him.

10               MR. POWELL:  Understood, Your Honor.

11               THE COURT:  Is there anything else I

12  can do this afternoon?

13               (No response)

14               THE COURT:  I want to thank counsel

15  for the quality of their arguments; and they were put

16  together under, as I alluded to, very, very difficult

17  time constraints.  I found them very helpful and very

18  thorough.  But as I said, it's just the nature of the

19  process that we all have to act without full command

20  of the record that we would like to have; but it was

21  important that we deal with this as promptly as we

22  could.

23               I will then wait to hear from counsel

24  in terms of scheduling in the future.

CHANCERY COURT REPORTERS

26

1              MR. POWELL:  Yes, Your Honor.

2              THE COURT:  With that, recess Court,

3   please.

4              (Court adjourned at 1:03 p.m.)

5                    - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MACIEJ MURAKOWSKI, | ) | |
| | ) | C.A. No. 07-475-MPT |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNIVERSITY OF DELAWARE, | ) | |
| | ) | |
| Defendant. | ) | |

**APPENDIX TO DEFENDANT UNIVERSITY OF DELAWARE'S ANSWERING
BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

BUCHANAN INGERSOLL & ROONEY

William E. Manning, Esquire (#697)
James D. Taylor, Jr., Esquire (#4009)
Jennifer M. Becnel-Guzzo, Esquire (#4492)
The Brandywine Building
1000 West Street, Suite 1410
Wilmington, DE  19801
(302) 552-4200
(302) 552-4295 (facsimile)
william.manning@bipc.com
james.taylor@bipc.com
jennifer.becnelguzzo@bipc.com
*Attorneys for the University of Delaware*

April 9, 2008

# TABLE OF CONTENTS

**Page Number**

Documents regarding Murakowski's previous disciplinary charge, Spring 2007 ....................B1

Email exchange between Lt. Rahmer and Office of Judicial Affairs, April 19, 2007 ..............B13

Letter from Cynthia Cummings to Murakowski, April 20, 2007 ...........................................B15

University Judicial Charge, April 20, 2007 ...........................................................................B16

Letter from Murakowski to Office of Judicial Affairs, April 2007 .........................................B18

Letter from Dr. Philip R. Braun to Cynthia Cummings, April 23, 2007 .................................B19

Email from Jim Tweedy to Cynthia Cummings, April 24, 2007.............................................B21

PDI Dormitory Access Records, April 24, 2007 ....................................................................B22

Letter from Cynthia Cummings to Murakowski, April 25, 2007 ...........................................B23

Letter from Kathryn Goldman to Murakowski, April 25, 2007 ..............................................B24

Email from Office of Judicial Affairs to Murakowski, April 27, 2007 ....................................B25

Email from Kathryn Goldman to Murakowski, May 4, 2007..................................................B26

Exhibits from Student Disciplinary Hearing..........................................................................B27

    Email from Cheryl Davis-Robinson .............................................................................B27

    Murakowski's web postings ........................................................................................B29

Decision Letter, May 23, 2007 .............................................................................................B69

Murakowski's Appeal Letter, June 4, 2007 ...........................................................................B75

Email from Scott Mason to University Appellate Board, June 6, 2007 ..................................B78

Email from Holli Harvey to University Appellate Board, June 25, 2007.................................B79

Appellate Board Case Review Worksheet, June 29, 2007.....................................................B80

Appellate Board Decision Letter, July 2, 2007.....................................................................B82

Excerpts from the Student Guide to University Policies ..........................................................B85

**Subject:** Copyright Violation Notice - Student TT#167469
**From:** UD IT Security <secadmin@UDel.Edu>
**Date:** Tue, 20 Feb 2007 15:21:49 -0500
**To:** Maciej Adam Murakowski <kuactet@UDel.Edu>
**CC:** judicial-affairs@UDel.Edu

-----BEGIN PGP SIGNED MESSAGE-----
Hash: SHA1

The University of Delaware received the notification of claimed infringement below alleging you are distributing copyrighted material from your computer in violation of US Copyright Law, Title 17 United States Code Section 106(3) and possibly other state, county, or international laws and/or treaty obligations. Copyright infringement is a serious offense which violates federal law and the University's Code of Conduct, which includes the expectation that all members of the University community understand and abide by the Policy for Responsible Computing http://www.udel.edu/ExecVP/polprod/1-14.html. Further information on copyright infringement is available at http://www.udel.edu/security/copyright_abuse.htm.

This notice informs you that you must STOP distributing copyrighted material immediately. In accordance with section 512(c)(1)(C) of Title 17 United States Code, your network connection has been suspended to remove, or disable access to the copyrighted material(s)described below. Until this matter has been resolved, your computer may not use the University network.

This case has been referred to the Office of Judicial Affairs for their review. You will be contacted by them concerning judicial charges and sanctions.

In addition to judicial sanctions, you must remove all illegally obtained copyrighted materials - movies, music and software - from your system before your network connection can be restored. Also, you must call IT-User Services at 831-8442 to schedule an appointment to have your system examined. It is important that you mention the TT# in the subject line when calling. Charges are $70 for the first-time clean-up service and $100 for any subsequent service.

Please know that the University takes responsible electronic citizenship seriously. All users of the University network are responsible for ensuring their systems are secure, do not get compromised and do not adversely affect network performance or other users of the network. The computer security help page http://www.udel.edu/security/ offers guidance and tips for keeping your system secure. You are also encouraged to familiarize yourself with the Responsible Computing Student Manual http://www.udel.edu/ecce/student-toc.html and the Code of the Web http://www.udel.edu/codeoftheweb/.


UD IT Security
-------------------------------------------------------------
From: bsa-no-reply2@copyright-compliance.com
Subject: Copyright Infringement Notice ID: 197-792014
To: secadmin@UDel.Edu
Reply-To: bsa-no-reply2@copyright-compliance.com
Date: Tue, 20 Feb 2007 12:03:07 -0800

20 Feb 2007 18:30:53 GMT

UD499

Copyright Violation Notice - Student TT#167469

University of Delaware

RE: Unauthorized Distribution of the following copyrighted computer program(s):

Dear Sir/Madam:

The Business Software Alliance (BSA) has determined that the above connection, which appears to be using an Internet account under your control, is using a P2P network seen below to offer unlicensed copies of copyrighted computer programs published by the BSA's member companies.

Evidentiary Information:
Notice ID: 792014
Asset: The MathWorks Matlab
Protocol: BitTorrent
IP Address: 128.175.29.239
DNS: host29-239.student.udel.edu
File Name: MATLAB R2006b
File Size: 1821499038
Timestamp: 19 Feb 2007 04:07:25 GMT
Last Seen Date: 19 Feb 2007 04:07:25 GMT
URL: http://torrent-download.to:2710/announce
Username (if available):

The above computer program(s) is/are being made available for copying, through downloading, at the above location without authorization from the copyright
owner(s).

Based upon BSA's representation of the copyright owners in anti-piracy matters, we have a good faith belief that none of the materials or activities listed above have been authorized by the rightholders, their agents, or the law. BSA represents that the information in this notification is accurate and states, under penalty of perjury, that it is authorized to act in this matter on behalf of the copyright owners listed above.

We are giving notice of these activities pursuant to Section 512 of Title 17 of the U.S. Code (as enacted by the 'Online Copyright Infringement Liability Limitation Act'). We expect that you will take expeditious action to remove or disable access to the materials described above, and thereby prevent the illegal reproduction and distribution of pirated software via your company's network. As you know, illegal on-line activities can result in 50 million people on the Internet accessing and downloading a copyrighted product worldwide without authorization - a highly damaging activity for the copyright holder.

We appreciate your cooperation in this matter. Please advise us regarding what actions you take.

Please include the following Notice ID in any response you send:
197-792014

Please respond indicating the actions you have taken to resolve this matter. The provided link has been assigned to this matter
http://webreply.baytsp.com/webreply/webreply.jsp?customerid=197&commhash=3559da1eb7e514c5b0cea60444b0f739.

For email correspondence, please reference the above Notice ID in the subject line
mailto:bsa@copyright-compliance.com?subject=RE%3A%20Copyright%20Infringement%20Notice%20ID%3A%20197%2D792014

Yours sincerely,

John R. Wolfe
Manager of Investigations
Business Software Alliance
1150 18th St NW Suite 700
Washington, DC 20036
URL: http://www.bsa.org
E-mail: bsa@copyright-compliance.com

B2

UD500

Copyright Violation Notice - Student TT#167469

1-888-667-4722

-----BEGIN PGP SIGNATURE-----
Version: PGP 8.0.2

iQA/AwUBP+b0oPTNfJECmdXfEQILAQCggCSFFPnuGvPX27N0SX63Q6IGl4kAoMqr
/m3Z+2vicVIaCE9gtgBEentM
=Fo0y
-----END PGP SIGNATURE-----

B3

UD501

2/21/2007 9:16 AM



OFFICE OF JUDICIAL AFFAIRS

218 Hullihen Hall
University of Delaware
Newark, Delaware 19716-6107
*Ph:* 302/831-2117
*Fax:* 302/831-8191
*Website:* www.udel.edu/judicialaffairs

CONFIDENTIAL

February 21, 2007

Mr. Maciej Murakowski
214 Sypherd Hall
CAMPUS MAIL

Dear Mr. Murakowski,

This letter will serve as formal notification that the Information Technologies Department of the University has sent us notification that you were found to be distributing or receiving copyrighted material through your University network connection. Information regarding the specific nature of the violation was also sent to your University e-mail account. Copyright infringement is a serious offense which violates both federal law and the University's Code of Conduct, which includes the expectation that all members of the University community understand and abide by the Policy for Responsible Computing.

Detailed information concerning your rights as a charged student within the Undergraduate Student Judicial System, information about the University of Delaware's judicial policies and procedures, and a description of the Responsible Computing Policy may be found in the Student Guide to University Policies, located on the Judicial Affairs website at www.udel.edu/judicialaffairs or www.udel.edu/stuguide/06-07/code.html#respcomp.

If you wish to contest the allegation of violating the Responsible Computing Policy, it is your obligation to present yourself in the Office of Judicial Affairs, 218 Hullihen Hall, for a pre-hearing meeting no later than March 7, 2007. Pre-hearings are held Tuesdays, Wednesdays and Thursdays from 9AM-12Noon and 1-4PM. Pre-hearing appointments take place on a first-come, first-served basis. Failure to contest your case will be considered an admission of guilt to the violation being considered, your case will be handled administratively, and the sanctions outlined below will go into effect.

During the pre-hearing, you will be given the chance to discuss the incident further, and will have the opportunity to ask questions and review relevant information available in your judicial file. You will also have the option of taking responsibility for the charge(s) by pleading "guilty" in the pre-hearing or contesting the charge(s) by pleading "not guilty" and requesting a full administrative hearing.

If you elect to have an administrative hearing following the pre-hearing, your charge(s) will be heard by an individual member of the University's staff, serving as an administrative hearing officer. You will be given a structured opportunity to hear the reporting party's information and to respond to all the information and charges. You will also have the right not to appear or you may choose to remain silent. The hearing officer will make and communicate a decision regarding your situation several days following the administrative hearing.

February 21, 2007
Page 2

If you plead guilty to the above charge, or do not attend a pre-hearing by the date specified above, the following sanctions will be applied. These sanctions are based upon the current incident in conjunction with any past judicial history:

You are being placed on Disciplinary Probation through the end of Fall semester 2007. So that there will be no misunderstanding, disciplinary probation is defined as a period of observation and review during which you must demonstrate your willingness and ability to comply with all University regulations.

You are restricted from accessing the University network using your computer (either from your residence hall room, another resident's room or port, via wireless connection, dial-up PPP access or any other means) for thirty days from the date of the infringement notification. Any time you are not registered for an academic session does not count towards this restriction. You may still access the Internet (and view your University e-mail account) from any public computing site on campus.

In addition, as per the instructions included in the notification from the IT Security Administration, you must remove all illegally obtained copyrighted materials – movies, music, software – from your system before your network connection can be restored. Also, you must call IT-User Services at 831-8442 to schedule an appointment to have your system examined. It is important that you include the TT# (found in the subject line of the notification sent by IT Security Administration) when calling. Charges are $70 for a first-time clean-up and $100 for any subsequent service.

Finally, in accordance with the administrative process of the Office of Judicial Affairs, a letter will be sent to your parent(s)/guardian(s) informing them that you have been found guilty of violating a Code of Conduct Policy.

Please contact me if you have any questions about this matter.

Sincerely,

Michael J. Fernbacher
Judicial Affairs Coordinator

cc:     file

B5

UD503



OFFICE OF JUDICIAL AFFAIRS

218 Hullihen Hall
University of Delaware
Newark, Delaware 19716-6107
*Ph:* 302/831-2117
*Fax:* 302/831-8191

April 11, 2007

Maciej Murakowski
214 Sypherd Hall
CAMPUS MAIL

Dear Mr. Murakowski,

This letter will summarize an Administrative Hearing that took place on March 15, 2007 in Hullihen Hall at 10:00am. You appeared to address the charge of violating the Responsible Computing Policy as reported by Karl Hassler of the Information Technology (IT) – Network & Systems Services Department. The charge is the result of a copyright infringement incident which the Business Software Alliance traced to your IP address on February 19th, 2007.

Mr. Hassler (presenting party), you and I were present for the entire hearing. You entered a plea of *not guilty* to violating the Responsible Computing Policy.

The following points were raised during the hearing:

- Mr. Hassler stated that the University received a notice of claimed infringement alleging that you were distributing copyrighted material from your computer. Specifically, the Business Software Alliance believes that you were copying or distributing copyrighted material through a peer to peer application. On February 19th, 2007, the Business Software Alliance traced The Mathworks Matlab to your IP address and believed that it was available for sharing through a file sharing program, BitTorrent. The University informed you of the violation on February 20th, 2007.
- Mr. Hassler explained that BitTorrent is a file-sharing program that is readily available on the Internet. While it is not illegal to have these programs, it becomes a problem for the University when they are used to share copyrighted material.
- You stated that you have a license for this software, due to your employment with a computer lab on campus. You also stated that you have used a peer-to-peer sharing program called Bit Thief that fools other computers into thinking you are sharing in order to increase the likeliness that users will share with you. You did go on, however, to say that you were probably not using this software at the time of the violation.

Based upon the information presented at the hearing, I am finding you *guilty* of violating the Responsible Computing Policy. Mr. Hassler provided clear information that copyrighted materials was available for sharing (in violation of copyright law) from your computer. It is important to note that even though you have the license to use this software on your computer, you are not licensed to share it with others. A review of your judicial record indicates that this is your first violation of University policy. Accordingly, the following sanctions apply:

You are being placed on **Disciplinary Probation through the end of Fall semester 2007**. So that there will be no misunderstanding, disciplinary probation is defined as a period of observation and review during which you must demonstrate your willingness and ability to comply with all University regulations.

You are **restricted from accessing the Internet using your computer (either from your residence hall room, another resident's room or port, via wireless connection, dial-up PPP access or any other means) for thirty days from the date of the infringement notification.** Any time you are not registered for an

AN EQUAL OPPORTUNITY UNIVERSITY

UD504

academic session does not count towards this restriction. You may still access the Internet (and view your University e-mail account) from any public computing site on campus.

In addition, as per the instructions included in the notification from the IT Security Administration, if you have not already done so, you must remove all illegally obtained copyrighted materials -- movies, music, software -- from your system before your network connection can be restored. **Also, you must call IT-User Services at 831-8442 to schedule an appointment to have your system examined.** It is important that you include the TT# (found in the subject line of the notification sent by IT Security Administration) when calling. Charges are $70 for a first-time clean-up and $100 for any subsequent service.

Finally, in accordance with the administrative processes of the Office of Judicial Affairs, **a letter will be sent to your parent(s)/guardian(s)** informing them that you have been found guilty of violating a Code of Conduct policy.

This action is being taken administratively in accordance with established University policy and at your request. Should you wish to exercise your right to appeal, you may do so by communicating this wish directly to the Chairperson of the Appellate Judicial Board, c/o Office of Judicial Affairs, 218 Hullihen Hall. Your appeal petition must be filed within five (5) days of receipt of this letter. The statement of appeal shall be prepared by you and your judicial advisor and shall be limited to three double spaced pages with regular margins. The statement of appeal shall not include citations to judicial or other authorities outside the University. (In the event that such citations are included, the chairperson may, in her or his discretion, reject the appeal.) The appeal must clearly explain, in detail, the basis for the appeal, and should include one or more of the appeal grounds:

1. The decision is contrary to evidence presented at the hearing or contrary to new evidence not known in advance of the hearing;
2. Procedures were not followed during the process; or
3. The sanction imposed is inappropriate or unreasonable."

If you submit an appeal, the presenting party and I will be provided an opportunity to respond to your petition. If you submit an appeal, sanctions will not take effect until the Appellate Board renders a decision, unless otherwise noted.

