## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MACIEJ MURAKOWSKI, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C. A. No. 07-475-MPT |
| | : | |
| UNIVERSITY OF DELAWARE, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

David Finger, Esq., Finger & Slanina, One Commerce Center, 1201 Orange Street, Suite 725, Wilmington, De 19801-1155, Attorney for Plaintiff

William E. Manning, Esq., James D. Taylor, Esq., Jennifer M. Becnel-Guzzo, Esq., Buchanan Ingersoll & Rooney, The Brandywine Building, 1000 West Street, Suite 1410, Wilmington, DE 19801, Attorneys for Defendant

_____

September 4, 2008
Wilmington, DE

U.S. Magistrate Judge

**Introduction**

Plaintiff, Maciej Murakowski ("Murakowski"), who instituted his civil rights action pursuant to 42 U.S.C. § 1983 against the University of Delaware ("University") on August 1, 2007, challenges the University's right to discipline him for posting allegedly threatening comments on a website maintained on the University's server. In his verified complaint, Murakowski contends that his rights under the First and Fourteenth Amendments were violated as a result of disciplinary proceedings which concluded that Murakowski violated the University's Disruptive Conduct and Failure to Comply policies. As a result, he was suspended for one semester, banned from residence halls and place on Deferred Expulsion through graduation. On appeal, the University's Appellate Board upheld the hearing officer's decision and sanctions.

In its answer dated August 22, 2007, the University denies any constitutional violations, and notes that at the time of the hearing, Murakowski who was already on disciplinary probation for other infractions and by his conduct, disregarded a direct command by a senior University official.

On October 25, 2007, a scheduling order was entered which was supplemented on February 14, 2008. Pursuant to 28 U.S.C. § 636 and Fed. R. Civ. P. 73, the parties stipulated to the jurisdiction of the Magistrate Judge on January 22, 2008.

On March 17, 2008, Murakowski filed his motion for summary judgment. On April 9, 2008, the University filed its answering brief and opening brief on its cross motion for summary judgment. Briefing was completed on the motions on May 16, 2008.

This opinion addresses the parties' cross motions for summary judgment.

**Facts**

According to the parties' representations during the teleconferences on the scheduling orders and from the briefing, the relevant facts are not in dispute. The parties' spin on or interpretation of those facts, however, are.

At the time of the events described herein, Murkowski was a nineteen year old sophomore at the University. He began classes at the University in 2005. In June 2005, he established a website using the University's server, which contained essays authored by him addressing a variety of topics. Some of those topics reference violence and sexual abuse, which Murkowski admits were included for shock effect.

The University has a policy for student use of computing resources for home pages, which the priority purpose is for the institution "to carry out its responsibilities of education, research and public service." It allows students to use its resources for "personal use provided they abide by the policies and procedures governing such use." The policy requires students to "abide by the Policy for Responsible Computing" and "[t]hey assume full legal and moral responsibility for the content of their home pages." Under the policy, students

> must abide by all local, state and federal laws that pertain to communication and to publishing. This includes laws on libel and copyright law. Copyright law pertains to all published and unpublished materials, including cartoons, pictures, graphics, text, song lyrics and sounds.

Regarding the right to privacy, the students are cautioned to "consider the public nature of information they disseminate on the Internet" and not to "assume that their information is restricted to only a close circle of friends, or even the campus

3

community."

The University provides that it

> will not impose any restraints on, nor make any effort to monitor the content of communications other than those imposed by applicable Federal, State or local laws, including laws regarding the right to privacy and laws which prohibit defamatory material. Users of the University's information system are advised that their communications are subject to such laws and that the consequences of violation can be severe.

Under the policy, students are warned that they cannot use their home pages for commercial activity or for fund-raising for commercial or non-commercial organizations, except for University-related organizations or events. Further, the policy clearly notes that the University name or logos may not be used and that the responsibility for content of the home pages remains solely with the authors/students and that their opinions and views are not those of the University.

At the time of the charges which lead to the present disciplinary action under consideration, Murakowski was on Disciplinary Probation through the end of the Fall 2007 semester for violating the Responsible Computing Policy by copying or distributing copyrighted material through his computer. That disciplinary sanction was imposed after an Administrative Hearing which occurred on March 15, 2007. Thereafter the restrictions were re-imposed after the Appellate Board review on April 25, 2007. In addition, he was restricted "from accessing the University network using his computer (either from [his] residence hall room, another resident's room or port, via a wireless connection, dial-up, PIP access or another other means) for thirty days" from the date of the original infringement notification which occurred in February 2007. In explaining the import of Disciplinary Probation, the letter from the Appellate Board noted:

4

So that there is no misunderstanding, disciplinary probation is defined as
a period of observation and review during which you *must* demonstrate
your willingness and ability to comply with *all* University regulations.

Regarding the present charges, they initially arose in relation to the writings
contained on his website.[1]  His essays or writings include:

♦     How to Skin a Cat in which Murakowski discusses one way to literally skin

        a cat and keep the skin intact.  The article includes pictures of a kitten in

        different stages of the process including breaking its "frail little neck," and

        allegedly shows a dead cat after accomplishing this feat.  The article

        begins with the materials necessary, including "a cat, preferably alive" and

        "a pair of sharp scissors" which may be substituted with a knife.  In steps

        2 and 3 of the essay, he describes in fairly graphic detail, the cuts needed

        to effectively and pristinely remove the skin, in which if the head fur is not

        used, the skinning is completed whereby the reader is advised to either

        "bury the cat or clean it and eat it."  If the head is to be skinned, smaller

        blades, such as a scalpel or razor blade, are recommended to complete

        that process.  Figure 6 allegedly is a picture of the skinning process of the

        cat's head.  He notes "many legitimate reasons for wanting cat skin," such

        as for clothing (coat, glove or scarf), bedding, to attract and trap more cats

---

[1] Although Murakowski asserts that he did not advertise his website, the
University notes that he "acknowledged during the hearing that he placed materials on
his dormitory door directing students to his website."  In his  reply brief, Murakowski
takes issue with that comment, noting that there is no evidence that he posted his URL
or gave any indication that his writings were available anywhere else.  The court
considers this mini-foray to be picayune and not relevant to the analysis herein.  In any
event, both sides agree that he posted certain of his "essays" on his dormitory door.

or a yurt.[2]  This article apparently was published on March 12, 2007.

♦    The Relationship Advice Pamphlet (for girls in a relationship), in which
Murakowski appears to mimic the advice columns found in various
newspapers or magazines.  In one part of the "advice column," a
hypothetical question is posed:  "My boyfriend punches his friends in the
arm, as a form of greeting.  He started doing this to me, except really hard
and in the stomach, when I told him I might be pregnant . . . What should I
do?"  His response is "[y]ou should feel proud that he's treating you like
one of his male friends.  This sort of abuse, and most other forms, is
perfectly acceptable in an otherwise healthy relationship.  Above all,
remember that he's only hitting you because he loves you.  *And to kill the
baby*."  In another hypothetical question, the concern expressed is burning
on urination with redness of the area, which when such symptoms were
mentioned to the boyfriend, he reacts guiltily and claims that it is a normal
part of puberty.  Murakowski's advice is to believe the boyfriend and
eschew seeking medical advice.  In response to the question of "how do I
know I'm in a relationship," Murakowski comments "[y]ou are tied up in a
closet for the majority of your waking hours, except for brief interludes of
violent, painful sex with a masked man who insists you call him 'Master.'"
In the same article, Murakowski contends that "STDs are just another way

---

[2] A tent like dwelling of the peoples of central Asia consisting of a cylindrical wall
of poles in a lattice arrangement with a conical roof, both covered by felt or skins.
*Wikipedia.org*.  The court is unaware of any slang meaning associated with the word
"yurt."

to show you that he cares."