Should there be any questions regarding this matter or if I may be of assistance to you, please feel free to contact me at 302-831-4311.

Sincerely,

Michael R. Diesner
University Hearing Officer

cc:    Karl Hassler, Presenting Party
       File

UD505

RECEIVED

APR 2 0 2007

OFFICE OF
JUDICIAL AFFAIRS

**Statement of Appeal for the violation of the University of Delaware Responsible Computing Policy by Maciej Murakowski**

I, Maciej Murakowski, having been found guilty of violating the UD Responsible Computing Policy, would like to petition for appeal on the basis of evidence that was not presented at the hearing which may have affected the outcome of said hearing.

In particular, I had more evidence, which, due to extreme nervousness (it was my first experience with the Judicial System), I neglected to present. What I had came out in poorly-explained bits and pieces scattered throughout my testimony, and a garbled, almost nonsensical statement at the very end, and could not have been very persuasive. I respectfully request the opportunity to present this evidence again, in hopefully a clearer manner.

Thank you for your consideration.

-Maciej Murakowski

UD506

**Subject:** Murakowski Appeal
**From:** UD IT Security <secadmin@UDel.Edu>
**Date:** Tue, 24 Apr 2007 15:18:39 -0400
**To:** Cindi Munyan <munyan@UDel.Edu>
**CC:** Security Administration <secadmin@UDel.Edu>

The basis of Mr. Murakowski's appeal is that he had, in his possession during the hearing, "evidence that was not presented at the hearing". He then goes on to request he be given the opportunity "to present this evidence again, in hopefully a clearer manner." So while he did apparently present the evidence, he seems dissatisfied with the outcome and would like to argue his case again. Clearly, this is not a sufficient basis for granting an appeal, which might include "the decision is contrary to information presented at the hearing or contrary to new information not known in advance of the hearing". Since he did not make this motion and has not provided such evidence, there is no basis for an appeal and it should be denied.

Also, during the hearing, I believe Mr. Murakowski admitted downloading The MathWorks Matlab using a torrent P2P application. He tried to rationalize his actions using a variety of rather entertaining lines of thinking: sharing copyrighted materials with P2P applications is a form of Fair Use, he had a copy but lost it so he should be free to obtain another free of charge, theoretically he might have been using a home-grown torrent variant that fakes its participation in torrents and really doesn't share out material (only downloads, so that would be OK).

Karl Hassler

UD507

Cindi,

I got the fax.  I do not have a response, other than to state the
letter I wrote stands on it's own.

Michael

UD508

## *APPELLATE BOARD CASE REVIEW WORKSHEET*

Name of Student: *Murakowski, Maciej*                   File Date: 4/20/07

Incident Date: ___2/20/07___                    Date of Review: 4/25/07

Charges: ___RC1___                     Past Record ___Yes _X_ No

### Grounds for Appeal (Check all that apply):

_____    Procedures were not followed during the process

_____    Sanction imposed is inappropriate or unreasonable

__X__    Decision is contrary to information presented at the hearing or contrary to new information not

        known in advance of the hearing

_____    Appeal of sanctions only

### Sanctions Applied by Hearing Officer (Check all that apply):

_____    Disciplinary Warning

__X__    Disciplinary Probation through __Fall 2007__

_____    Deferred Suspension from Residence Halls_____

_____    Deferred Suspension from University_____

_____    Suspended/Banned from _____ Residence Hall(s) through _____

_____    Move out of _____ Residence Hall and re-assigned to _____

_____    Suspension from the University and Banned from Campus through _____

_____    Expulsion

_____    Academic Penalty _____ Course _____

_____    F/X    Course _____

_____    Academic Integrity Seminar

_____    Alcohol Education Program

_____    Substance Abuse Assessment

_____    Completion of substance abuse treatment program prior to re-enrollment

_____    Fine    _____$100 _____$250 _____$500 _____$1000 _____

_____    Restitution $_____

_____    Anger Management Program

_____    Conflict Resolution Course

_____    Ethics/Decision Making Seminar

_____    Paper on _____

_____    Judicial Educator

__X__    Parent Letter

__X__    Other _30 day internet suspension / system must be cleaned by IT_

UD498



OFFICE OF JUDICIAL AFFAIRS

218 Hullihen Hall
University of Delaware
Newark, Delaware  19716-6107
*Ph:* 302/831-2117
*Fax:* 302/831-8191
*Website:* www.udel.edu/judicialaffairs

CONFIDENTIAL

April 30, 2007

Maciej Murakowski
214 Sypherd Hall
Campus Mail

Dear Mr. Murakowski,

The Appellate Board met on April 25, 2007 to review your request for an appeal concerning the incident that occurred on February 20, 2007. You appealed on the grounds that the decision is contrary to information presented at the hearing or contrary to new information not known in advance of the hearing.

Upon reviewing all available information relevant to your situation, the Appellate Board has determined that you have not presented sufficient grounds on which to base an appeal.  Therefore, the following sanctions will apply:

You will be placed on Disciplinary Probation through the end of Fall Semester 2007.  So that there is no misunderstanding, disciplinary probation is defined as a period of observation and review during which you must demonstrate your willingness and ability to comply with all University regulations.

You are restricted from accessing the University network using your computer (either from your residence hall room, another resident's room or port, via wireless connection, dial-up PPP access or any other means) for thirty days from the date of the infringement notification. You may still access the Internet (and view your University e-mail account) from any public computing site on campus.

In addition, as per the instructions included in the notification from the IT Security Administration, you must remove all illegally obtained copyrighted materials – movies, music, software – from your system before your network connection can be restored. Also, you must call IT-User Services at 831-8442 to schedule an appointment to have your system examined. It is important that you include the TT# (found in the subject line of the notification sent by IT Security Administration) when calling. Charges are $70 for a first-time clean-up and $100 for any subsequent service.

Finally, in accordance with the administrative process of the Office of Judicial Affairs, a letter will be sent to your parent(s)/guardian(s) informing them that you have been found guilty of violating a Code of Conduct policy.

The decision of the Appellate Board is final.

Sincerely,

Zakia Reaves
Chairperson Appellate Judicial Board

cc:  Karl Hassler, Presenting Party
     Mike Diesner, Hearing Officer
     Residence Life
     File

B12                                                                UD496

**Subject:** Fwd: Public Relations 07-10796 Maciej Murakowski
**From:** Thomas Rahmer <tomr@UDel.Edu>
**Date:** Thu, 19 Apr 2007 14:04:31 -0400 (EDT)
**To:** kgoldman@UDel.Edu, harv@UDel.Edu
**CC:** jivory@UDel.Edu, amfm@UDel.Edu, daajr@UDel.Edu

Kathryn and Holli,

I just spoke with Holli on the phone concerning Mr. Murakowski. Holli checked your database and he is not in your system even though in one of his blogs from April 15 he addresses the point that he was charged with irresponsible computing. (by whom we don't know at this point)

The incidents we have on him was a harassment complaint by ▇▇▇▇▇▇▇ (RA) in 2005 and on 4/8 the brother of a female resident of Sypherd came to HQ because his sister and her roommate had read some of the blogs and feels uneasy around Murakowski. Once again there was no harassment involved but they just felt uneasy around him.

I have to apologize for letting this slip through the cracks for 10 days but, given the Va Tech incident and the implications that some professional intervention may have prevented it from happening, I believe that both of you should read these ramblings, especially the seventh one down "Talking About Sex" and the clean up procedure may indeed warrant some intervention from the counseling center or whatever resource either of you deem appropriate. I have not read each and every blog. It would take about 2 uninterrupted hours to do so.

Feel free to give me a call.

Thank you.

Tom

---

**Subject:** Public Relations 07-10796
**From:** Adam Mease <amfm@UDel.Edu>
**Date:** Mon, 9 Apr 2007 00:09:39 -0400 (EDT)
**To:** tomr@UDel.Edu
**CC:** daajr@UDel.Edu

```
Lt.,
As a follow up from Investigator Anderson's email regarding the incident having to
check the Facebook web page.  The subject (Maciej Murakowski) also has a UD Copeland
webpage: http://copland.udel.edu/~kuactet/
On this web site he posts his personal views and the like.  The one subject that
caused the RP to come into UDPD is the topic regarding "sex".  I would suggest that
you look at that one and read to the bottom where it describes how to "cleanup" after
sex.  This topic has me concerned.
I also contacted ▇▇▇▇▇▇▇ who was a victim of a previous incident 05-16032.
She described him to me as being very different and should could see him as someday
becoming psychotic or as she put it "a serial killer".  For this being said I wonder
if it is possible to attempt to get some kind of psychological evaluation done on
```

him.  I understand that his thoughts and such are rights of free speech but for the safety of the students that live with him I feel this should be looked into a little more.
Please check the website and evaluate as you like.  He also has a livejournal website that is accessible through his Facebook.com site.
Please contact me if you have any further questions.  Thank you.


PTL A. Mease
U of DE Police
413 Academy St
Newark DE 19716
(302) 831-2222

**Message 6**    **Content-Type:**    message/rfc822
               **Content-Encoding:** 8bit

B14

UD562



OFFICE OF THE
ASSOCIATE VICE PRESIDENT
FOR CAMPUS LIFE

218 Hullihen Hall
University of Delaware
Newark, Delaware 19716-6107
Ph: 302/831-8939
Fax: 302/831-8191
Website: www.udel.edu/campuslife

April 20, 2007

Mr. Maciej Murakowski
214 Sypherd Hall

HAND DELIVERED

Dear Mr. Murakowski:

On April 19, 2007, I received a report from the University of Delaware Police Department that referred me to the following website, *http//udel.edu/~kuactet*. Apparently you created this website using the University of Delaware server. On the website, I found a number of postings that are sexually graphic, hostile, and violent. The subject matter includes such things as rape, murder, relationship violence, and animal torture and cruelty. It also contained racist, sexist, anti-Semitic, and homophobic statements.

The University Police Department became aware of this website as a result of formal complaint being filed by two students, one on November 9, 2005, and one on April 8, 2007. In addition, on April 20, 20007, the Counseling Center received a call from a parent expressing concern about your "bizarre behavior".

As a result of these reports, the following action will be taken:

1.   You will be charged through the University's judicial system with violating the Responsible Computing Policy.
2.   You will be prohibited from staying in your residence hall room or attending classes until you receive a psychiatric assessment.
3.   You must provide me with a letter from a licensed mental health provider that indicates that you are not a threat to yourself or others.
4.   You must sign a waiver granting me permission to speak with that licensed mental health provider to confirm his or her conclusions and to learn about any recommendations he or she might have pertaining to mental health treatment.

These actions are necessary because your behavior has caused alarm to members of the University of Delaware community.

Please feel free to contact me if you have any questions or concerns.

Sincerely,

Cynthia E. Cummings
Associate Vice President for Campus Life

cc:   James Flatley, University Police
      Kathryn Goldman, Director, Office of Judicial Affairs
      Kathleen Kerr, Director, Residence Life
      Januz Murakowski



OFFICE OF JUDICIAL AFFAIRS

218 Hullihen Hall
University of Delaware
Newark, Delaware 19716-6107
*Ph:* 302/831-2117
*Fax:* 302/831-8191

## UNIVERSITY JUDICIAL CHARGE

Name of Charged Student: Maciej Murakowski
DOB: 2/4/88
Local Address:  214 Sypherd Hall, CAMPUS
Phone: 837-8944
Classification:   EG  09S  CHE
Date of Incident:   April 19, 2007 & on-going
Time of Incident:
Location:   University Computer Network
Name of Witness:  University Police
Address of Witnesses:   Academy Street
Reporting Party:  Office of Judicial Affairs
Address: 218 Hullihen Hall
Phone Number: 831-2117

Note: Numbers in parenthesis indicate multiple violations for each category.

( ) ___  Academic Honesty
( ) ___  Alcohol Regulations
( ) ___  Complicity
(1) _X_  Disruptive Conduct
( ) ___  Drug Policy
( ) ___  Endangering the Safety of Others
( ) ___  Failure to Comply
( ) ___  False Information
( ) ___  Guest Policy
( ) ___  Hazing
( ) ___  Misuse of University Materials, Services or Property
( ) ___  Off-Campus Convictions
( ) ___  Residence Hall Regulations
(1) _X_  Responsible Computing and Use of University Computer Resources
( ) ___  Sexual Assault
( ) ___  Sexual Harassment
( ) ___  Student Organizations
( ) ___  Theft
( ) ___  Weapons, Dangerous Instruments, and Explosive Chemicals or Devices on
         Campus

Please enter below a brief explanation of charges:

UD151

AN EQUAL OPPORTUNITY UNIVERSITY

Mr. Murakowski is alleged to have used University computer resources for non-academic purposes to create and post a website (http://copland.udel.edu/~kuactet/). The contents of this site have caused concern and alarm to University community members. The information posted is graphic in nature, violent, derogatory, hostile, and disturbing.

University of Delaware
Student Judicial Referral

Note to Student:

The information contained in this e-mail concerns your alleged involvement in a recent violation of the *Student Guide to University Policies*. This e-mail serves as formal notification that you are charged with violating one or more policies of the Student Guide to University Policies (as listed and described above). You are directed to appear at the **Office of Judicial Affairs, 218 Hullihen Hall within three business days** of the date of this e-mail. Pre-hearings are held **Tuesdays, Wednesdays and Thursdays** from **9AM-12Noon and 1-4PM.** Pre-hearing appointments take place on a first-come, first-served basis.

**Failure to attend the pre-hearing meeting within the specified time will be considered an admission of guilt** to the violation(s) being considered and the referral will be handled administratively. A decision will be rendered in your absence and a sanction, including the potential for a fine and parental notification, will be imposed without your input.

During the pre-hearing, you will be given the chance to discuss the incident further, and will have the opportunity to ask questions and review relevant information available in your judicial file. You will also have the option of taking responsibility for the charge(s) by pleading "guilty" in the pre-hearing or contesting the charge(s) by pleading "not guilty" and requesting a full administrative hearing.

If you elect to have an administrative hearing following the pre-hearing, your charge(s) will be heard by an individual member of the University's staff, serving as an administrative hearing officer. You will be given a structured opportunity to hear the reporting party's information and to respond to all the information and charges. You will also have the right not to appear or you may choose to remain silent. The hearing officer will make and communicate a decision regarding your situation several days following the administrative hearing.

For more information about your rights as a charged student within the Undergraduate Student Judicial System, please refer to the Student Guide to University Policies at http://www.udel.edu/stuguide. Additional information may also be found on the Judicial Affairs website, located at http://www.udel.edu/judicialaffairs

Once again, **within three business days, you must to report to the Office of Judicial Affairs, 218 Hullihen Hall** to conduct a pre-hearing. Pre-hearings are held on **Tuesdays, Wednesdays and Thursdays from 9AM-12Noon and 1-4PM** and take place on a first-come, first-served basis.

Please contact the Office of Judicial Affairs at 831-2117 if you have any questions prior to your pre-hearing meeting. Thank you for your attention to this very important matter.

Sincerely,
Kathryn Goldman
Director of Judicial Affairs kgoldman@udel.edu
831-2117

To: Office of Judicial Affairs
From: Maciej Murakowski

On the evening of Monday, April 23, 2007, I underwent a thorough mental health evaluation by Dr. Philip Braun, Ph. D., a licensed mental health provider. I believe this satisfies the requirement for my returning to classes as stipulated in the letter I received on April 20, and shall therefore return to classes.

Sincerely,

Maciej Murakowski

UD220



**Behavioral Health Care Associates**

Cynthia E. Cummings
Associate Vice President for Campus Life
218 Hullihen Hall
University of Delaware
Newark De 19716-6107

April 23, 2007

Re: Maciej Murakowski date of birth 2/4/88

Dear Ms. Cummings,

I had the opportunity to both meet and assess the above mentioned young man on April 23, 2007. Mr. Murakowski was accompanied to the session by his mother and father. They remained in the session at my request for the initial introduction and then were excused from the interview. This was all done with Mr. Murakowski's approval.

Mr. Murakowski is a sophomore at the University majoring in engineering. His father is a professor of engineering at the University of Delaware as well. His mother is employed by the University in the food services division. Maciej is the older of two sons in this family; his younger brother is a senior in high school and plans to attend the University in the fall.

The purpose of the assessment was to determine the extent to which Mr. Murakowski presents a threat to himself or others. This question arose as a result of expressions of concern by members of the university community concerning his web-site. I asked Mr. Murakowski to reproduce a sample of the web-site writings. He presented approximately 25 pages of text to me for my review. In addition, I addressed the various issues of the subject matter of the web-site. My assessment is based on my clinical interview and review of the writings.

Mr. Murakowski presents himself as a highly intellectualized young man. There is some element of social disconnect present. He reports that he would rather be alone than in the company of others, however, does report having a number of close personal friends as well as internet relationships. His writing began as a result of a personal relationship which developed over the summer of 2004 when he was at a summer camp while still in high school. He reports that his website and his writings are motivated by other people's expression of interest in his writings.