♦ A posting which discusses Sexual Assault Awareness Day,[3] in which Murakowski purposes to obtain a sexual awareness t-shirt and "wear it while I'm raping some drunk girl in a dark alley. It'd be funny. Or maybe ironic. She'd certainly be aware of sexual assault. And that's ironic because the shirts are about promoting sexual assault awareness." Later in the same essay, he claims to have looked online in Wikipedia for the possible predictors for being a rapist. After the listing of the various characteristics,[4] Murakowski cautions "[r]eading over those, all I can say is 'S—.' No matter how I interpret them, s—. Don't walk alone with me at night, ladies." He also asserts that every man is a potential rapist. In another section in the same essay, Murakowski critiques the seminar regarding young black womanhood by commenting, "I always knew that letting the negroids have their music was a bad idea."

♦ In another article captioned "Happy birthday to me," Murakowski includes in the litany of his birthday wishes, "A small Asian girl. I would keep her tied up in the closet (like the brother does with his) and do unspeakable things to her when I got bored. It would be better than pretending to be a

---

[3] This commentary appears to have been published in March-April 2007.

[4] The predictors include "habitual degradation and verbal devaluation of others; consistently using intimidation in language, excessive, chronic, or brooding language; and becoming obsessed with the object of his or her romantic affections, long after his advances have been rejected."

cripple" (another one of his birthday wishes).  He also asks for a katana,[5] to flip out with and to kill people.

♦   In "Maciej's Official Guide to Sex", Murakowski vividly describes how to kidnap, rape and murder.  In the opening paragraphs, he brags about "watching a lot of porn in my day," but claims that he will not be having sex any time soon.  In his advice to the reader, he first suggests to find a partner, and once found to "make sure nobody else is around, tie them up and drag them to a secluded location."  He recommends foreplay to avoid going to jail thereafter.  As part of this ritual, he suggests "[b]iting all exposed body part (this includes eyeballs)."  Under the section "Moves and Position," he provides explanations for certain words, such as, "bukkake"[6] which is getting a bunch of friends "and gangrape a girl;" "flaming gay" described as "[f]ind a man.  Set him on fire.  Repeat;" Regarding the word "sociopath," he suggests romantic approaches of using rose petals, washing your partner gently with oils and scented soaps, sensually massaging her, slowly letting your hands explore her body and after making love and falling asleep entwined, "[t]hen set her on fire."  Thereafter, under the section headed "cleanup," he counsels on

---

[5] A Japanese sword that is around 70-90 cm. long with a curved blade, which is the longer variant of the nihontō.  *Wikipedia.org.*

[6] Bukkake is a Japanese word that involves a group sex practice which features a female subject being ejaculated on by multiple men. Used with other words such as "udon" or "soba," it describes a type of dish where toppings are poured on top of noodles.  In light of Murakowski's description and the context, the court doubts that his intent was to describe food.

8

how to dispose of the body of one's murdered partner. He advises under "what you need" as follows: "1 shovel; 1 hole large enough to fit a dead body the size of your partner dug in advance; 1 tarp large enough to completely wrap said body. What you do: Use your imagination."

♦ In the article "Rub my belly for luck!," Murakowski discusses the purpose of black gloves that he apparently constantly wears. He starts the description by "[t]his is my glove choking a bitch. That bitch has been thoroughly choked. See if you can spot my glove. Hint: it's the one choking him." Although he acknowledges that the gloves keep his hands warm, he admits that "the gloves make me feel menacing. When I wear them, I find myself talking in a deeper voice, flexing my fingers, and generally intimidating the hell out of everybody." As a result he forgets that he is a spindly pale virgin, "and feel[s] more like a smooth ass-kicking biker. Or maybe OJ Simpson, on his way to choke some more bitches. Oh man, they rule so hard. And by 'they' I mean 'me.' And by 'me,' I really mean 'the gloves.'" He concludes, "[a]nd in case you are wondering, I'm serious."[7]

The University first became of aware of Murakowski's postings through a complaint on April 8, 2007 lodged through the brother of a female student to the University Police Department ("UDPD"). That female student and her roommate lived in the same dormitory as Murakowski. They had read his blog and felt uneasy and fearful

_____

[7] As with a number of the articles mentioned herein, Murakowski ended with "Email me or die: [Murakowski's email address]."

around him. Previously, another female student complained about an harassment incident in November 2005. Thereafter on April 20, 2007, the University's Counseling Center received a call from a parent of a student expressing concern about Murakowsi's "bizarre behavior." Apparently one of the students who complained was so concerned about her personal safety, that she physically shook and was noticeably upset when discussing Murakowski. As a result of her inability to focus and the anxiety she experienced, she requested a change of at least one class from a standard grade to audit status. She expressed a serious concern that Murakowski would learn that she was responsible for reporting him.

Lieutenant Thomas Rahmer of the UDPD sent an email Cynthia Cummings ("Cummings"), the Associate Vice President for Student Life advising of the student complaints and his concerns on April 19, 2007. Alarmed about what was reported and what she reviewed, Cummings immediately contacted Murakowski's father, a research engineer at the University, on the same day of Lt. Rahmer's email. She asked him to remove his son from campus for that night and to report to her the following day with his son.

Cummings, Murkowski and his father met on April 20, 2007 in Cumming's office. During that meeting, she explained her concerns regarding Murakowski's postings, specifically his "Definitive Guide to Sex." Murakowski claims that he explained that the essay was a "humor piece," a description with which Cummings clearly did not agree. At that time, Cummings provide Murakowski a letter which noted as follows:

> On the website, I found a number of postings that are sexually graphic, hostile, and violent. The subject matter includes such things as rape, murder, relationship violence, and animal torture and cruelty. It also

contained racist, sexist, anti-Semitic, and homophobic statements.

The letter advised of the formal complaints by "two students, one on November

9, 2005, and one on April 7, 2007," as well as the call to the Counseling Center by a

parent who described his behavior as bizarre. Because of those reports, the following

action was taken:

> 1. You will be charged through the University's judicial system with violating the Responsible Computing Policy.
> 2. You will prohibited from staying in your residence hall room or attending classes until you receive a psychiatric assessment.
> 3. You must provide me with a letter from a licensed mental health provider that indicates that you are not a threat to yourself or others.
> 4. You must sign a waiver granting me permission to speak with that licensed mental health provider to confirm his or her conclusions and to learn about any recommendations he or she might have pertaining to mental health treatment.

In addition, Cummings provided Murakowski with a University Judicial Charge

form which advised him of the charges "of Disruptive Conduct and Responsible

Computing and Use of University Computer Resources." Following the charges, that

form continued with the brief explanation:

> Mr. Murakowski is alleged to have used University computer resources for non-academic purposes to create and post a website (http://copland.udel.edu/[Murakowski's website]  The contents of this site have caused concern and alarm to University community members. The information posted is graphic in nature, violent, derogatory, hostile, and disturbing.

The form also contained a "note to the student" which directed him to appear

within three days for a pre-hearing meeting.[8]  The form cautioned that the "failure to

---

[8] The form advised that pre-hearing meetings are held on certain days of the week during certain times, specifically Tuesdays through Thursdays and from 9:00 a.m. to 12:00 noon and from 1:00 p.m. to 4:00 p.m.  This information was provided in bold in two locations on the form.

attend the pre-hearing meeting within the specified time will be considered an admission of guilt to the violation(s) and the referral will be handled administratively," which would result in a decision being rendered in his absence and a sanction imposed without his input.  The form further noted that the purpose of the pre-hearing meeting is to allow Murakowski to discuss the incident further, ask questions and review relevant information from the his judicial file.  During the pre-hearing meeting, Murakowski had the option to plead guilty or contest the charges and request a full hearing.  The form also addressed what would occur during an administrative hearing:  it advised that the "charges would be held before an individual member of the University's staff," who would serve as the hearing officer.  During the hearing, Murakowski would be given "a structured opportunity to hear the reporting party's information and to respond to all information and charges."  In addition, Murakowski was told that he had the right not to appear or choose to remain silent.  The form indicated that the hearing officer would make and communicate a decision several days following the administrative hearing.