4 Vera Lane Conshohocken, PA 19428 610-825-5112

Upon my review of his writings and his responses to me during the clinical assessment, I do not believe that this young man is threat to himself or others. Some of his writings are insensitive and depending on the context in which they are read can be seen as disrespectful to some individuals. While I certainly do not condone such expressions, I do not believe that they reflect any potential for physically acting out against any member of any of the groups referenced in your letter to Mr. Murakowski dated April 20, 2007.

It is clear that one can not predict future behavior with absolute certainty. I do not believe, based on the information that I have received and the writings I have reviewed, that Mr. Murakowski represents a threat at this time. I would certainly recommend he be permitted to return to the University, attend his classes and complete the semester. I did discuss with him the possibility of the utilization of the University counseling services should he experience subjective distress in the future. He is amenable to such an idea. I do not believe that counseling need be mandated at this time, but am heartened by his willingness to consider such an option should he feel the need.

I hope that my comments are helpful to you. I sincerely respect the position that recent events across the country have put you in and respect the posture you initially took concerning this young man. I do not believe, however, that, at this time, he represents a threat to the university. If I can be of further assistance to you please feel free to contact me. I can be reached during the day at 267-893-5282 or in the evening at 610-825-5112. Thank you very much.

Respectfully,

Philip R. Braun, Ph.D.
Licensed Clinical Psychologist

UD233

Cummings, Cynthia



| | |
|---|---|
| From: | Jim Tweedy [tweedy@UDel.Edu] |
| Sent: | Tuesday, April 24, 2007 3:46 PM |
| To: | Cummings, Cynthia |
| Subject: | [Fwd: RE: Card Check] |

UNIVERSITY OF DELAWARE    OFFICE OF JUDICIAL AFFAIRS

218 Hullihen Hall
University of Delaware
Newark, Delaware 19716-6107
Ph: 302/831-2117
Fax: 302/831-8191
Website: www.udel.edu/judicialaffairs

Attachments:    SYP 214 B.rtf



SYP 214 B.rtf (9 KB)

Hi,

I checked Maciej's card-access activity and it appears he entered the hall twice on Sunday. No activity since this point.

If you need anything else on this end, please let me know.

Thanks for your help on this one.

-------- Original Message --------
Subject: RE: Card Check
Date: Tue, 24 Apr 2007 10:26:52 -0400
From: Moylan, Sue <S_Moylan@facilities.udel.edu>
To: Jim Tweedy <tweedy@UDel.Edu>
References: <462D1858.9000702@udel.edu>

Hi Jim - if you have need anything else, please let me know.

Thanks Sue
-----Original Message-----
From: Jim Tweedy [mailto:tweedy@UDel.Edu]
Sent: Monday, April 23, 2007 4:35 PM
To: Suzanne P Moylan
Subject: Card Check

Hi Sue,

Could you send me an activity summary for card #8297 (Maciej Murakowski, Sypherd hall)?

I am interested in April 20 through today.

Thanks!

B21

UD228

AN EQUAL OPPORTUNITY UNIVERSITY

UD162

UNIVERSITY OF DELAWARE
FACILITIES
SYP 214 B
4/20/07-4/25/07

| Event Date | Description | Detail | Message | Card Number | Badge Holder Name |
|---|---|---|---|---|---|
| 04/20/2007 07:53:12 | SYP SE MALL SIDE PDI - Reader | Local Grant | | 8297 | SYP 214 B |
| 04/20/2007 08:54:48 | SYP SE MALL SIDE PDI - Reader | Local Grant | | 8297 | SYP 214 B |
| 04/20/2007 11:56:56 | SYP SE MALL SIDE PDI - Reader | Local Grant | | 8297 | SYP 214 B |
| 04/20/2007 14:31:22 | SYP SE MALL SIDE PDI - Reader | Local Grant | | 8297 | SYP 214 B |
| 04/20/2007 17:05:38 | SYP SE MALL SIDE PDI - Reader | Local Grant | | 8297 | SYP 214 B |
| 04/20/2007 18:29:00 | SYP SE MALL SIDE PDI - Reader | Local Grant | | 8297 | SYP 214 B |
| 04/22/2007 15:09:51 | SYP SE MALL SIDE PDI - Reader | Local Grant | | 8297 | SYP 214 B |
| 04/22/2007 15:22:30 | SYP SE MALL SIDE PDI - Reader | Local Grant | | 8297 | SYP 214 B |
| 04/24/2007 11:10:59 | SYP SE MALL SIDE PDI - Reader | Local Grant | | 8297 | SYP 214 B |
| 04/24/2007 13:40:31 | SYP SE MALL SIDE PDI - Reader | Local Grant | | 8297 | SYP 214 B |

B22



OFFICE OF THE
ASSOCIATE VICE PRESIDENT
FOR CAMPUS LIFE

218 Hullihen Hall
University of Delaware
Newark, Delaware  19716-6107
Ph: 302/831-8939
Fax: 302/831-8191
Website: www.udel.edu/campuslife

April 25, 2007

Mr. Maciej Murakowski
16 Waltham Street
Newark, DE 19713

Dear Mr. Murakowski:

I have received a letter from Dr. Philip Braun, Licensed Psychologist, stating that at this time, he does not believe that you pose a threat to yourself or others.  Therefore, I am writing to inform you that you may return to classes and to your job in the laboratory.

I am aware that you have entered Sypherd Hall on several occasions since we met last Friday. This is in direct violation of the terms I established during our meeting.  While you asked if you could go back to your room to collect your belongings, you did not indicate that you would be in and out of the room as you saw fit.  I did not agree to such an arrangement.  Therefore, you will be charged with Failure to Comply by the Office of Judicial Affairs.

Sincerely,

Cynthia E. Cummings
Associate Vice President for Campus Life

cc:    Kathryn Goldman, Director, Office of Judicial Affairs
       Kathleen Kerr, Director, Office of Residence Life
       James Tweedy, Associate Director, Office of Residence Life
       File

UD167

AN EQUAL OPPORTUNITY UNIVERSITY





OFFICE OF JUDICIAL AFFAIRS

218 Hullihen Hall
University of Delaware
Newark, Delaware 19716-6107
Ph: 302/831-2117
Fax: 302/831-8191

**CONFIDENTIAL**

April 25, 2007

Mr. Maciej Murakowski
<u>HAND DELIVERED</u>

Dear Mr. Murakowski:

On Friday, April 20, 2007, the Associate Vice President for Campus Life directed you in writing and orally to stay out of Sypherd Hall. I have received a report from the Ms. Cummings, that you entered Sypherd Hall on several occasions since then. This information has been confirmed by the University's records of the use of residence hall access cards. Your conduct is in direct violation of the terms that were established in your meeting with Ms. Cummings. While you asked if you could go back to your room to collect your belongings, you did not indicate that you would be in and out of the room as you saw fit. Ms. Cummings did not agree to such an arrangement. Therefore, you are charged with Failure to Comply by the Office of Judicial Affairs.

In light of the serious charges that were already pending (Disruptive Conduct; violation of Responsible Computing) as well as your disregard for the University's directive, the Office of Judicial Affairs is hereby suspending you from all residence halls, pending the outcome of a formal disciplinary process. The authority to do so is set forth in the Student's Guide to University Policies, Section II, Part I.

Effective immediately, you are prohibited from entering all University of Delaware residence halls pending the conclusion of this judicial matter. In addition, you are required to call for an appointment if you have business to conduct in the Office of Judicial Affairs or the Office of Campus Life, 218 Hullihen Hall. You are not to show up unannounced and unscheduled. If you violate the terms of this emergency suspension, you will be arrested for trespassing. You will also face an additional judicial charge of Failure to Comply.

You are required to meet with me in a pre-hearing meeting immediately. You must give me your residence hall room key and access card. If you maintain that you are not guilty of three offenses charged against you, a hearing will be held on April 30, 2007 at 3:45 p.m. in 218 Hullihen Hall. Ms. Holli Harvey, Assistant Director of Judicial Affairs will present the case and Ms. Cummings will attend the hearing as a witness.

You will have the opportunity to ask questions about the emergency suspension, the charges against you and the process by which those charges will be resolved at the pre-hearing meeting.

Sincerely,

Kathryn G. Goldman
Director - Office of Judicial Affairs

cc:    Cynthia Cummings, Associate Vice President for Campus Life
        University of Delaware Police Department
        Office of Residence Life
        file

B24

UD089

**Subject:** JUDICIAL HEARING
**From:** Brenda Irwin <bren@UDel.Edu>
**Date:** Fri, 27 Apr 2007 17:20:41 -0400
**To:** Maciej Adam Murakowski <kuactet@UDel.Edu>, Scott F Mason <avenger@UDel.Edu>, Holli Anne Harvey <harv@UDel.Edu>
**CC:** kgoldman@UDel.Edu

Mr. Murakowski:

As per your request, the Administrative Hearing, originally scheduled to take place on Monday, 4/30/07, has been moved to allow you more time to prepare.

A University of Delaware Administrative Hearing has been scheduled to take place on Wednesday, 5/2/07, at 3:00 pm. This hearing has been scheduled to address the following University of Delaware Student Judicial Case:

| Student Name | Incident Date |
|---|---|
| <>1. Maciej Murakowski | 4/19/07 & 4/25/07 |

**PRESENTING PARTY: Holli Harvey**

This hearing will take place in 218 Hullihen Hall. Please report to room 218 and inform the staff that you have arrived for a hearing.

The Administrative Hearing Officer will be Scott Mason. The Office of Judicial Affairs can be reached at 831-6380 between the hours of 8:00 am and 4:30 pm, Monday through Friday. Please note the following:

1. It is your responsibility to arrange for your witness(es) and advisor, if applicable, to attend this hearing.

2. Failure to attend this hearing will result in the hearing being conducted in your absence and, therefore, without your input.

3. More information about the Undergraduate Student Judicial System is available through the World Wide Web at:

http://www.udel.edu/stuguide/06-07

**Subject:** Your agreement to commute
**From:** Kathryn Goldman <kgoldman@UDel.Edu>
**Date:** Fri, 04 May 2007 16:58:55 -0400
**To:** Maciej Adam Murakowski <kuactet@UDel.Edu>
**CC:** "Kathleen G. Kerr" <kkerr@UDel.Edu>, Scott F Mason <avenger@UDel.Edu>, "kg >> Kathryn Goldman" <kgoldman@UDel.Edu>

Dear Mr. Murakowski,

I have accepted your offer to commute for the rest of the semester.    I want to make it perfectly clear that you are not to enter Sypherd Residence Hall. If you want to move your belongings out of your old room, you must contact me, in advance and give me the time and date you want to move out.  I will then contact University Police to determine if they will have an officer available during your desired time period. If they do not have an officer available, you will have to determine a new time., and I will try to make those arrangements with University Police.
If you return to Sypherd Hall, except when  moving your belongings out with a police escort, you will be charged with a violation of the Failure to Comply policy and the consequences will  be serious.
Thank you for your cooperation.
Sincerely,
Kathryn Goldman
Director of Judicial Affairs

B26

**Subject:** Student Follow Up – ▮▮▮▮▮
**From:** "Davis-Robinson, Cheryl A." <cadavis@art-sci.udel.edu>
**Date:** Tue, 1 May 2007 14:50:35 -0400
**To:** <harv@UDel.Edu>
**CC:** "Cummings, Cynthia" <cc@UDel.Edu>, "Shenkle, Cynthia W." <cshenkle@art-sci.udel.edu>,
"Davis-Robinson, Cheryl A." <cadavis@art-sci.udel.edu>,

Holli:

Per Cynthia's request here is a summary of my interaction with ▮▮▮▮▮
regarding the student, Maciej.

On Tuesday, April 25, 2007, ▮▮▮▮▮ came to the Dean's office to request a late change
of registration. She was requesting to change ▮▮▮▮▮ for 07S from a standard grade
to an audit (listener) status. ▮▮▮▮▮ expressed that she had been dealing with a
personal matter and the situation was really taking a toll on her emotionally. She said that
she has been unable to focus and experiencing anxiety. She has been overwhelmed with
everything that has occurred and worries if Maciej would find out that she was
responsible for reporting him.

She shared with me the incident involving Maciej and how she was worried about her
personal safety. ▮▮▮▮▮ discussed how her father wanted to take her out of school for
the semester but she and her mother talked him out of this option. If she pursued this
option, she felt that it would only "draw attention" to herself if she withdrew from UD
and was no longer a resident on the floor. The student Maciej would then know that
she had some role and/or involvement. ▮▮▮▮▮ then reported that she had visibly seen
Maciej on the floor several times and her friends had seen him across campus. ▮▮▮▮▮
reported that she thought "Maciej was suspended and not permitted on campus". I
explained that there are different parameters of suspension. He could have been
suspended from the residence halls but still permitted to attend class or suspended from
all campus activities, including classes. I suggested she follow up with Officer Mease
and/or Ms. Cynthia Cummings since she referred to both during our meeting. She shared
that she did attempt to call Officer Mease when she first saw Maciej on the floor but to
this day she has not receive a follow up phone call. ▮▮▮▮▮ also stated that Maciej had
his belongings in his room and thus could not understand this if he was suspended from
the residence halls. Again, I suggested she follow up with Ms. Cummings and/or Officer
Mease.

Student was physically shaking and her left hand was shaking uncontrollable. I asked if
she would be all right. She said sure. She just wanted to finish the semester. I
recommended that she seek out counseling to at least discuss her feelings with someone.
We discussed the Counseling for Center and Student Development (CCSD), local
resources, as well as her home physician. She was eager to hear that if she went to the

CCSD to speak with a counselor. There would be no associated and/or additional cost. Also, she requested to speak with someone but she did not want her parents notified. She didn't want them to know that she was bothered by this incident and having trouble emotionally and academically. I provided student with the contact information for CCSD and printed out information from the website. Student said she would be making an appointment for this week.

I informed ████████ that I had no doubt that this situation is real and happened; however, I would need official documentation and/or confirmation before I was permitted to allow for a late change in registration. The deadline to make registration changes was Monday, April 9, 2007 by 5:00pm. Student understood. I asked her permission to contact either Office Mease, Campus Police and/or Ms. Cynthia Cummings. She agreed. I asked the student to return to see me on April 26, 2007. At time, I informed ████████ that I would have a decision on whether I would support her late registration request, pending approval.

The following day, I called Campus Police but Officer Mease was not available; thus, I spoke with Lt. Tom Rahmer. I then called Ms. Cynthia Cummings as well to confirm. Both Lt. Rahmer and Ms. Cummings confirmed an incident did occur that involved Maciej. Ms. Cummings informed me that upon ████████ arrival, please convey to her that Maciej is not permitted in the residence halls under any circumstances and that his pdi access had been revoked. Ms. Cummings also asked to convey to ████████ that if she or any of her friends notice Maciej in the residence halls, call Campus Police immediately.

Student returned on Wednesday, April 26, 2007. I approved her late registration request and completed the necessary paperwork for her to process the late change of registration to an audit status. Student did report that she was able to make an appointment with the CCSD office for next week. ████████ said she would keep me posted. Prior to departure, I shared with ████████ what Ms. Cummings wanted me to articulate to her. ████████ said this information was good to know.

If you have any additional questions and/or need clarification do not hesitate to contact me.

████████
College of Arts and Sciences
Undergraduate Academic Services
University of Delaware
219 Mitchell Hall
Newark, DE 19716

B28

Telephone: 302-831-3020

UD356

Why does this suck so much?    *Evidence Copies*

*This was added after the Charges*

# This is my page. If you don't like it, there's nothing I can do about that.

Did you hear? This page is released under the Awesome License. Don't know what the Awesome License is? Click the pirate. Yar!



My LiveJournal is here. It's updated more often than this.

Hey, it's my Week of Reviews.

## The second of what will probably be only two weeks.
Updated never! (April 15, 2007)

## The first of what will probably be only one week.
Updated not daily! (April 6, 2007)

## More stuff from an English class.
Still at rock bottom... (March 24, 2007)

## Stuff from an English class.
You've hit rock bottom when... (March 3, 2007)

## An open letter to Ruckus.
You know, the music service. (February 11, 2007)

## A video, not humor.
High point of my Cali-fucking-fornia talk. (January 29, 2007)

## Talking about sex.
Updating once a month. Fucking great. (January 12, 2007)

## I are a skater.
I've been busy. Sorry. (December 19, 2006)

## NaNoWriMo 2006 post-mortem
'Back' after a hiatus. (December 1, 2006)

## Some more about differential equations
I got a bit creative, fuckers. (September 5, 2006)

http://www.kuactet.com/index2.html

Why does this suck so much?