Regarding his rights as a charged student, the form also directed Murakowski to the Student Guide to University Policies and the Judicial Affairs websites.  The telephone number for the Office of Judicial Affairs and the Director of that office was provided along with her email address.

During the meeting with Cummings, Murakowski asked to be able to return to his room for some of his things, which request was granted.  When Murakowski returned to his dorm room, in addition to packing up some items, he posted a notice on his door

advising that he had been suspended.[9]

Prior to his psychological examination and after his allowed limited return to the dorm, the evidence shows (which Murakowski does not dispute) that his access card was used to enter the residence hall on two occasions on April 22, 2007. Thereafter on April 24, 2007, his access card was again used twice to enter the dorm.[10]

As noted in Murakowski's undated letter to the Office of Judicial Affairs, on the evening of April 23, 2007, he was evaluated by Dr. Philip Braun, Ph.D.[11] Murakowski met with Cummings on April 24, 2007 to advise her of his psychological examination and provided her with Dr. Braun's report.[12] Whether Cummings explained to Murakowski her concerns regarding the completeness of the materials that he provided to Dr. Braun, apparently she was concerned and was awaiting further response from Dr. Braun. At that time, Murakowski provided Cummings with his letter about returning to class. He was told that he could not do so.

According to Dr. Braun's letter dated April 23, 2007, after interviewing Murakowski, reviewing twenty-five pages of his website writings and assessing him and his compositions, Dr. Braun determined the extent to which Murakowski presented a

_____

[9] Murakowski's representation in his brief is incomplete. The "notice" also includes a four page explanation of his view of the situation, also posted on his website, which included the full text of Cummings' letter.

[10] According to the University, access to its dormitories is limited to only those students who reside in that hall, with each student provided an electronic access card, or "PDI," which authorizes access to their dormitory building only. Murakowski does not dispute that representation.

[11] According to his letter, Murakowski assumed that since he underwent the evaluation, he could return to classes.

[12] Again, there may be a slight, irrelevant, disagreement between the parties on whether Murakowski provided a copy of Dr. Braun's report to Cummings. In any event, it is undisputed that she received a copy of that report on April 24.

13

threat to himself or others:

> Mr. Murakowski presents himself as a highly intelluctualized young man.
> There is some element of social disconnect present.  He reports that he
> would rather be alone than in the company of others, however, does
> report having a number of close personal friends as well as internet
> relationships . . . .
>
> Upon my review of his writings and his responses to me during the clinical
> assessment, I do not believe that this young man is a threat to himself or
> others.  Some of his writings are insensitive and depending on the context
> in which they are read can be seen as disrespectful to some individuals.
> While I certainly do not condone such expressions, I do not believe that
> they reflect any potential for physically acting out against any member of
> any of the groups referenced in your letter . . . .
>
> It is clear that one can not predict future behavior with absolute certainty.
> I do not believe, based on the information that I have received and the
> writings I have reviewed, that Mr. Murakowski represents a threat at this
> time.  I would certainly recommend that he be permitted to return to the
> University, attend his classes and complete the semester.  I did discuss
> with him the possibility of the utilization of the University counseling
> services should he experience subjective stress in the future . . . .

After their meeting, Cummings learned of the use of Murakowski's dormitory

access card on April 22.[13]  In response, Cummings forwarded a letter to Murakowski

dated April 25, 2007 advising of the additional violation as evidenced by the use of his

access card and informed him that he would be charged with Failure to Comply by the

Office of Judicial Affairs.

In light of the access card usage and Murakowski's direct violation of a senior

administrator's order, Ms. Kathryn Goldman, Director of the Office of Judicial Affairs,

hand delivered a letter dated April 25 to Murakowski explaining the additional violation

_____

[13] Jim Tweedy's email was sent to Ms. Cummings at 3:46 p.m. on April 24.  Mr.
Tweedy initially received the information regarding the PDI usage at 10:26 a.m. on April
24 before access occurred at 11:10 a.m. and 1:40 p.m. on that date.

14

and the charge. The letter advised of the evidence in support of the use of his

residence hall access card and that such usage was in direct violation of Cummings'

directive on April 20. Murakowski was further informed that as a result of his conduct,

he was suspended from all residence halls pending the outcome of the disciplinary

proceedings. He was directed to meet with Goldman for a pre-hearing meeting

immediately and to give up his residence room key and access card. The letter advised

that the administrative hearing on all three charges would be held on April 30, 2007 and

that Ms. Holli Harvey ("Harvey"), Assistant Director of Judicial Affairs, would present the

case and Cummings would be a witness. He was further informed that he could ask

questions about the emergency suspension, the charges against him and the process

by which those charges could be resolved at the pre-hearing meeting. During the

meeting with Goldman, Murakowski was authorized to return to classes.[14]

At Murakowski's request, the Administrative Hearing was rescheduled for May 2,

2007. In the email advising of the date change and the time of the hearing, the hearing

officer, Scott Mason ("Mason"), was identified. The email also included the website for

the undergraduate student judicial system.

**The Hearing**

During the Administrative Hearing, the three charges were addressed:

Disruptive Conduct,[15] Failure to Comply and violating the Responsible Computing

---

[14] Murakowski claims that he missed classes on April 23 through April 26 as a result of the University's conduct.

[15] Under the statement of policy for Disruptive Conduct, a student is not to "impair, interfere with, or obstruct the orderly conduct, process, or function of the University or any of its students, faculty members, University Officials, or guests." A non-exhaustive list of the prohibited activities follow the policy.

15

Policy.   Mason served as the hearing officer and Harvey was the presenting party.

Harvey's evidence on the Disruptive Conduct charge was that at least one student in

Murakowski's dormitory was so frightened by his postings that her brother complained

to UDPD on April 8.  As a result fear and anxiety, another female student changed at

least one class to listener status.  According to the memorandum of the interview from

Cheryl David-Robinson to Harvey, which was introduced as an exhibit, that student was

very concerned that Murakowski would learn of her involvement and exact revenge.

Since the student was so frightened, her name was withheld and she was not called as

a witness.[16]  As a result, that student did not testify and neither did David-Robinson who

interviewed the student.[17]  In addition, the essays, previously discussed herein, were

submitted in support the Disruptive Conduct charge and violation of the Responsible

Computing Policy.

Regarding the evidence presented in support of the Failure to Comply charge,

Harvey introduced the PDI record which showed that Murakowski's access card had

been used twice on April 22 and again on two occasions on April 24.

In his defense, Murakowski contended that his postings were satirical and funny,

_____

[16] All identifiers of any complaining students have been removed from the exhibits, which the University maintains is in compliance with the Family Educational Rights and Privacy Act, 20 U.S.C. § 1221, *et seq.*  The decision not to identify a complainant is consistent with the Student Guide at Section II, which provides that: "Prior to the hearing [an accused student may] review all documents and materials in the possession of the Office of Judicial Affairs . . . that relate to the complaint, provided however, that such materials may be edited to shield the identity of those giving information when officials believe that confidentiality is necessary to avoid risk to those persons."