## Something about differential equations
This counts as writing something. (September 2, 2006)

## The Awesome License
Now that my account's open I can post again. (August 4, 2006)

## Another game review thing.
S.T.A.L.K.E.R. (July 20, 2006)

## Yet Another Shit Play.
Happy 4th of July, fuckers. (July 4, 2006)

## Some interesting news.
There's snakes on this motherfucking plane. (June 6, 2006)

## This one web comic.
Maybe I'll write something later. (June 4, 2006)

## The season finale of House.
Spoilers abound. (May 23, 2006)

## My review of the music service Ruckus.
Whatever. (May 22, 2006)

## Uh, guys...?
Uh, you should see this. (May 21, 2006)

## My review of the The Da Vinci Code movie
Dedicated to Dan Brown. (May 19, 2006)

## Another play.
You shouldn't read it. (May 12, 2006)

## My appearence on The Tonight Show.
Yes, this really happened. (May 11, 2006)

## My first program on this site.
Four hours, give or take. (May 4, 2006)

## A review of *United 93*
Spoilers inside. (May 1, 2006)

B30

UD033

Why does this suck so much?

## I am *so* failing English.
Screw it. (April 28, 2006)

## A preview of the upcoming Spore.
I'm sorry, Will. (April 20, 2006)

## It's April.
This is not a joke. (April 1, 2006)

## This used to be my neighborhood.
... In stead of, you know, actually writing something...(March 15, 2006)

## A review of The Elder Scrolls IV: Oblivion
That's right! A full two weeks before release! (March 7, 2006)

## Hey, a professor at UD is a skinhead.
Now, who the fuck cares? (March 2, 2006)

## An explanation of some of my conventions.
It's not that interesting, really. (March 1, 2006)

## Stalking Una Kim: Memoirs of an Asian Fetishist (full version)
For the Kobi. (February 23, 2006)

## Stalking Una Kim, preview
The rest will be up tomorrow. (February 22, 2006)

## No, I didn't write anything yet.
But it's still funny. (February 19, 2006)

## Some more art. And Happy Valentine's Day.
Two pictures in one! (February 14, 2006)

## A bit of help for all the couples out there.
Face it, you need all the help you can get. (February 13, 2005)

## With classes starting again, this might help some people out.
Or, "How to make your English teacher love you and your classmates fear you." (February 8, 2006)

## Some pictures of the sky.
Well, *I* think they're pretty. (February 4, 2006)

B31

Why does this suck so much?

## Frank and the Zombies (Complete Theatrical Release)
It's the full version of something new and wonderful. (January 30, 2006)

## Frank and the Zombies (Part 1)
It's something new and wonderful. (January 24, 2006)

## This is one of the reasons that you shouldn't be an asshole to me.
Oh, and Happy New Year. (December 31, 2005)

## This is the first bit of art here.
Welcome to the future of this site (December 21, 2005)

## You're wrong. You're wrong again. How can you be so wrong?
Me, once again, being completely awesome (December 12, 2005)

## Spammers and assholes.
Would it be wrong the hate the entire campus on principle? (December 10, 2005) Edit
December 12

## An English paper on Woody Allen's "Love and Death"
It's sad that I have to rely on these for posts. (December 7, 2005)

## A friendly little article.
Fuck fuck fuck fuck fuck fuck fuck. (November 30, 2005)

## Some shit about movies.
This time, I'm really back. (November 28, 2005)

## I'm back, aren't you glad?
Sorry about the lack of recent updates. (November 18, 2005)

## The end of a little bit of 'drama.'
As far as I'm concerned, it's over. Move on. I am. (November 10, 2005)

## You know, it's just a little journal.
There's no real reason to talk to me about anything in here. (November 8, 2005)

## I get the feeling people are pissed.
Some people are angry at me! Oh no! (November 4, 2005)

## This is what Bethesda did wrong.

Why does this suck so much?

They really screwed the pooch here. (November 1, 2005)

## A letter to an old friend.
Please, should you meet, give it to them. (October 27, 2005)

## Kuactet's guide to comedy.
Or, A letter to Dane Cook (pass it on). (October 25, 2005)

## Sometimes I really hate college kids.
Anger at some dumbasses. (October 20, 2005)

## For the MATH-242 students. If it helps you, pass it on
This is, interestingly, the first published bit containing an explicit copyright notice. (October 20, 2005)

## A bit about fashion
When you think about it, it's so true. (October 17, 2005)

## I don't know when, but a day is gonna come.
I watched you taking off. (October 12, 2005)

## This is my life.
It's why I haven't updated in a while. (October 9, 2005)

## There are people who I hate. And then there are people like him.
I've included a special treat with this one. (October 4, 2005)

## Some narrative and commentary.
This is my rebound post. (October 3, 2005)

## A review of the Rubber Chickens show.
There is irony here. See if you can catch it. (September 24, 2005)

## Another one of those great papers.
A bit more fun at the expense of English. (September 22, 2005)

## You'd think that they would have grown out of it by now...
Part 1 of a series that I will end when I lose interest. (September 19, 2005)

## Filthy perverted bastards everywhere, rejoice!
Is it just me, or do cell phones have too many features? (September 18, 2005)

Why does this suck so much?

# I was so incredibly happy!
If you're not in chorus... (September 13, 2005)

# Some random shit about football.
I hate you all so very much. (September 13, 2005)

# My experience with Dagorhir.
The medieval fantasy LARP (by Ian Wang). (September 12, 2005)

# Talking to Kuactet.
Interview with a writer (by Ian Wang). (September 8, 2005)

# A bit of bitterness towards Virgil.
First English assignment I handed in. (September 6, 2005)

# Dr. Phil's take on evolution versus creationism.
A contribution by a lawyer type. (September 1, 2005)

# We welcome another member of the writing squad.
You want to fuck with me? I'm game. (August 29, 2005)

# A somewhat late review of Charlie and the Chocolate Factory
By Ian Wang (August 25, 2005)

# There are no jokes here.
A sad realization, an apology. (August 22, 2005)

# Guess what? It's my birthday!
There will be no cake. Or party. Or birthday. (August 18, 2005)

# Pie.
Pie (August 16, 2005)

# How was my week? Well...
I'm almost back. Rejoyce. (August 15, 2005)

# I hate fish.
Why are they even allowed to live? (August 5, 2005)

# Our shitty newspaper.
If you liked it you should be shot. (July 29, 2005)

Why does this suck so much?

## FRIENDS is a tumor.
If the cast died, I would approve. (July 22, 2005)

## Who's the best?
An objective analysis (July 21, 2005)

## The shitty adventures of a shitty British kid.
An interview with the author. (July 13, 2005)

## We need more terrorism.
*Or,* Without random bombings, how would journalism majors feed their families? (July 13, 2005)

## Shit, don't let them catch you saying that!
And I've got some big news.(July 5, 2005)

## Ooh, you were born in Poland? So was I! <3!
I'm tired of the bullshit people do, aren't you? (July 3, 2005)

## Hot shit! I've moved to the UD servers!
My first post on the new site. (June 25, 2005)


You can email me, if you want. But I don't want you to feel any pressure. It's entirely up to you:
kuactet@udel.edu

And now, unfortunately, the page is done. Come back soon, if it suits you.


B35

UD038

I don't know what's more pathetic: that I'm a virgin writing about sex, or that I got this idea from Encyclopædia Dramatica. However, I like to think mine suck less.

I've watched a lot of porn in my day. And while I personally won't be having sex any time soon, I know that some of you might. And you probably haven't watched as much porn as me. So, as a public service to all the couples out there, I present Maciej's **Definitive Guide to Sex**. You're welcome.

## Getting Started

First you need to find a partner. You could find them in a grocery store, outside, or on the internet. After you have found your partner, make sure nobody else is around, tie them up, and drag them to a secluded location.

## Foreplay

Foreplay is strictly optional. If you do it though, you might not have to go to jail after. I recommended it.

Foreplay is anything to get you warmed up and ready for sex, including (but not limited to):
-Sucking parts of their body.
-Petting them heavily, making the occasional unkind reference to other animals.
-Oral sex.
-Biting all exposed body parts (this includes eyeballs).
-Saying, "I love you," when you don't.

Now you are ready to begin the sex.

Marie's Official Guide to Sex

Moves marked with an (M) can only be performed by males during sex. (M/F) moves can be performed by members of either gender. Two guys are required for ones marked (M,M). And so forth. Unless otherwise noted, this guide assumes heterosexuals.

Moves and Positions:

**Bukkake** (M,M,M,M,M,M,M)
Get a bunch of your friends and gangrape a girl. Ejaculate on her face in turn. Note: this is fucking weird.

**Buttsex, Ungay** (M)
Fuck her shitter.

**Buttsex, Gay** (M)
Fuck his shitter.

**Buzzer, The** (M/F)
Words alone cannot describe it; this move is based on the television show Jeopardy. Watch that until you get it.

**Douchebag, The** (M/F)
During foreplay, masturbate to orgasm. Immediately go to sleep, leaving your partner unsatisfied.

**Emo, The** (M/F)
Shake and cry whenever your partner touches you.

**Flaming Gay** (M)
Find a man. Set him on fire. Repeat.

**Good Wife, The** (F)
Make dinner.

## John F. Kennedy, The (M)
Position your partner halfway on the bed, facing up, so that her legs are hanging off the edge. You stand facing her, lift her legs, put her ankles on your shoulders, and lean forward as far as you can. Then you kill the President.

## Missionary, The (M)
The woman lies on her back, with her legs spread, with the man on top, facing her. The penis goes in the vagina. The man thrusts his hips repeatedly for maximum effect. Contrary to the name, converting her to Christianity is not required, unless you don't want to catch sin.

## Rocket Scientist, The (M)
Obtain an advanced degree from a prestigious university. Become a renowned expert in your field.

## Sociopath, The (M)
On a Friday night, leave her a trail of rose petals leading to a hot bath. Wash her gently, using oils and scented soaps where appropriate. Dry her, then take her into the bedroom for a sensual massage (be careful, you are not kneading dough!) Kiss her and tell her she is beautiful. Slowly let your hands explore her body. Kiss her some more. Then make sweet gentle love to her for hours. After you both climax, hold her and let her fall asleep in your arms. Then set her on fire.

## Vow of Chastity, The (M/F)
Don't.


The Aftermath

Wait until you feel like getting up to clean up. Then get up. Then clean up.

## Cleanup

What you need:
1 shovel
1 hole large enough to fit a dead body the size of your partner, dug in advance
1 tarp large enough to completely wrap said body

What you do:
Use your imagination.


Have fun, fuckers!


Email me. Or not. It's up to you: kuactet@udel.edu



UD042

http://udel.edu/~kuactet/sexpage.htm

4/19/2007

③

UD043

# The Relationship

## Advice Pamphlet

(For girls in a relationship)

Funded in part by:

The KE Foundation

and

Pirates for a Better Life

---

I want to marry my boyfriend, but he says he's not ready to settle down yet. I don't want to pressure him, but I don't want to wait forever. What should I do?

Wait until he's ready. If you get bored, you could always make him dinner and get him some beer.

I have a rash…

Please refer to the Quick Tips section of this pamphlet.

My uncle Ted says that I'm a bad little girl and I need to be punished. Is he right?

Yes.

I don't like cooking. And I miss the daylight.

That's not a question!

If you have any more relationship questions, email them to kuactet@udel.edu where a -qualified relationship counselor will be happy to answer you.

---

My boyfriend punches his friends in the arm, as a form of greeting. He started doing this to me, except really hard and in the stomach, when I told him that I might be pregnant. I want to feel like part of the group, but it hurts! What should I do?

You should feel proud that he's treating you like one of his male friends. This sort of abuse, and most other forms, is perfectly acceptable in an otherwise healthy relationship. Above all, remember that he's only hitting you because he loves you. And to kill the baby.

It burns when I urinate, and lately it has started turning red. Whenever I mention this to my boyfriend, he looks guilty and quickly says that it's a normal part of puberty. He's twenty, so I want to believe him, but I still think I should see a doctor. What should I do?

A doctor would only confirm what your boyfriend has already told you: it's a normal part of puberty. Your boyfriend knows best, after all.

UD044

# Quick Tips
## for a healthy relationship:

-Yes, that rash is normal.
-Your boyfriend owns you.
-God hates condoms.
-Chastity is an old-fashioned concept.
-STDs are just another way to show you that he cares.
-You deserve it.

# In Closing,

A relationship can be the best thing that's ever happened to you, but only if you handle it correctly. Just remember the Three O's:

1) Obedience
2) Obeisance
3) O:

---

Some relationship do's and dont's for common relationship issues:

**If you are unhappy in your relationship:**

Don't: Try to end it. It will only make your boyfriend unhappy as well.

Do: Concentrate on satisfying your boyfriend. His happiness will trickle down to you, if he deems you worthy.

**If your boyfriend beats you:**

Don't: Tell your family about it. Their worry that he might be abusive, as well as the subsequent police investigation, will be sure to make him love you less.

Do: Ask him what you did wrong, and how you can correct it in the future. He doesn't want to hit you, but he has to, because you disappointed him somehow.

**If your boyfriend wants to do something you feel uncomfortable with:**

Don't: Think your opinion matters. It doesn't.

Do: Whatever he wants. He is your life now.

The most common mistake that girls in their first relationship make is thinking that their feelings and opinions matter. This will not only quickly end your current relationship, but make you less desirable to all other men. Don't fall into the trap!

---

The most commonly asked question about relationships: **What is it?**

Well, a relationship is a consensual or non-consensual union between two people, where they share their thoughts, mind, souls, possessions, and body fluids. It can be between a man and a woman, between a men and two women, between a man and three women, or between a man and many women. It can involve sex, cooking, servitude, children, and yes, sometimes conversation. There are no age limits on relationships. And, no matter how you define one, a relationship is a wonderful thing.

**How do I know I'm in a relationship?**

There are many ways that you can tell you're in a relationship. You're probably in a relationship if:
-There is one man in your life that you spend most of your time with. This person is often known as your boyfriend or husband.
-There is one man in your life that you do most of your cooking for. This person is often known as your boyfriend or husband.
-There is one man in your life that you have all of your sex with. This person is often known as your boyfriend or husband.
-You are tied up in a closet for the majority of your waking hours, except for brief interludes of violent, painful sex with a masked man who insists you call him 'Master.' And that's what he is.

B40

http://udel.edu/~kuactet/sexualassaultawareness.htm



Happy April!

April is Sexual Assault Awareness Month. But, that's not really the important thing. The important thing is that April is also Chocolate Eaters and Mathematics Education Month. And Poetry Month. And National Pecan Month. And National Smile Month. So, everybody, smile! Smile and write poetry while being sexually assaulted by a chocolate-pecan-eating math teacher!

The Office of Women's Affairs has a bunch of shit going on this month. And most of it does not have to do with poetry or pecans. In fact, pretty much all of it has to do with rape.

**April 6**
NATIONAL "DAY TO END SEXUAL VIOLENCE"
All survivors of sexual violence, their friends and loved ones, and anyone who wishes to raise awareness or show support for survivors are encouraged to wear teal shirts, as **teal represents sexual assault awareness**. Join others locally and nationally to show your individual commitment as well as our collective campus commitment to ending sexual violence. If you don't have a teal shirt, stop by our kiosk on Monday, April 3, or attend an event to pick one up for free while supplies last. Or support our student groups who work to end sexual violence by wearing your V Day UD/Vagina Monologues shirt, MARS (Men Against Rape Society) "No" shirt, or your tye-dyed "No Means No" shirt from First Night at DelaWorld.

**Teal**? Who the fuck thought of that? What the hell does **teal** have to do with sexual assault? Why not **bukkake gray**, or

UD045

red, like fresh vaginal blood? Or, you know, something that actually makes sense? But, still, I'm going to go get one of those shirts. And then wear it while I'm raping some drunk girl in a dark alley. It'd be funny. Or maybe ironic. She'd certainly be aware of sexual assault. And that's ironic because the shirts are about promoting sexual assault awareness. Get it?

One more thing: V Day UD/Vagina Monologues shirt? What the fuck? Vagina monologues? That's either sexy or scary, and I can't decide which. Oh, wait. I can. And it's not sexy.

## April 13
## PORNOGRAPHY AND THE SEXUAL OBJECTIFICATION OF WOMEN

How is pornography made: Who profits and who is hurt in the process? What does pornography say: What are the themes in its content? How is pornography used: What effects does it have on audiences? Pornography, so often portrayed as a harmless outlet for men's sexual energy, tells us stories about men and women, power and domination. As contemporary mass-marketed pornography becomes more mainstream and normalized, it also has become more overtly cruel and humiliating. In this lecture, University of Texas at Austin professor Robert Jensen will explore these questions and discuss the messages about gender and sexuality in pornography and their role in men's sexual behavior. He will also report on his research at the pornography industry's annual convention in Las Vegas in January 2006.