[17] Lt. Rahmer substantiated the complaint by the female student and that she and her roommate where disturbed and concerned about the posted writings.

but not threatening. His witnesses, including female University students, testified that he was not violent; that they were not disturbed or threatened by the content of his website; and that if the students reading the writings had known him, they would not have been frightened. In addition, Murakowski admitted that he entered his dormitory on the morning of April 24 and that he had a friend enter the residence hall on three occasions, twice on April 22 and once on April 24, to post additional messages on his dormitory door.

On May 4, 2007, while the opinion of the hearing officer was pending, the University accepted Murakowski's offer to commute for the rest of the semester.[18]

Following the hearing, on May 23, 2007, a decision letter was issued by Mason which found Murakowski not guilty of violating the Responsible Computing policy, and guilty of the Failure to Comply and Disruptive Conduct policies. The punishment imposed, after completing his classes for the Spring 2007 semester, was that Murakowski was suspended from the University and banned from campus through the end of the Fall 2007 semester and placed on deferred expulsion through graduation.

Murakowski appealed the decision on the basis that the outcome was contrary to the evidence presented and evidence since discovered; University procedure was not followed; and, the imposed sanctions were unjust and unreasonable for the given offenses. Consistent with University policy and as noted in the decision letter, both Mason and Harvey were provided the opportunity to respond to his appeal petition.

_____

[18] Under that arrangement, Murakowski could not enter his residence hall, and to remove any of his belongings, he was required to contact Goldman in advance to schedule a date and time for a police escort. He was warned that if he violated that condition, he would be charged with Failure to Comply..

In her response to Murakowski's appeal, Harvey noted that two students were
disturbed by his postings, with one so upset that her academics were affected. She
emphasized the threats of harm contained in Murakowski's writings, noting that other
students should have the right to feel safe in the University community.

Mason commented to the Appellate Board that

[e]ven if one were to consider reversing my decision on disruptive
conduct, he makes no appeal, nor is there room for one, for his blatant
failure to comply with (at the time) one of the two highest senior
administrators in Student Life. This alone is worth of a semester
suspension because clearly if he has no respect for a senior vp level
person then will he ever listen to an RA, Hall Director, professor, etc? He
needs to understand that this failure to comply is not acceptable.

By letter dated July 2, 2007, the Appellate Board upheld the hearing officer's
decision, including the imposition of the sanctions and denied Murakowski's appeal.

## Summary Judgment Standard

Summary Judgment is appropriate if the "pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that
there is no genuine issue as to any material fact and the moving party is entitled to a
judgment as a matter of law."[19] Once there has been adequate time for discovery, Rule
56(c) mandates judgment against the party that "fails to make a sufficient showing to
establish the existence of an element essential to that party's case, and on which that
party will bear the burden of proof at trial."[20] When a party fails to make such a
showing, "there can be no 'genuine issue as to any material fact' since a complete
failure of proof concerning an essential element of the nonmoving party's case

---

[19] Fed. R. Civ. P. 56(c).
[20] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

necessarily renders all other facts immaterial."[21]  The moving party is therefore entitled

to judgment as a matter of law because "the nonmoving party has failed to make a

sufficient showing on an essential element of her case with respect to which she has

the burden of proof.[22]  A dispute of material fact exists where "the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."[23]

The moving party bears the initial burden of identifying portions of the record

which demonstrate the absence of a genuine issue of material fact.[24]  However, a party

may move for summary judgment with or without supporting affidavits.[25]  Therefore, "the

burden on the moving party may be discharged by 'showing' – that is, pointing out to

the district court – that there is an absence of evidence supporting the nonmoving

party's case."[26]

If the moving party has demonstrated an absence of material fact, the

nonmoving party must then "come forward with specific facts showing that there is a

genuine issue for trial."[27]  If the nonmoving party bears the burden of proof at trial, he

"must go beyond the pleadings in order to survive a motion for summary judgment."[28]

That party "may not rest upon the mere allegations or denials of his pleadings, but must

set forth specific facts showing that there is a genuine issue for trial."[29]  At the summary

---

[21] *Id.* at 323.

[22] *Id.*

[23] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[24] *Celotex*, 477 U.S. at 323.

[25] *Id.*

[26] *Id.* at 325.

[27] Fed. R. Civ. P. 56(c).

[28] *Yeager's Fuel v. Pennsylvania Power & Light Co.*, 22 F.3d 1260, 1273 (3d Cir. 1994).

[29] *Anderson*, 477 U.S. at 248.

19

judgment stage, the court is not to "weigh the evidence and determine the truth of the

matter, but to determine whether there is a genuine issue for trial."[30]  Further, "there is

no issue for trial unless there is sufficient evidence favoring the nonmoving party for a

jury to return a verdict for that party."[31]  The threshold inquiry therefore is "determining

whether there is a need for trial – whether, in other words, there are any genuine factual

issues that properly can be resolved only by a finder of fact because they may

reasonably be resolved in favor of either party."[32]

This standard does not change merely because there are cross-motions for

summary judgment.[33]  Cross-motions for summary judgment

> are no more than a claim by each side that it alone is entitled to summary
> judgment, and the making of such inherently contradictory claims does not
> constitute an agreement that if one is rejected the other is necessarily
> justified or that the losing party waives judicial consideration and
> determination whether genuine issues of material fact exist.[34]

Moreover, "[t]he filing of cross-motions for summary judgment does not require

the court to grant summary judgment for either party."[35]

---

[30] *Id*. at 249.

[31] *Id*.

[32] *Id*. at 250.

[33] *Appleman's v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).

[34] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

[35] *Krups v. New Castle County*, 732 F. Supp. 497, 505 (D. Del. 1990).

20

**Discussion**

### Fourteenth Amendment Due Process[36]

Murakowski contends that he was denied fundamental due process at the

hearing because the hearing officer relied on double hearsay and Murakowski was

unable to confront his accuser.  In support of his argument, Murakowski compares the

administrative hearing process to the procedural protections affording during criminal

proceedings.

Any analysis of due process requirements in an educational setting begins with

the case of *Goss v. Lopez*.[37]  Therein, the Supreme Court held that, when suspending a

university student from a public school for disciplinary reasons, due process requires

"that the student be given oral or written notice of the charges against him and, if he

denies them, an explanation of the evidence the authorities have and an opportunity to

present his side of the story."[38]  "Once it is determined that due process applies, the

question remains what process is due."[39]  *Goss* only requires that an "'informal give-

and-take' between the student and the administrative body" involved in the decision for

dismissal to provide the student "'the opportunity to characterize his conduct and put it

---

[36] The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of the law."  Whether a liberty interest is implicated (damage to the student's standing) or a property interest in education is involved, due process applies.  *See Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971); *see also Goss v. Lopez*, 419 U.S. 565, 575 (1975).  The University does not dispute that it is a state actor operating under color of state law for the purposes of 42 U.S.C § 1983 or the Fourteenth Amendment.

[37] 419 U.S. 565 (1975).

[38] *Id.* at 581.

[39] *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

in what he deems the proper context.'"[40]  However, "'[t]he very nature of due process

negates any concept of inflexible procedures universally applicable to every imaginable

situation.'"[41]  Thus, "[r]equiring effective notice and [an] informal hearing permitting the

student to give his version of the events will provide a meaningful hedge against

erroneous action.  At least the disciplinarian will be alerted to the existence of disputes

about the facts and arguments about cause and effect."[42]  Although a hearing is

required for disciplinary proceedings, a *formal* hearing is not since "further formalizing

the suspension process and escalating its formality and adversary nature may not only

make it too costly as a regular disciplinary tool but also destroy its effectiveness as a

part of the teaching process."[43]  *Goss* cites *Dixon v. Alabama State Board of

Education*,[44] which concluded that the notice should contain a statement of the specific

charges and grounds, and in matters involving suspension, something more than an

informal interview with the administrative authority of the college is needed.  However,

*Dixon* recognizes that the right to a hearing does "not imply that a full-dress judicial

hearing, with the right to cross-examine witnesses, is required."  Due process is

satisfied "by way of adequate notice, definite charge, and a hearing with opportunity to

present one's own side of the case and with all necessary protective measures."[45]

Contrary to Murakowski's assertions, neither a full-scale adversarial proceeding

---

[40] *Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 86 (1978)
(quoting *Goss v. Lopez*, 419 U.S. at 584).