I can answer all of those questions right now. How is pornography made? Simple: a guy with a camera films people

http://udel.edu/~kuactet/sexualassaultawareness.htm

having sex. What are the themes? I'd venture a guess and say, sex. What effects does it have on audiences? I can't say for certain, but I'm pretty sure it involves wood.

Now, I feel bad about mocking Robert for his career path. But, seriously, Rob, how did you tell your grandmother what you were doing for a living without killing the poor woman? Grandma, I'm studying porn...

Oh, and, good job mixing up the past and the future, asshats. But don't worry, I'm going to start doing that all the time in January of 2006, which is in the future.

## April 17
THE ONE IN FOUR RV TOUR: WHAT MEN CAN DO
Presented by NO MORE, Inc. (National Organization of Men's Outreach for Rape Education), this powerful program approaches men as potential helpers, not potential rapists. Members of the audience will learn about ways they can help women recover from rape and how they can better define consent in their own intimate encounters. They will also learn how they can move from being a bystander to intervening to help end abuse of women.

Interesting that they should do that because, you know, pretty much all of the rapes committed against women (and a majority of those against men) are, in fact, done by men. I'm not saying that every man is a potential rapist; I'm just saying that, odds are, if you get raped, it won't be by a woman. And also that every man is a potential rapist.

http://udel.edu/~kuactet/sexualassaultawareness.htrr

## April 19
### HOOCHES AND WHORES: HIP HOP AND THE CRISIS IN YOUNG BLACK WOMANHOOD

"In the quiet, undisputed dignity of my womanhood..." Anna Julia Cooper's words in 1892 have all but disappeared in the current form of unbridled nastiness. Once considered queens and formidable rulers of countries, young black women have forgotten their legacy. Instead, they have replaced it with sexual arrogance and a loose regard for principles and virtue. This talk will investigate the recreation of young womanhood in the hip hop industry, its impact on the future, and what's at sake in the national and international communities. Likewise, in honor of Sexual Assault Awareness Month, we will talk about the silence surrounding rape and black women.

Unbridled nastiness. How eloquent.

I always knew that letting the negroids have their music was a bad idea...

## April 24
### FRIEND OR FOE? WHAT YOUR FACEBOOK PROFILE SAYS ABOUT YOU

Graduate students in Counseling In Higher Education will present this interactive program and discuss the positive aspects of online communities, (including Facebook, MySpace, BlackPlanet, MIGente, and JDate) as well as the potential risks of revealing too much information in your profile. Cyberstalking, in particular, may lead to sexual assault. Learn strategies to reduce your risk of cyberstalking and other negative consequences of participating in an

on-line community.

Wait, back up a moment. You're saying that... online communities like Facebook... have *positive* aspects? Huh. And here I was thinking that they were just dumb wastes of time. I'm going to go to this one, to find out exactly what positive aspects they're talking about.

I once went to JDate. It was horrifying. I don't know why anybody would ever post a profile there. I don't know why anybody would go there in the first place. Trust me. Don't click that link.

I looked online (wikipedia) and I found possible predictors for being a rapist:

-Extreme emotional insensitivity and egotism;
-Habitual degradation and verbal devaluation of others;
-Consistently using intimidation in language;
-Uses words like "bitch" and "whore" to describe women;
-Excessive, chronic, or brooding anger;
-Becoming obsessed with the object of his or her romantic affections, long after his advances have been rejected;
-Extreme mood swings;

Reading over those, all I can say is, "Shit." No matter how I interpret them, shit. Don't walk alone with me at night, ladies.

Email me. Or not. It's up to you: kuactet@udel.edu

Happy birthday to me...



Hey, my birthday is in a few days. There are a number of things that you could get me. I'd love you...

A pair of dark glasses. Not only do they look super-cool, but I'd combine them with the next item for a truly kickass effect.

A blind person's cane. How much would having a blind guy's cane rock? I contend that it would rock very much. I'd put on the dark glasses and wander around Main Street. If I saw somebody that looked like an asshole, WHAM! right in the shins with the cane. They'd be like, "What the hell's wrong with you?" And then I'd reply, "Oops, sorry, I didn't see you," and they'd feel bad. Or they should. If they tried to beat me up, well, what do you think happens to assholes that try to beat up the blind?

A wheelchair. I could have so much fun with one of those. Cruise around, running over toes and small creatures, I'd leave a trail of pain and anger in my wake. But what would any of those fuckers do about it? I'm a cripple, goddamn it.

A pair of crutches and a fake cast. This is for when I blow my cover as a blind guy and a paraplegic. I might be able to see, and I might have an intact spinal cord, but I've still got a broken leg. Do you really want to smack a guy with a broken leg in full view of everybody?

A raccoon. Preferably rabid, but healthy would still be OK. I could throw it at people and it would latch onto their head and start biting them all over. And they'd be screaming and yelling and I'd call the raccoon off their face and they'd be like, "Thank you for calling that raccoon off my face, now here is my wallet," and I'd be like, "Yeah." That would rock so much.

A small Asian girl. I would keep her tied up in the closet (like

file://C:\Documents and Setti

the brother does with his) and do unspeakable things to her when I got bored. It would be better than pretending to be a cripple.

Sympathy. Not a whole lot, I just want people to feel sorry enough for me that they don't throw rocks all the time. Please. The bruises really hurt.

Some nails. I could hammer them into things. Like your tires.

A prosthetic arm. I'd tuck my real arm into my shirt and wear the fake. Then, when I'd meet somebody, they'd think I had only one real arm until my hidden one whipped out and punched them in the crotch. It would rule.

A katana. You know, one of those Japanese sword things that you flip out and kill people with.

My brother also wants a blind guy's cane. And it's not too late to get him one.

Every asshole that would beat me if I pretended to be blind should...

Email me or die: kuactet@udel.edu



Yeah, this is another re-render of an older picture (circa January, 2005). Another season-appropriate piece. And I'm liking these fast render times on an obviously superior computer. Finishing one in under 10 minutes makes me happy inside.

Email me or die: kuactet@udel.edu

UD052

http://udel.edu/~kuactet/art003_004.htm



This is a re-render, with some slight modifications, of a bit of art done exactly a year ago, for this very occasion. I fucking hate Valentine's Day.

http://udel.edu/~kuactet/art003_004.htm

UD053

# MEMORANDUM

From:       Maciej Murakowski

To:         Patrick J. White

RE:         Instructions on how to skin a cat

Date:       March 12, 2007

Please find attached the requested instructions on the one way to really skin a cat.
If you have any questions, please contact me at kuactet@udel.edu

UD054

# How to Skin a Cat



Maciej Murakowski
Patrick J. White
March 12, 2007

UD055

# Introduction



*Fig 1: A cat, with skin*

The phrase "There's more than one way to skin a cat," has its origins in Colonial America where it was first used describing that there are, in fact, multiple ways to skin a cat. For example, with one's teeth. Naturally, each method has its own advantages and disadvantages, for example, hairballs.

However, there is only one way to skin a cat and keep the skin intact. The following is a set of instructions, with pictures, for this method.

# Materials

The following materials are needed before any attempts are made to skin a cat:

- A cat, preferably alive
- A pair of sharp scissors (may be substituted with a knife), preferably with a rounded point.

# Step 1: Kill the Cat

If you can't kill the cat, how do you expect to be able to skin it? Pick it up, pet it a little, coo and cuddle with it and viciously break its frail little neck, as in Fig 2. Those of you that cannot complete this step should give up now and go



*Fig 2: Breaking the neck*

UD056



*Fig 3: A dead cat*

back to petting the cat. You have failed. You will never be cat skinner now.

For those still with us, lay the cat flat on its back, as shown in Fig 3. When you begin cutting, there may be a lot of blood, so it's important to put it on a surface you don't mind having stained with the precious lifeblood of an ex-mammal (or one that is easy to clean). Get your scissors (knife?) out, as you'll be needing them now.

## Step 2: The Cuts

Find the spot at the bottom of the ribs where they meet the sternum. That little hollow spot just underneath that is where you will start cutting. Take your cutting tool and make a small, shallow cut there, large enough to insert the blade into.

Note: with scissors it is easier to keep from cutting the flesh beneath the skin, but with a knife it is easier to keep from cutting the hair. If you choose the knife, cut by inserting it under the skin with the edge facing up, towards you, and slice upwards. If you choose scissors, cut as though you're cutting paper, taking whatever care you deem necessary to prevent damage to the fur. Use whichever tool suits you.



*Fig 4: What a lovely hat...*

Insert the blade under the skin, and begin cutting upwards in a straight line towards the neck. Stop just under the chin. If you want your skin to have a face, leave

UD057

this for now. If you don't want the head, cut the skin around the neck, detaching the head-skin. The head can add both character and major what-the-fuck factor, those eyes always open and staring, seeming to ask, "Why, James, *why*?" Use your own judgment.

Return to the cut you had made at the ribs. Again insert the edge underneath the skin, this time cutting downwards towards the pelvis. Stop before you reach the genitals (on cats, they are disproportionately small).

You have just completed the primary cut. This (along the underside of the animal) is called the 'ventral cut.' There is also a 'dorsal cut' which runs along the back, but is generally less desirable for most applications of the skin.

Next, cut out from the ventral cut down the inside of each leg. Cut past the knee, to wherever you want the skin to end, and cut around the leg at that point. Note: it is not recommended that you keep the paws (and claws) attached, in case the cat's spirit decides to come back and haunt your shit; see Fig 5.



*Fig--Oh Jesus fuck!*

## Removing the Skin

Starting from the ventral cut and moving down the legs, gently peel the skin away from the underlying tissue, being careful to take only the skin. In general, it is loosely attached and should be easy to remove, but you will sometimes run into problem areas. Remember: work slowly and carefully, until the skin is only attached at the head (if you're keeping it), genitals, anus, and tail.

Now, cut around the genitals and anus, leaving the patch of skin and fur around

UD058

them attached... unless you want to make a little 'toy,' in which case, shame on you. Then, cut down the tail, and remove the skin from it. If you don't want the head, you are done! Congratulations! Wash your hands, bury the cat, or clean and eat it; I hear they make great soup. Otherwise, continue on.

## Skinning the Head

Are you sure you want to keep the head, James? Because that's fucking creepy. Well, if you're sure...



Fig 6: Skinning the head

Skinning the head is delicate and involved, and will probably take as long as the rest of the cat. Extend your initial cut from under the chin to the corner of the mouth, and begin peeling the skin away from there. Continue peeling until you reach the ears. You can feel underneath them, the ear canal. Cut this, and continue peeling. At this point, you may want to switch to a scalpel or razor blade, as the skin is usually tighter and thinner, and it is easier to work with a smaller blade.

Continue peeling until you reach the eyes. Cut around the sockets, leaving the eyelids and a little bit of skin attached to the body. Note: if you nick the eyeballs, you'll make a mess. Try to avoid this. Cut deep, almost to the bone, around the mouth. At the nose, leave it attached to the skin and cut away the tissue behind it. Check the inside of the skin to make sure you have not cut away any tissue. Peel or scrape (carefully!) away any that you find.

Congratulations! You have a skin!

# But... Why?

There are many legitimate reasons for wanting a cat skin: you could intend to use it as a coat, for example, or as a glove or a scarf. Cat fur is both warm and soft, especially if the cat is young (the disadvantage of this is that there is simply less of it). Especially as cats typically have a fairly small surface area, this greatly limits the amount of skin that can be obtained from any one animal.



Fig 7: Why, James? Oh, God, why? It hurts. Please, James, stop, it hurts so much. Oh, no, James, please... just let me die, please, James, why? Aah, no...

However, this limitation can often be overcome by using a Bonsai Kitten; while the odd shape may increase the difficulty of skinning, it can often result in a significant decrease in effort required to utilize the coat. For example, the skin of a hand shaped Bonsai Kitten can be easily worked into a glove, while a toroidal kitten makes a lovely scarf.

More than being just suited for fashion accessories, cat fur also has many practical applications. A well-cared-for cat skin can be used, for example, as part of a lure to trap *more* cats. Alternately, the skin could be used as part of a larger sheet of insulation for your yurt. Or as bedding. The possibilities for a high-quality fur are nearly endless.

Or, you could just, you know, wear it. Like Ed Gein (Fig 8).



Fig 8: Warm and sexy

UD060

## Conclusion

Before the fur can be used, it must be treated and preserved. Unfortunately, such care is beyond the scope of this guide. Contact your local taxidermist for additional instructions. I hope you found these instructions informative, and happy skinning!



*Fig 10: Your local taxidermist*

UD061

http://www.kuactet.



# Maciej Murakowski

has been, effective immediately,

## suspended from classes and the dormitories

pending a

## psychiatric evaluation of his mental health.

He is also being investigated for a violation of the University's

Disruptive Conduct

policy. If found guilty, he

could face expulsion.

# Seriously.
# This is not a joke.

(unlike "How To Skin a Cat")

This is a long bit of narrative. It's pretty boring, and more than a bit rambling, but I want to get as much as I remember written out. I apologize in advance for probably messing up the chronology.

On Thursday afternoon, I was called to have a meeting with Cynthia Cummings, the Associate Vice President of Campus Life. Well, rather, I wasn't called. My dad was, and he called me. She had asked that I be taken off campus tonight, and that a meeting be set up, at 3:15 the

UD062

next day.

Feeling rather resentful, I grabbed a few things, and went home. I was mildly curious what they wanted to talk to me about, annoyed that they hadn't contacted me directly, and even more annoyed that I would have to leave the campus for no apparent reason, but what can you do? The next morning, I came back to campus, went to all of my classes, did some homework, and went to the meeting at precisely 3:15.

Cummings came and got us at 3:28.

So, we went into her office and a lady from Judicial Affairs. I didn't catch her name.

My only regret about what followed is that I didn't ask to tape record the conversation. If I had, I'd just write up a transcript of it. But, unfortunately, I didn't expect it to end up like this. Point is, there's a good chance that any direct quotes are inexact, but I try to preserve the spirit.

So we sat down and Cummings explained why I was there.

In summary: there have been three complaints about my website. As a result, I was being accused of 'Disruptive Conduct' and a violation of the University's Responsible Computing Policy.

The first complaint was in November of 2005; I thought that one had been settled.

The second was on April 8, about this article. If I recall correctly, some girl on my floor and her brother were disturbed by it and complained to the University Police.

The third time, the father of somebody else on my floor "expressed his concern" about me. That was just Friday morning, after the meeting had been scheduled.

The first time, the police decided that there were no grounds for any action on their part, and it was settled without the intervention of the Judicial System. The second time, they apparently also decided that there was no grounds for any sort of investigation--in fact, I never even heard about it until the Friday meeting.

Then the VA Tech shootings happened. After that, apparently, somebody decided to go back through the complaints, and my name came up. They read the website and the articles in question, and decided, based on that, that I might be a threat to myself and/or others. That's why I was there.

The third complaint had been received just that morning, so I don't know if the police had the chance to decide that there is no grounds any sort of action.

Anyway, they reviewed the complaints and my website, and decided that I might pose a threat to myself and others. So they were going to suspend me from attending classes and ban me from the dorms until such time as I was able to produce a letter from a "licensed mental health provider" asserting that I was not.

I wish HTML had a <speculation> tag.

To me, it looks like they are using the Virginia Tech shootings as an excuse to run what amounts to a witch hunt.

&lt;/speculation&gt;

http://www.kuacte

Cummings presented us with a letter. The full text, copied verbatim, is as follows:

On April 19, 2007, I received a report from the University of Delaware Police Department that referred me to the following website, http/udel.edu/~kuactet [sic]. Apparently you created this website using the University of Delaware server. On the website, I found a number of postings that are sexually graphic, hostile, and violent. The subject matter includes such things as rape, murder, relationship violence, and animal torture and cruelty. It also contained racist, sexist, anti-Semitic, and homophobic statements.

The University Police Department became aware of this website as a result of formal complaint [sic] being filed by two students, one on November 9, 2005, and one on April 8, 2007. In addition, on April 20, the Counseling Center received a call from a parent expressing concern about your "bizarre behavior". [sic]

As a result of these reports, the following action will be taken:

1. You will be charged through the University's judicial system with violating the Responsible Computing Policy.
2. You will be prohibited from staying in your residence hall room or attending classes until you receive a psychiatric assessment.
3. You must provide me with a letter from a licensed mental health provider that indicates that you are not a threat to yourself or others.
4. You must sign a waiver granting me permission to speak with that licensed mental health provider to confirm his or her conclusions and to learn about any recommendations he or she might have pertaining to mental health treatment.

These actions are necessary because your behavior has caused alarm to members of the University of Delaware community.

Please feel free to contact me if you have any questions or concerns.

Sincerely, etc.

She asked about my website, what it was all about. I said that it's a humor site; comedy.
"And you think that sort of thing's funny?"
"Yeah."
"Well, I don't think anybody else does."
"Respectfully, you're wrong."
"Well, I don't think it's funny."