[41] *Id.* (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 851 (1961)).

[42] *Goss*, 419 U.S. at 580, 583-84.

[43] *Id*. at 583.

[44] 294 F.2d 150 (5th Cir. 1960).

[45] *Esteban v. Central Missouri State College*, 415 F.2d 1077, 1089 (8th Cir.
1969), *cert. denied*, 398 U.S. 965 (1970).

similar to those afforded criminal defendants, nor an investigation, which would withstand such a proceeding, is required to meet due process. A university's primary purpose is to educate students: "[a] school is an academic institution, not a courtroom or administrative hearing room."[46] A formalized hearing process would divert both resources and attention from a university's main calling, that is education.[47] Although a university must treat students fairly, it is not required to convert its classrooms into courtrooms.

Murakowski's emphasis regarding due process focuses on the hearing itself; however, he clearly received sufficient notice of the charges against him and a meaningful opportunity to prepare for the hearing. He received a copy of the charges against him, including letters from Cummings and Goldman explaining the factual bases for those charges. He was provided a pre-hearing meeting, which gave him the opportunity to discuss the incidents further, to ask questions and review relevant information contained in his judicial file. He was also directed to the website for the Student Guide to University Policies, as well as, the Judicial Affairs website regarding his rights as a charged student. The website advised Murakowski of the option to be assisted by an advisor of his choice during the hearing process.[48] At his request, the hearing, which was originally scheduled for the end of April, was moved to the

---

[46] *Board of Curators v. Horowitz*, 435 U.S. 78, 88 (1978).

[47] *See Jackson v. Corrier*, 424 F.2d 213, 217 (6th Cir. 1969) (noting the relationship between the school, parents and students maintained "in an adversary atmosphere and according [to] the procedural rules to which we are accustomed in a court of law would hardly best serve the interests of any of those involved").

[48] Advisors are members of the University community, who are familiar with the judicial process. Their names are available from the Office of Judicial Affairs. The student is responsible to obtain his advisor.

beginning of May to allow him more time to prepare. He was informed of the identity of the hearing officer and the presenting party.

Murakowski's hearing also complied with the requirements of due process. Although the students who complained about the content of his website and his behavior were not present, Murakowski submitted several University documents detailing definitions of the use of computer resources, as well as, quotes from University officials. He presented female witnesses who emphatically stated that the content of his website was for humor and satire, supporting Murakowski's statements that the website content was satirical composition falling under the creative use definitions of academic pursuit. Murakowski presented a defense that included not only witnesses and documents, but his own testimony in which he explained why he felt authorized to return to his dorm room. He also was allowed to challenge the hearing officer's questions of him.

The information submitted in support of the charges included the concern expressed by the brother of a female student and her roommate who live on the same floor. That complaint was substantiated by the investigator officer, Lt. Rahmer. In addition, the letter from the campus academic advisor regarding the interview of that female student was submitted, along with a substantial number of his essays previously discussed herein. Also submitted were Cummings' letter banning Murakowski from his residence hall, a University facilities report which detailed use of his PDI card while the restriction was in force and the print-out from his website, which discussed his first meeting with Cummings, the action taken by the University, and acknowledged the ban imposed.

Since Murakowski received adequate notice of the charges and grounds, actively participated in the hearing where those charges and grounds were explored, and had the opportunity to present his side through his own statements and the statements of witnesses, his due process rights under the Fourteenth Amendment were not violated.

**First Amendment**[49]

The parties do not dispute that University website postings by students may be subject to First Amendment protection:  they differ on whether the postings by Murakowski are entitled to such protection.  Murakowski contends that they are and do not contain any true threats, referencing primarily cases which analyze the application of criminal statutes in relation to free speech.  The University maintains that his postings are not protected because they contain threatening speech and caused, and reasonably could cause, substantial disruption.

For students of a public university, its grounds or campus possess many of the characteristics of a public form.  With the technology age, a university's computing services function in that capacity as well.  Both the campus and the media outlet that the University has made available to its students operate as the customary means for communicating with the administration, faculty members and other students.  The Supreme Court has recognized that students enjoy First Amendment rights of speech and association on a campus and the "denial . . . of use of campus facilities for meetings and other appropriate purposes" are subject to the level of scrutiny

_____

[49] The First Amendment of the United States Constitution provides: "Congress shall make no law . . . abridging the freedom of speech . . . ."

appropriate to any form of prior restraint.[50]  Although *Healy* noted that "[t]he college

classroom with its surrounding environs is peculiarly 'the marketplace of ideas,'"[51] the

Court recognized that First Amendment rights must be analyzed "in light of the special

characteristics of the school environment."[52]  As a result, a university differs from public

forums, such as, theaters, auditoriums, streets or parks.  Since a university's mission is

education, it has the right to impose reasonable regulations consistent with its mission

upon the use of its campus and facilities.  Thus, a university has the right to exclude

First Amendment activities that violate reasonable campus rules or substantially

interfere with the opportunity for other students to obtain an education.[53]  Student

expression may be suppressed when school officials reasonably decide that such

expression will "materially and substantially disrupt the work and discipline of the

school."[54]  Because the Court in *Tinker* found that the school's actions were motivated

by "the mere desire to avoid discomfort and unpleasantness that always accompany an

unpopular viewpoint" or "an urgent wish to avoid controversy which might result from

expression," such underlying interests were not sufficient to ban "a silent, passive

expression of opinion, unaccompanied by any disorder or disturbance."[55]  An

---

[50] *Healy v. James*, 408 U.S. 169, 181 (1972).

[51] *Id.*

[52] *Tinker v. Des Moines Independent School District*, 393 U.S. 503, 506 (1969).
*Tinker* involved a group of high school students who wore black armbands to protest
the Vietnam war.  In response, school officials adopted a policy which prohibited such
conduct.  Students who continued to wear the black armbands and not obey the
directive were suspended.

[53] *Healy*, 408 U.S. at 188-89.

[54] *Tinker*, 393 U.S. at 513.

[55] *Id*. at 508-09.

26

"undifferentiated fear or apprehension of disturbance" is not enough under *Tinker*.[56]

Subsequently in *Bethel School Dist. No. 403 v. Fraser*, however, the Supreme Court reversed the lower courts' findings of no basis for discipline in the absence of disruption, and held that the "school district acted entirely within its permissible authority in imposing sanctions upon Fraser in response to his offensively lewd and indecent speech."[57] *Fraser* clearly did not apply the "substantial disruption" analysis suggested under *Tinker*. *Fraser* establishes that the analysis under *Tinker* is not the exclusive method in determining when restrictions on student speech violate the Constitution and that the rights of students in a public education setting are not the same as others in non-school public forums.[58]

In *Hazelwood School Dist. v. Kuhlmeier*,[59] members of a high school newspaper sued the school when it banned two articles for publication. In reversing the lower court's decision which found no evidence of material disruption to the classroom or school discipline, the Supreme Court determined that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities as long as their actions are reasonably related to legitimate pedagogical concerns."[60] *Kuhlmeier* recognizes "that schools may regulate some speech 'even though the government could not censor similar speech outside the

---

[56] *Id.*

[57] 478 U.S. 675, 685 (1986). Fraser, a student, was suspended for a speech delivered before a high school assembly which contained "an elaborate, graphic, and explicit sexual metaphor." *Id.* at 678.