&lt;speculation&gt;

UD064

kept saying 'they' because typically a committee is formed to investigate allegations of a student having the crazy... er, being "unable to cope." However, based on the language of the

http://www.kuacte.

letter and specific comments she made, I would not be surprised if I learned that Cummings was exercising her 'emergency' powers and acting entirely on her own.

</speculation>

The objection was raised that I am an excellent student taking too many classes and that missing them for any reason would be pretty much crippling at this point in the semester. If I miss a week now, I might as well just throw the semester away. The response?

"It will be difficult."

Then, the objection was raised that suspending me on the *suspicion* of mental instability violated everything that due process stood for.

"But attending a university is not a right, it is a privilege. We decide who we want attending."

Okay, sure, I can live with that. Heads up, students: all of those rights you think you have (e.g. free speech, a fair trial, the implicit assumption of innocence, etc.) only exist insofar as you conform exactly to the administration's definition of acceptable behavior. Note: this definition is arbitrary, secret, and subject to change without notice.

The objection was raised that, having grown up behind the Iron Curtain, this is looking awfully familiar.

"I realize that, I know your background, and I expected your reaction, and I realized how it might appear to you."

...

At that point, I was curious what the woman from Judicial Affairs had. So I asked.

The 'Disruptive Conduct' charge was easy enough to explain. After all, people had complained. You remember, those complaints that the police had already decided were meritless?

The 'Responsible Computing' charge surprised me; part of it was intimately related to the 'Disruptive Conduct' violation (e.g. using the network for such). But (surprisingly!) part of it was for having a personal webpage in the first place. This seemed strange, since I was under the impression that UD didn't monitor, regulate, or *care* about what people did with their UD-hosted websites, or their network connections in general, so long as it's not illegal or commercial. Mine was neither.

It turns out that it's against the policy to use the University computer resources for non-University-related purposes. So no University employees playing Solitaire during their lunch breaks. No reading the online news feeds. No buying things from Amazon.com. And, God help you if you should want to have a casual conversation over AIM.

But anyway, my website was in violation from the very moment it was created. Who knew?

Well, uhh, I guess they did. Since November of 2005.

Anyway.

UD065



OFFICE OF JUDICIAL AFFAIRS

218 Hullihen Hall
University of Delaware
Newark, Delaware 19716-6107
Ph: 302/831-2117
Fax: 302/831-8191

CONFIDENTIAL

July 2, 2007

Maciej Murakowski
16 Waltham Drive
Newark, DE 19713

Dear Murakowski,

The Appellate Board met on June 29, 2007 to review your request for an appeal concerning the incident that occurred on April 19, 2007. You appealed on the grounds that procedures were not followed, the decision is contrary to information presented at the hearing or contrary to new information not known in advance of the hearing, and the sanction imposed is inappropriate or unreasonable.

Upon reviewing all available information relevant to your situation, the Appellate Board has determined that you have not presented sufficient grounds on which to base an appeal. Therefore, the following sanctions will apply:

Effective immediately, you are suspended from the University of Delaware and Banned from Campus through the end of Fall semester 2007. You will be withdrawn from all classes, banned from all University facilities, rendered ineligible to register for any University class, and prohibited from participating in University activities for the period of the suspension. Entrance onto campus and into these facilities will be viewed as a violation of this sanction and you will be confronted and charged accordingly for trespassing and failure to comply. A student who is suspended from the University is nonetheless responsible for all financial obligations to the University. Your transcript will indicate you were withdrawn by the University. Should you wish to re-enter the University as a matriculated student following your period of suspension, you will be required to reapply to the University through the Admissions Office.

In addition, if you return to campus after your period of Suspension, you are being placed on Deferred Expulsion from the University through your graduation. Deferred Expulsion means that if you are again found guilty of violating the Code of Conduct, you will be expelled from the University.

Finally, in accordance with the administrative process of the Office of Judicial Affairs, a letter is normally sent to your parent(s)/guardian(s) informing them that you have been found guilty of violating a Code of Conduct policy. This letter will be waived as your father attended the hearing.

UD362

AN EQUAL OPPORTUNITY UNIVERSITY

The decision of the Appellate Board is final.

Sincerely,

Frank Newton
Chairperson Appellate Judicial Board

cc: Holli Harvey, Presenting Party
    Scott Mason, Hearing Officer
    File

UD363

http://www.kuacte

For those unfamiliar with Judicial Affairs, standard operating procedure is to have a pre-hearing where the accused hears the charges brought against them, and is allowed to enter a plea of guilty or not guilty. If they plead guilty, they waive their right to a hearing (trial) and the sanctions are immediately imposed. The sanctions for the Responsible Computing violation would be having my network access cut off for some time. The sanctions for the Disruptive Conduct charge would be suspension for two years.

I pled not guilty.

<speculation>

The woman from Judicial Affairs didn't really sound convinced of the charges, even as she was presenting them to me, and was even less so when I questioned them; Cummings, however, was rather adamant in her defense of the policy. Judicial Affairs woman seemed almost relieved when I entered my plea.

Or I could just be reading too much into the behavior of people I met less than thirty minutes before.

</speculation>

I asked where I can have this mental health evaluation done. Cummings told me that the University has several faculty members that are also licensed psychiatrists, but that it would be preferable if I went off-site to have it done. This is because "I believe that our faculty has integrity, but at the same time, I don't want to give you any reason to be able to come back and accuse us of misconduct."

She knew of a place not far from here, The Rockford Center, or something like that, a "24-hour" place.

The meeting was over pretty soon after that.

I went to that Rockford place on April 21, so that I could hopefully have this straightened out and not miss any classes. I met with a social worker, and was told that he would only be able to write a letter saying what sort of treatment options would be available for me, and maybe what medications he would recommend. He wouldn't be able to write a letter saying that maybe I didn't need treatment at all.

And, in fact, the only way I would be able to get an actual psychiatric evaluation from them would be to submit to their treatment. That means partial or full hospitalization. We left.

<speculation>

There's *no way* that Cummings didn't know that, if I pursued evaluation at the Rockford, I wouldn't be able to return to classes for at least several days, and not before being hospitalized.

</speculation>

So, looking ahead, I'm going to ask the Office of Judicial Affairs to drop the charges against

UD066

http://www.kuactet.

me and strike the incident from my record. Which, practically, means that as soon as the hearing date is set, I'll make sure you know.

This next bit's important.

If you love my writing, please support me in this. If you have ever laughed at anything I wrote (even this post), please support me in this. If you hate me and everything I stand for, but love freedom, please support me in this. If you hate both me and freedom, you may be more comfortable here.

To show your support *right now*, you can email me (kuactet@udel.edu). I would love to hear from you. Or, even better, email Cynthia Cummings (cc@udel.edu). But if you do that, *please* be respectful; also, consider CCing me a copy. Seriously, if you want to help me right now, that's the best way to do it; it would be best if you used an @*.edu address if you have one.

One last thing: I ask that nobody submit this to any newspapers, radio stations, or anything like that. See, there's always this guy who would get the ACLU involved and make this a huge big deal on all of the national news outlets he could get on about how his free speech is being trampled and how this is a gross injustice that cannot be tolerated. I don't want to be *that* guy. Not yet, at least.

If you want, spread this page around to the people you know, but don't, like, post it to digg or something. If you want to complain to anybody about this, write to Cynthia Cummings.

If you can't think of anything to write, you could try something like this:

Dear Ms. Cummings,
I have read Maciej's website, and believe it is obviously satirical. He is no more a threat to the community than Jonathan Swift was to babies. Your decision to suspend him was a gross overreaction and I wholeheartedly support Maciej Murakowski in this matter.
Sincerely,


Thanks in advance, everybody.



You can read what I'm getting in trouble for here.

I have migrated everything personal off UD's servers. I now have my own hosting and my own domain name, http://www.kuactet.com (where you are right now!). It is, for now, a straight mirror of what used to be on the UD server. I'll eventually clean it up and make it look less crap. Total out-of-pocket cost: $200.



UD067

Rub my belly for luck!



i went to see Star Wars Ep. III: Revenge of the Sith again on Friday. Once again, it sucked, except for the part where children were dying. When Anakin started cutting up the kids, I started giggling. When the little boy got shot, I almost burst out laughing. And people all around me were staring, with the, "What the hell is wrong with you?" look that I get so often in theaters. Even though it was a terrible film, this time, I remembered to bring marshmallows to roast over Hayden Christensen's body. Like they say, smores always taste best when made over a burning cyborg.

Shorts kick ass. They are like pants, but better, since they give me a chance to show off my hot man-legs. They are fuzzy, like kittens. Or hobbits. Come and pet my Frodo, little girl.

I started to wear gloves, since my fingers were getting cold when I was biking to class; numb fingers are not fun, and the gloves really help with that. They are bulky and they rock. This is my glove. Is it not cool?

This is my glove choking a bitch. That bitch has been thoroughly choked. See if you can spot my glove. Hint: it's the one choking him.

The glove is like a fish, in that people ask me about them a lot:

"Why are you wearing those huge gloves?"

"What's up with the huge gloves?"

"Do you know that you look weird with those huge gloves on?"

"You have huge gloves on. Why?"

Lo, and behold, your questions are to be answered, right now.

Rub my belly for luck!                                                    Page 2 of 2

Apart from keeping my hands warm and being the bitch-chokingest gloves in the entire fucking universe, the gloves make me feel menacing. When I wear them, I find myself talking in a deeper voice, flexing my fingers, and generally intimidating the hell out of everybody. I forget that I am a spindly pale virgin, and feel more like a smooth ass-kicking biker. Or maybe OJ Simpson, on his way to choke some more bitches. Oh man, they rule so hard. And by 'they' I mean, 'me.' And by 'me,' I really mean 'the gloves.'

I have decided, that since I own everybody at everything and am the best, that I need a new name, a name that suitably reflects my cool. Of course, I am only cool with the gloves on. Therefore, when I am wearing the gloves, I will only respond to my new title.

Henceforth, I shall be known as Darth Buddha.

Look at him: thin and made of gold, with a head of pure evil. It is a perfect metaphor for me, the gold standing for my flesh and the head of pure evil standing for my head of pure evil. Darth Buddha: the name perfectly combines my sadistic streak with the part of me that just doesn't care. And it is the awesome.

And in case you are wondering, I'm serious.

Email me or die: kuactet@udel.edu

B67

UD071



UD072



OFFICE OF JUDICIAL AFFAIRS

CONFIDENTIAL

218 Hullihen Hall
University of Delaware
Newark, Delaware  19716-6107
*Ph:* 302/831-2117
*Fax:* 302/831-8191
*Website:* www.udel.edu/judicialaffairs

May 23, 2007

Maciej Murakowski
16 Waltham Dr.
Newark, DE 19713

Dear Mr. Murakowski:

This letter will summarize an Administrative Hearing that took place on May 2, 2007 in Hullihen Hall at 3pm. You appeared to address the charges of violating the Disruptive Conduct Policy, violating the Responsible Computing Policy, and violating the Failure to Comply Policy as reported by Holli Harvey of the Office of Judicial Affairs. The charges are the result of several incidents which occurred on campus during April 2007.

Holli Harvey (presenting party), you, and I were present for the entire hearing. Lt. Rahmer of University Public Safety, Melissa Day, Michelle Betty, Jennifer Wilson, Sohan Banthi, Janusz Murakowski, Dariusz Murakowski and Peter Adelman were present for portions of the hearing. You entered a plea of Not Guilty to all three charges.

The following information was presented during the hearing:

- Ms. Harvey submitted, and Officer Rahmer substantiated that a brother of a female student reported to Public Safety that his sister (which for the sake of this letter I will identify as "person A") and her roommate were disturbed and concerned about writings you had posted on your website on the University's Copeland server. Person A and her roommate live on the same floor (2nd) of Sypherd Hall as you do.
- Ms. Harvey submitted a letter from a campus Academic Advisor which detailed information about how Person A was so scared for her personal safety and distressed due to your postings that she could not focus on her studies and had to drop to "audit" status.
- Additionally, the Advisor's letter explained that Person A saw you in Sypherd Hall (despite you announcing in public postings that you had been banned from it); she feared retribution from you since you were blatantly ignoring the ban from your residence hall
- Ms. Harvey submitted a substantial number of print-outs from your website containing a preponderance of material degrading, demeaning, and violent toward women, as well as advocating violence towards others or in general. Many of the examples contained content that was racist and/or sexist.

UD342

AN EQUAL OPPORTUNITY UNIVERSITY

- Here are **samples** used in my review of the case and submitted as information in the case file:
  - **Sample**: "How to Skin A Cat": a document you created and posted online about killing and skinning a cat; also posted as a hard copy on your door in Sypherd Hall.
  - **Sample**: While explaining your experience of seeing Star Wars Episode 3: "It sucked, except for the part where children were dying. When Anakin started cutting up the kids I started giggling. When the little boy got shot, I almost burst out laughing."
  - **Sample**: "This is my glove choking a bitch" and "Apart from keeping my hands warm and being the bitch-chokingest gloves in the entire fucking universe, the gloves make me feel menacing" These statements are from a section of your website where you talk about your black gloves which you and your witnesses later acknowledged in the hearing that you wear all the time. You go on to say on your website how the gloves make you feel powerful and you compare yourself to OJ Simpson. In the close of this section you clearly state, "And in case you are wondering, I'm serious."
  - **Sample**: In a section where you talk about what you want for your birthday you stated: "A small Asian girl. I would keep her tied up in the closet... and do unspeakable things to her when I get bored . . . . Some nails. I could hammer them into things. Like your tires . . . . until my hidden one (*arm*) whipped out and punched them in the crotch[and] one of those Japanese sword things that you flip out and kill people with."
  - **Sample**: While posting your thoughts on UD's Sexual Assault Awareness Week t-shirts: "and then wear it while I'm raping some drunk girl in a dark alley."
  - **Sample**: On an April 17th entry you say "every man is a potential rapist." In the next few postings you focus on different aspects of rape including a review of African-American women where you use the term "negroids.". You talk about looking at indicators for potential rapists and list those indicators you found on "wikipedia" and then state, "Reading over those, all I can say is 'Shit.' No matter how I interpret them, shit. Don't walk with me at night, ladies."
  - **Sample**: A "Relationship Advice Pamphlet" in which you mock relationships but once again state, "Above all, remember that he's only hitting you because he loves you" and include information about killing babies.
  - **Sample**: In a "Guide to Sex": "After you have found your partner, make sure no one else is around, tie them up, and drag them to a secluded location." You later close the guide with tips on how to dispose of the dead body of your partner once you have had sex with it.
  - **Sample**: In a "disclaimer" for your website you posted, "It [your site] is bitter, angry, mostly useless, and only sometimes amusing -like the author."
- Ms. Harvey submitted information on University policies regarding use of computer resources and stated that the content of your website was not within the mission of the University and the use of computer resources.
- Ms. Harvey presented a letter to you dated April 20, 2007 from the Associate Vice President for Campus Life, Cynthia Cummings. Amongst other information, the letter informed you that you were banned from your residence hall. You were only given permission to enter your room on that Friday in order to retrieve your belongings.

UD343

- Ms. Harvey presented a University Facilities report that detailed that your PDI Card that you use to access your residence hall was used twice on April 22 and twice on April 24 to access the residence hall while you were still banned from it.
- Ms. Harvey provided a print out from your website which detailed your meeting with Ms. Cummings as well as the action that was being taken by the University on April 20, 2007. Content of this post said: "Maciej Murakowski has been, effective immediately, suspended from classes and the dormitories.... Seriously. This is not a joke. (unlike 'How to Skin A Cat')"
- Ms. Harvey closed by stating that the content of your website affected other students living on your residence floor, creating an environment that was disruptive to their academic success and campus living environment, that the content of your website violated the responsible computing policies of the University, and that you blatantly failed to comply with the directive of a senior administrator by entering your residence hall while banned from it.
- You submitted several University web documents detailing other definitions of the use of computing resources besides those directly affiliated with the Code of Conduct. You also submitted quotes from Dr. Roselle and Dr. Brooks. You claimed that your website content was satirical composition which met the "creative use" definitions of academic pursuit.
- You claimed that all the content identified in the hearing by Ms. Harvey was meant as humor and satire.
- You submitted "A Modest Proposal" as an example of what is now considered a classical piece of satirical composition. You also explained that when it was first published during the Ireland potato famine with suggestions of eating babies that indeed the community was shocked and appalled to the extent that the author almost lost his patrons.
- You stated that a friend of yours, University student ██████████, was the one who used your PDI card to enter Sypherd. She did this for you in order to check on information that you had posted on your residence door as well as to place new information on your residence door. It was noted that this information was your detailed account of meeting with Ms. Cummings and being suspended, as well as letting your friends know that you had moved your website to an off-campus server.
- ██████████ as your witness verified that she used your PDI card to enter Sypherd on the 22nd. I explained to you and ███████ that you both violated the University's Housing Contract and policies: you by giving ███████ your PDI card and ███████ by using that PDI card to gain entry to Sypherd. Both of you claimed that you were not aware of this fact.
- I asked you if you were in close proximity to Sypherd when ███████ entered and you said yes and that indeed people could see you from the residence hall windows if they were looking.
- I asked you why you couldn't just e-mail your friends the information, and you claimed you wanted to let everyone on your floor know what was happening to you since you were not there.
- You admitted that you entered your residence hall on April 24th as identified by the facility report; however, you defended that action by isolating Ms. Cumming's one bullet line from her April 20th letter: "2. You will be prohibited from staying in your residence hall room or attending classes until you receive a psychiatric assessment." You claimed that since you had received a psychiatric assessment that you then were permitted to enter your residence hall.