[58] *Morse v. Frederick*, 127 S. Ct. 2618, 2625 (2007).

[59] 484 U.S. 260 (1988).

[60] *Id.* at 273.

school.'"[61]  It also "confirms that the rule of *Tinker* is not the only basis for restricting student speech."[62]

*Tinker*, *Fraser*, *Kuhlmeier* and *Morse* involve public elementary or secondary schools where more leeway is granted to school administrators to restrict or control speech than in a university setting.[63]  The Third Circuit posited in *Saxe v. State Coll. Area Sch. Dist.*[64] that speech falling outside the categories under *Fraser* and *Kuhlmeier* "is subject to *Tinker's* general rule:  it may be regulated only if it would substantially disrupt school operations or interfere with the rights of others."[65]

Although freedom of speech is a cherished right, it "is not absolute at all times and under all circumstances."[66]  Certain types of speech may be regulated if they are likely to cause or inflict unacceptable harm.  One category of such unprotected speech is "true threats."[67]  In *Watts*, the Supreme Court determined that a true threat is beyond the protection of the First Amendment.  In that case, an eighteen year old antiwar demonstrator was prosecuted and convicted under a federal criminal law for making threats against the President.[68]  The Court upheld the constitutionality of the statute, but

---

[61] 127 S. Ct. at 2627 (2007) (quoting *Kuhlmeier*, 484 U.S. at 266).

[62] *Id.*  Clearly, both *Fraser* and *Kuhlmeier* decisions have moved away from a literal application of the "substantial disruption" analysis under *Tinker*.

[63] *DeJohn v. Temple University*, No. 07-2220, 2008 WL 2952777, at \*10 (3d Cir. Aug. 4, 2008) (citing *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 260 (3d Cir. 2002)).

[64] 240 F.3d 200, 214 (3d Cir. 2001).

[65] *DeJohn*, 2008 WL 2952777, at \*11 n.17 (citing *Saxe*, 240 F.3d at 214).  *Saxe* and *Sypniewski* were decided before *Morse v. Frederick*, 127 S. Ct. 2618 (2007).

[66] *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942).

[67] *Watts v. United States*, 394 U.S. 705 (1969).

[68] Watts stated at a public rally on the grounds of the Washington Monument that "if they ever make me carry a rifle the first man I want to get in my sights is L.B.J."

reversed Watts' conviction on the basis that his statement was mere "political hyperbole," and did not constitute a true threat.  Although the Court did not specifically define the meaning of "true threat," it commented that "taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise."[69]  Since *Watts*, the Supreme Court has provided no additional guidance regarding what constitutes a true threat, leaving it to the lower courts to wrestle with the definition of a true threat and its application.

In *Lovell by and through Lovell v. Poway Unified School Dist.*,[70] a 10th grade student threatened to shoot a school guidance counsel if changes were not made to her class schedule, which resulted in her suspension for three days.  The student in her federal suit claimed that she was punished for exercising her free speech and that the school district violated her First Amendment rights.  On appeal from a favorable decision for the student, the Ninth Circuit, in determining whether the student's speech constituted a true threat, analyzed whether a reasonable person would foresee that the statements would be a serious expression of intent to harm or assault.  The court considered the surrounding events and reactions of listeners and whether the threat was unconditional and unequivocal and communicated a gravity of purpose and the prospect of immediate execution.  In applying those standards, the court found that the student's comment was a true threat.[71]

In *In the Interest of A.S.*,[72] a thirteen year old student made threatening

---

[69] *Watts*, 394 U.S. at 708.
[70] 90 F.3d 367 (9th Cir. 1996).
[71] *Id.* at 372.
[72] 626 N.W.2d 712 (Wis. 2001).

comments to others that the he was going to kill everyone in the middle school over a ten minute period, similar to Columbine. The student also described in detail how he was going to hang the local police officer, shoot the middle school principal and social studies teacher and rape another student. In deciding that the statements were true threats, the court applied the objectively reasonable person standard previously discussed herein and evaluated the facts under the totality of the circumstances. The court acknowledged that although the speaker did not have to have the ability to carry out the threat, it is the context of the statement that is important. The Wisconsin court, in deciding that the statements constituted a true threat, considered similar factors applied by the Ninth Circuit.[73]

In the present matter, the court will apply the guidelines propounded in the *Lovell* and *AS* decisions to determine whether Murakowski's writings fall within the category of true threats. That analysis will consider whether the communication is a serious intent to inflict harm by examining the statements, the context in which they were made, the reaction of the readers and the nature of the comments.

An analysis of the statements in their context is appropriate – a totality of the circumstances review examining the website beyond the statements in isolation. Although Murakowski's postings were not directed to a specific recipient, they were directed to selected groups: women, African-American women, Asian women, homosexuals and handicapped individuals, who were the intended subjects of his writings. A number of his articles are demeaning to women in general and some

---

[73] *Id.* at 720-21.

contain racist and anti-ethnic themes in relation to women of color.  As outlined

previously herein, the content of his postings are racist, sexist, homophobic, insensitive,

degrading and contain graphic descriptions of violent behavior, and promote such

behavior.  At least one female student found his tasteless comments threatening to the

point that she was visibly afraid and suffered emotional harm requiring her to change a

class to audit status.  However, other women did not find his writings threatening.  Upon

complaints from students and a parent, the University responded by immediately

confronting Murakowski about his writings, advising his father of its concerns, and

temporarily segregating him from the student population until he was evaluated by a

counselor, psychologist or psychiatrist.

His statements are not conditional – he suggests that he intends to rape, kidnap

and murder,[74] requesting a sword to accomplish his wishes.  In one article, he obtains

strength and confidence to intimidate or menace and become like "OJ Simpson" and kill

through his black gloves.  Reviewing his articles, Murakowski clearly implies an interest

in raping and/or murdering women.[75]

Recognizing the limited exceptions to the right of free speech and the analysis to

determine a true threat, in light of the totality of the circumstances present in this case

and the overall nature of Murakowski's writings, the court does not find that his

comments constitute a true threat.  Clearly, his "essays" are sophomoric, immature,

crude and highly offensive in an alleged misguided attempt at humor or parody.  They

---

[74] For example, a small Asian girl (for his birthday) or some girl in a dark alley to
educate her about sexual assault presumably during sexual awareness day.

[75] He also expresses a strong interest in mutilating or killing homosexuals.

do not, however, evidence a serious expression of intent to inflict harm. As noted previously herein, a number of his comments, although directed to women as a whole, are not directed to specific individuals, a particular group or even to women on the University's campus. The "Happy Birthday to me" article, which contains the comment regarding an Asian girl, is focused primarily on criticizing, in very bad taste, the handicapped. Moreover, of the over eighty articles on Murakowski's website, less than ten caused the University concern. Apparently, some of the offensive commentaries had been on his website for more than a year. While certain students, a parent and University officials were offended, other students did not take his "works" seriously or view them as threatening. Although the University initially banned Murakowski from campus, he was allowed to return to class and complete the Spring semester after he underwent a mental health evaluation as required.[76]

Therefore, despite the overtly objectionable nature of Murakowski's compositions, they do not arise to true threats.