UD344

- ███████████████████████████████████████████
  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and ▓▓▓▓▓▓▓▓ entered the hearing to state emphatically that the content of your website is only meant in humor and satire. They also claimed that, though you might be perceived as "weird" and they thought that some of the things you do are strange, they do not believe you are a violent person.

- I challenged you with the notion that in providing me information to consider as the Hearing Officer was sometimes asking me to look at information in totality (*i.e.*, to consider your entire web site content and not just the isolated sentences of violence, etc.) to understand that it is overall a satirical or humorous composition. Yet, at the same time you were asking me to look at one specific sentence of a letter from a senior administrator as defense for entering your residence hall without looking at the overall spirit of the instructions.

- I told you that I could not review a case in both manners. Either you wanted me to look at the totality of information or pick and choose specific line by line elements. I asked which way you wanted and you told me to look at everything in totality.

- At that point you admitted that when taking item 3 of Ms. Cummings' letter, "You must provide me with a letter from a licensed mental health provider that indicates you are not a threat to yourself or others," in conjunction with item 2 quoted above, that indeed, your instructions were not to go back into the residence hall until you had the psychiatric assessment and provided the follow up documentation to Ms. Cummings.

- You admitted that you entered your residence hall at least once on the 24th before ever providing Ms. Cummings with the documentation.

- You made a statement toward the end of your information that you meant for some of your writing to be sexist and demeaning.

- You did state that you felt horrible that you caused Person A such distress and apologized for anyone else who may have been affected by your postings

Based on this information, I am finding you Guilty of violating the Failure to Comply Policy and Disruptive Conduct Policy. I am finding you NOT Guilty of violating the Responsible Computing Policy.

First, and clearly most obvious, the decision on the Failure to Comply is that you admitted to entering your residence hall on April 24th as well as standing right outside of it on April 22nd. You also admitted that you knew it was the intent of Ms. Cummings' letter that you not enter your residence hall until you provided her with the documentation of your psychiatric assessment. Furthermore, you also disregarded the housing policies by giving your PDI card to someone else to use, which is another example of failing to comply with University regulations while even on a serious emergency suspension.

Second, though the content of your website is not in violation of the use of the University's computing resources, you are responsible for putting the content there and for what outcomes may occur as a result of reviewing the content. You claimed numerous times, and your witnesses did as well, that the content of the site is meant as humor and satire. You likened your writings to that of the satirical essay "A Modest Proposal" but that essay was written as a means of political awareness or outcry in a time of national crisis in Ireland. Furthermore, you admitted that initially "A Modest Proposal" caused great disturbance. Your website taken in totality is not a satirical essay, nor is it

even a series of satirical essays. Many times it is nothing more than an on-line journal; sometimes it is a satirical spoof of a "how to guide" such as "How to Skin A Cat" or sometimes it is a simply a review of a film such as the Star Wars III entry. Unlike "A Modest Proposal" your entries do not appear to be satirical responses to national or even local crises. More importantly, no where in your "disclaimer" is the word "satire" found and it even says that your site is "bitter, angry, mostly useless, and only sometimes amusing -like the author." The overall consistency with your website is that the bulk of the entries end in some means, discussion, or promotion of violence. Or, the overall feel of the piece lends itself to violence. Even some pieces that may start out wittily or humorously continue to descend into nothing more than a violent end or violent solution. Indeed, if you can understand that "A Modest Proposal" caused disturbance upon its initial release then you realize that even if you contend your site is satire that it too could cause the same response, thus being disruptive to the community in which you live.

Finally, there is one overriding concern about your defense of the references to violence as satire and that you are not seriously promoting violence. In the section where you talk about using your gloves for violence you end the section saying... "And in case you are wondering, I'm serious." You use a similar statement when describing the judicial action... "Seriously. This is not a joke. (unlike 'How to Skin A Cat')." So, if one takes your website in totality, how is one to determine what is humor and what is not and therefore not become concerned about the violence? You claim to be serious about killing "bitches" with your gloves but then argue that saying you are serious is just satire. On the other hand, the details of your suspension were true and you had to clarify that you were serious. Thus, if you clarify that you are serious about the judicial action, why should a normal person not think it is possible that you are serious about using your gloves for violence? The bottom line is that your web site is filled with violence that created an uncomfortable and disruptive environment in your residence hall.

A review of your judicial record indicates this is your second case. Moreover, you failed to comply with a senior level administrator's directive. Accordingly, the following sanctions apply:

Effective upon the completion of your final exam for Spring Semester 2007, pending appeal, you are suspended from the University of Delaware and banned from Campus through the end of Fall 2007. You will be withdrawn from all classes, suspended from the residence halls (if applicable), and banned from all University facilities, rendered ineligible to register for any University class, and prohibited from participating in University activities for the period of the suspension. Entrance onto campus and into these facilities will be viewed as a violation of this sanction and you will be confronted and charged accordingly for trespassing and failure to comply. A student who is suspended from the University is nonetheless responsible for all financial obligations to the University. Your transcript will indicate you were withdrawn by the University. Should you wish to re-enter the University as a matriculated student following your period of suspension, you will be required to reapply to the University through the Admissions Office.

Also effective immediately, pending appeal, you are being Suspended and banned from any and all residence halls owned by the University of Delaware through graduation. *You must remove all your belongings from the room, turn in your key and access card to an appropriate staff member and complete all necessary check-out procedures no later than 7:00 p.m. on by May 25, 2007.* Failure to do so (or submit an appeal, as outlined below) by this date and time will result

in an additional charge of trespassing. If you do not return your key and key card upon moving out, the core will be changed and your card deactivated and you will be billed accordingly.

Finally, if you return to campus after your period of Suspension, you are being placed on Deferred Expulsion from the University through graduation. Deferred Expulsion means that if you are again found guilty of violating the Code of Conduct, you will be expelled from the University.

Finally, in accordance with the administrative processes of the Office of Judicial Affairs, a letter is normally sent to your parent(s)/guardian(s) informing them that you have been found guilty of violating a Code of Conduct policy. As your father attended the hearing on your behalf, this letter will be waived.

This action is being taken administratively in accordance with established University policy and at your request. Should you wish to exercise your right to appeal, you may do so by communicating this wish directly to the Chairperson of the Appellate Judicial Board, c/o Office of Judicial Affairs, 218 Hullihen Hall. Your appeal petition must be filed within five (5) days of receipt of this letter. The statement of appeal shall be prepared by you and your judicial advisor and shall be limited to three double spaced pages with regular margins. The statement of appeal shall not include citations to judicial or other authorities outside the University. (In the event that such citations are included, the chairperson may, in her or his discretion, reject the appeal.) The appeal must clearly explain, in detail, the basis for the appeal, and should include one or more of the appeal grounds:

1. The decision is contrary to evidence presented at the hearing or contrary to new evidence not known in advance of the hearing;
2. Procedures were not followed during the process; or
3. The sanction imposed is inappropriate or unreasonable.

If you submit an appeal, the presenting party and I will be provided an opportunity to respond to your petition. If you submit an appeal, sanctions will not take effect until the Appellate Board renders a decision, unless otherwise noted.

Sincerely,

Scott F. Mason

Scott F. Mason
University Hearing Officer

cc: Holli Harvey, Judicial Affairs, Presenting Party
    Office of Residence Life
    File

UD347

RECEIVED

JUN 0 4 2007

OFFICE OF
JUDICIAL AFFAIRS

FROM: Maciej Murakowski                                        June 4, 2007
TO: Chairperson of the Appellate Judicial Board, c/o Office of Judicial Affairs

I wish to appeal the outcome of the hearing that took place on May 2, 2007. I petition for an appeal on the grounds that: the outcome is contrary to the presented evidence and evidence since discovered, University procedure was not followed, and that the imposed sanctions are unjust and unreasonable given the offense.

According to established University procedures, the Disruptive Conduct charge is not a question of whether or not my maintaining a website on the University's servers *could* have created a disruptive environment. The University has a history of refusing to take action against those that *might* be considered disruptive. For example, the University decided not to take action against attendees of a recent racism-themed party[1], or against the graduate student Robert Huber after he was outed as a Neo-Nazi. Thus, precedent has established that, in order for any conduct to be found disruptive, it *must* interfere with the legitimate functioning of the University or its community. Otherwise, it is considered free speech, which the University has often stated is immutable.[2] Hypothetical disruption (e.g. "This *might* lead to a disruption,") does not count.

However, in my case, at the time the charges were filed, the only "evidence" against me was purely hypothetical. According to evidence "L" (enclosed), the alleged disruption took place only *after* the charges where filed. In other words, *there was never any evidence that would warrant bringing the charge of Disruptive Conduct against me on April 20.* (Note that a complaint to the University Police does not constitute, nor is it evidence of, disruption). Therefore, I allege that the Decision of the Hearing Officer is contrary to information presented at the hearing. I further allege that in bringing this charge against me, the Office of the Associate Vice President for Campus Life (OAVPL) did not follow established University procedures, which materially prejudiced the case.

Additionally, I allege that the only disruption was caused solely by the University's actions. Going back to evidence "L," I quote "She said that she has been unable to focus and experiencing anxiety. She has been overwhelmed with everything that has occurred and worries if Maciej would find out that she was responsible for

---

[1]  http://www.udel.edu/PR/UDaily/2007/may/rmeeting051007.html
[2]  President Roselle: "[…] a fundamental tenet of our nation is that my objection or, as in this case, the University's objection, is not sufficient reason to deny the right of free speech." And, "First Amendment protections are sometimes a little bit inconvenient for us when we want to perhaps punish someone who we think by all rights deserves to be punished. But it's the law of the land, and it's a wonderful law and one we all should happily abide by. So it is what it is, and you have to deal with it."

UD348

reporting him. […] she was worried [that] […] the student Maciej would then know that she had some role and/or involvement. […]." The letter focuses *entirely* on emotional distress *after* she learned that I was suspended. There is *no* evidence suggesting emotional distress leading to disruption prior to my suspension. She was worried about *retribution*, and *not* about the content of the website itself. She was *not* worried about what I might do to her; she was worried about what I might do to her *because the University had suspended me*. The content of my website did not cause her to withdraw, the University's *overreaction* to her complaint did.

A simple statement of fact, e.g. "Maciej Murakowski has been suspended," is *not* disruptive the way an encyclopedia is not disruptive. There is nothing in it, not even the shadow of a hint, that would indicate I meant to do violence to anybody. My suspension was the *sole reason* for disruption here.

I contend that the Disruptive Conduct charge was contrary to existing evidence, and the 'guilty' verdict directly contradicts the evidence in "L," which proves that disruption came about as a direct result of the actions of the OAVPCL. Furthermore, I also allege that the presenting party violated established procedure (bypassing 'due process'[3]) by *misrepresenting* evidence "L" as being among the causes of the charges being brought, which materially prejudiced the case.

Regarding the Failure to Comply charge, both new evidence and evidence presented at the hearing casts serious doubt on the validity of the charge. It was discovered after the hearing that a Behavioral Review Committee[4] (BRC) was *not* formed to decide whether or not to take action against me after the complaint was received by the OAVPCL. However, according to ([4]), if a student exhibits 'disruptive behavior,' the procedure calls for "The Behavioral Review Committee (or in an emergency the Associate Vice President for Campus Life)" to "take the necessary action to protect the student or other affected parties."

As a BRC was not formed, and the AVPCL acted unilaterally in deciding to suspend me, this implies that she believed it was 'an emergency.' However, this assertion is contradicted by the testimony of the University Police and the timeline of events. The entries on my web site that the OAVPCL found objectionable have been posted months or even years before. The initial complaint was filed on April 8, and it took nearly two weeks to pass the

---

[3] http://www.udel.edu/stuguide/06-07/judicial.html
[4] http://www.udel.edu/stuguide/06-07/grievance.html#behave

UD349

information to the OAVPCL; Lt. Rahmer of the University Police testified the UD Police thought it would be, at most, a Responsible Computing charge and that nobody at the Police Department thought that I could potentially be dangerous. Then, after receiving the complaint, the AVPCL allowed my meeting with her to be pushed back to the afternoon of the next day, *after I had finished classes for the day*. If a house is on fire, we do not wait for when it is convenient to call the fire department. In an emergency, we do not allow time lapse before taking action—we take action *immediately*. Clearly then, *nobody*, not even the AVPCL, seriously considered me dangerous, or dealing with me an emergency, even before I had received a psychiatric evaluation proving this.

In summary, the directive to suspend me was issued by the AVPCL *unilaterally* and in the *absence of emergency*, and therefore according to ($^4$) it lacked the proper authority to be binding. In other words, AVPCL had no authority to suspend me in the first place, which makes the Failure to Comply charge void.

The limited space of the allotted three pages prevents me from listing the numerous self-inconsistencies, misrepresentations of evidence, instances of *completely disregarding* presented evidence, as well as other deviations from the established University procedures, which materially prejudiced the case. I will gladly provide such a list upon request.

Based on the presented evidence, I respectfully request that the Appellate Judicial Board reconsider the decision in this case, and find me not guilty of the charges of Disruptive Conduct and Failure to Comply. However, if, contrary to the presented evidence, the Appellate Board upholds the verdict, I request that the sanctions be reduced. For a student, like myself, who places his academic career above all else, being suspended from classes is the harshest punishment there is. Applying this harshest punishment for being different, for being creative, is unjust not to mention unbecoming for an institution of higher learning. I therefore submit that the imposed sanctions are unreasonable and unjust and respectfully request their reduction. Also, since the entire issue revolved around in-dorm interactions, I submit that at most a temporary ban from the residence halls would be more appropriate.

Thank you for your consideration,

CC: Kathryn Goldman, Director of Judicial Affairs

UD350

**Subject:** My response to Murakowski appeal
**From:** Scott Mason <avenger@UDel.Edu>
**Date:** Wed, 06 Jun 2007 16:44:49 -0400
**To:** Kathryn G Goldman <kgoldman@UDel.Edu>

I reviewed Mr. Murakowski's appeal and stand behind the decision I made. Here are my considerations:

1) When I refer to the letter about the student who felt threatened, I specifically said "postings" which is inclusive of the posting Mr. Murakowski made on his door of his floor where he posted the information of being suspended. Had he not posted that on his door then the young woman would not have felt in danger of retribution.

Additionally, as he did in his hearing, Mr. Murakowski likes to focus on individual pieces of information and not the whole picture depending on what suits his argument. In this case, the young woman felt threatened when he posted his suspension on the door in connection with what he had historically written on his web site which is violence.

2) His inclusion of the Neo-Nazi professor in appeal was also submitted by him in the hearing where I explained that the professor was not reprimanded because he did not practice his hate on campus nor did he use campus resources to promote his hate. It was not a comparable situation.

3) His inclusion of the La Raza-Phi Sigma Pi racial t-shirts at a party is not "new evidence." He certainly could have introduced that issue in the hearing (and it certainly was occurring during the period in which I was making my decision so I already looked at his case in comparison to that issue) but it would have made no difference. The t-shirts did not promote violence. The shirts did not say "Kill Latinos" or "Strangle or rape latinos." The shirts were insensitive and racist. Insensitivity and racism are not points of Mr. Murakowski's case or my decision.

4) Even if one were to consider reversing my decision on disruptive conduct, he makes no appeal, nor is there room for one, for his blatant failure to comply with (at the time) one of the two highest senior administrators in Student Life. This alone is worthy of a semester suspension because clearly if he has no respect for a senior vp level person then will he ever listen to an RA, Hall Director, professor, etc? He needs to understand that this failure to comply is not acceptable.

Let me know if I need to provide any more information.

UD353

of 1

6/7/2007 12:54 PM

**Subject:** Maciej Murakowski APPEAL
**From:** Holli Harvey <harv@UDel.Edu>
**Date:** Mon, 25 Jun 2007 10:51:12 -0400
**To:** Cynthia Munyan <munyan@UDel.Edu>, Kathryn Goldman <kgoldman@UDel.Edu>

To the Board,

In response to Maciej's letter of appeal, the Board should be aware that Maciej has taken points out of context and then uses them to formulate his argument.  I urge the Board to review the hearing decision letter thoroughly as well as I evidence I provided (items 1-11 and A-L which are all included in his judicial file).