The court's analysis does not end here. As noted previously herein, a university has the educational mission to provide an environment that is safe and conducive to learning. Thus, "conduct by a student . . . which for any reason–whether it stems from time, place, or type of behavior–materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the

_____

[76] The court is mindful of timing of the complaints regarding Murakowski's musings in relation to the shootings at Virginia Tech and the effect of that horrific event, along with the recent history of violent crimes on school campuses, which justifies University officials to seriously consider student threats against others.

constitutional guarantee of freedom of speech."[77]  Further, the developing Supreme Court case law emphasizes the ability of school authorities to discipline a student for certain speech in light of the educational mission.  Although "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint"[78] or "an urgent wish to avoid the controversy which might result from the expression" [79] are inadequate to justify banning speech, educational authorities are not required to wait for harm or material disruption to occur before taking appropriate action.  Educational institutions may prohibit and punish the student for speech if they establish that the student speech materially disrupts the educational process or activities, creates substantial disorder, invades the rights of others or is reasonably foreseen to do so.

Murakowski's publications appear to fall within the political speech under *Tinker* and the lewd and offensive speech in *Fraser*.  The most significant effect caused by his postings was the reaction of a fellow female student, who lived in Murakowski's residence hall, and who manifested both verbally and by her appearance abject terror of Murakowski and fear for her safety to the point that she had to change her academic schedule.  She also sought counseling.  The brother of a female student complained to University police about Murakowski's essays.  In response, University police reviewed Murakowski's website and discussed with senior administrators the potential for violence.  In addition, a parent of another student expressed concern about the content of his writings.  Although complete chaos is not required, something more than

---

[77] *Tinker v. Des Moines Independent School District*, 393 U.S. at 513.
[78] *Id.* at 509.
[79] *Id.* at 510.

distraction or discomfiture created by the speech is needed.  Absent those complaints, no other evidence of any other similar reaction has been presented.

As noted previously, Murakowski's compositions not only included vile references to sexual oppression, rape, mutilation and murder, but contained racial slurs and inappropriate remarks about homosexuals and physically impaired individuals. Murakowski admits that his intent was to shock.  In the writings which the court has reviewed, Murakowski obviously wanted not only to shock his readers, but to elicit a negative response by the patently offensive content.

The University, however, has not shown that Murakowski's writings caused a material disruption or was likely to do so.  Unlike the circumstances in *J.S. ex. rel. H.S. v. Bethlehem Area Sch. Dist.*,[80] no instructors or administrators were adversely impacted to the point that they were unable to work through the end of the academic year.  No substitute instructors were needed as a result of the reaction to the postings that could have or would have adversely impacted the educational environment.  Three students and a parent complained.  One student was negatively effected and sought counseling.  The other complainants expressed offense regarding the website, but did not appear to be material affected by it, nor feared for their safety.  There is no evidence that his writings were of interest to other students or a topic of conversation on campus even in light of the events at Virginia Tech.  Certain materials had been published for awhile – long enough to determine whether the web site would or likely could create disorder and adversely effect the delivery of education.  No negative

---

[80] 807 A.2d 847 (Pa. 2002).

34

atmosphere permeated the campus because of Murakowski's writings. The University has presented no evidence which reasonably led it to forecast material interference with campus education and activities. The evidence does not suggest that Murakowski's website or articles were intentionally aimed at disrupting the college environment and actually materially did so in a concrete fashion.

The University reacted to the offensive nature of the writings. It reacted to the promotion of violence in certain articles. It responded to a student's fear arising from her belief that she was being subjected to Murakowski's hostility towards women. When the events herein were unfolding, Virginia Tech occurred, which factored into the University's response. Understandably the University was seriously concerned and motivated by that concern. However, despite its good intentions, the University has not shown that Murakowski's articles or his website created disruption or significantly and adversely impacted the college community.

### Appropriateness of the Sanction

Murakowski contends that the sanction imposed was overly severe because a Failure to Comply finding does not carry a mandatory penalty of suspension and the initial ruling does not indicate the weight accorded to that violation in determining the penalty. He argues that the hearing officer's comments to the Appellate Board should be disbelieved because of his self-interest to have his decision upheld. Murakowski claims that he is entitled to have the stain of his conviction removed from his record. He suggests that remand is appropriate to decide the correct sanction.

The University notes that Murakowski does not dispute the hearing officer's findings on the Failure to Comply charge. It urges that under the University's Guide to

35

University Policies, the hearing officer has broad authority in the imposition of sanctions. It contends that Murakowski's cases allegedly supporting remands are irrelevant since none involve college disciplinary matters. Regarding Murakowski's claim of self-interest on the part of the hearing officer, the University maintains that the heightened burden to support such a claim has not been met.

The unrefuted evidence shows that after being directed not to return to his residence pending an evaluation by a mental health provider, Murakowski not only entered his dormitory, but had another student to do the same through the use of his PDI.[81] At the hearing, although initially quibbling over semantics, Murakowski confirmed that he understood that he was to stay out of his resident hall. He also admitted that he entered the residence hall and provided his PDI to a friend to enter the dormitory on his behalf. That friend confirmed that she used Murakowski's PDI to access his residence hall at his request. The University PDI access records confirm the testimony of Murakowski and his witness.

Universities have the right to maintain order and discipline students.[82] Courts recognized that schools have the inherent authority, with broad latitude and discretion in establishing standards and regulating conduct.[83]

Murakowski's argument that suspension was not mandatory is irrelevant.

---

[81] Allowing a student use of his electronic access card is a violation of another University policy.

[82] *Healy v. James,* 408 U.S. 169, 194 n.24 (1972) ("In addition to the College administration's broad rule making power to assure that the academic atmosphere is safeguarded, it may also impose sanctions on those who violate the rules . . . .").

[83] *Pi Lambda Phi Fraternity, Inc. v. University of* Pittsburgh, 229 F.3d 435, 445 (3d Cir. 2000 ); Esteban *v. Central Missouri State College*, 415 F.2d 1077, 1088 (8th Cir. 1969).

According to the Student Guide to University Policies dealing with disciplinary sanctions, the University has "absolute discretion to determine appropriate sanctions to be imposed . . . for any infraction of the Code of Conduct." Further, sanctions may be cumulative and a sanction is not required to be exhausted before another sanction is imposed. Thus "[g]ross disrespect and contempt for the officials of an educational institution may be justification not only for suspension but also for expulsion of a student."[84] Under University disciplinary policy, sanctions may also be enhanced "based on past disciplinary record," and "tailored to specific situations." At the time of the charges, including the Failure to Comply offense, Murakowski was on Disciplinary Probation through the Fall semester for a copyright related violation – a fact that he conveniently ignores. Disciplinary probation "is a period of review during which the student . . . must demonstrate the ability to comply with University rules, regulations, and all other stipulated requirements." The Failure to Comply charge arose because Murakowski refused to temporarily stay away from his dormitory until after he was authorized to return. He violated a directive by Cummings, a senior official of the University. At the hearing, Mason learned that Murakowski committed another violation by improperly authorizing a fellow student to use his PDI to access his dormitory – a fact to consider regarding punishment. The manner in which he failed to comply with Cummings' order, that is, directly by entering the resident hall himself and surreptitiously by having a friend access his dormitory, is another element relevant to the penalty to impose. Moreover, Murakowski did not have a clean slate since he was

---

[84] *Schwartz v. Schuker*, 298 F. Supp. 238, 242 (E.D.N.Y 1969).

already on probation for another violation. By disregarding a directive from a University superior, he violated his disciplinary probation.