In response to the Disruptive Conduct charge, it is very clear that Maciej's actions were disruptive as the brother of a female student who lived in Sypherd filed a report with UDPD because his sister and her roommate were disturbed and concerned about the postings on Maciej's website.  Again, I want to repeat that two students were disturbed by Maciej's postings.

In his appeal, Maciej has taken the content of  Evidence "L" out of context and argues that one of the women was disturbed only because of his intended suspension. The truth is that this woman was so disturbed by his postings that her academics were affected and she sought assistance from her academic advisor.  In fact, the thought that Maciej might be suspended only compounded the woman's anxiety because she wasn't sure what he was capable of doing if he found out that she was the one who initially reported him.  In reading through the content of his disturbed writings, I can understand why the woman was so affected by this entire incident.

In response to Maciej's allegation that this is a free speech issue and the University took no action in similar incidents, there was no direct or indirect mention of threat or harm in those other cases.  Again, I urge the Board to read the evidence presented in this case (included in  his file) which contains printouts directly from his website.  The material is degrading, demeaning, and violent toward women.

In response to Maciej's allegation that Cynthia Cummings did not follow protocol, it is within Ms. Cummings' purview to do what she did.

Regarding the time delay, the Office of Judicial Affairs took action very quickly once our office found out about the incident. We could not act any sooner as we did not know about the matter.  The Office of Judicial Affairs found about about the incident on April 19th. Ms. Cummings and I met with Maciej and his father during the afternoon of April 20th.   We were very kind to meet with Maciej later in the day on April 20th, after he finished his classes for the day.

Regarding Maciej's statement that he has more information to present but was limited in space, I urge the Board to decide this case on the information provided.  Maciej was redundant at times in his appeal and he could have bulleted his appeal points.

Based upon all that we know about this case, this incident is a very serious matter. Our students have a right to feel safe in their community and Maciej's postings have taken that right away from some of our students.  His writings range from satirical to violent but there is no way to tell the difference.  I do not believe that Maciej's sanctions should be lessened; in fact, he should have been expelled!

Sincerely,

Holli Harvey
Presenting Party

## *APPELLATE BOARD CASE REVIEW WORKSHEET*

Name of Student: __Murakowski, Maciej__        File Date: __6/4/07__

Incident Date: __4/19/07__        Date of Review: __6/29/07__

Charges: __DC, RC + FC__        Past Record __X__ Yes ___ No

### Grounds for Appeal (Check all that apply):

__X__    Procedures were not followed during the process

__X__    Sanction imposed is inappropriate or unreasonable

__X__    Decision is contrary to information presented at the hearing or contrary to new information not known in advance of the hearing

_____    Appeal of sanctions only

### Sanctions Applied by Hearing Officer (Check all that apply):

_____    Disciplinary Warning

_____    Disciplinary Probation through_____

_____    Deferred Suspension from Residence Halls_____

_____    Deferred Suspension from University_____

_____    Suspended/Banned from _____ Residence Hall(s) through _____

_____    Move out of _____ Residence Hall and re-assigned to _____

__X__    Suspension from the University and Banned from Campus through __Fall Spring 2007__

_____    Expulsion

_____    Academic Penalty _____ Course _____

_____    F/X    Course _____

_____    Academic Integrity Seminar

_____    Alcohol Education Program

_____    Substance Abuse Assessment

_____    Completion of substance abuse treatment program prior to re-enrollment

_____    Fine    _____ $100 _____ $250 _____ $500 _____ $1000 _____

_____    Restitution $_____

_____    Anger Management Program

_____    Conflict Resolution Course

_____    Ethics/Decision Making Seminar

_____    Paper on _____

_____    Judicial Educator

_____    Parent Letter

__X__    Other __Deferred Expulsion after eval suspension is over__

**Appellate Board Members Present:**

Chair: _Newton_
_TUKe_
_Carodthers_
_Ziegelbaver_

_____    _____
_____    _____
_____    _____
_____    _____

**Grounds for Appeal (Check all that apply):**

_X_    Procedures were not followed during the process

_X_    Sanction imposed is inappropriate or unreasonable

_X_    Decision is contrary to information presented at the hearing or contrary to new information not known in advance of the hearing

_____    Appeal of sanctions only

**Appellate Board Decision**

_X_    Student HAS **NOT** presented sufficient grounds on which to base an appeal. Appeal has been denied and no change has been made to sanctions (see original sanctions).

_____    Student HAS presented sufficient grounds on which to base an appeal. Decision has been upheld and sanctions have been modified as follows:

_____
_____
_____

_____    The case has been deferred for more information.

**Notes/Rationale on Decision:**

_Board feels Sanction is not only appropriate,_
_but completely not not harsh enough._
_All procedures followed._
_Sanctus appropriate_
_Decision in line w/evidence_

**Appellate Board Chair:**

- Please explain rationale for decision
- Please organize file with all originals in order
- Please collect all extra copies of appeal information/packets and return to OJA

UD340

**Subject:** APPELLATE BOARD OUTCOME
**From:** judicial-affairs <judicial-affairs@udel.edu>
**Date:** Mon, 02 Jul 2007 11:39:42 -0400
**To:** Maciej Adam Murakowski <kuactet@UDel.Edu>
**BCC:** harv@udel.edu

Below please find a decision letter summarizing a recent Appellate Board
decision. Please read the letter carefully, as
it may contain information regarding sanctions for which you are
responsible for completing.

If you are using PINE to access your e-mail and need help opening the
attachment, please visit the following site for step-by-step directions:

http://www.udel.edu/topics/e-mail/pine/faq2.html

If you are unable to read the decision letter, it is your responsibility
to report in person to the Office of Judicial Affairs, 218 Hullihen
Hall, and request a copy of the letter, which is contained in your
confidential judicial file. Hours are 8AM-12Noon and 1-5PM. Please note
that your appeal period still begins as of the date of this e-mail.

A hard copy of the decision letter has also been sent to your
campus/local address (or permanent address if no local address was
provided in SIS.) Included with this hard copy will be all Sanction
Follow Up Forms (if necessary). It is imperative that you check your
mailbox and review these forms carefully once they arrive, as they
contain information and directions on how to complete each sanction.
Failure to complete the sanctions may result in an additional charge (of
failure to comply) and additional sanctions.

Should you have further questions, please contact the Office of Judicial
Affairs at 831-2117.

**Murakowski,M.6.07APPEALDECISION.doc**    **Content-Type:**    application/msword
    **Content-Encoding:** base64



OFFICE OF JUDICIAL AFFAIRS

218 Hullihen Hall
University of Delaware
Newark, Delaware 19716-6107
Ph: 302/831-2117
Fax: 302/831-8191

CONFIDENTIAL

July 2, 2007

Maciej Murakowski
16 Waltham Drive
Newark, DE 19713

Dear Murakowski,

The Appellate Board met on June 29, 2007 to review your request for an appeal concerning the incident that occurred on April 19, 2007. You appealed on the grounds that procedures were not followed, the decision is contrary to information presented at the hearing or contrary to new information not known in advance of the hearing, and the sanction imposed is inappropriate or unreasonable.

Upon reviewing all available information relevant to your situation, the Appellate Board has determined that you have not presented sufficient grounds on which to base an appeal. Therefore, the following sanctions will apply:

Effective immediately, you are suspended from the University of Delaware and Banned from Campus through the end of Fall semester 2007. You will be withdrawn from all classes, banned from all University facilities, rendered ineligible to register for any University class, and prohibited from participating in University activities for the period of the suspension. Entrance onto campus and into these facilities will be viewed as a violation of this sanction and you will be confronted and charged accordingly for trespassing and failure to comply. A student who is suspended from the University is nonetheless responsible for all financial obligations to the University. Your transcript will indicate you were withdrawn by the University. Should you wish to re-enter the University as a matriculated student following your period of suspension, you will be required to reapply to the University through the Admissions Office.

In addition, if you return to campus after your period of Suspension, you are being placed on Deferred Expulsion from the University through your graduation. Deferred Expulsion means that if you are again found guilty of violating the Code of Conduct, you will be expelled from the University.

Finally, in accordance with the administrative process of the Office of Judicial Affairs, a letter is normally sent to your parent(s)/guardian(s) informing them that you have been found guilty of violating a Code of Conduct policy. This letter will be waived as your father attended the hearing.

UD362

AN EQUAL OPPORTUNITY UNIVERSITY

The decision of the Appellate Board is final.

Sincerely,

Frank Newton
Chairperson Appellate Judicial Board


cc: Holli Harvey, Presenting Party
    Scott Mason, Hearing Officer
    File

UD363

ii. A guest may only possess or consume alcohol if the guest is over the age of 21 and is visiting a resident's room where at least one of the assigned student residents is also of legal drinking age (i. e., if a double-occupancy room is occupied by two students under the age of 21, those students shall not permit the consumption, possession, or use of alcohol by anyone, including guests, in that room. However, if one of the roommates is over the age of 21, he or she may allow the possession or consumption of alcohol by guests who are over 21).

iii. The student's (or a guest's) possession, use, or consumption of alcohol shall not infringe upon the privacy, peace, or enjoyment of other students or guests in the residence hall.

iv. A residence hall student has a duty to know if there is or has been illegal use or possession of alcohol in his or her room. Therefore, the burden of proof shall be on the resident in cases where the resident claims no knowledge of such use.

c. **Alcohol at the University Football Stadium**

The possession, use, consumption, manufacture, sale, or distribution of alcohol at the University football stadium is prohibited, except that alcohol may be possessed and consumed in the stadium parking areas only on the day of a home varsity football game and only by those of legal drinking age. Beer kegs and any alcohol-related games, activities or apparatus (such as a beer pong table, ice slides, beer funnels, etc.) are prohibited at all times, and alcoholic beverages are not permitted in the stadium. Individuals are not permitted to possess any open container containing spirits, wine, or beer, or consume any spirits, wine, or beer in stadium parking areas while the football game is in progress.

**Back to Top of Document**

C. **Complicity**

A student shall not, through act or omission, assist another student, individual, or group in committing or attempting to commit a violation of this Code of Conduct. A student who has knowledge of another committing or attempting to commit a violation of the Code of Conduct is required to remove him or herself from the situation, and failure to do so when reasonable under the circumstances may be the basis for a violation of this policy.

**Back to Top of Document**

D. **Disruptive Conduct**

1. **Statement of Policy**

A student shall not impair, interfere with, or obstruct the orderly conduct, process, or function of the University or any of its students, faculty members, University officials, or guests.

2. **Prohibited Activities**

   Specific violations of this standard include, but are not limited to:

   a. Committing or threatening to commit any act of violence against self or other;

   b. Threatening the health, safety, or welfare of another;

   c. Acting recklessly or in a manner that endangers or could reasonably be expected to endanger the health, safety, or welfare of the student or anyone else;

   d. Interfering with the freedom of movement of another person;

   e. Invading the privacy of another person;

   f. Interfering with the right of another to enter, use, leave, or enjoy any University building, facility, property, service, resource, or activity;

   g. Interfering with a faculty member or University official in the performance of his or her duty;

   h. Interfering with the freedoms of speech, religion, or association of another;

   i. Trespassing or the unauthorized entering or accessing of any University building, facility, property, service, resource, or activity;

   j. Instigating or otherwise encouraging others to engage in a fight, riot or other disruption;

   k. Making, exhibiting, or producing any inappropriate, loud, or disruptive noise or behavior;

   l. Exhibiting public nudity or lewd behavior; or

   m. Urinating in any area of University buildings, facilities, or property.

**Back to Top of Document**

E. **Drug Policy**

2.  Setting or causing a fire;

3.  Tampering with, misusing or damaging fire or safety equipment, such as alarms, heat sensors, smoke detectors, hoses, and fire extinguishers;

4.  Failing to immediately exit any facility or building when a fire alarm has been sounded, or hindering or impairing the orderly evacuation of any University facility or building; or

5.  Disobeying a command by any University official or faculty member in connection with a fire, alarm, or other safety or security matter.

**Back to Top of Document**

G.  **Failure to Comply**

It is a violation to ignore, disobey, disregard, or otherwise violate any provision of this Code of Conduct or any applicable rule. Specific violations include, but are not limited to:

1.  Failing to comply with the directive of any University official or faculty member, including any sanction imposed by the Office of Judicial Affairs upon a group or individual;

2.  Failing to comply with the terms of any University **Agreement**, policy, or procedure;

3.  Failing to comply with any applicable federal, state, or local law;

4.  Failing to advise the University of an off-campus criminal charge(s) or conviction.

**Back to Top of Document**

H.  **False Information**

A student shall not provide false or misleading information. Specific violations of this standard include, but are not limited to:

1.  Making a false or misleading oral or written statement to any University official or faculty member when the student knew or should have known the statement was false;

2.  Making a false or misleading oral or written statement that misrepresents the character, qualifications, or reputation of another;

3.  Falsely reporting the presence of an explosive or incendiary device, or fire or other safety hazard;

An accused student is entitled to:

a. Have a hearing within a reasonable period of time after the complaint is filed. Once a hearing is scheduled, it may only be postponed, for cause, by the Office of Judicial Affairs or the Assistant Provost for Graduate Studies.

b. Receive a written notice at least 5 business days prior to the hearing, of the time and place of the hearing.

c. Prior to the hearing, review all documents and materials in the possession of the Office of Judicial Affairs (for undergraduate students) or the Office of Graduate Studies (for graduate students) that relate to the complaint, provided, however, that such materials may be edited to shield the identity of those giving information when officials believe that confidentiality is necessary to avoid risk to those persons. **Note:** These offices do not always receive all information that may eventually be offered at a disciplinary hearing, and the files referred to in this section will not, in all cases, contain all information in the possession of the party filing the complaint.

d. Appear in person and present information on his or her own behalf, call witnesses, and ask questions of those present at the hearing; or elect not to appear at the hearing. Absence will be noted without prejudice, but the hearing may be conducted in the accused student's absence.

e. Refuse to answer any question or make any statement.

f. Be assisted by an advisor of his or her choice from among the members of the University community. For undergraduate students, names of advisors familiar with the judicial process are available upon request through the **Office of Judicial Affairs**. It is the responsibility of the accused student to obtain an advisor if he or she desires one and to provide the advisor's name to the Office of Judicial Affairs or the Office of Graduate Studies (for graduate students) at least 24 hours prior to the hearing. An advisor should be selected promptly. The advisor may:

    i. Advise the accused student on the presentation of a defense;

    ii. Accompany the accused student at all judicial hearings; and

    iii. Advise the accused student in the preparation of any appeal.

g. Be safeguarded against criminal self-incrimination. No legal counsel for an accused student may be present in the hearing room except when:

    i. The accused student is charged both within the Student Judicial System and with a felony offense in an off-campus criminal court system; and

    ii. The accused student's judicial hearing occurs before the off-campus felony hearing has been conducted.

In the limited situation when counsel is permitted at the hearing, counsel's function shall be limited to advising the accused student on whether to answer a question and safeguarding the student from self-incrimination. The legal counsel may not question witnesses, object to questions, or otherwise

# STUDENT GUIDE TO **UNIVERSITY POLICIES**

SEARCH [          ] [  ]

[ GUIDE HOME ]  [ GUIDE INDEX ]  [ CONTACT US ]  [ UD HOME ]

## III. DISCIPLINARY SANCTIONS

The University reserves the absolute discretion to determine appropriate sanctions to be imposed upon a student for any infraction of the Code of Conduct. The sanctions explained below may be cumulative, and no sanction need be exhausted before any other sanction may be imposed. The sanctions may be enhanced based on a past disciplinary record, the severity of behavior, or the impact upon the community. Sanctions may be tailored to specific situations. Therefore, the following list is not exhaustive.

- **Descriptions of Disciplinary Sanctions**
- **Enhanced Sanctions for Bias-Related Acts**
- **Sanctions for Violations of Academic Honesty Policy**
- **Sanctions for Alcohol or Drug Policy Violations**
- **Sanctioning of Fraternities, Sororities and Student Organizations**

A. **Descriptions of Disciplinary Sanctions**

Disciplinary sanctions include, but are not limited to:

1. **Disciplinary Warning**

   A disciplinary warning is an official written notice expressing disapproval of conduct and a statement that the conduct violates one or more University rules or regulations.

2. **Disciplinary Probation**

   Disciplinary probation is a period of review during which the student or organization must demonstrate the ability to comply with University rules, regulations, and all other stipulated requirements.

3. **Deferred Suspension from Residence Halls or Graduate Housing**

   Deferred suspension from residence halls or graduate housing is a period of review during which the student must demonstrate the ability to comply with University rules, regulations, and all other stipulated requirements. If, during the deferred suspension period, the student is again found guilty of violating any University rule or an order of an administrative hearing officer or member of a judicial body, the student will be suspended immediately from the residence hall or graduate housing.

4. **Deferred Suspension from the University**