Despite Murakowski's arguments to the contrary, the court knows the penalty that would have been imposed for Failure to Comply charge – the hearing officer addressed that issue in his comments to the Appellate Board:

> Even if one were to consider reversing my decision on disruptive conduct . . . *[t]his alone* is worthy of a semester suspension because clearly if he had no respect for a senior vp [administrator] then will he ever listen to an RA, Hall Director, professor, etc.? *He needs to understand this failure to comply is not acceptable.*[85]

In denying Murakowski's appeal, the Appellate Board found that he had not presented sufficient grounds, and no changes were made to the original punishment. The Board also concluded that the "sanction is not only appropriate but not harsh enough."[86]

Murakowski baldly asserts that the hearing officer's comments to the Appellate Board were motivated by self-interest. No evidence is presented to support that contention. He relies solely on the fact that the hearing officer explained his decision to the appeals panel consistent with University protocol. "Alleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences."[87] "Generally, in examining administrative proceedings, the presumption

---

[85] Emphasis added.

[86] The Appellate Board's reference to "sanction" obviously is the penalty of suspension. Murakowski was also placed on Deferred Expulsion after the period of suspension which means if he again is found in violation of the code of conduct, he would be expelled – a potential penalty that could be imposed depending on his conduct.

[87] *Duke v. North Texas State Univ.*, 469 F.2d 829, 834 (5th Cir. 1972).

favors the administrators, and the burden is upon the party challenging the action to produce evidence sufficient to rebut this presumption."[88]  Murakowski has not met that heightened burden.

Absent his due process claim which this court found herein was not violated, Murakowski's First Amendment claim is not implicated in to the Failure to Comply offense.  Moreover, his appeal at the administrative level did not contest that he violated a directive from an administrator and his arguments to this court do not seriously contend the finding against him for that offense was erroneous.  "In the absence of a constitutional or statutory deprivation, the federal courts should be loathe to interfere with the organization and operation of an institution of higher learning."[89]  Moreover, courts "cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values."[90]  Generally, for matters involving school discipline, courts should "defer to the 'expertise' of school authorities."[91]  Therefore, the court finds that the University acted within its discretion under its disciplinary policy in suspending Murakowski,[92] and as noted herein, there is considerable evidence supporting that punishment for the Failure to Comply offense.

**Costs, Damages and Attorney's Fees**

---

[88] *Gorman v. University of Rhode Island*, 837 F.2d 7, 15 (1st Cir. 1988).

[89] *Tigrett v. Rector and Visitors of Univ. of Virginia*, 290 F.3d 620, 629 (4th Cir. 2002).

[90] *Epperson v. Arkansas*, 393 U.S. 91, 104 (1968).

[91] *Quarterman v. Byrd*, 453 F.2d 54, 56 (4th Cir. 1971).

[92] *Doe v. Superintendent of Schools of Stoughton,* 767 N.E.2d 1054, 1059 (Mass. 2002).

Murakowski claims lost income damages for the delay in graduation and entering the work force as a chemical engineer, as well as, attorney's fees and costs for violation of his constitutional rights.

The penalty of suspension for the Fall semester purportedly caused his delay in entering the workforce and alleged earnings loss of over $59,000.[93] The court previously determined herein that that sanction was appropriate, supported by the Failure to Comply charge and within the discretion of the University. As a result, the compensatory damages allegedly incurred were not proximately caused by a constitutional violation.[94] Although the prevailing party on the First Amendment claim, Murakowski has not shown any justification for an award beyond nominal damages in the range of ten dollars on that claim. He has presented no evidence to support punitive damages. The favorable finding on the First Amendment claim is merely a judicial acknowledgment of his right to free speech.

---

[93] Murakowski maintains that as a consequence of the suspension, he "missed an opportunity to take some classes I need to graduate" which would defer his graduation as much as a year.

[94] Murakowski, relying on the University's employment figures for the 2006 graduating class, asks the court to assume that 80.3% who earned a B.S in engineering were employed at the time of graduation. According to the survey on which he relies, the information is as of February 2008, more than eighteen months after the Spring graduation for that class. Further, the report does not state that 80.3% were employed as of graduation. It provides that 80.3% of the 61.7% who responded to the survey were employed as of February 2008, which means 49.5% or roughly 50% of that graduating class are known to be employed as of early 2008. The court does not know what percentage of the *total* engineering students who graduated in 2006 were employed at the time of graduation. 11.1% (18.1% of the 61.7%) of the total 2006 engineering class are continuing their education, which means approximately 61% of all 2006 engineering graduates are either employed or pursuing further education. For a significant number, nearly 40% of the 2006 graduating class, it is unknown whether they are employed.

40

The technical nature of nominal damages bears on the "propriety of fees awarded under § 1988."[95]

> Once civil rights litigation materially alters the legal relationship between the parties, 'the degree of the plaintiff's overall success goes to the reasonableness' of a fee award . . . . Indeed, 'the most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained'. . . . This litigation accomplished little beyond giving petitioners 'the moral satisfaction of knowing that a federal court concluded that [their] rights had been violated' in some unspecified way.[96]

Where recovery of damages is sought in civil rights litigation, the trial court in its analysis of fees "is [obligated] to give primary consideration to the amount of damages awarded as compared to the amount sought."[97] Under that comparison, the court's focus is "the assessment of what is a reasonable fee under the circumstances of the case."[98] When the court considers "the amount and nature of the damages awarded," low fees or no fees may be awarded without analyzing the factors on reasonableness.[99]

"[A] § 1983 action must always be designed to *compensate injuries* caused by the [constitutional] deprivation."[100] Fee awards under § 1988 "were never intended to produced windfalls to attorneys."[101] Therefore, where nominal damages are only recovered because a plaintiff did not prove "an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all."[102] Here, Murakowski

---

[95] *Farrar v. Hobby*, 506 U.S. 103, 114 (1992).

[96] *Id.* (internal citations omitted).

[97] *Riverside v. Rivera*, 477 U.S. 561, 585 (1986).

[98] *Blanchard v. Bergeron*, 489 U.S. 87, 96 (1989).

[99] *Farrar*, 506 U.S. at 115.

[100] *Id.* (citing *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 309 (1986)). (emphasis and brackets in original) (internal quotations omitted).

[101] *Farrar*, 506 U.S. at 115 (quoting *Riverside*, 477 U.S. at 580).

[102] *Id.* at 115.

cannot show that his alleged economic loss from the sanction imposed did not result from the Failure to Comply violation. Moreover, the "evidence" upon which he relies to support lost earnings of over $59,000 is speculative, particularly where it is unknown whether approximately 40% of the engineering students of the 2006 graduating class were employed at the time of graduation or are presently employed. Murakowski's "evidence" is merely generic statistics which fail to indicate the percentage of students who were chemical engineers or the number who matriculated within four years. As a result, considering the extent of success, that is, the finding of nominal damages in relation to the amount demanded on the First Amendment claim, Murakowski's request for attorney's fees is denied.

His request for costs is granted. Pursuant to Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920, prevailing parties may recover taxable costs. However, Murakowski, as the prevailing party on the First Amendment claim which carries a fee-shifting provision, is not limited just to taxable costs and is entitled "'to recover any reasonable costs associated with litigating [his] claims, provided that the costs are necessary and properly documented.'"[103] The court has not been provided the amount of costs or such documentation from Murakowski to determine whether the costs are necessary. Once such documentation is provided, the court will determine the appropriateness of the costs demanded.

---

[103] *Petrunish v. Sun Bldg. Systems, Inc.*, No.3: CV-04-2234, 2008 WL 974574, at *8 (M.D. Pa. Apr. 7, 2008) (citing *Kratzer v. Wegman's Rest., LLP*, No. Civ. A. 04-05889, 2005 WL 2847320, at *3 (E.D. Pa. Oct. 27, 2005)).

**Conclusion**

For the reasons contained herein, Murakowski's motion for summary judgment is DENIED in part and GRANTED in part, and the University's motion for summary judgment is DENIED in part and GRANTED in part.  An Order consistent with this Opinion shall follow.